IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - X

OAO ALFA-BANK
7 Novatorov St., Bldg. 2
Moscow 117421, Russian Federation,

ZAO ALFA-ECO
7 Novatorov St., Bldg. 1
Moscow 117421, Russian Federation,

MIKHAIL FRIDMAN
30 Bolshoy Afanasievskiy Per. #9
Moscow 121019, Russian Federation,

and

PYOTR AVEN
30 Bolshoy Afanasievskiy Per. # 8
Moscow 121019, Russian Federation,

    Plaintiffs,

v.

CENTER FOR PUBLIC INTEGRITY,
KNUT ROYCE, and
NATHANIEL HELLER,

    Defendants.

- - - - - - - - - - - - - - - X

CASE NUMBER 1:00CV02208

JUDGE: Richard W. Roberts

DECK TYPE: Civil General

DATE STAMP: 09/14/2000

No. _____

**COMPLAINT**

Plaintiffs OAO Alfa-Bank ("Alfa-Bank"), ZAO Alfa-Eco ("Alfa-Eco"), Mikhail Fridman, and Pyotr Aven, complaining of Defendants Center for Public Integrity ("CPI"), Knut Royce, and Nathaniel Heller (collectively, "the CPI Defendants"), state as follows:

## PRELIMINARY STATEMENT

1. This is an action for defamation arising out of an article written by defendants Royce and Heller and published by defendant CPI on its website, the *Public i*, entitled "Cheney Led Halliburton To Feast at Federal Trough / State Department Questioned Deal With Firm Linked to Russian Mob" ("the Article," attached hereto as Exhibit A). The CPI Defendants have falsely and maliciously accused plaintiffs of being involved in drug trafficking and other criminal or otherwise disreputable activities, and of being connected to organized crime. The CPI Defendants' assertions, which are false, have damaged plaintiffs' reputation. Plaintiffs bring this action to clear their names, to recover compensation for their injuries, and to permanently enjoin publication of the Article.

## PARTIES

2. Plaintiff Alfa-Bank is an open-joint stock company organized under the laws of the Russian Federation. Its principal place of business is at 7 Novatorov St., Bldg. 2, Moscow 117421, Russian Federation. Alfa-Bank is among the largest financial institutions in Russia and is authorized to conduct and does conduct business in Russia and internationally.

3. Plaintiff Alfa-Eco is a closed-joint stock company organized under the laws of the Russian Federation. Its principal place of business is at 7 Novatorov St., Bldg. 1, Moscow 117421, Russian Federation. Alfa-Eco is a trading company affiliated with Alfa-Bank.

4. Plaintiff Mikhail Fridman is a citizen of the Russian Federation. He resides at 30 Bolshoy Afanasievskiy Per. #9, Moscow 121019, Russian Federation. Mr. Fridman is Chairman of the Board of Directors of Alfa-Bank.

5. Plaintiff Pyotr Aven is a citizen of the Russian Federation. He resides at 30 Bolshoy Afanasievskiy Per. # 8, Moscow 121019, Russian Federation. Mr. Aven is President of Alfa-Bank.

6. Upon information and belief, defendant CPI is a corporation organized and acting under the laws of the District of Columbia. Its principal place of business is at 910 17th Street, N.W., Seventh Floor, Washington, D.C. 20006. CPI is engaged in the business of reporting on matters it deems to be of public interest. CPI maintains a website on the World Wide Web called the *Public i*, located at www.public-i.org, on which it publishes various articles.

7. Upon information and belief, defendant Knut Royce is an individual residing at 3619 Fordham Rd., N.W., Washington, D.C. 20016-1905. Upon information and belief, Mr. Royce is employed by CPI.

8. Upon information and belief, defendant Nathaniel Heller is an individual residing at 9143 Santayana Dr., Apt. 91, Fairfax, Va. 22031. Upon information and belief, Mr. Heller is employed by CPI.

