## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

OAO ALFA BANK, ZAO ALFA ECO,
MIKHAIL FRIDMAN, and
PYOTR AVEN,

          **Plaintiffs,**

     **vs.**

CENTER FOR PUBLIC INTEGRITY,
KNUT ROYCE, and
NATHANIEL HELLER,

          **Defendants.**

**PUBLIC VERSION – CONFIDENTIAL
MATERIAL REDACTED**

**Case No. 1:00CV02208 (JDB)**

## MOTION FOR SUMMARY JUDGMENT

Defendants the Center for Public Integrity ("CPI"), Knut Royce ("Royce"), and
Nathaniel Heller ("Heller") respectfully move this Court for summary judgment. As set
forth more fully in the accompanying Memorandum in Support of Defendants' Motion
for Summary Judgment, this motion should be granted for the following reasons:

      1.      The Article is a privileged report of an official action or proceeding
(namely, the contents of a dossier prepared by officials of Russia's Federal Security
Service ("FSB"), which the Chairman of the Duma's Security Committee transmitted to
the Director of the FSB and to the Deputy Chairman of Russia's Ministry of the Interior
requesting those agencies investigate the dossier's charges).

      2.      Plaintiffs cannot satisfy their burden of proving with clear and convincing
evidence that defendants published the Article with constitutional actual malice; that is,
that defendants published the challenged allegations about plaintiffs knowing that the

allegations were false or despite a "high degree of awareness" of their "probably falsity."

*Garrison v. Louisiana*, 379 U.S. 64, 74 (1964).

WHEREFORE, for the reasons set forth herein and in the supporting

memorandum filed herewith, defendants respectfully request that their motion be granted

and that summary judgment be entered for defendants.

## <u>REQUEST FOR HEARING</u>

Pursuant to Local Rule 108(f), defendants respectfully request a hearing on this

motion.

Respectfully submitted,

LEVINE SULLIVAN KOCH & SCHULZ, L.L.P.

By: _____
    Michael D. Sullivan, Bar. No. 339101
    Elizabeth C. Koch, Bar No. 412828
    Celeste Phillips, Bar No. 481464
    Chad R. Bowman, Bar No. 484150

1050 Seventeenth Street, N.W.
Suite 800
Washington, D.C.  20036
(202) 508-1100

*Counsel for Defendants*
*the Center for Public Integrity,*
*Knut Royce, and Nathaniel Heller*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

OAO ALFA BANK, ZAO ALFA ECO,
MIKHAIL FRIDMAN, and
PYOTR AVEN,

            **Plaintiffs,**

    vs.

CENTER FOR PUBLIC INTEGRITY,
KNUT ROYCE, and
NATHANIEL HELLER,

            **Defendants.**

**PUBLIC VERSION – CONFIDENTIAL
MATERIAL REDACTED**

**Case No. 1:00CV02208 (JDB)**

## MEMORANDUM IN SUPPORT OF DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

Michael D. Sullivan, Bar No. 339101
Elizabeth C. Koch, Bar No. 412828
Celeste Phillips, Bar No. 481464
Chad R. Bowman, Bar No. 484150
Levine Sullivan Koch & Schulz, L.L.P.
1050 Seventeenth Street, N.W.
Suite 800
Washington, D.C.  20036
(202) 508-1100

*Counsel for Defendants the Center for Public
Integrity, Knut Royce and Nathaniel Heller*

Defendants the Center for Public Integrity ("CPI"), Knut Royce ("Royce), and Nathaniel Heller ("Heller) submit this memorandum in support of their motion for summary judgment pursuant to Fed. R. Civ. P. 56, and in support thereof state as follows:

## INTRODUCTION

This is a defamation action arising from an August 2, 2000 article written by defendants Royce and Heller and published on the *Public i*, CPI's website, entitled "Cheney Led Halliburton To Feast at Federal Trough/State Department Questioned Deal With Firm Linked to Russian Mob" ("the Article").  Plaintiffs OAO Alfa Bank ("Alfa Bank"), ZAO Alfa Eco ("Alfa Eco"), Mikhail Fridman ("Fridman") and Pyotr Aven ("Aven") each deny that they are public figures for purposes of this defamation action.  Accordingly, concurrently with the present motion, defendants are filing a Motion for Order Ruling that Plaintiffs Are Public Figures as a Matter of Law addressing this issue, which is a pure question of law for the Court to decide.[1]  Plaintiffs have alleged that the Article defamed them by accusing "plaintiffs of being involved in drug trafficking and other criminal or otherwise disreputable activities, and of being connected to organized crime."  SDA ¶1.[2]  Plaintiffs complain that the Article "impugn[s] plaintiffs in their trade, profession, community standing and/or business ethics," SDA ¶2, and seek injunctive relief as well as compensatory and punitive damages.  SDA ¶3.

After approximately three and a half years, discovery in this case, which has been extensive, came to a close on March 4, 2004, and this case is now ripe for resolution on the present motion.  As demonstrated below, the Court should grant summary judgment and dismiss this action at this juncture for two independent reasons:  First, the Article constitutes a privileged report of an official action or proceeding, which is not actionable in defamation.  Second,

---

[1] Defendants respectfully refer the Court to that Public Figure Motion which sets out pertinent background information regarding the individual and corporate plaintiffs.

[2] In particular, plaintiffs have challenged six specific statements, which are enumerated in paragraphs 12.a. through 12.f. of plaintiffs' Complaint.  Those statements are set forth verbatim in paragraph 4 of the Appendix to the Declaration of Michael D. Sullivan.  For the convenience of the Court, the Declaration includes a detailed Appendix that contains references to the voluminous summary judgment record.  The Sullivan Declaration Appendix ("SDA") is cited herein simply as "SDA" with an appropriate paragraph reference.  SDA ¶4.

plaintiffs cannot come forward with clear and convincing evidence that the defendants published with constitutional malice.

The availability of summary judgment is particularly critical in cases such as this where plaintiffs have targeted speech about matters of legitimate public concern. As the Court observed in *Washington Post Co. v. Keogh*, 365 F.2d 965, 968 (D.C. Cir. 1966), *cert. denied*, 385 U.S. 1011 (1967):

> Summary judgment serves important functions. … Chief among these are avoidance of long and expensive litigation productive of nothing, and curbing the danger that the threat of such litigation will be used to harass or to coerce a settlement. In the First Amendment area, summary procedures are even more essential. For the stakes here, if harassment succeeds, is free debate.

*See, e.g., White v. Fraternal Order of Police*, 707 F. Supp. 579, 586 (D.D.C. 1989) (quoting *Keogh*); *Secord v. Cockburn*, 747 F. Supp. 779, 786 (D.D.C. 1990) (same); *see also McBride v. Merrell Dow & Pharms., Inc.*, 717 F.2d 1460, 1466 (D.C. Cir. 1983) (libel suits "should be controlled so as to minimize their adverse impact upon press freedom;" "[e]ven if many actions fail, the risks and high costs of litigation may lead to undesirable forms of self-censorship").