**JURISDICTION AND VENUE**

9. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(2), in that plaintiffs, on the one hand, are citizens of a foreign state, and defendants, on the other hand, are citizens of the United States, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

10. This Court has personal jurisdiction over defendant CPI pursuant to D.C. Code § 13-422(a), in that CPI is organized under the laws of and maintains its principal place of business in the District of Columbia. This Court has personal jurisdiction over defendant Heller pursuant to D.C. Code §§ 13-422(a), in that Mr. Heller is domiciled in the District of Columbia. Alternatively, this Court has personal jurisdiction over defendant Heller pursuant to D.C. Code §§ 13-423(a)(1) and 13-423(a)(3), in that plaintiffs' cause of action arises, respectively, out of business transacted by Mr. Heller in the District of Columbia and acts committed by Mr. Heller in the District of Columbia that have caused tortious injury to plaintiffs in the District of Columbia. This Court likewise has personal jurisdiction over defendant Royce pursuant to D.C. Code §§ 13-423(a)(1) and 13-423(a)(3), in that plaintiffs' cause of action arises, respectively, out of business transacted by Mr. Royce in the District of Columbia and acts committed by Mr. Royce in the District of Columbia that have caused tortious injury to plaintiffs in the District of Columbia.

11. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(2), in that a substantial part of the events giving rise to plaintiffs' claim occurred in the District of Columbia.

## CAUSE OF ACTION

12. CPI published the Article on its *Public i* website on or about August 2, 2000. As of the filing of this Complaint, the Article remains accessible on this website. The Article published and/or republished numerous false and defamatory assertions of fact of and concerning plaintiffs ("the defamatory statements"). The defamatory statements falsely portrayed plaintiffs as involved in drug trafficking and other criminal or otherwise

disreputable activities, and as being connected to organized crime. The defamatory statements included the following:

    a.    That Alfa-Bank and Alfa-Eko were involved in the trafficking of drugs from the Far East to Europe in the early 1990s.

    b.    That shortly after its formation, Alfa-Bank hired "rogue" KGB agents who "'quickly determined that dealing in drugs would bring the highest profits with literally no risk in Russia.'"

    c.    That "Alfa Group's top executives, oligarchs Mikhail Fridman and Pyotr Aven, 'allegedly participated in the transit of drugs from Southeast Asia through Russia and into Europe'" and that a "'large channel of heroin transit was established from Burma through Laos, Vietnam, to the Far East [Siberia].'" "From there the drugs were camouflaged as flour and sugar shipments and forwarded on to Germany. The drug operation was controlled by a Chechen mob family."

    d.    That in 1995, residents of the Siberian city of Khabarovsk became ill "after they had eaten heroin-laced sugar that had been shipped in a rail car container leased to Alfa Eko [sic]" and then sold to them by a railroad worker who had stolen a sack of sugar from the container.

    e.    That at the end of 1993, a top Alfa-Bank official met with Gilberto Rodriguez Orejuela, the now-imprisoned financial mastermind of Colombia's notorious Cali cartel, to conclude a money laundering agreement.

    f.    That "top officials of the Alfa Group 'cooperated' with a number of Russian crime organizations, notably the notorious Solntsevo mob family in Moscow."

13. The title of the Article – "Cheney Led Halliburton To Feast at Federal Trough / State Department Questioned Deal With Firm Linked to Russian Mob" – also defamed plaintiffs because, when viewed in the context of the Article itself, it falsely portrayed plaintiffs as being connected to organized crime in Russia.

14. The CPI Defendants published the defamatory statements with negligent disregard for the truth because they failed to act with ordinary care with respect to whether these statements were false. The CPI Defendants also published the defamatory statements with actual malice because they knew or acted with reckless disregard as to whether these statements were false.

15. To the extent the CPI Defendants published or republished defamatory statements attributed to others, they are not shielded from liability because the sources on which they relied either were anonymous or otherwise obviously unreliable: (a) a report said to have been delivered in 1997 to the national security committee of the Russian Duma by "anonymous officials" from the Russian Security Service or FSB, successor to the KGB; (b) an unnamed "former U.S. intelligence officer" who was allegedly given information by an unnamed "former KGB major" who was part of the KGB's "ideological counterintelligence branch," was working for "two banks formed by the KGB," and "had himself been involved in the plan by the KGB and Communist Party to loot state enterprises;" and (c) "a private investigative report" commissioned in Russia by a party to a commercial dispute with an affiliate of Alfa-Bank which was "slipped" to the CIA through an intermediary.

16. The defamatory statements were not privileged.

6

17. The defamatory statements have been and are available to a large audience of individuals who understand the CPI Defendants' false assertions of fact to be about plaintiffs and to impugn plaintiffs in their trade, profession, community standing, and/or business ethics.

18. By imputing to plaintiffs the commission of a criminal offense or criminal offenses, the CPI Defendants have committed the tort of libel per se.