## I.   THE CHALLENGED STATEMENTS CONSTITUTE PRIVILEGED REPORTS OF AN OFFICIAL ACTION OR PROCEEDING AND THUS ARE NOT ACTIONABLE IN DEFAMATION

This Circuit has long held that journalists are privileged to report to the citizenry fair and accurate accounts of the official actions and proceedings of government. *See White v. Fraternal Order of Police*, 909 F.2d 512, 527 (D.C. Cir. 1990); *Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287, 1298-99 (D.C. Cir.), *cert. denied*, 488 U.S. 825 (1988); *Dameron v. Washington Magazine, Inc.*, 779 F.2d 736, 739 (D.C. Cir. 1985), *cert. denied*, 476 U.S. 1411 (1986). As the following discussion demonstrates, the Article constitutes a privileged report of an official action of the Chairman of the Security Committee of the Russian Duma, Victor Ilyukhin ("Ilyukhin").

The Article reports that "allegations of organized crime and drug activities involving Tyumen's parent company, the Alfa Group," were "contained in a report [the "FSB Report"] delivered in 1997 by anonymous officials from the FSB . . . to the national security committee of the Duma, or lower house of parliament." SDA ¶5. The Article also reports that "the allegations

contained in the 1997 report have been the subject of an investigation by the FSB but that probe, for unexplained reasons, had been 'put away for a better day.'" *Id.*

In November 1997, Chairman Ilyukhin forwarded the FSB Report to the Director of the Federal Security Service ("FSB") and the Deputy Chairman of the Ministry of the Interior ("MVD")[3] requesting those agencies to investigate the charges and report back to the Duma Security Committee with the results of their inquiries. SDA ¶6.[4] By letter dated December 24, 1997, the MVD's First Deputy Minister reported back to the Duma Security Committee Chairman that "[i]t has been established that currently the firms comprising this [Alfa Group] consortium are being investigated in connection with a number of criminal cases. In October of this year the Moscow customs officials checked the shipment that had arrived from the Republic of Moldavia to the address of the Alfa Echo Company and found arms and ammunition in it. The Moscow-Ryazan prosecutor['s] office filed a criminal case related to this matter." SDA ¶11.

As plaintiffs readily concede, the FSB report was widely disseminated in Russia well before defendants published the challenged article. SDA ¶12. In fact, plaintiffs themselves produced a copy of the FSB report in discovery in this case. *See* SDA ¶13.[5] As the Bank's head of security, Sergei Bakumov, explained, Alfa Bank obtained its copy of the FSB report from a former law enforcement officer who was applying for a position with the Bank's "security" department in 1997. SDA ¶15. The applicant provided a copy of the report to "win favor" with Alfa Bank. *Id.*

In addition to being widely disseminated, the FSB report was widely reported in Russia. SDA ¶22. Indeed, plaintiffs wrote to various FSB and MVD officials complaining that media

---

[3] Both the FSB and the MVD are Russian law enforcement entities with jurisdiction over a broad range of criminal matters.

[4] Plaintiffs were aware of the requested investigation: Fridman testified that he had seen the letters written by Ilyukhin to the MVD and others requesting that the allegations be investigated, but that he was not sure Alfa still had copies of the letters. SDA ¶7. Aven testified that he too saw the letter from Ilyukhin to the MVD enclosing a copy of the FSB report, SDA ¶8, and that he was aware that Ilyukhin had requested the MVD to conduct an investigation into the allegations in November 1997. SDA ¶9. Although Aven testified that he reviewed a copy of Chairman Ilyukhin's correspondence to the MVD at Alfa Bank in late 1997, plaintiffs failed to produce a copy of that letter in discovery. *See also* SDA ¶10 (Alfa Bank's head of security testified that he too saw the letter at Alfa Bank, but did not believe that Alfa Bank still had a copy).

[5] In addition, plaintiffs concede that the version of the FSB report used by Royce in preparing the Article was substantially similar to the version of the FSB report plaintiffs had previously obtained. SDA ¶14.

3

reports of the correspondence from the Duma Security Committee Chairman were "damaging to the honor, dignity and business reputation of the Alfa Group Consortium and the Alfa Bank and their directors."  SDA ¶16.  An article in the Russian newspaper *Versiya*, which was attached to Alfa Bank's letter to the MVD, was one of the first to report at length on the allegations contained in the FSB report.  For example, *Versiya* reported, *inter alia*, the FSB report's allegations: (1) that both Aven and Fridman were involved in drug trafficking from Southeast Asia via Russia to Europe; (2) that Aven met in 1993 with Gilberto Rodriguez Orejuela, a.k.a. the "Chess player," in Vienna to conclude an agreement to invest Columbian drug money in the Russian economy; (3) that Alfa Eco was involved in secret operations with illegal drug trafficking; and (4) that Alfa Eco's offices were searched for illegal drugs in April 1995 after citizens in Khabarovsk were poisoned after consuming sugar contaminated with illegal drugs shipped in containers used by Alfa Eco.  SDA ¶17.[6]  Although plaintiffs pursued litigation against a small German publisher who later reported the same allegations contained in the FSB report, plaintiffs did not pursue litigation against *Versiya* at that time.  Indeed, as plaintiffs explained to the German Court:  "Under the circumstances [plaintiffs Fridman and Aven] did not have any remedies to prevent the Russian Press from distributing the claims in the alleged Ilyukhin dossier [the FSB report].  Representatives of the Duma enjoy complete immunity even with regard to civil matters.  *Quotations from publications of Representatives also are considered privileged communications*."  SDA ¶18 (emphasis added).[7]

     In preparing the Article, defendants faithfully reported the contents of the FSB report, and all but one of the challenged statements in the Article are attributed directly to that report.

---

[6] These, of course, are the same allegations of criminal activity that plaintiffs challenge in the present case. *Compare* Sullivan Decl. Ex. 27 (*Versiya* July 6, 1999 Article, "Alfa Group Portrait") *with* Sullivan Decl. Ex. 2 (Complaint ¶12 setting forth challenged statements).

[7] Fridman and Aven were less than candid with the German Court when they filed their Motion for Preliminary Injunction dated February 17, 2000.  In particular, Fridman and Aven represented to the Court that they "[we]re not familiar with the documents that Viktor Ilyukhin is said to have given to the Ministry of Internal Affairs in November 1997 for investigation" and that "they learn[ed] of the possible existence of the letter in question through a publication in the newspaper *Versiya* ... that was published on July 6, 1999."  SDA ¶19.  To the contrary, Fridman and Aven both were aware of the FSB report and had, in fact, reviewed it well before the article appeared in *Versiya* in the summer of 1999.  *See id.* (citing Aven testifying that he reviewed the FSB report at Alfa Bank in 1998; and Bakumov testifying that Alfa Bank obtained FSB report from applicant for security service position in late 1997 and Bakumov provided a copy to management, including Fridman who reviewed it in his presence).

SDA ¶20.  In circumstances such as these, courts in this Circuit have repeatedly recognized that journalists are privileged to provide fair and accurate reports of the official actions and proceedings of government.  *See, e.g., White v. Fraternal Order of Police*, 909 F.2d at 527; *Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d at 1298-99; *Dameron v. Washington Magazine, Inc.*, 779 F.2d at 739; *Bell v. Associated Press*, 584 F. Supp. 128, 129 (D.D.C. 1984).