19. CPI has intentionally and maliciously defamed plaintiffs in order to harm plaintiffs in their personal and business relations.

20. As a direct and proximate result of the Article, plaintiffs Fridman and Aven have been damaged in their trade, profession, and community standing. As a direct and proximate result of the Article, the business ethics and business reputation of plaintiffs Alfa-Bank and Alfa-Eco have been impugned.

21. An actual controversy exists between the parties.

### PRAYER FOR RELIEF

WHEREFORE, plaintiffs request that the Court:

a. Pursuant to 28 U.S.C. § 2201, enter a declaratory judgment that the CPI defendants have defamed plaintiffs;

b. Permanently enjoin the CPI Defendants from further publishing the Article and any of the defamatory statements therein;

c. Award plaintiffs Fridman and Aven compensatory damages in an amount to be proved at trial;

d. Award plaintiffs Fridman and Aven punitive damages;

    e.  Award plaintiffs their costs, including reasonable attorneys' fees;

and

    f.  Grant plaintiffs such further relief as the Court may deem just and

appropriate.

Dated: September 14, 2000    Respectfully submitted,

                     [signature]

                Daniel Joseph, D.C. Bar No. 95842
                Jonathan S. Spaeth, D.C. Bar No. 394921
                Joshua Toll, D.C. Bar No. 463073
                Nicole L. Hagenbuch, D.C. Bar No. 468568
                AKIN, GUMP, STRAUSS, HAUER
                & FELD, L.L.P.
                1333 New Hampshire Ave., N.W.
                Suite 400
                Washington, D.C. 20036
                (202) 887-4000
                (202) 887-4288 FAX

                COUNSEL FOR PLAINTIFFS

*Exhibit A*

US OFFICE PRODUCTS

# The Public I
### An Investigative Report of the Center for Public Integrity

Main Page
News Reports
Center Commentary
From the Editor
Feedback
Join the Center
527s/Issue Ad Watch

Subscribe
[    ] Go

Enter your e-mail address and click 'Go' to subscribe to *The Public i* and receive brief overview of each issue. It's **FREE!**

Search
[    ] Go
Advanced Search



**States Project**
The 50 States Project is an on-going state-by-state analysis of lawmakers' conflicts of interest, based on their sources of income and assets, committee assignments, leadership positions and legislative duties.

## Investigative Report
# Cheney Led Halliburton To Feast at Federal Trough
## State Department Questioned Deal With Firm Linked to Russian Mob

By Knut Royce and Nathaniel Heller

(Washington, August 2) Under the guidance of Richard Cheney, a get-the-government-out-of-my-face conservative, Halliburton Company over the past five years has emerged as a corporate welfare hog, benefiting from at least $3.8 billion in federal contracts and taxpayer-insured loans.

One of these loans was approved in April by the U.S. Export-Import Bank. It guaranteed $489 million in credits to a Russian oil company whose roots are imbedded in a legacy of KGB and Communist Party corruption, as well as drug trafficking and organized crime funds, according to Russian and U.S. sources and documents.

Those claims are hotly disputed by the Russian oil firm's holding company.

Halliburton, which lobbied for the Ex-Im loan after the State Department initially asserted that the deal would run counter to the "national interest," will receive $292 million of those funds to refurbish a massive Siberian oil field owned by the Russian company, the Tyumen Oil Co., which is controlled by a conglomerate called the Alfa Group.


Photo illustration

**INTERNET LINKS :**
- Alfa Bank
- BP-Amoco
- Halliburton Company
- Overseas Private Investment Corp.
- U.S. Export-Import Bank


Printer-friendly Version

The April Ex-Im taxpayer-insured loan, which has the effect of reducing the borrower's interest rate and extending its repayment term, is but the latest of a series of government bank guarantees from which Halliburton has benefited under Cheney, who joined the company as chairman and chief executive officer in 1995.

Since then Halliburton and its subsidiaries have undertaken foreign projects in which Ex-Im and its sister U.S. bank, the Overseas Private Investment Corp., have guaranteed or made direct loans totaling $1.5 billion, mostly over the last two years. That compares with a total of about $100 million the government banks insured and loaned in the five years before Cheney joined the company.