In the D.C. Circuit, the fair reporting "privilege extends broadly to the report 'of any official proceeding, or any action taken by any officer or agency of government,'" *White v. Fraternal Order of Police*, 909 F.2d at 527 (quoting Restatement (Second) of Torts § 611, comment d (1977)), so long as (1) the report is a "fair and accurate" account of the proceeding or action it purports to describe, and (2) it is "apparent either from specific attribution or from the overall context that the article is quoting, paraphrasing, or otherwise drawing upon official documents or proceedings," *Dameron v. Washington Magazine, Inc.*, 779 F.2d at 739; *accord Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d at 1299.[8]  CPI's Article unquestionably meets these two requirements.

In *White v. Fraternal Order of Police*, this Circuit applied the privilege to news reports about a series of letters, written by a police union ("FOP") to the Mayor of the District of Columbia, which alleged irregularities in drug tests performed on the plaintiff police captain. *See* 909 F.2d at 515.  The Mayor referred the letters to the Police Chief, "who in turn created the 'Cox Committee,'" an internal group within the department "headed by Assistant Police Chief Ronal Cox, to investigate the matter." *Id.*  During the course of the Cox Committee's

---

[8]  The privilege applies to fair and accurate reports of governmental proceedings themselves and of the "allegations" that "prompted" the governmental action or proceeding "in the first place." *White v. Fraternal Order of Police*, 707 F. Supp. 579, 597 (D.D.C. 1989), *aff'd in relevant part*, 909 F.2d 512 (D.C. Cir. 1990).  Where, as here, the allegedly defamatory publication constitutes a report of allegations which the Duma Security Committee Chairman requested be investigated, there can be no dispute that the fair report privilege is applicable.  In fact, this Circuit has gone so far as to hold that, in applying the privilege, "'it would be untenable to make a distinction between a report about an official proceeding and that which, for all purposes, is the subject matter of the proceeding.'" *White v. Fraternal Order of Police*, 909 F.2d at 527 (quoting 707 F. Supp. at 597); *accord Reeves v. American Broadcasting Co.*, 719 F.2d 602, 603-04 (2d Cir. 1983) (California's codification of fair report privilege extends to report of "charges made to a grand jury," even though "[n]o formal charges were ever filed against" plaintiff or anyone else); *Medico v. Time, Inc.*, 643 F.2d 134, 139-40 (3d Cir.) (fair report privilege extends to magazine's report based on FBI documents that "express only tentative and preliminary conclusions that the FBI never adopted as accurate"), *cert. denied*, 454 U.S. 836 (1981).

investigation, but before it made any findings or recommendations, the *Washington Post* published eight articles "concerning the FOP's allegations and the Cox Committee's investigation of those allegations." *Id.* at 516.

The district court granted summary judgment for the *Post* on the ground, *inter alia*, that "[c]omparing the allegations in the FOP letters to the allegations set forth in the Post articles," the articles "contained 'fair and substantially correct repetition[s] of these allegations.'" *White v. Fraternal Order of Police*, 707 F. Supp. at 597 (quoting *Johnson v. Johnson Publishing Co.*, 271 A.2d 696, 698 (D.C. 1970)). The D.C. Circuit unanimously affirmed, holding that "we have no doubt that the Post's reports were fair summaries of the contents of the FOP letters" and that "the Post's reports concerned a governmental or official proceeding." *White v. Fraternal Order of Police*, 909 F.2d at 527. According to the Court of Appeals, the *Post* articles "summarized the gist of the allegations set out in the FOP letters which the 'special panel' was investigating, and consistently attributed the reported facts to those documents." *Id.* at 528. Therefore, the Circuit Court held, "the Post has met all of the requirements for invoking the fair report privilege." *Id.*

In the present case, a comparison of the challenged defamatory statements with the FSB report upon which they are expressly based demonstrates that "all of the requirements for invoking the fair report privilege" have been satisfied. First, it cannot be disputed that all of the challenged statements, save one,[9] constitute reports "about an official [governmental] proceeding and that which, for all purposes, is the subject matter of the proceedings" – *i.e.*, the allegations contained in the FSB report that the Duma Security Committee Chairman requested be investigated by the FSB and the MVD. *White v. Fraternal Order of Police*, 909 F.2d at 527.

---

[9] The only challenged statement in the Article not attributed to the FSB report is as follows: "That shortly after its formation, Alfa-Bank hired 'rogue' KGB agents who 'quickly determined that dealing in drugs would bring the highest profits with literally no risk in Russia.'" Sullivan Decl. Ex. 2 ¶12.b. (Compl.). Where, as here, this statement does not communicate a defamatory "gist" or "sting" that extends beyond the meaning conveyed by the other five challenged statements that clearly constitute privileged reports, it cannot independently form the basis for liability. *See, e.g., Tavoulareas v. Piro*, 817 F.2d 762, 787-88 (D.C. Cir.)(en banc)(where defamatory implication of publication as a whole is not actionable, specific false statement contained in publication is not actionable if it communicates the same defamatory implication), *cert. denied*, 484 U.S. 870 (1987); *Herbert v. Lando*, 781 F.2d 298, 312 (2d Cir.) ("if the appellees' published view that Herbert lied about reporting war crimes was not actionable, other statements – even those that might be found to have been published with actual malice – should not be actionable if they merely imply the same view, and are simply an outgrowth of and subsidiary to those claims upon which it has been held there can be no recovery"), *cert. denied*, 476 U.S. 1182 (1986).

Second, the Article is, on its face, explicit in attributing its information to the allegations made in the FSB report by "quoting, paraphrasing, or otherwise drawing upon" that "official document[]." *Dameron v. Washington Magazine, Inc.*, 779 F.2d at 739; *accord Pittman v. Gannett River States Publishing Corp.*, 836 F. Supp. 377, 383 (S.D. Miss. 1993)(citing *Dameron*, 779 F.2d at 739); *see also Prins v. ITT Corp.*, 757 F. Supp. 87, 93 (D.D.C. 1991)(requiring attribution of "allegedly defamatory statement to the official government record or proceeding").

Third, the allegedly defamatory statements certainly constitute "fair and accurate" summaries of the "gist of the allegations set out in the" FSB report. *White v. Fraternal Order of Police*, 909 F.2d at 527. "Comparing the allegations" contained in the FSB report, *see* SDA ¶ 21, with "the allegations set forth" in the Article, *see* SDA ¶20, it cannot be disputed that the Article "contained 'fair and substantially correct repetition[s]'" of those allegations. *White v. Fraternal Order of Police*, 707 F. Supp. at 597 (citation omitted). Indeed, the Article quite obviously draws its substance from and faithfully reproduces in detail the allegations contained in the FSB report. *See* SDA ¶5 (Article, at 3-5). As the courts have made clear, it is not necessary that "the official report be set forth verbatim;" a "[s]ummary of substantial accuracy is all that is required." *Friedman v. Israel Labour Party*, 957 F. Supp. 701, 709 (E.D. Pa. 1997); *see Crane v. Arizona Republic*, 972 F.2d 1511, 1519 (9th Cir. 1992)(news report "need not track verbatim the underlying proceeding"). A report will be deemed to be "substantially accurate if its 'gist' or 'sting' is true, that is, if it produces the same effect on the mind of the recipient which the precise truth would have produced." *Friedman*, 957 F. Supp. at 709.[10] The critical inquiry, therefore, is whether the statements capture the "gist" of the allegations that constitute the "subject matter" of the underlying official document or report. *See White v. Fraternal Order of Police*, 909 F.2d at 528. In the instant case, the result of that inquiry is self-evident; as plaintiffs'