Under Cheney, Halliburton—largely through its Brown & Root subsidiary—has garnered $2.3 billion in U.S. government contracts. This is almost double the $1.2 billion it



Export-Import Bank loans and guarantees to Halliburton and its subsidiaries over last 10 years
Source: U.S. Export-Import Bank

Total U.S. Government contracts (in US$) awarded to Halliburton and its subsidiaries over the last 10 years

earned from the government in the five years before he arrived. Most of the contracts have been with the U.S. Army for engineering work in a variety of hot spots, including Bosnia, Albania, Kosovo and Haiti.

Halliburton spokeswoman Wendy Hall issued this statement:

"The Ex-Im Bank loan to Tyumen Oil Co. was carefully investigated by the Ex-Im Bank and approved by its governing body. Halliburton's participation in the loan complies with all applicable United States law and Ex-Im Bank regulation. The loan proceeds will be used to export millions of dollars of goods and services from the U.S. to Russia for much needed oil field improvements.


Source: General Services Administration

"These exports will create many jobs in the U.S.

"Any innuendo that Halliburton or Dick Cheney has acted improperly in connection with the Ex-Im Bank loan is false and misleading."

Though there is no evidence that Cheney has espoused business dealings with criminal organizations, Cheney has said publicly that the government should lift restrictions on U.S. corporations in countries that the U.S. government says have sponsored terrorism, such as Libya and Iran.

**High-level access**

Wall Street analysts praise Cheney's stewardship of the company and attribute his ability to attract government contracts and grants to his high-level access to the corridors of power that stems from his days as defense secretary under President George Bush. If he becomes vice president, according to a Halliburton official who admires Cheney but asked to remain anonymous, "the company's government contracts would obviously go through the roof."

If Halliburton has benefited from government generosity, it also has reciprocated with substantial political contributions, largely to Republicans. During Cheney's five years at the helm, the company has donated $1,212,000 in soft and hard money to candidates and parties, according to numbers compiled by the non-partisan Center for Responsive Politics. In the five years prior to his arrival, the company had given $534,750.

Though the White House has been Democratic during those years, Congress, which appropriates funds for OPIC and the Ex-Im bank, has been controlled by Republicans.


Halliburton's lobbying expenditures (1996-1999)
Source: Federal Lobbying Reports

The goodwill generated by those political contributions and extensive lobbying by Halliburton and its allies on the Tyumen project helped save the day after the White House and State Department in December directed the Ex-Im Bank to delay approval of the $489 million credit guarantee. The administration wanted the breathing space after complaints by Western investors and companies that they had been defrauded by Tyumen in an unrelated dispute.

One of the aggrieved firms was BP-Amoco, the largest oil and gas producer in

the United States. It and the others claimed that through fraud and other unsavory practices in a Russian bankruptcy proceeding, Tyumen had effectively "stolen" a vast oil field in which they held substantial equity.

BP-Amoco commissioned a private investigative report on Tyumen, which was slipped to the CIA through an intermediary.

That report, a CIA official confirmed, contained 2 1/2 pages labeled "criminal situation.' The CIA promptly classified the report "secret' and passed it along to the Ex-Im Bank. Further, the CIA briefed Ex-Im about its own material on Tyumen in December and told the bank that the BP-Amoco investigative report "tracked" with its own information.

### 'Criminal situation'

The CIA declined to discuss with *The Public i* what was contained in the brief section labeled "criminal situation."

Marsha E. Berry, vice president of communications for the Ex-Im Bank, said that the bank was "not aware of Tyumen's connections to the mob. We take all due diligence in researching our partners and making sure that they are legitimate."

An Ex-Im attorney who worked on the Tyumen account said that the bank checked with both the CIA and the U.S. Embassy in Moscow and concluded that there was "no evidence to support the allegations" raised in the BP-Amoco report, which he said included links to Russian organized crime. He would not further discuss the allegations. He said that the CIA had rated Tyumen in the upper quartile of Russian oil companies in above-board business practices.

Some allegations of organized crime and drug activities involving Tyumen's parent company, the Alfa Group, had been made public in Russia last year.

The allegations were contained in a report delivered in 1997 by anonymous officials from the FSB (the Russian equivalent of the FBI) to the national security committee of the Duma, or lower house of parliament.

A Russian-American specialist on business practices in the former Soviet Union who has worked with the White House and Pentagon told *The Public i* that the allegations contained in the 1997 report have been the subject of an investigation by the FSB but that the probe, for unexplained reasons, had been "put away for a better day."

Some of the key elements in the FSB report, a translation of which was obtained by *The Public i*, are virtually identical to those provided to a former senior American intelligence officer two years earlier by a former KGB major who had been part of the Soviet spy agency's ideological counterintelligence branch.