---

[10] "The question of whether a published account is fair and accurate is a question of law." *Q Int'l. Courier, Inc. v. Seagraves*, No. 95-1554, 1999 WL 1027034, at *4 (D.D.C. Feb. 26, 1999); *Coles v. Washington Free Weekly, Inc.*, 881 F. Supp. 26, 30 n.4 (D.D.C. 1995)(citing *Dorsey v. National Enquirer, Inc.*, 973 F.2d 1431, 1435 (9th Cir. 1992)).

own pleadings confirm, defendants have been sued, not because they failed to capture the "gist" of the FSB report's allegations, but because they captured it all too well.

Fourth, the fair report privilege has been applied to news reports of government documents and proceedings from foreign countries. *See, e.g., Friedman v. Israel Labour Party*, 957 F. Supp. at 703 (applying fair report privilege to news report of Israeli press release); *Daniel Goldreyer, Ltd. v. Van de Wetering*, 630 N.Y.S.2d 18, 22 (App. Div. 1st Dept. 1995)(applying fair report privilege to Dutch Ministry of Justice report regarding laboratory tests on restored painting); *Saenz v. New York Tribune, Inc.*, 290 N.Y.S. 316, 319-24 (N.Y. S. Ct. 1936)(applying fair report privilege to Cuban criminal proceedings). Although one federal court has refused to apply the fair report privilege to a report of a foreign government document or proceeding, *see Lee v. Dong-A Ilbo*, 849 F.2d 876, 877-78 (4th Cir. 1988)(refusing to apply fair report privilege to report of press release issued by South Korean intelligence agencies), the more modern view is to the contrary. Indeed, as one court emphasized recently:

> The absence of the fair report privilege would effectively stand
> international news reporting on its head. Without the privilege, the news
> media who report international news would find it incredibly difficult, if
> not impossible, to publish reports of official acts of foreign governments
> without subjecting themselves to intolerable defamation liability.

*Friedman, 957* F. Supp. at 713. The view expressed by the court in *Friedman* is wholly in keeping with the expansive application of the fair report privilege in the District of Columbia where the courts have stressed that the privilege should be "interpreted broadly." *White v. Fraternal Order of Police*, 707 F. Supp. at 596 (emphasizing that "[t]his jurisdiction has interpreted broadly what constitutes an official proceeding"); *White v. Fraternal Order of Police*, 909 F.2d at 527 (emphasizing that "privilege extends broadly to the report 'of any official proceeding, or any action taken by any officer or agency of government'")(citation omitted). In the present case, it would be anomalous indeed if a fair and true news account of the FSB report were to be privileged in Russia, as plaintiffs readily conceded in a prior judicial proceeding, but went without protection in America, which boasts the most robust free speech and press rights in the world.

Finally, plaintiffs cannot, as a matter of law, assert that defendants have "abused" the privilege so as to forfeit its protections. As the *Restatement* recognizes, the privilege cannot be lost by a finding of "actual malice" in the traditional sense – *i.e.*, clear and convincing evidence that the defendant "does not believe the defamatory words he reports to be true and even … knows them to be false." *Restatement (Second) of Torts*, § 611, comment a (1977). Indeed, since the privilege exists for the precise purpose of permitting "a person to publish a report of an official action or proceeding … even though the report contains what he knows to be a false and defamatory statement," it would render the privilege meaningless if its protections could be forfeited by proof of actual malice. *Id.*, comment b.

As demonstrated above, "ha[ving] met all of the requirements for invoking the fair report privilege" in this Circuit, *White v. Fraternal Order of Police*, 909 F.2d at 528, defendants are entitled to summary judgment because the Article constitutes a privileged report of an official action or proceeding of the Chairman of the Security Committee of the Russian Duma.

## II.    PLAINTIFFS' DEFAMATION CLAIM FAILS BECAUSE PLAINTIFFS CANNOT ESTABLISH "ACTUAL MALICE" AS A MATTER OF LAW

In *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964) the Supreme Court recognized our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." Three years later, in *Curtis Publishing Co. v. Butts*, 388 U.S. 130 (1967), the Court extended the First Amendment protections afforded to speech about public officials to public figures. As the Court observed, "[o]ur citizenry has a legitimate and substantial interest in the conduct of such persons, and freedom of the press to engage in uninhibited debate about their involvement in public issues and events is as crucial as it is in the case of 'public officials.'" *Id.* at 164.

Because of the solicitude granted to criticism of public figures and officials, the Constitution places a special burden on libel plaintiffs: they must prove both that the challenged statements are false and that defendants published those statements with "actual" or "constitutional malice." What is more, plaintiffs cannot prevail in this lawsuit, *or defeat this motion*, unless they come forward with clear and convincing evidence that the defendants acted

with constitutional malice.[11]  *New York Times*, 376 U.S. at 285-86; *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 510 (1991) (actual malice must be shown by clear and convincing evidence).

Whether the evidence in the record in a defamation case is sufficient to support a finding of actual malice is a question of law for the court to decide.  *Harte-Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657, 685 (1989); *accord Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 511 (1984).  In order to defeat summary judgment, public figures must present affirmative evidence from which a reasonable fact finder could find with convincing clarity that the challenged publication was made with actual malice – *i.e.*, "with knowledge that it was false or with reckless disregard of whether it was false or not."  *New York Times*, 376 U.S. at 271-72, 279-80, 285-86.  Summary judgment is appropriate where, as here, the evidence is "of insufficient caliber or quantity to allow a rational finder of fact to find actual malice by clear and convincing evidence."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986).  If a plaintiff fails to meet this burden of proof, Rule 56(c) of the Federal Rules of Civil Procedure "mandates the entry of summary judgment."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Moreover, in reviewing the record at the summary judgment stage, a court must "'make an independent examination of the whole record' in order to make sure that 'the [plaintiff's claim] does not constitute a forbidden intrusion on the field of free expression.'"  *Liberty Lobby v. Dow Jones & Co.*, 838 F.2d at 1293 (quoting *Bose Corp. v. Consumers Union*, 466 U.S. at 499), *cert. denied*, 488 U.S. 825 (1988)).  Thus, "[j]udges, as expositors of the Constitution," are not merely to determine whether the finder of fact could reasonably find such "convincing clarity," to exist, but "must independently decide whether the evidence in the record is sufficient to cross th[is] constitutional threshold."  *Bose Corp.*, 466 U.S. at 511.

The actual malice standard requires clear and convincing evidence that the defendants published a defamatory falsehood about a public person despite a "high degree of awareness" of

---

[11] Defamation plaintiffs, regardless of their public figure status, must prove actual malice by clear and convincing evidence to recover punitive damages. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974). At a minimum, therefore, plaintiffs' prayer for an award of punitive damages is precluded as a matter of constitutional law, absent proof of actual malice.

the publication's "probable falsity." *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964).  To prevail, a public figure must demonstrate "that the defendant[s] *in fact* entertained serious doubts as to the truth of [their] publication." *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968) (emphasis added).