The former U.S. intelligence officer, who asked not to be further identified, wrote a contemporaneous report of what the former KGB major, at the time working for two banks formed by the KGB, told him in 1995. The intelligence specialist provided a copy of his report to *The Public i*.

### Money laundering, drug trafficking

That document and the FSB report claim that Alfa Bank, one of Russia's largest and most profitable, as well as Alfa Eko, a trading company, had been deeply involved in the early 1990s in laundering of Russian and Colombian drug money and in trafficking drugs from the Far East to Europe.

The former KGB major, who with the fall of communism in the late 1980s had

himself been involved in the plan by the KGB and Communist Party to loot state enterprises, said that Alfa Bank was founded with party and KGB funds, and quickly attracted rogue agents who had served in anti-organized-crime units. "They (the rogue agents on the bank's payroll) quickly determined that dealing in drugs would bring the highest profits with literally no risk in Russia," according to the former KGB officer.

He claimed that a "large channel of heroin transit was established from Burma through Laos, Vietnam, to the Far East [Siberia]." From there the drugs were camouflaged as flour and sugar shipments and forwarded on to Germany. The drug operation was controlled by a Chechen mob family, he said.

The FSB report, too, claimed that the Alfa Group's top executives, oligarchs Mikhail Fridman and Pyotr Aven, "allegedly participated in the transit of drugs from Southeast Asia through Russia and into Europe."


Fridman

Reached by telephone, Alexander Tolchinskiy, an officer of Alfa Bank in Moscow, described as "nonsense" the reports that Alfa or its bosses had been involved in the trafficking of drugs or the laundering of drug profits. Another Alfa official said that the reports were planted by representatives of a competing company, whom he would not identify, which wanted to take over the commodities trade.

**'Way off the mark'**

A lawyer at the blue-chip Washington law firm of Akin, Gump, which represents Tyumen, said that the claims that the company's top officers had been involved in narcotics trafficking and money laundering were "way off the mark." The lawyer declined to be further identified.

Rory Davenport of Fleischman Hillard, which handles Tyumen's public relations in Washington, said that his firm had performed a background check on Tyumen and "there was no concern" about Tyumen's alleged mob connection.

Both the FSB and KGB reports cite an event in 1995 in which residents of a Siberian town became "intoxicated," according to the American's report, and "poisoned," according to the FSB report, after they had eaten heroin-laced sugar that had been shipped in a rail car container leased to Alfa Eko, which specializes in the shipment of foodstuffs.

The account from the former KGB officer was that a railroad worker had stolen a sack of sugar from the container and sold it to the persons who became ill. The FSB document said that the incident occurred in Khabarovsk, a large city in Siberia. The former KGB officer only described the location as Siberia.

The FSB report said that within days of the incident, Ministry of Internal Affairs (MVD) agents conducted raids of Alfa Eko buildings and found "drugs and other compromising documentation."

Both reports claim that Alfa Bank has laundered drug funds from Russian and Colombian drug cartels.

The FSB document claims that at the end of 1993, a top Alfa official met with Gilberto Rodriguez Orejuela, the now-imprisoned financial mastermind of Colombia's notorious Cali cartel, "to conclude an agreement about the transfer of money into Alfa Bank from offshore zones such as the Bahamas, Gibraltar and others. The plan was to insert it back into the Russian economy through the purchase of stock in Russian companies."

The account from the former KGB officer is unclear about Alfa's alleged role with

Rodriguez, but apparently confirms that "in 1993-94 there were attempts of the so-called 'Chess Player' [Rodriguez's nickname] to launder and legalize large amounts of criminal money in Russia.' He reported that there was evidence "regarding [Alfa Bank's] involvement with the money laundering of . . . Latin American drug cartels."

**Pattern not unusual**

The former KGB officer claimed that the Alfa empire had its roots in a cooperative formed by KGB officers in 1987 to import computers. It would profit by avoiding import duties and launder funds by creating phony invoices to themselves reflecting 500 percent markups in their cost.

The FSB document said that in the 1980s, Alfa's Fridman "secretly cooperated with operatives of the KGB," was active in the Komsomol (Communist Youth League) and established the cooperatives Gelios and Orsk to purchase computers from abroad.