Notably, the standard for "reckless disregard" of the truth is a subjective one and, thus, the inquiry must focus on the journalist's state of mind at the time of publication.  *McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501, 1508 (D.C. Cir. 1996) ("The actual malice standard is subjective; the plaintiff must prove that the defendant actually entertained a serious doubt."). "Reckless disregard" must not be equated with recklessness in the ordinary sense of extreme negligence.  *Lohrenz v. Donnelly*, 223 F. Supp. 2d 25, 45 (D.D.C 2002), (Lamberth, J.) ("The standard for actual malice is not what a 'reasonable person' or a 'prudent publisher' would do, nor can it be defined as 'an extreme departure from professional standards.'") (citations omitted), *affirmed*, 350 F.3d 1272 (D.C. Cir. 2003).  Instead, "reckless disregard" requires that a defendant published while subjectively believing that the challenged statement is probably false.  *St. Amant*, 390 U.S. at 731.  "'No matter how gross the untruth, the *New York Times* rule deprives a defamed public [figure] of any hope for legal redress without proof that the lie was a knowing one. ...'"  *Washington Post Co. v. Keogh*, 365 F.2d 965, 970 (D.C. Cir. 1966) (quoting *Rosenblatt v. Baer*, 383 U.S. 75, 92 (1966) (Stewart, J., concurring)).

As the D.C. Circuit has repeatedly emphasized, the "standard of actual malice is a daunting one," *McFarlane v. Esquire Magazine*, 74 F.3d 1296, 1308 (D.C. Cir. 1996), and "[f]ew public figures have been able clearly and convincingly to prove that the scurrilous things said about them were published by someone with 'serious doubts as to the truth of the publication.'"  *McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d at 1515 (citation omitted); *see also Lohrenz v. Donnelly*, 223 F. Supp. 2d at 45-49 ("Because of the paramount importance of First Amendment protection for the media, the showing that a public figure must make to hold a media defendant liable for slander or libel is very high.").

Because the actual malice inquiry centers on the defendant's state of mind, evidence that plaintiffs proffer to support a finding of actual malice must "necessarily be drawn solely upon the basis of the information that was available to and considered by the defendant prior to publication." *McFarlane v. Sheridan Square Press*, 91 F.3d at 1508; s*ee Bose Corp.*, 466 U.S. at 512 (evidence must establish that defendant "realized the inaccuracy at the time of publication"); *New York Times v. Sullivan*, 376 U.S. at 286 (actual malice must be demonstrated "at the time of the publication"); *Lohrenz v. Donnelly*, 223 F. Supp. 2d at 45 (same).

Plaintiffs come before this Court to challenge defendants' publication of allegations about their checkered past in Russia, including reports of plaintiffs' involvement with Russian organized crime, drug trafficking and money laundering. As set forth herein, there is no evidence in the record – let alone clear and convincing evidence – that defendants published the six challenged statements with a high degree of subjective awareness of their probably falsity, so as to enable plaintiffs to meet their burden of proof and defeat summary adjudication.

Rather, the uncontroverted evidence establishes that the challenged statements were based on information provided to defendants by several credible sources, including previous press reports. As in *Tavoulareas*, "[w]hen the entire record in this case is scrutinized in light of *St. Amant* and other governing precedents, it is clear beyond cavil that" defendants did not publish the Article with actual malice as a matter of law. *Tavoulareas v. Piro*, 817 F.2d at 790.

A.       **Factual Background**

1.       **The Authors**

CPI is a nonprofit, nonpartisan, watchdog group, founded in 1990 by former *60 Minutes* producer Charles Lewis ("Lewis"). SDA ¶23. CPI's stated mission is to "provide the American people with the findings of [its] investigations and analyses of public service, government accountability, and ethics-related issues." SDA ¶24. As Lewis has said, "[w]e're ... a tiny, by most standards, very small nonprofit organization trying to cover ethics-related issues in the entire world. It's a rather daunting task. ..." SDA ¶25.

The Center has proved able to meet the challenge, publishing scores of in-depth reports and several books about the role of money in politics and "influence peddling" in Washington. SDA ¶26. When the *Public i* newsletter began, its content was largely derived from these lengthy reports. SDA ¶27. In 1999, the *Public i* went online and, in addition to articles based on the Center's studies, included regularly updated stories about current events, known as "spot news" reporting. SDA ¶28. The Article herein was just such an effort: coverage of the story that broke days before the Republican National Convention, when George W. Bush announced his surprise selection of Dick Cheney ("Cheney") as his vice-presidential running mate. SDA ¶29. The two reporters assigned to cover that breaking story were Royce and Heller. SDA ¶30.

Royce began his award-winning journalism career almost four decades ago. By the time Royce joined CPI in 1999, he had been a contributor to three Pulitzer prize-winning stories, and specialized in coverage of national security, intelligence and law enforcement matters, with access to a wide network of sources in the intelligence communities. SDA ¶¶31, 32. Prior to the Article's publication, Royce's reporting included stories related to international organized crime activity. SDA ¶¶33, 34.

Heller also joined CPI in 1999, on a fellowship after his graduation from college. SDA ¶36. While with CPI, Heller worked on a variety of projects, including articles about emerging technologies, the 2000 Presidential campaign, government accountability and international crime. SDA ¶37.

### 2.   Reporting the Article

On July 25, 2000, just days before the kick-off of the Republican National Convention, George W. Bush, the GOP's presumptive presidential nominee, announced that Cheney, Halliburton's Chief Executive Officer, had agreed to be his vice-presidential running mate. SDA ¶29. Lewis saw this as an important story that warranted immediate coverage. As he explained, "the whole country – for that matter, the whole world is looking at this election and they are looking at this new person who could be the vice-president and they are going to want to know who he is and what he is about." SDA ¶39.

Given CPI's signature niche – tracking "the role of money in politics, the importance of money and lobbying heft" on Washington decision makers – the story approach that logically suggested itself was a review of the public record to assess the relationship between Halliburton and the federal government.  SDA ¶40.  In particular, the Center was interested in charting the government contracts Halliburton had landed, and the lobbying expenditures and campaign contributions it had made, during the five years before and the five years after Cheney took the reins in 1995.  SDA ¶41.

This story was naturally tied to events at the upcoming Republican national convention and Lewis knew there was a short window during which the Center's coverage of the Cheney nomination would retain its currency.  As he candidly noted, "information is perishable [  ] in the 24/7 world we live in now, what is interesting and new today is history tomorrow and that is the atmosphere [journalists] operate in."  SDA ¶¶42, 43.

Lewis assigned Heller and Royce, as well as two interns, to the pressing task at hand. SDA ¶44.  They began plumbing public records to access Halliburton's campaign contribution and lobbying data, as well as the federal contracts the company was awarded over the past decade.  SDA ¶45.