The former U.S. intelligence officer who interviewed the ex-KGB major said that such a pattern was not unusual. He said that the KGB and Komsomol often teamed up with bright young entrepreneurs like Fridman in the late 1980s and early 1990s and provided seed money to launch private ventures, often involving the importing of computers or the formation of banks. He said that Russian oligarch Mikhail Khodorkovsky, whose reputedly heavily mobbed-up Menatep bank folded in 1998, also got his seed money from the Komsomol and also initially dealt in computers. He said that 47 percent of the KGB agents in the Soviet Union had been groomed by Komsomol.

The FSB report also claims that top officials of the Alfa Group "cooperated" with a number of Russian crime organizations, notably the notorious Solntsevo mob family in Moscow. The Russian-American specialist on business practices in Russia, who has a wide array of contacts inside Russia's law enforcement and intelligence communities, agreed that Alfa Bank, as well as others, are used by the Solntsevo crime family.

As with most of Russia's post-Soviet privatization efforts, Alfa Group's takeover of Tyumen Oil was complicated and fraught with allegations of impropriety. In July of 1997, Novy Holdings, a joint venture involving Alfa and a New York-based Russian-American firm, Access Industries, purchased a 40 percent stake in Tyumen Oil from the Russian government for roughly $810 million. The sale, however, was not without controversy. Russian President Boris Yeltsin himself instructed his privatization czar, Deputy Prime Minister Alfred Kokh, to "personally control the investment tender of the TNK company [Tyumen Oil]" because he was concerned that Tyumen's worth might have been grossly undervalued due to Alfa's improper influence on the audit of the oil giant.

A second cash auction for the remainder of the oil company was scheduled for later that year, with most analysts predicting that Alfa would seek to increase its stake to a majority position. But the auction was suspended in November of 1997, drawing criticism that the government was deliberately delaying the sale of Tyumen in order to give Alfa additional time to raise the necessary funds it needed to take control of the company. The most outspoken critic of Alfa's attempt to wrest control of Tyumen was Viktor Paly, general director of Nizhnevartovskneftegaz, Tyumen Oil's production subsidiary. Paly held a 9% stake in Tyumen Oil through an off-shore company Cadet Establishment.

By February of 1998, however, following meetings at Alfa's offices in Moscow, Paly agreed to divest his stake in Tyumen Oil to Alfa. One month later, Alfa bought an additional 1.17 percent of Tyumen Oil as part of the long-delayed second auction, raising its total stake in the oil company to a 51 percent controlling position.

**Was Cheney's chief of staff**

Tyumen could have significant access to the White House should the Bush-Cheney ticket win in the November presidential elections. Tyumen's lead attorney at Akin Gump is James C. Langdon Jr., a managing partner at the firm. He is also one of George W. Bush's "Pioneers," one of the elite fund raisers who have brought in at least $100,000 for the Republican presidential hopeful.

Last June in Washington, Langdon helped coordinate a $2.2 million fund raiser for Bush, and agreed to help recruit 100 lawyers and lobbyists in the capital to raise $25,000 each. Langdon's secretary told *The Public i* that he was away on travel this week and could not be immediately reached.

Tyumen could also look to one of Cheney's deputies for access should the Republicans triumph in November. One of Halliburton's top lobbyists, Dave Gribbin, was Cheney's chief of staff at the Defense Department during the Bush administration, and his lobbying activities have borne fruit for Halliburton over the last several years.

As with Halliburton's campaign donations, the company's lobbying expenditures increased under Cheney's watch. In 1996, the company spent $280,000 on lobbying. In 1997, the company increased those expenditures to $360,000, to $540,000 in 1998, and to $600,000 in 1999. That upward trend parallels the increasing success Halliburton has had in winning government contracts, loans, and guarantees under Cheney's direction.

Not surprisingly, several key issues relating to Halliburton's success in securing government largesse appear frequently on the company's lobbying reports. Among them are "OPIC Reauthorization," Defense Appropriations Bills," and "Foreign Operations Appropriations Bills Funding EXIM, OPIC, and TDA" [the Trade and Development Agency, a government agency similar to Ex-Im and one that also funds Halliburton projects around the world]. Gribbin also lists "EXIM," "OPIC," and "TDA" as federal agencies that were contacted as part of the company's lobbying activities. Gribbin did not return repeated calls from *The Public i* .

In no small irony, the official Bush Web site, recently revamped to accommodate the addition of Cheney to the ticket, notes in the "Foreign Policy" section that the duo supports "redirecting American assistance, investment and loans to the Russian people, not to the bank accounts of corrupt officials."