Royce recalled that one of those contracts had recently figured prominently in the news: the half-billion dollar ExIm loan that pitted the interests of Halliburton and Alfa's Tyumen against those championing the rights of minority shareholders such as BPAmoco.  SDA ¶46. Royce decided to pursue this angle and conducted an Internet database search that turned up, among other items, a January 9, 2000 *Washington Post* ("*Post*") column by David Ignatius ("Ignatius") that set forth a detailed post-mortem of this controversy that had "created a buzz in Washington" – the Ex-Im's decision to back the Tyumen loans and the White House's unprecedented decision to overrule the Bank and block the funding.  SDA ¶47.

Ignatius reported that a "29 page investigative report on Tyumen, classified 'Secret'" had been commissioned by BPAmoco and provided to the CIA in autumn 1999.  *Id*.  According to the *Post*, the CIA said the report was compiled by "'a Russian security firm that employs former

members of the Russian security service.'"  *Id.*  Ignatius reported that, while "most of the report dealt with ordinary corporate issues," it also contained "2 ½ pages [  ] labeled 'criminal situation' and included some detailed allegations about Tyumen management."  *Id.*  According to an unnamed senior intelligence officer who spoke to Ignatius, CIA analysts briefed ExIm officials and told them that they did not find the allegations in the BPAmoco report at all anomalous; rather, the CIA "'gave [the ExIm its] take on the Tyumen report,' which was that *it tracked other information the [CIA] had gathered.*"  *Id.* (emphasis added).

Royce also obtained articles about Tyumen and its owners from a variety of other sources.  SDA ¶48.  One Nexis search – "Fridman w/20 criminal" – had unearthed a *Banking and Exchanges Weekly* ("*Banking and Exchanges*") English language summary of a July 1999 article published by the Russian newspaper *Versiya*.  SDA ¶49.  The synopsis of the *Versiya* article – "Alfa Group Portrait" – written by Oleg Lurye ("Lurye"), indicated that it contained profiles of Alfa principals Aven, Fridman and Khan.  *Id.*  The excerpt was graphic in its description of the conduct attributed to plaintiffs, including allegations that they were connected with known Russian mobsters, and had engaged in drug trafficking and money laundering.  *Id.* [12]

Royce's search turned up another article Lurye had written in 1999 for *Sovershenno Sekretno*.  SDA ¶50. [13]  This article was republished on the Internet by the *Russian Press Digest*, an English language news service.  *Id.*  The article referred to a formal inquiry that Security Committee Chairman Ilyukhin submitted to Russian law enforcement about Alfa principals two years earlier.  *Id.; see also* SDA ¶ 55.  According to this article, Ilyukhin's 1997 "inquiry contained a list of prosperous businessmen who in the former years collaborated with the KGB,

---

[12] The *Banking and Exchanges'* summary of "Alfa Group Portrait" reported, *inter alia*, on Aven's 1993 meeting in Vienna with "Gilberto Rodgriguez Orejuel, a representative of Columbia drug barons" regarding "an agreement to 'pump' capital from offshore zones into Alfa-bank"; Fridman's role "in organizing drug trafficking from South East Asia to Europe via Russia"; and Fridman's "numerous contacts" with Moscow's "most aggressive" criminal group.  SDA ¶49.

[13] In 1999, *Versiya* and *Sovershenno Sekretno* were published by one of Russia's most admired journalists, Artyom Borovik ("Borovik").  Plaintiffs' Russian press expert Jonathan Sanders ("Sanders") stated that Borovik "helped transform the reporter's role from repeater of Kremlin messages to teller of unpleasant truths.  Borovik saw it as his duty to be a contrarian, loudly, proudly and often at great risk to his own life."  SDA ¶52.  Indeed, in March 2000, Borovik met an untimely death in an airplane crash, an event some have viewed with suspicion.  SDA ¶53.  The Overseas Press Club of America created an annual award in Borovik's honor for outstanding reporting by Russian journalists.  SDA ¶54.

or *had ties with organized crime involved in drug trafficking, used criminal groups for eliminating rivals, or were involved in bribe taking, embezzlement or had contacts with foreign intelligence services ... The list included, among others, persons associated with the Alfa Group – Mikhail Fridman, ... German Khan, ... Alexander Fain,* leader of the *Alfa Eco* company, ... and *Pyotr Aven,* President of the *Alfa Bank.*" *Id.* (*emphasis added*). The *Sovershenno Sekretno* article also stated that, though it had been two years since "Ilyukhin asked that the information be verified," the authorities remained silent. Lurye posed the obvious question: what had become of Ilyukhin's directive? *Id.*

Royce located a later *Versiya* article – "Russia by Gangs: The Solntsevos" – written by Andrey Polynskiy. This 2000 article profiled the Solntsevos, described as "the most influential organized crime group in Moscow's criminal world." SDA ¶51. According to *Versiya*, "[o]ne of the main directions of the Solntsevo activity is to exert influence on credit-financial institutions. *Major financial structures over which they have influence include Alfa-Bank ... The Solntsevos have mutual commercial interests with many Moscow businessmen. These include the owners of the Alfa Financial Group. The Solntsevo 'soldiers' guarantee the protection of the gang's leaders – the messrs. Fridman, Aven and others – and also support some of Alfa's operations.*" *Id.* (emphasis added).

After reading these articles, Royce wanted to obtain a complete version of *Versiya's* "Alfa Group Portrait," as well as a copy of the BPAmoco report Ignatius wrote about. To this end, he contacted one of his longtime sources at the CIA. SDA ¶56. While confirming that the BPAmoco report existed, the source declined to give Royce a copy of the document, then classified "secret." *Id.* He also would not divulge the specific content of the report. *Id.* However, when Royce asked whether the criminal allegations "had any credibility," his CIA source assured him that the information in the BPAmoco report, which he told Royce he had read, did track with the CIA's own intelligence. *Id.* In essence, the agent confirmed the accuracy of the *Post* account: whatever the BPAmoco investigators had come up with about Alfa's alleged criminal activity, it was in sync with what the agency already knew. *Id.*

Royce contacted another source from the intelligence community, former CIA official Richard Palmer ("Palmer"), whose posts had included Russia in the early 1990s.  SDA ¶58. Palmer provided Royce with an unabridged copy of "Alfa Group Portrait," and working on a tight schedule, Royce arranged for the article's translation.  SDA ¶59.

As accurately presaged by the *Banking and Exchanges* synopsis he found on the Internet, the translated *Versiya* article did include profiles of Aven, Fridman, Khan and Fain.  SDA ¶60. It also elaborated upon Ilyukhin's call for the authorities to investigate criminal allegations leveled against the Alfa principals.  According to the article, the charges Ilyukhin wanted verified were in a dossier he gave to the MVD in 1997.  *Id.*  Obtained by *Versiya* in 1999, the dossier contained charges that:[14]

- "During his studies at the Moscow State University Aven was the head of students' music club and developed many contacts among bohemian youths who were the main drug clientele.  Thus, Aven attracted the attention of criminals and established connection with 'respected leaders;'"

- "According to the clerks of [Aven's former Ministry], Aven did not reject commission income and even expensive presents for helping to organize and carry out deals between the foreign and Russian companies.  Aven was very influential because he controlled the process of granting the necessary trading licenses. ... In 1991-1992, the KGB led the investigation of Aven's case, based on the indictment [o]f a large-scale theft; creating great losses for the country, and criminal ties with Israeli secret service.  In 1992, the former Security Minister handed the investigation materials over to President Yeltsin. On December 22, 1992, Aven was removed from his post of the minister."