**Export-Import Bank and Overseas Private Investment Corp. projects involving Halliburton: 1990- 2000**

| Year | Amount | Type | Project | Country |
|---|---|---|---|---|
| **Ex-Im Bank:** | | | | |
| 1990 | $311,482 | guarantee | Entreprise Nationale de Geophysique SP | Algeria |
| 1990 | $311,482 | loan | Entreprise Nationale de Geophysique SP | Algeria |
| 1991 | $2,975,030 | guarantee | Entreprise Nationale de Geophysique SP | Algeria |
| 1991 | $2,975,030 | loan | Entreprise Nationale de Geophysique SP | Algeria |
| 1992 | $1,055,730 | guarantee | Entreprise Nationale de Geophysique SP | Algeria |
| 1992 | $1,055,730 | loan | Entreprise Nationale de Geophysique SP | Algeria |
| 1992 | $29,742,049 | guarantee | Sonatrach | Algeria |
| 1992 | $52,064,663 | guarantee | Sonatrach | Algeria |

| Year | Amount | Type | Entity | Country |
|---|---|---|---|---|
| *1994 | $266,271,425 | guarantee | Samotlornefgaz | Russia |
| 1996 | $88,535,400 | guarantee | Special Purpose Entity | Angola |
| 1997 | $134,604,799 | guarantee | Sonatrach | Algeria |
| 1997 | $15,393,372 | guarantee | Sonatrach | Algeria |
| 1998 | $161,139,799 | guarantee | Pemex Project Funding Master Trust, The | Mexico |
| 1998 | $375,379,380 | guarantee | Pemex Project Funding Master Trust, The | Mexico |
| 1999 | $64,151,962 | loan | Soc National de Combustiveis de Angola | Angola |
| 2000 | $400,000,001 | guarantee | Pemex Project Funding Master Trust, The | Mexico |
| 2000 | $36,838,454 | guarantee | Samotlornefgaz | Russia |
|  | $1,632,805,788 |  |  |  |

**OPIC**

| Year | Amount | Type | Purpose | Country |
|---|---|---|---|---|
| 1997 | $100,000,000 | insurance | offshore gas development | Bangladesh |

* Carried over to year 2000 as part of guarantee to Tyumen.

Halliburton's fiscal year 1999 U.S. government contracts by agency (include subsidiaries of Halliburton)

| Agency | Total Amount | No. of Transactions |
|---|---|---|
| Department of Defense - Navy | $28,180,000 | 326 |
| Department of Defense - Army (Except Corps of Engineers) | $624,926,000 | 461 |
| Department of Defense - Air Force (Headquarters) | $6,310,000 | 20 |
| Department of Defense - Army Corps of Engineers | $267,000 | 2 |
| Department of Defense - Army Corps of Engineers | -$4,654,000 | 2 |
| Department of Defense - Defense Information Systems Agency | $332,000 | 1 |
| Department of Health and Human Services - National Institutes of Health | $40,477,000 | 280 |
| Department of Interior - Geological Survey | $27,000 | 1 |
| Department of Interior - Minerals Management Service | $50,000 | 1 |
| Department of Interior - National Park Service | $99,000 | 3 |
| Department of State | $31,200,000 | 7 |
| Environmental Protection Agency | $172,000 | 1 |
| National Aeronautics and Space Administration | $52,901,000 | 136 |
|  | $780,287,000 | 1241 |

Knut Royce is a senior fellow and Nathaniel Heller is the James R. Soles Fellow at the Center for Public

Integrity. They were assisted by researchers Gil Shochat and Amy Zader.

Related Reports:

- Dick Cheney's role in the compensation packages of other CEOs could add a complicating factor to his defense of the $13.6 million in stock and options that he received after leaving Halliburton to become Texas Gov. George W. Bush's running mate. (Washington Post, Aug. 30)

- Mixed reviews for Cheney in chief executive role at Halliburton. (New York Times, Aug. 24) (Free registration required)

- Out of D.C., Cheney still carried clout (Chicago Tribune, Aug. 10) (Free registration required)

- Cheney linked to oil-loans funding. (the Guardian, London, Aug. 5)

- Primary ways to nail jelly. (Harold Evans commentary, the Guardian, London, Aug. 7)

▲TOP

© Copyright 2000,The Center for Public Integrity. All rights reserved
IMPORTANT: Read the Copyright & Disclaimer statement for more information.