- "Among [Aven's] acquaintances were also O. Kvantrishcili, O. Kobzon, respected criminals S. Timofeyev [ ] and A. Petrov [ ], as well as international machinators Mark Rich and Grigory Luchansky.  According to the investigation materials, Aven took part in the organization of drug transit from Southeastern Asia – via Russia – to Europe";

- "In the end of 1993, Aven had a meeting with Gilberto Rodrigez Orehuel (known as Chess Player), the representative of Columbia drug barons, in Vienna.  Partners agreed on pumping into the Alfa Bank money resources from offshore territories (Bahamas, Gibraltar) in order to invest in buying shares of Russian companies";

- Fridman, "a young dealer" while at college, was "contacted by the 'Bauman brigade' – the most aggressive criminal group in Moscow [and] the only criminal group in Moscow to be seriously dealing with drugs";

- "Fridman also took part in the organization of drug transit from Southeastern Asia – via Russia – to Europe."  He shared many of the same contacts as Aven:  Kvantrishvili, Kobzon, Timofeyev, Rich and Luchansky;

---

[14] Many of the particulars in this dossier are accurate according to plaintiffs' testimony.  SDA ¶61.

- Alfa Eco was "involved in the international narcotics business and drug-money laundering. These companies are parts of a chain, responsible for drug transport from Southeastern Asia to Europe";

- In April 1995, the MVD organized crime squad raided Alfa Eco's offices after "the mass contamination of people in [Khabarovsk] after using sugar that contained a large dosage of narcotics. It turned out that the containers used for the transportation of sugar had been previously rented by Alfa Eco." *Id.*

Royce obtained other press reports that echoed the tenor of "Alfa Group Portrait." For instance, a December 4, 1999 article in *The Economist* reported that a number of charges had been made against Alfa's oil company, Tyumen, including that it "intimidated judges and journalists;" that "its sources of funds are unclear;" and that "behind the scenes it is run by bandits." SDA ¶62. Jonathan Winer ("Winer"), a former United States Deputy Assistant Secretary of State, who specialized in tracking global crime, including international money laundering, provided Royce with several translated Russian news articles about Alfa. SDA ¶63. These also sounded the by now familiar refrain about Alfa's reputed criminal conduct. SDA ¶64.

During his reporting, Royce contacted another source, a Russian-American specialist on business practices in the Soviet Union who had worked with the White House and Pentagon, and had a wide array of contacts inside Russia's law enforcement and intelligence communities. SDA ¶65. Royce knew the specialist was "extremely knowledgeable about criminal activity" in the Russian business world. SDA ¶66. The two arranged to meet at the specialist's office to discuss Alfa. SDA ¶67. The specialist provided Royce with information on the controversial privatization of Tyumen, and on its ownership and management structure. SDA ¶68. He told Royce that "no major oil company [in Russia] is free of criminal activity" and that Tyumen and its partners had engaged in "bribes, tax evasion, intimidations and worse." SDA ¶69.[15] The Russian-American specialist told Royce he had direct knowledge of the plaintiffs' involvement with the Solntsevo mob, including the fact that the Solntsevos moved some of their money through Alfa Bank. He told Royce that he had *little doubt that TNK* ("*Tyumen*") *committed crimes [o]n numerous occasions*." SDA ¶¶70, 71.

---

[15] The Russian-American specialist's estimation finds support in a recently declassified CIA document that indicates that Tyumen shareholder and former president, Simon Kukes, admitted bribing Russian officials during Tyumen's battle for Sidanco. SDA ¶72.

Finally, Royce asked the specialist about the documents referenced in *Versiya*'s "Alfa

Group Portrait": what of the dossier Ilyukhin received in 1997 from unidentified FSB officers,

and what became of his request for Russian officials to investigate the allegations? SDA ¶73.

The specialist told Royce that he had contacted a source he had in the FSB at the time to ask that

very question. *Id.* The specialist's FSB source told him that they would be investigating the

allegations. *Id.* However, when the specialist subsequently inquired about the progress of the

investigation, he was told by his source that it had been "put away for a better day." *Id.* The

specialist explained that "the political and governmental structures in Russia at that time made it

very difficult, if unlikely, for the FSB to pursue the allegations, that they would pursue it at some

other date when the politics and the governmental environments had changed somewhat." *Id.*

Royce asked the Russian-American specialist if he could provide him with a copy of the

1997 FSB report. SDA ¶74. The specialist indicated that he would be able to locate a copy and,

true to his word, Royce was soon faxed a translated, abridged version of the document. SDA

¶75.[16]

As it turned out, the *Versiya* articles he had read had provided a faithful recount of the

FSB report's contents, which set forth numerous allegations of criminal activity by Aven,

Fridman and other Alfa Group principals:

-   In the 1980s, Fridman "secretly cooperated with operatives of the KGB," was active in
    the Komsomol (Communist Youth League), and established the cooperatives Gelios and
    Orsk to purchase computers from abroad.

-   Alfa Group had "cooperate[d]" with a number of Russian crime organizations, notably
    the notorious Solntsevo mob.

-   Fridman and Aven "allegedly participated in the transit of drugs from Southeast Asia
    through Russia and into Europe."

-   In late March or early April 1995, residents of the city of Khabarovsk were "poisoned"
    by eating narcotic-contaminated sugar that had been transported in a container leased by
    Alfa Eco's Fain.

---

[16] The fax cover sheet accompanying the FSB report, sent by an aide to the Russian-American specialist,
included a postscript: "P.S. Please don't take this article as the gospel." Royce took the caveat to heart. As he
testified, Royce understood not to "assume that every bit of information [in the report] is accurate" and that, as was
true of "anything that comes out of Russia, [to] be a little careful." SDA ¶76.

- In April 1995, MVD organized crime agents searched Alfa Eco and found "drugs and other compromising documentation."

- At the end of 1993, Aven met with a representative of the Colombian drug trade, Gilberto Rodriguez Orejuela (the "Chessman") to "conclude an agreement about the transfer of money into Alfa Bank from off-shore zones such as the Bahamas, Gibraltar and others. The plan was to insert it back into the Russian economy through the purchase of stock in Russian companies." *Id.*

Royce asked the Russian-American specialist about the FSB report's authenticity.

SDA ¶77. The specialist told Royce "*there was not much question in his mind that the material came from the FSB.*" *Id.* (emphasis added). His belief was based in part on the fact the language and some of the information in the FSB report "tracked with the way [the FSB] would do this." *Id.* As Royce testified, once he understood that the specialist was confident that the report was bona fide and had originated with the FSB, "there was not much question in his mind" of its authenticity. *Id.* Royce was convinced that the FSB report "was not a trumped-up or phony document." *Id.*

Royce and the specialist also discussed what he thought about the report's contents. He told Royce that "there were allegations in [the FSB report] that he couldn't personally substantiate and others that he generally could, given what he knew, *what he himself knew.*" SDA ¶78 (emphasis added). Certain allegations in the report "rang true to other things [the specialist] had tracked." SDA ¶79. For instance, the specialist indicated to Royce that, while he did not have knowledge of plaintiffs' involvement in narcotics, he did have knowledge of plaintiffs' involvement with the Solntsevo mob. SDA ¶80. He explained that there was "a business relationship, a close relationship" between this "most influential organized crime group" and Alfa Bank, and that "they did more than break bread occasionally." *Id.; see* SDA ¶81. In particular, he told Royce that the Solntsevos moved some of their money through Alfa Bank. SDA ¶80; *see* SDA ¶82.

Royce had also arranged to meet Palmer and John Forbes ("Forbes"), a United States Customs officer, for a social lunch. SDA ¶83. Over lunch, Royce asked both men what unpublished information they might have about plaintiffs. SDA ¶84. While Forbes recalled press coverage about Tyumen, he told Royce that he had no further information for him.

SDA ¶85.  Palmer, who had provided Royce with published materials about Alfa and Russian

organized crime in the past, did not recall whether he had any other unpublished information

about the plaintiffs.  SDA ¶86.  Royce asked the two men if they would search their records.

SDA ¶87.

    As it turned out, Palmer did have something he thought would be of interest to Royce that

he had not recalled during their lunch.  SDA ¶88.  Filed away in his personal papers was a

memorandum given to him by a former KGB major,

                     SDA ¶89.[17]   Palmer faxed the memorandum to Royce.  SDA ¶90.

    When Royce read the memorandum, it was obvious that the KGB major had given

Palmer a detailed account of the very allegations about the plaintiffs that were made *two years*

*later* in the FSB report.  SDA ¶92.[18]  Specifically, the KGB major reported that:

–    "As to Alfa-Bank, there is evidence regarding its involvement with money laundering of
     Russian and Latin American drug cartels.  Alfa was [a] KGB creation in 1987 as [a]
     cooperative, eventually made into a bank to help move money.  The cooperative was to
     deal in computers because the KGB already had a network available for purchasing
     computers in the West and [importing them] into Russia without duties."

–    "Alfa Bank was founded with both KGB and Communist Party funds.  By then, several
     'rogue' former members of the KGB had come into this bank – often bringing their
     criminal world contacts with them.  Several of the KGB personnel had served in SE Asia
     or in the KGB anti-mafia units.  They quickly determined that dealing in drugs would
     bring the highest profits with literally no risk in Russia."

–    "Alfa Bank's connections with drug dealers were revealed since autumn 1991—since the
     moment of the appointment of Pyotr Aven a minister of foreign trade.  At that time, a
     large channel of heroin transit was established – from Burma – through Laos - Vietnam –
     to the Far East."

–    "From the Far East, the drugs were transported to the central part of Russia as if sugar or
     flour cargo, then they were forwarded to Germany."

–    "P.P.S. Sometimes the taking out of the drugs was carried out with the help of some [of]
     Gaydar' ministers – in their luggage."

---

[17]                                                     That amalgamation is the document Palmer faxed to
Royce, and has been referred to throughout this action as the KGB major report.  *Id.*

[18] As with the FSB report, many of the details in the KGB major's report are accurate according to
plaintiffs' own testimony.  SDA ¶93.

— "In 1993-1994, there were attempts by the so-called 'Chess-player' (the head of the Columbian drug cartel Cali) to launder and legalize large amounts of criminal money in Russia."

— "P.S. The first attempts of the Columbian drug money laundering were discovered in Russia 4-5 years ago (1990-1991) and had some connection with the so called 'red mercury' (Gaidar was said to be involved)." *Id.*

The KGB major's report also described the Siberian "sugar poisoning" incident, with citizens becoming "intoxicated" by drugs sold by a railway worker, who had stolen a sack of sugar from a railcar. *Id.* According to the KGB major, it was later "ascertained that the 'sugar' cargo belonged to the firm Alfa-Eco. ... a branch of Alfa-Bank. The criminal investigations were instituted – but were quickly stopped." *Id.*

As Royce testified, his level of confidence in the credibility of the allegations of criminality leveled against Alfa, when what he had in hand was the FSB report, was less than what he sought even for the straightforward republication of previously reported allegations about plaintiffs. SDA ¶94. However, when Royce learned of the intelligence Palmer had received from the KGB major, with its notable measure of detail concerning the identical allegations leveled against Alfa in the FSB report, but predating that report by two years, his confidence in the underlying credibility of the charges was decidedly strengthened. SDA ¶95.

Royce wanted more information about the KGB major and asked Palmer to tell him his identity, as he wanted to talk to the KGB major for himself. SDA ¶96. However, Palmer quickly made clear that was simply out of the question: he had assiduously protected the KGB major's identity since 1995 and had no intention of making an exception for Royce. SDA ¶97.[19]

Royce asked Palmer for his measure of the man: did he think the Russian intelligence officer and his accusations about the plaintiffs were credible? SDA ¶101. Palmer's estimation of the KGB major was unstinting. He told Royce that, in his view, the KGB major "had given me various other items of information that appeared to be very accurate, that he seemed to be

---

19 ·

   and he flatly refused to disclose the KGB major's name to Royce. SDA ¶98. Palmer testified that because of their sensitive nature, there were many other specifics about the KGB major, Palmer's meetings with him, and the information he provided to Palmer that he would not disclose to Royce. SDA ¶99. Palmer did provide Royce with some details about the KGB major's background, including that he had worked with two KGB founded banks and had been assigned to the counterintelligence branch of the KGB. SDA ¶100.

who he said he was, and that *I had seen nothing in the information to indicate he was anything other than who he said he was and his information was accurate."* SDA ¶102 (emphasis added).

As Palmer testified, he was, and remains, tightly constrained as to what he could tell anyone, including Royce, about his knowledge of plaintiffs to the extent that he obtained such information as a result of his work as a CIA agent. SDA ¶103. Simply put, regardless of Royce's probing, Palmer could not, and did not, divulge anything he knew about Alfa prior to his retirement from the CIA in October 1994. *Id.* Of course, Palmer could refer Royce to matters already in the public domain, and he did tell Royce that he had seen references to plaintiffs' criminal activities in the media, and had never heard the allegations refuted. SDA ¶¶104, 105.

Royce knew that Palmer, an intelligence expert whose many years of experience involved "direct contact with [Russian] security and police services, as well as members of Russian banking, business, Organized Crime and corrupt officials," had no doubt that

SDA ¶106. Moreover, Palmer believed that the KGB major had been forthcoming in relating information that Palmer, *at that time separated less than one year from his CIA post,*

SDA ¶107. In short, Royce knew that Palmer had no doubt that the KGB major was who he said he was and that he "knew what he was talking about." SDA ¶108.[20] Royce also knew that Palmer had given him the KGB major's report attributing criminality to plaintiffs, without caveat, and with the assurance that he still believed the information accurate. SDA ¶109.

At this point, Royce felt confident that there was a discrete set of allegations of criminal conduct that had been leveled against plaintiffs by a KGB major in 1995 and, two years later, by

---

[20]

SDA ¶107 (emphasis added).