# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - - - - X

OAO ALFA-BANK, ZAO ALFA-ECO,    :    **PUBLIC VERSION**
MIKHAIL FRIDMAN, and
PYOTR AVEN,    :


Plaintiffs,    :


v.    :    Case No. 1:00CV02208 (JDB)


CENTER FOR PUBLIC INTEGRITY,    :
KNUT ROYCE, and
NATHANIEL HELLER,    :


Defendants.    :
- - - - - - - - - - - - - - - - - - - X



**PLAINTIFFS' RESPONSE  TO DEFENDANTS' STATEMENT OF MATERIAL FACTS
NOT GENUINELY IN DISPUTE**

Daniel Joseph, D.C. Bar No. 195842
Jonathan S. Spaeth, D.C. Bar No. 394921
Tobias E. Zimmerman, D.C. Bar No. 475202
Jeremy A. Paris, D.C. Bar No. 483276
AKIN GUMP STRAUSS HAUER & FELD LLP
1333 New Hampshire Ave, N.W.
Washington, D.C.  20036
(202) 887-4000
(202) 887-4288 FAX

**ATTORNEYS FOR PLAINTIFFS**

Pursuant to Local Rules 7(h) and 56.1, Plaintiffs OAO Alfa-Bank ("Alfa- Bank"), ZAO Alfa-Eco ("Alfa-Eco"), Mikhail Fridman, and Pyotr Aven ("collectively Plaintiffs") hereby respond to Defendants Center for Public Integrity's ("CPI"), Knut Royce's, and Nathaniel Heller's (collectively "Defendants") Statement of Material Facts Not Genuinely in Dispute.

In addition to Plaintiffs' specific responses, Plaintiffs also assert two more general objections to Defendants' use of inadmissible evidence in support of their renewed motion for summary judgment. These objections are set forth in Plaintiffs' responses to assertions 4 and 46.

**1.     Defendants' Assertion:**

On August 2, 2000, an article written by Defendants Royce and Heller was published on CPI's website, the *Public i,* entitled "Cheney Led Halliburton to Feast at Federal Trough/State Department Questioned Deal With Firm Linked to Russian Mob" ("the Article"). SDA ¶¶ 5, 40.

**Plaintiffs' Response:**

**2.     Defendants' Assertion:**

In November 1997, Chairman of the Security Committee of the Russian Duma, Victor Ilyukhin ("Ilyukhin") forwarded the FSB report to the Director of the Federal Security Service ("FSB") and the Deputy Chairman of the Ministry of the Interior ("MVD") requesting the FSB and MVD to investigate the charges and report back to the Duma Security Committee with the results of their inquiries. SDA ¶6.

**Plaintiffs' Response:**  What Ilyukhin forwarded is not known (and certainly was not in Defendants' possession at the time the Article was published). Although Ilyukhin requested an investigation, there is no evidence that either the FSB or MVD ever verified the charges in the "FSB Report" or found them to be accurate, a fact Defendants would have known had they taken the time to contact Mr. Fridman or Mr. Aven. *See* Fridman Declaration at ¶¶ 7-8, 11-14; Aven Declaration at ¶¶ 11-20 ; Decl. Ex. A; Decl. Ex. C.

**3.     Defendants' Assertion:**

1

By letter dated December 24, 1997, the MVD's First Deputy Minister reported back to the Duma Security Committee Chairman that "[i]t has been established that currently the firms comprising this [Alfa Group] consortium are being investigated in connection with a number of criminal cases. In October of this year the Moscow customs officials checked the shipment that had arrived from the Republic of Moldavia to the address of the Alfa Echo Company and found arms and ammunition in it. The Moscow-Ryazan prosecutor['s] office filed a criminal case related to this matter." SDA ¶11.

**Plaintiffs' Response:** This statement is not material. Furthermore, Defendants did not have the document at the time they published the Article. Fain Tr. at 335:22 – 337:13 (statement of counsel). Moreover, as the letter cited by Defendants explicitly notes, one of the two "criminal cases" was a case in which Alfa-Eco was the plaintiff, i.e., the aggrieved party, and the unrefuted testimony of Alexander Fain, Alfa-Eco's chairman, was that the other case was not brought against Alfa-Eco. *See* Fain Tr. at 344:5 – 347:3; Pls.' Ex. 88. What *is* material are the letters from the FSB and MVD (cited above in Response No. 2) verifying that neither agency had information that Plaintiffs were involved in drug trafficking, money laundering, or organized crime, the allegations asserted in the "FSB Report."

4.     **Defendants' Assertion:**

The FSB report was widely disseminated in Russia prior to the Article's publication in August 2000. SDA ¶12.

**Plaintiffs' Response:**

A. Plaintiffs object to the use of the terms "FSB Report" and "KGB Major Report" as improperly suggesting official reports of the current or former Russian government. The "FSB Report" was not written by the FSB and its authorship is unknown. Royce Tr. at 219:21-220:18. Defendants, in fact, admit that the "FSB Report" "was not a sanctioned FSB Report…." Royce Tr. at 207:16-17.

Both terms were coined

2

by Royce.  See Royce Tr. at 283:8-284:4; 332:2-16.  In fact, the Russian articles allegedly relied

upon by Defendants in publishing the Article link the allegations contained in the so-called "FSB

Report" to Victor Ilyukhin, a well-known Communist and avowed anti-Semite.  See Pls.' Mem.

at 39-40.  Aven and Fridman are both Jewish businessmen.  *See* Frid. Decl. at ¶¶ 3, 5, 6, 14, at

13; Aven Decl. at ¶ 18, at 8.

      B.  There is no evidence that the FSB created an actual report, much less the various

documents that have been referred to as the "FSB Report."  Royce himself relied only on an

English translation he named the "FSB Report."  Since the FSB acknowledged that it did not

have any information indicating that Plaintiffs had engaged in criminal wrongdoing, *see* Decl.

Ex. A, any document purporting to be an official report of the FSB is a fraud.  Therefore, while

some of the allegations repeated in the so-called "FSB Report" were circulated in Russia, there is

no evidence that an actual document written by the FSB and containing the allegations against

Plaintiffs ever existed or was ever circulated in Russia or elsewhere.

**5.**    **Defendants' Assertion:**

      Plaintiffs produced a copy of the FSB report in discovery in this case.  SDA ¶13

      **Plaintiffs' Response:**  *See* response to no. 4.  Additionally, Plaintiffs produced, in

discovery, a Russian-language Kompromat document bearing no official markings of the FSB or

any other government agency, containing allegations similar to those set forth in the English

language document Defendants refer to as the "FSB Report."  Unlike the document produced by

Plaintiffs, the English language document Defendants refer to as the "FSB Report" contained a

statement warning against its own veracity.  *Compare* Pls.' Ex. 93 *with* Pls.' Ex. 2.

**6.**    **Defendants' Assertion:**

      The version of the FSB report used by Royce in preparing the Article was substantially
similar to the version of the FSB report Plaintiffs had previously obtained.  SDA ¶14.

**Plaintiffs' Response:**  See responses to nos. 4 and 5.   Additionally, Royce's English language document contained  a warning that the allegations against Plaintiffs had not been verified. *See* Pls.' Ex.2.

7.   **Defendants' Assertion:**

The Russian media had reported about the FSB report prior to publication of the Article in August 2000.  SDA ¶22.

**Plaintiffs' Response:**

A.  Regarding use of the term "FSB Report", see response to no. 4.

B.  The term "Russian media" is misleading.  Articles reporting on the "FSB Report" appeared in two publications, V*ersiya* and *Sovershenno Sekretno*.  Moreover, Defendants had been told that the author of both articles, Oleg Lurye, as well as *Versiya*, had reputations that were "a mixed bag."  *See* Royce Tr. at 97:7 – 97:14.  The *Versiya* article also explicitly warned that the "FSB Report" might not be true and that Ilyukhin may be behind a "communist provocation aimed at three honest businessmen."  *See* Pls.' Ex. 13.

8.   **Defendants' Assertion:**

Plaintiffs wrote to various FSB and MVD officials complaining that media reports of the correspondence from the Duma Security Committee Chairman were "damaging to the honor, dignity and business reputation of the Alfa Group Consortium and the Alfa Bank and their directors."  SDA ¶16.

**Plaintiffs' Response:**

9.   **Defendants' Assertion:**

An article in the Russian newspaper *Versiya,* which was attached to Alfa Bank's letter to the MVD, reported on the allegations contained in the FSB report.  SDA ¶¶17, 16.

**Plaintiffs' Response:**  Regarding use of the term "FSB Report", see Response No. 4.

10.   **Defendants' Assertion:**

*Verisiya* reported, *inter alia,* the FSB report's allegations: (1) that both Aven and Fridman were involved in drug trafficking from Southeast Asia via Russia to Europe; (2) that Aven met in 1993 with Gilberto Rodriguez Orejuela, a.k.a. the "Chess player," in Vienna to conclude an agreement to invest Colombian drug money in the Russian economy; (3) that Alfa Eco was involved in secret operations with illegal drug trafficking; and (4) that Alfa Eco's offices were searched for illegal drugs in April 1995 after citizens in Khabarovsk were poisoned after consuming sugar contaminated with illegal drugs shipped in containers used by Alfa Eco.  SDA ¶17.

**Plaintiffs' Response:**

A.  Regarding use of the term "FSB Report", see response to no. 4.

B.  *Versiya* did not "report" this.  Defendants neglect to mention that, as noted in response to no. 7 above, *Versiya*, a publication whose reputation was a "mixed bag," specifically attributed the allegations to Ilyukhin and warned that the allegations might be "a communist provocation aimed at three honest businessmen" and that Ilyukhin may have "lied" about Plaintiffs.  *See* Pls.' Ex. 13.  Futhermore, Ilyukhin is a Communist and avowed anti-Semite.  Pls.' Ex. 22; Pls.' Exs. 6 and 7 (House and Senate resolutions condemning Ilyukhin's comments); Pls.' Ex. 25.

11.  **Defendants' Assertion:**

These are essentially the same allegations of criminal activity that Plaintiffs challenge in the present case.  *Compare* SDA ¶17 (Ex. 27) with SDA ¶4 (Complaint).

**Plaintiffs' Response:**  These are not the same allegations.  As noted above, the *Versiya* article contained explicit warnings that the allegations could very well be false and nothing more than a communist provocation.  No such condition was placed on the allegations in the CPI article.  *Compare* Article *with* Pls.' Ex. 13.

12.  **Defendants' Assertion:**

Plaintiffs did not pursue litigation against *Versiya* at that time, advising a German court that: "Under the circumstances [Plaintiffs Fridman and Aven] did not have any remedies to prevent the Russian press from distributing the claims in the alleged Ilyukhin dossier [the FSB Report].  Representatives of the Duma enjoy complete immunity even with regard to civil matters.  Quotations from publications of Representatives also are considered privileged communications."  SDA ¶18.

**Plaintiffs' Response:**  Defendants' use of the term "FSB Report" is inaccurate and misleading.  *See* response to no. 4.  This statement is also misleading in other respects:

A.  This statement primarily explains why Plaintiffs did not pursue litigation against *Versiya*.  *See* Aven Tr. at 91:18-94:1.

B.  In the German lawsuit referenced by Defendants, Plaintiffs were seeking an injunction to restrain the publication of the libelous material.  *See* Pls.' Ex. 105.  The statement cited by Defendants did not address the issue of a lawsuit for damages, which Plaintiffs chose not to pursue against *Versiya* at that time because Russian courts had not historically awarded significant judgments in libel cases.  *See* Frid. Decl. ¶ 28.

C.  After this case was brought, Plaintiffs did sue *Versiya* and won.  Decl. Ex. K.

13.  **Defendants' Assertion:**

Defendants accurately reported the contents of the FSB report.  SDA ¶¶20, 5, 21.

**Plaintiffs' Response:**

A.  This statement is false.  Defendants deliberately misstated the contents of the "FSB Report" in several respects.  *See* Pls.' Mem. at 38-42.

B.  Regarding Defendants' use of the term "FSB Report", see response to no. 4.

14.  **Defendants' Assertion:**

All but one of the statements challenged by Plaintiffs are attributed in the Article directly to the FSB report.  SDA ¶¶20, 4, 5.

**Plaintiffs' Response:**  Defendants use of the term "FSB Report" is inaccurate and misleading.  *See* response to no. 4.

6

**15.**   **Defendants' Assertion:**

> The only challenged statement in the Article not attributed to the FSB report is as follows: "That shortly after its formation, Alfa-Bank hired 'rogue' KGB agents who " 'quickly determined that dealing in drugs would bring the highest profits with literally no risk in Russia.'" SDA ¶¶4,5.

> **Plaintiffs' Response:**   Defendants use of the term "FSB Report" is inaccurate and

misleading.  *See* response to no. 4.

**16.**   **Defendants' Assertion:**

> CPI is a nonprofit, nonpartisan, watchdog group, founded in 1990 by former *60 Minutes* producer Charles Lewis ("Lewis").  SDA ¶23.

> **Plaintiffs' Response:**   This statement is not material to any issue in this case.

**17.**   **Defendants' Assertion:**

> CPI's stated mission is to "provide the American people with the findings of [its] investigations and analyses of public service, government accountability, and ethics-related issues."  SDA ¶24.

> **Plaintiffs' Response:**

> A. The quoted statement appears in a brochure and is inadmissible hearsay.  *See* Fed. R.

Evid. 802.

> B. Furthermore, this statement is not material to any issue in this case.

> C. Finally, to the extent the statement suggests that CPI wrote the Article from altruistic

motives, it is in error.  At the time the Article was published, *The Public i* was in financial

difficulty and needed to break a big story to attract funding and sustain its operations.  *See* Lewis

Tr. at 260:3-7 (admitting that *The Public i* was "hemorrhaging several hundred thousand dollars a

year"); Eisner Tr. at 13:3-14:7 (lack of funding had been an "ongoing problem" for *The Public i*

since April 1999).  To this end, Defendants contacted numerous prominent news organizations –

including NBC, ABC, CBS, CNN, Reuters, the Associated Press, *The Washington Post*, and *The*

*New York Times* – to induce them to mention the Article.  *See* Pls.' Ex. 6; *see also* Royce Tr. at

7

442:10-18 (acknowledging that credit from other news organizations "is important for purposes

of raising funds"). In fact, not one of these news organizations "picked up" the defamatory

allegations against Plaintiffs. *See, e.g.,* Pls.' Ex. 6 (noting that a story in *The Guardian*, an

English newspaper, had picked up the Article but "left out the mob altogether"). Eventually, *The*

*Public i's* activities were severely curtailed and its "overall employee staff," including Royce,

was laid off. Eisner Tr. at 10:13-19; 12:1-5.

18.   **Defendants' Assertion:**

> The Center has published numerous in-depth reports and several books about the role of
> money in politics and "influence peddling" in Washington. SDA ¶26.

> **Plaintiffs' Response:** This statement is not material to any issue in this case.

19.   **Defendants' Assertion:**

> In 1999, the *Public i* went online and, in addition to articles based on the Center's studies,
> included regularly updated stories about current events, known as "spot news" reporting.
> SDA ¶27.

> **Plaintiffs' Response:** This statement is inaccurate. Defendants know the Article

contains numerous misstatements and it has never been updated, much less "regularly updated."

*See* Pls.' Mem. at 38-42; 60.

20.   **Defendants' Assertion:**

> Royce, who had been an award-winning journalist for more than thirty years, specialized
> in coverage of national security, intelligence and law enforcement matters, and had access
> to a wide network of sources in the intelligence communities. SDA ¶¶31, 32.

> **Plaintiffs' Response:**

21.   **Defendants' Assertion:**

> Prior to 1999, Royce had been a contributor to three Pulitzer prize-winning stories. SDA
> ¶31.

**Plaintiffs' Response:**  Royce's contribution to at least one of the three Pulitzers was exceedingly minor.  Out of the 38 articles cited by the Pulitzer Committee as forming the basis on which Newsday was awarded the prize for Spot News Reporting, Royce was listed as contributing to only two, and in both of those articles at least 35 other reporters were identified as contributors.  *See The Pulitzer Prize Winners: 1997, at* http://www.pulitzer.org/year/spot-news-reporting/works/3-1/index.html (last visited August 1, 2004).  The Pulitzer website does not provide details on awards earlier than 1995.

22.     **Defendants' Assertion:**

Prior to the Article's publication, Royce's reporting included stories related to international organized crime activity.  SDA ¶¶33, 34.

**Plaintiffs' Response:**


23.     **Defendants' Assertion:**

On July 25, 2000, a few days before the beginning of the Republican National Convention, George W. Bush, the GOPs presumptive presidential nominee, announced that Dick Cheney ("Cheney"), Halliburton's Chief Executive Officer, had agreed to be his vice-presidential running mate.  SDA ¶29.

**Plaintiffs' Response:**


24.     **Defendants' Assertion:**

Lewis saw this as an important story that warranted immediate coverage; as he explained, "the whole country – for that matter, the whole world is looking at this election and they are looking at this new person who could be the vice-president and they are going to want to know who he is and what he is about."  SDA ¶39.

**Plaintiffs' Response:**


25.     **Defendants' Assertion:**

The story was tied to events at the upcoming Republican national convention and Lewis

9

knew there was a short window during which the Center's coverage of the Cheney nomination would retain its currency.  SDA ¶¶42, 43.

**Plaintiffs' Response:**  This statement is incomplete.  As long as the story came out during the campaign, which did not end until November 7, 2000, it would be timely.  Lewis admitted this when he conceded that he had suggested that Royce delay publication of the part of the Article that mentioned Plaintiffs until he had time to check its accuracy.  *See* Lewis Tr. at 232:18 – 235:7.

26.   **Defendants' Assertion:**

Lewis assigned Heller and Royce, as well as two interns, to the story.  SDA ¶44

**Plaintiffs' Response:**

27.   **Defendants' Assertion:**

Defendants began reviewing public records to access Halliburton's campaign contribution and lobbying data, as well as the federal contracts the company was awarded over the past decade.  SDA ¶45.

**Plaintiffs' Response:**

28.   **Defendants' Assertion:**

Royce recalled that one of those contracts had recently figured prominently in the news in connection with a dispute about whether the federal government should guarantee a half-billion dollar loan to Alfa's Tyumen.  SDA ¶46.

**Plaintiffs' Response:**  This statement is inaccurate insofar as it states or implies that Tyumen is owned by Alfa.  In 1997, a joint venture – owned 50% by the Alfa Group and 50% by Access Industries/Renova, an American concern not affiliated with the Alfa Group – purchased a majority interest (50.1%) in Tyumen from the Russian government.  At no time prior to publication of the Article did any entity or individual affiliated with the Alfa Group own a

controlling interest in TNK. *See* Frid. Decl. at ¶ 23. Prior to 1997, and at the time the Ex-Im

loan was applied for, TNK was owned by the Russian government. *See* Frid. Decl. at ¶ 24.

**29.**   **Defendants' Assertion:**

Royce decided to pursue this angle and conducted an Internet database search. SDA ¶47.

**Plaintiffs' Response:** The material cited by Defendants does not support this statement.

*See* SDA ¶ 47 (citing to Royce Tr. at 78:2-79:13 and Pls.' Ex. 95).

**30.**   **Defendants' Assertion:**

Royce's search turned up, among other items, a January 9, 2000 *Washington Post* *("Post")* column by David Ignatius ("Ignatius") about the Ex-Im's decision to back the Tyumen loans and the White House's decision to overrule the Bank and block the funding. SDA ¶47.

**Plaintiffs' Response:**


**31.**   **Defendants' Assertion:**

Ignatius reported that a "29 page investigative report on Tyumen, classified 'Secret,'" had been commissioned by BP Amoco and provided to the CIA in autumn 1999. SDA ¶47.

**Plaintiffs' Response:**


**32.**   **Defendants' Assertion:**

Ignatius reported that, while "[m]ost sections of the report dealt with ordinary corporate issues," it also contained "2 ½ pages [] labeled 'criminal situation' and included some detailed allegations about Tyumen management." SDA ¶47.

**Plaintiffs' Response:**


**33.**   **Defendants' Assertion:**

According to an unnamed senior intelligence officer who spoke to Ignatius, CIA analysts briefed ExIm officials and "'gave them our take on the Tyumen report,' which was that it tracked other information the [CIA] had gathered." SDA ¶47.

**Plaintiffs' Response:**  This statement is inadmissible hearsay.  *See* Fed. R. Evid. 802.  It

is also hearsay within hearsay, as the source for all these statements is a story published in the

*Washington Post.*  *See* Fed. R. Evid. 805.

34.    **Defendants' Assertion:**

Royce also obtained articles about Tyumen and its owners from a variety of other
sources.  SDA ¶48.

**Plaintiffs' Response:**  There is no concrete meaning to the phrase "variety of other

sources" such that Plaintiffs can respond in a meaningful way.  As such, the phrase lacks any

probative value and is not "material."  *See* Fed. R. Civ. P. 56.

35.    **Defendants' Assertion:**

One Nexis search – "Fridman w/20 criminal" produced a *Banking and Exchanges Weekly
("Banking and Exchanges")* English language summary of a July 1999 article published
by the Russian newspaper *Versiya.*  SDA ¶49.

**Plaintiffs' Response:**

36.    **Defendants' Assertion:**

The synopsis of the *Versiya* article – "Alfa Group Portrait" – written by Oleg Lurye
("Lurye"), indicated that it contained profiles of Alfa principals Aven, Fridman and Khan.
SDA ¶49.

**Plaintiffs' Response:**  The material cited by Defendants does not support the statement.

For example, the synopsis does not identify Khan as a principal of Alfa-Bank and, in fact, he is

not.  *See* Khan Tr. at 73:12 – 73:17.

37.    **Defendants' Assertion:**

The *Banking and Exchanges'* summary of "Alfa Group Portrait" reported on Aven's 1993
meeting in Vienna with "Gilberto Rodriguez Orejuel, a representative of Columbia drug
barons" regarding "an agreement to 'pump' capital from offshore zones into Alfa-bank,"
Fridman's role "in organizing drug trafficking from South East Asia to Europe via
Russia," and Fridman's "numerous contacts" with Moscow's "most aggressive" criminal
group.  SDA ¶49.

**Plaintiffs' Response:**  The first error in Defendants' statement is that *Banking and Exchanges* did not purport to be reporting anything.  It merely purported to summarize a story in *Versiya.  See* Pls.' Ex. 97.  Second,  at the time Royce wrote the Article he knew that this summary of the *Versiya* article was incomplete.  Royce knew this because he had an English language translation of the *Versiya* article, which, as stated above, (*see* responses to nos. 7 and 10) reported the equal possibility that the allegations were nothing more than a "Communist provocation aimed at three honest businessmen."  *See* Pls.' Ex. 13.

38.   **Defendants' Assertion:**

The excerpt included allegations that Plaintiffs were connected with known Russian mobsters, and had engaged in drug trafficking and money laundering.  SDA ¶49.

**Plaintiffs' Response:**  The excerpt was from *Versiya*, not *Banking and Exchanges Weekly.  See* Pls.' Ex. 97.

39.   **Defendants' Assertion:**

Royce's search turned up another article Lurye had written in 1999 for *Sovershenno Sekretno.*  SDA ¶50.

**Plaintiffs' Response:**

40.   **Defendants' Assertion:**

This article was republished on the Internet by the *Russian Press Digest*, an English language news service.  SDA ¶50.

**Plaintiffs' Response:**  The material cited does not support the conclusion that the article was available through any service other than the subscription service Lexis-Nexis.  *See* Pls.' Ex. 96.

41.   **Defendants' Assertion:**

The article referred to a formal inquiry that Security Committee Chairman Ilyukhin submitted to Russian law enforcement about Alfa principals two years earlier.  SDA ¶50.

**Plaintiffs' Response:**  The article refers to an inquiry, not a formal inquiry.  *See* Pls.' Ex.

96.

42.  **Defendants' Assertion:**

According to this article, Ilyukhin's 1997 "inquiry contained a list of prosperous businessmen who in the former years collaborated with the KGB, or had ties with organized crime involved in drug trafficking, used criminal groups for eliminating rivals, or were involved in bribe taking, embezzlement or had contacts with foreign intelligence services … The list included, among others, persons associated with the Alfa Group – Mikhail Fridman, … German Khan, … Alexander Fain, leader of the Alfa Eco company, … and Pyotr Aven, President of the Alfa Bank."  SDA ¶50.

**Plaintiffs' Response:**  This statement erroneously suggests that the statements regarding

Plaintiffs were established facts.  Defendants omitted the next sentence from the quote, which

reads:  "Ilyukhin asked that the information be verified."  *See* Pls.' Ex. 96.

43.  **Defendants' Assertion:**

Royce located a later *Versiya* article – "Russia by Gangs: The Solntsevos" – written by Andrey Polynskiy.  SDA ¶51.

**Plaintiffs' Response:**

44.  **Defendants' Assertion:**

This 2000 article profiled the Solntsevos, described as "the most influential organized crime group in Moscow's criminal world."  SDA ¶51.

**Plaintiffs' Response:**

45.  **Defendants' Assertion:**

According to the 2000 *Versiya* article, "[o]ne of the main directions of the Solntsevo activity is to exert influence on credit-financial institutions.  Major financial structures over which they have influence include Alfa-Bank … The Solntsevos have mutual commercial interests with many Moscow businessmen.  These include the owners of the Alfa Financial Group.  The Solntsevo 'soldiers' guarantee the protection of the gang's leaders – the messrs. Fridman, Aven and others – and also support some of Alfa's

14

operations." SDA ¶51.

**Plaintiffs' Response:** The *Versiya* article is inadmissible hearsay. *See* Fed. R. Evid. 802.

These underlying allegations published in *Versiya* are untrue. *See* Frid. Decl. at ¶¶ 7-8, 11-14;

Aven Decl. at ¶¶ 11-20; Tolch. Decl. at ¶¶15-16.

**46.    Defendants' Assertion:**

> After reading these articles, Royce wanted to obtain a complete version of *Versiya's* "Alfa Group Portrait," as well as a copy of the BP Amoco report Ignatius wrote about. To this end, he contacted one of his longtime sources at the CIA. SDA ¶ 56.

**Plaintiffs' Response:**   This evidence is not properly offered because it would not be

admissible at trial. Fed. R. Civ. P. 56(e) ("Supporting and opposing affidavits shall be made on

personal knowledge, *shall set forth such facts as would be admissible in evidence*, and shall

show affirmatively that the affiant is competent to testify to the matters stated therein.")

(emphasis supplied); *Broadway v. City of Montgomery, Alabama*, 530 F.2d 657, 661 (5th Cir.

1976) ("Evidence inadmissible at trial cannot be used to avoid summary judgment."); 10A

Charles Alan Wright et al., Federal Practice and Procedure § 2721, at 361 (1998) ("The court

may consider any material that would be admissible or usable at trial."); *cf Gleklen v. Democratic

Congressional Campaign Committee, Inc.*, 199 F.3d 1365 (D.C. Cir. 2000) ("While a nonmovant

is not required to produce evidence in a *form* that would be admissible at trial, the evidence must

still be capable of being converted into admissible evidence.") (emphasis in original).

Defendants' statement is inadmissible at trial, and therefore at summary judgment, because of

Defendants' repeated invocation of the "reporter's privilege."

During discovery, Plaintiffs requested that Defendants identify all anonymous sources for

the Article. Defendants, invoking the "reporter's privilege" and D.C. Shield Law, refused to

identify the so-called "Russian-American specialist," the purveyor of the "FSB Report," and a

"CIA official" with whom Royce claims to have spoken regarding the BP-Amoco report.

(Plaintiffs identified and deposed Richard Palmer, another source whom Defendants refused to

identify.) *See e.g.* Pls.' Ex. 6 at 5 - 8; Royce Tr. at 142:16-22; 170:12-16; 232:4-11; 245:1-7;

292:13-16.[1] Now, however, Defendants' statement, in a number of paragraphs, relies on

information attributed to these two sources.

Upon unraveling Defendants' unique method of citation, the source for all of these

statements turns out to be Royce. Defendants, thus, have exhibited their desire both to take

refuge behind the shield offered by the "reporter's privilege" and to introduce statements

claimed to have been made by the unnamed sources as a sword to support Defendants' claim that

they did not act with actual malice. This is either Defendants' way of signaling they are waiving

the privilege or an attempt to admit inadmissible evidence into the record.[2] *See* Dowd v.

Calabrese, 577 F. Supp. 238, 244 & n. 21 ("Dowd I") (D.D.C. 1983) (Harold H. Greene, J.)

---

[1] Defendants have not been so guarded with the identity of other unnamed sources in the Article. For example, Defendants readily identified Vladimir Lechtman as the formerly unnamed Akin Gump attorney referenced in the Article, *see* Pls.' Ex. 6, at 11, although Defendants admit that Lechtman insisted the conversation take place "on background." Heller Tr. at 240:2-19.

[2] By using information claimed to come from a confidential source, Defendants appear to have waived the privilege. *See In re Sealed Case*, 676 F.2d 793, 818 (D.C. Cir. 1982) ("When a party reveals part of a privileged communication in order to gain an advantage in litigation, [he] waives the privilege as to all other communications relating to the same subject matter."). The Defendants may assert that section 5 of the District of Columbia Free Flow of Information Act , codified at D.C. STAT. § 16-4701 et seq., prevents a waiver. That section provides that "publication or dissemination by a [reporter or news organization] . . . of a source of news or information or a portion of the news or information . . . shall not constitute a waiver . . . ." First, even assuming that this provision applies and by its text would prevent a waiver, it would not bar the Court from the alternate relief of excluding "evidence" Defendants offer of claimed statements by their anonymous sources. Alternatively, the privilege created by the D.C. act does not apply in this litigation. Federal Rule of Evidence 501 provides that the law of privilege in federal courts is judge-made federal law, except with respect to elements of claims or defenses in which "State law supplies the rule of decision", in which case the State law of privilege applies. See Fed. R. Evid. 501. As the phrase "State law supplies the rule of decision" indicates, the meaning of the term "State" in Rule 501 was intended to be identical to that used in the Rules of Decision Act, 28 U.S.C. §1652, to match the doctrine of *Erie R. Co., v. Tompkins*, 304 US 64 (1938). See 23 Wright & Graham, FEDERAL PRACTICE AND PROCEDURE: EVIDENCE, at § 5422 (1998). The District of Columbia is therefore not a state under Rule 501. Finally, state law does not provide the rule of decision with respect to the issue as to which the privilege claim presently pertains. At issue here is the Defendants' assertion, as a defense to a libel action, that under the United States Supreme Court's decisions placing limitations on the ability of the states or the District of Columbia (or other places governed by federal law) to make libel law, such that a public figure may not prevail unless he or she has shown actual malice. This rule of decision is not state law, but federal Constitutional law, so under Rule 501 the state law of privilege does not apply to issues arising about the demonstration *vel non* of actual malice.

(holding that Defendants could not "have it both ways", i.e. they could not refuse to divulge the identity of their confidential sources but rely on them at trial "as evidence of . . . lack of malice"); Dowd v. Calabrese, 101 F.R.D. 427, 442 ("Dowd II") (D.D.C. 1984) (reaffirming previous ruling); *Desai v. Hersh*, 954 F.2d 1408, 1412 (7th Cir. 1992) (dictum) ("Desai argues that by allowing Hersh to utilize the reporter's privilege and then permitting Hersh to vouch for the unnamed sources the district court virtually eliminated his ability to test the reliability – or even existence – of Hersh's sources. We agree"); *Mazella v. Philadelphia Newspapers, Inc.*, 479 F.Supp. 523, 529 (E.D.N.Y. 1979) (applying Pennsylvania shield law in diversity, court held that "Defendants shall be deemed to have waived the law's protections should they choose to prove their defense through witnesses whose identities are protected."); *see also Anderson v. Nixon*, 444 F. Supp. 1195, 1199 (D.D.C. 1978) ("Plaintiff is attempting to use the First Amendment as a sword and a shield … [h]e cannot have it both ways.").

In *Dowd I*, Judge Greene found that "[i]f indeed Defendants were to use the existence of these [unnamed] sources as proof of the truth of [the] article and of Defendants' lack of malice, Plaintiffs would be at a very substantial disadvantage which they would be unable to overcome irrespective of what evidence to the contrary they may have gathered and would be able to adduce." *Dowd I*, 577 F.Supp. at 244.

There is abundant evidence that access to these sources would assist Plaintiffs. In *Dowd II*, this Court supported its holding by pointing out that Plaintiffs there had "made at least a threshold showing that [the reporter] fabricated the existence of some of his sources and their evidence." *Dowd II*, 101 F.R.D. at 442. There are similar indications here. First, Defendants admit to inflating the number of sources they used by inventing a fictitious source. *See* Pls.' Mem at 38.

17

Second, Royce took no notes of his conversation with the alleged "CIA official" and only cursory notes of his lengthy conversation with the "Russian-American specialist." *See* Pls.' Ex. 28; Royce Tr. at 140:11-142:15; 237:16-238:1. In addition to the general difficulty that adds, Royce's notes of his conversation with the Russian-American specialist did not reflect statements that Royce now claims the specialist made, as conceded by Royce, that were exculpatory of Plaintiffs. This suggests that what Royce did not record, if it could be known, would be yet more harmful to Defendants' position. *See* Kaplan report at 25-32.

Third, the testimony of Richard Palmer (referred to as a "former CIA Official" in the Article), a source Plaintiffs have been able to identify and depose, is vastly different from Royce's testimony. *See* Pls.' Mem. at 12-16, 29 n. 31, 30. This would likely be true of other sources, still anonymous, of whose statements and actions Plaintiffs presently have only Royce's version.

47.   **Defendants' Assertion**:

   While confirming that the BP Amoco report existed, the source declined to give Royce a copy of the document, then classified "secret." SDA ¶56.

   **Plaintiffs' Response:**

   A. This statement is inadmissible for the reasons set forth in response to no. 46.

   B. This statement is also inadmissible hearsay. *See* Fed. R. Evid. 802.

48.   **Defendants' Assertion:**

   When Royce asked whether the criminal allegations "had any credibility," his CIA source assured him that the information in the BP Amoco report, which he told Royce he had read, did track with the CIA's own intelligence. SDA ¶56.

   **Plaintiffs' Response:**

   A. This statement is inadmissible for the reasons set forth in response to no. 46.

   B. This statement is also inadmissible hearsay. *See* Fed. R. Evid. 802.

C. The term "track" is ambiguous and, as used in this instance, falsely suggests the CIA believed this information was true. The CIA did not believe the information was true. *See* Pls.' Mem. at 37 n. 37.

**49.  Defendants' Assertion:**

Royce contacted another source from the intelligence community, former CIA official Richard Palmer ("Palmer"). SDA ¶58.

**Plaintiffs' Response**:


**50.  Defendants' Assertion:**

Palmer provided Royce with an unabridged copy of "Alfa Group Portrait," and Royce arranged for the article's quick translation. SDA ¶59.

**Plaintiffs' Response:**


**51.  Defendants' Assertion:**

As accurately represented in the *Banking and Exchanges* synopsis, the translated *Versiya* article included profiles of Alfa's principals Aven, Fridman, Khan and Fain. SDA ¶60.

**Plaintiffs' Response:**

A. This statement is inadmissible hearsay. *See* Fed. R. Evid. 802.

B. The statement is inaccurate in that the *Versiya* article makes no reference to Fain. *See*

Pls.'Ex. 13. Furthermore, Khan is not a principal of Alfa-Bank. Khan Tr. at 73:12-17

**52.  Defendants' Assertion:**

According to the *Versiya* article, Ilyukhin gave the MVD a dossier of criminal allegations against the Alfa principals that he wanted verified. SDA ¶60.

**Plaintiffs' Response:**  This statement is inadmissible hearsay. *See* Fed. R. Evid. 802.

**53.  Defendants' Assertion:**

According to the Article, the dossier was obtained by *Versiya* in 1999, and contained charges that:

"During his studies at the Moscow State University, Aven was the head of students' music club and developed many contacts among bohemian youths who were the main drug clientele. Thus, Aven attracted the attention of criminals and established connection with 'respected leaders;'"

"According to the clerks of [Aven's former Ministry], Aven did not reject commission income and even expensive presents for helping to organize and carry out deals between the foreign and Russian companies. Aven was very influential because he controlled the process of granting the necessary trading licenses. ... In 1991-1992, the KGB led the investigation of Aven's case, based on the indictment [of] a large-scale theft; creating great losses for the country, and criminal ties with Israeli secret service. In 1992, the former Security Minister handed the investigation materials over to President Yeltsin. On December 22, 1992, Aven was removed from his post of the minister."

"Among [Aven's] acquaintances were also 0.          Kvantrishcili, O. Kobzon, respected criminals S. Timofeyev [ ] and A. Petrov [ ], as well as international machinators Mark Rich and Grigory Luchansky. According to the investigation materials, Aven took part in the organization of drug transit from Southeastern Asia - via Russia - to Europe;"

"In the end of 1993, Aven had a meeting with Gilberto Rodrigez Orehuel (known as Chess Player), the representative of Columbia drug barons, in Vienna. Partners agreed on pumping into the Alfa Bank money resources from offshore territories (Bahamas, Gibraltar) in order to invest in buying shares of Russian companies;"

Fridman, "a young dealer" while at college, was "contacted by the 'Bauman brigade' - the most aggressive criminal group in Moscow [and] the only criminal group in Moscow to be seriously dealing with drugs;"

"Fridman also took part in the organization of drug transit from Southeastern Asia - via Russia - to Europe." He shared many of the same contacts as Aven: Kvantrishvili, Kobzon, Timofeyev, Rich and Luchansky;

Alfa Eco was "involved in the international narcotics business and drug-money laundering. These companies are parts of a chain, responsible for drug transport from Southeastern Asia to Europe;"

In April 1995, the MVD organized crime squad raided Alfa Eco's offices after "the mass contamination of people in [Khabarovsk] after using sugar that contained a large dosage of narcotics. It turned out that the containers used for the transportation of sugar had been previously rented by Alfa Eco." SDA ¶60.

**Plaintiffs' Response:**

A.  These statement are inadmissible hearsay. *See* Fed. R. Evid. 802.

B. The *Versiya* article suggested the equal possibility that "Ilyukhin's request was a communist provocation aimed at three honest businessmen" and that Ilyukhin had "lied" about Plaintiffs. *See* Pls.' Ex. 13.

**54.   Defendants' Assertion:**

Royce obtained a December 4, 1999 article from *The Economist* that reported that a number of charges had been made against Alfa's oil company, Tyumen, including that it "intimidated judges and journalists;" that "its sources of funds are unclear;" and that "behind the scenes it is run by bandits." SDA ¶62.

**Plaintiffs' Response:**

A. The phrase "Alfa's oil company" is inaccurate. *See* response to no. 28.

B. As incorrectly implied by Defendants, *The Economist* article makes no mention of Alfa or Plaintiffs. *See* Pls.' Ex. 99.

**55.   Defendants' Assertion:**

Jonathan Winer ("Winer"), a former United States Deputy Assistant Secretary of State who specialized in tracking global crime, including international money laundering, provided Royce with several translated Russian news articles about Alfa. SDA ¶63.

**Plaintiffs' Response:** Winer's supposed expertise is not material in that he only provided Plaintiffs with publicly available Russian news articles. *See* Pls.' Ex. 99.

**56.   Defendants' Assertion:**

These articles also reported about Alfa's reputed criminal conduct. SDA ¶¶ 63, 64.

**Plaintiffs' Response:**

A. This statement is inadmissible hearsay. *See* Fed. R. Evid. 802.

B. The term "reputed" is inaccurate. None of these articles suggested that Plaintiffs had a reputation for criminal conduct. *See* Pls.' Ex. 100. One of the articles sent by Winer describes Fridman as "clever, proper, and law abiding." *See Id.* at D0017.

**57.   Defendants' Assertion:**

21

During his reporting, Royce contacted another source, a Russian-American specialist on business practices in the Soviet Union who had worked with the White House and Pentagon, and had a wide array of contacts inside Russia's law enforcement and intelligence communities.  SDA ¶65.

**Plaintiffs' Response:**

A.  This statement is inadmissible for the reasons set forth in response to no. 46.

B.  This statement is also inadmissible hearsay.  *See* Fed. R. Evid. 802.

58.   **Defendants' Assertion:**

Royce knew the specialist was "extremely knowledgeable about criminal activity" in the Russian business world.  SDA ¶66.

**Plaintiffs' Response:**  This statement is inadmissible for the reasons set forth in response

to no. 46.

59.   **Defendants' Assertion:**

The specialist provided Royce with information on the controversial privatization of Tyumen, and on its ownership and management structure.  SDA ¶68.

**Plaintiffs' Response:**

A.  This statement is inadmissible for the reasons set forth in response to no. 46.

B.  This statement is inadmissible hearsay.  *See* Fed. R. Evid. 802.

60.   **Defendants' Assertion:**

The specialist told Royce that "no major oil company [in Russia] is free of criminal activity" and that Tyumen and its partners had engaged in "bribes, tax evasion, intimidations and worse."  SDA ¶69.

**Plaintiffs' Response:**

A.  This statement is inadmissible for the reasons set forth in response to no. 46.

B.  This statement is inadmissible hearsay.  *See* Fed. R. Evid. 802.

61.   **Defendants' Assertion:**

The Russian-American specialist told Royce that he had direct knowledge of the Plaintiffs' involvement with the Solntsevo mob, including the fact that the Solntsevos moved some of their money through Alfa Bank. He told Royce that he had "little doubt that TNK committed crimes on numerous occasions." SDA ¶¶68, 80.

**Plaintiffs' Response:**

A. This statement is inadmissible for the reasons set forth in response to no. 46.

B. This statement is inadmissible hearsay. *See* Fed. R. Evid. 802.

C. There is no evidence to suggest Plaintiffs have any involvement with the so-called "Solntsevo mob" but, even assuming, *arguendo*, that the specialist said he knew of Plaintiffs' "involvement" with this group, Royce himself has admitted that the specialist said only that there was a banking relationship, did not say that there was anything illegal about the relationship and did not provide any illustrations of Plaintiffs' alleged involvement with the Solntsevo group other than the banking relationship. *See* Royce Tr. at 156:3-157:13.

62.   **Defendants' Assertion:**

Royce asked the specialist about the documents referenced in *Versiya's* "Alfa Group Portrait;" specifically about the dossier Ilyukhin received in 1997 from unidentified FSB officers, and about Ilyukhin's request for an investigation of the allegations. SDA ¶73.

**Plaintiffs' Response:**

A. This statement is inadmissible for the reasons set forth in response to no. 46.

B. The material cited by Defendants does not support the statement. *See* Royce Tr. at 163:8 - 164:22 (cited to by SDA ¶73).

C. Furthermore, the statement that Ilyukhin received a dossier from unidentified FSB sources is based only on inadmissible hearsay. *See* Fed. R. Evid. 802.

63.   **Defendants' Assertion:**

The specialist told Royce that when he contacted a source in the FSB at the time to ask about the dossier, the FSB source told him that they would be investigating the allegations. SDA ¶73.

23

**Plaintiffs' Response:**

A. This statement is inadmissible for the reasons set forth in response to no. 46.

B. This statement is also inadmissible hearsay.  *See* Fed. R. Evid. 802.

**64.   Defendants' Assertion:**

The specialist also told Royce that when he subsequently inquired about the progress of the investigation, he was told by his FSB source that the investigation had been "put away for a better day."  SDA ¶73.

**Plaintiffs' Response:**

A. This statement is inadmissible for the reasons set forth in response to no. 46.

B. This statement is also inadmissible hearsay.  *See* Fed. R. Evid. 802.

**65.   Defendants' Assertion:**

The specialist explained to Royce that "the political and governmental structures in Russia at that time made it very difficult, if unlikely, for the FSB to pursue the allegations, that they would pursue it at some other date when the politics and the governmental environments had changed somewhat."  SDA ¶73.

**Plaintiffs' Response:**

A. This statement is inadmissible for the reasons set forth in response to no. 46.

B. This statement is also inadmissible hearsay.  *See* Fed. R. Evid. 802.

**66.   Defendants' Assertion:**

Royce asked the Russian-American specialist if he could provide him with a copy of the 1997 FSB report.  SDA ¶74.

**Plaintiffs' Response:**  This statement is inadmissible for the reasons set forth in response

to no. 46.

**67.   Defendants' Assertion:**

Royce was faxed a translated, abridged version of the 1997 FSB report.  SDA ¶¶75, 76.

**Plaintiffs' Response:**

24

A. This statement is inadmissible for the reasons set forth in response to no. 46.

B. The document faxed to Royce was not a  translated, abridged version of the report.  It contained warnings regarding veracity and reliability.  Royce ignored the warnings, shielded his co-workers from the warnings, and never made mention of the warnings in the Article.  *See* Pls.' Mem. at 7-11; Pls.' Exs. 8 and 2.

C. Defendants use of the term "FSB Report" is inaccurate and misleading.  *See* response to no. 4.

**68.**   **Defendants' Assertion:**

The FSB Report set forth various allegations of criminal activity by Aven, Fridman and other Alfa Group principals:

 - In the 1980s, Fridman "secretly cooperated with operatives of the KGB," was active in the Komsomol (Communist Youth League), and founded the cooperatives Gelios and Orsk to purchase computers from abroad.

- Alfa Group had "cooperat[ed]" with a number of Russian crime organizations, including the [Solntsevo] organized crime group.

- Fridman and Aven "allegedly participated in the transit of drugs from Southeast Asia through Russia and into Europe."

- In late March and early April 1995, residents of the city of Khabarovsk were "poisoned" from narcotic-contaminated sugar that had been transported in a container leased by Alfa Eco's director Alexander Fain.

- In April 1995, MVD organized crime agents searched Alfa Eco's buildings and found "drugs and other compromising documentation."

- "At the end of 1993, [Aven] met with a representative of the Colombian drug trade, Gilberto [Rodriguez] Orexuel, known by the nickname the 'Chessman' ... to conclude an agreement about the transfer of money into Alfa Bank from off-shore zones such as the Bahamas, Gibraltar and others. The plan was to insert it back into the Russian economy through the purchase of stock in Russian companies." SDA ¶75 (Ex. 29).

**Plaintiffs' Response:**

A. These statements are inadmissible hearsay.  *See* Fed. R. Evid. 802.

B. These statement are incomplete.  The report first warned that an attempt to verify the

allegations had been unsuccessful, then set them out:

> This memo contains excerpts from a letter, sent from an anonymous group of Federal
> Security Bureau agents to the head of the national security commission, Victor Ivanovich
> Ilyu[k]hin. *Although we have been unable to determine the veracity of the allegations
> made in the letter*, our sources confirm that they may be the basis for an ongoing
> investigation by the federal authorities in Moscow.
>
> *See* Pls.' Ex. 2.

C. Defendants use of the term "FSB Report" is inaccurate and misleading.  *See* response

to no. 4.

**69.**   **Defendants' Assertion:**

> When discussing the FSB report's authenticity, the specialist told Royce that because the
> language and some of the information in the FSB report "tracked with the way [the FSB]
> would do this," "there was not much question in his mind that the material came from the
> FSB."  SDA ¶77.

**Plaintiffs' Response:**

A. This statement is inadmissible for the reasons set forth in response to no. 46.

B. This statement is also inadmissible hearsay.  *See* Fed. R. Evid. 802.

**70.**   **Defendants' Assertion:**

> Royce was convinced that the FSB report "was not a trumped-up or a phony document."
> SDA ¶77.

**Plaintiffs' Response:**

A. The record contains more than sufficient evidence from which a fact finder could

conclude that Royce was not so convinced.  *See* Pls.' Mem. at 7, 16-21, 23-38; 39; 40; 42;

Kaplan Report at 14-71; Kapl. Decl. ¶¶ 2-17, 24-25.

B. Defendants use of term "FSB Report" is inaccurate and misleading.  *See* response to

no. 4.

**71.**   **Defendants' Assertion:**

The specialist told Royce that certain allegations in the report "rang true to other things [the specialist] had tracked." SDA ¶79.

**Plaintiffs' Response:**

A. This statement is inadmissible for the reasons set forth in response to no. 46.

B. This statement is also inadmissible hearsay. *See* Fed. R. Evid. 802.

C. This statement is also immaterial because the material cited by Defendants does not show what the phrase "other things" refers to. Royce Tr. at 193:9-21 (cited by SDA ¶ 79).

72. **Defendants' Assertion:**

The specialist indicated to Royce that, while he did not have knowledge of Plaintiffs' involvement in narcotics, he did have knowledge of Plaintiffs' involvement with the Solntsevo organized crime group. SDA ¶80.

**Plaintiffs' Response:**

A. This statement is inadmissible for the reasons set forth in response to no. 46.

B. This statement is inadmissible hearsay. *See* Fed. R. Evid. 802.

C. As stated in response to no. 61, Plaintiffs had no involvement with this group.

Moreover, even assuming the specialist said they did, the statement still is not material because the specialist also told Royce he had no knowledge of any illegal dealings between Plaintiffs and the group. *See* Royce Tr. at 157:9-13.

73. **Defendants' Assertion:**

The specialist explained to Royce that there was a "business relationship, a close relationship" between the Solntsevo organized crime group and Alfa Bank, and that the Solntsevos moved some of their money through Alfa Bank. SDA ¶80.

**Plaintiffs' Response:**

A. This statement is inadmissible for the reasons set forth in response to no. 46.

B. This statement is inadmissible hearsay. *See* Fed. R. Evid. 802.

C. As stated in response to no. 61, Plaintiffs had no involvement with this group.
Moreover, even assuming the specialist said they did, the statement is still not material because
the specialist also told Royce he had no knowledge of any illegal dealings between Plaintiffs and
the group. *See* Royce Tr. at 157:9-13.

**74.**   **Defendants' Assertion:**

Royce had also arranged to meet Palmer and John Forbes ("Forbes"), a United States
Customs officer, for a social lunch. SDA ¶83.

**Plaintiffs' Response:** The term "social" is inaccurate. Royce wanted to get information
from Forbes and Palmer, so whether they knew it or not, the lunch was business in nature. *See*
Royce Tr. at 252:8-15; 247:17-250:9.

**75.**   **Defendants' Assertion:**

Over lunch, Royce asked both men what unpublished information they might have about
Plaintiffs. SDA ¶84.

**Plaintiffs' Response:**

**76.**   **Defendants' Assertion:**

While Forbes recalled press coverage about Tyumen, he told Royce that he had no further
information for him. SDA ¶85.

**Plaintiffs' Response**: There is a conflict in the testimony. Forbes testified that he had
never heard of Plaintiffs prior to publication of the Article. *See* Forbes Tr. at 79:22-80:1; 93:16-
94:5.

**77.**   **Defendants' Assertion:**

Palmer, who had provided Royce with published materials about Alfa and Russian
organized crime in the past, did not recall whether he had any unpublished information
about the Plaintiffs. SDA ¶86.

**Plaintiffs' Response:**  The fact that Palmer, an expert on "Russian Organized Crime, Official Corruption and the Banking System in Russia", could not recall whether he had any unpublished information about the largest private bank in Russia was itself a warning to Royce about Palmer's view of the reliability of whatever information he did possess.  *See* Pls.' Mem. at 17-20.

78.   **Defendants' Assertion:**

Royce asked the two men if they would search their records.  SDA ¶87.

**Plaintiffs' Response:**  Forbes does not recall such a request.  *See* Forbes Tr. at 109:22-110:11.

79.   **Defendants' Assertion:**

Palmer located a memorandum regarding information from a former KGB major whom
                                                                    SDA ¶89.

**Plaintiffs' Response:**  This statement is inaccurate to the extent it implies the major is the source of information in the memorandum.  *See* Palmer Tr. at 105:18 – 106:5

, 122:20-123:2.

80.   **Defendants' Assertion:**

Palmer faxed the memorandum to Royce.  SDA ¶90.

**Plaintiffs' Response:**

81.   **Defendants' Assertion:**

Royce recognized the memorandum as a detailed account of the same allegations about the Plaintiffs contained in the FSB report.  SDA ¶92.

**Plaintiffs' Response:**

A. As indicated by the fax lines on each of the two documents, Royce did not have the "FSB Report" at the time he received the "KGB Major Report." *Compare* Pls.' Ex. 2 *with* Pls.' Ex. 3.

B. The term "FSB Report" is inaccurate and misleading. *See* response to no. 4.

82.   **Defendants' Assertion:**

The KGB major report includes the following:

- "As to Alfa-Bank, there is evidence regarding its involvement with money laundering of Russian and Latin American drug cartels. Alfa was [a] KGB creation in 1987 as [a] cooperative, eventually made into a bank to help move money. The cooperative was to deal in computers because the KGB already had a network available for purchasing computers in the West and [importing them] into Russia without duties."

"Alfa Bank was founded with both KGB and Communist Party funds. By then, several 'rogue' former members of the KGB had come into this bank - often bringing their criminal world contacts with them. Several of the KGB personnel had served in SE Asia or in the KGB anti-mafia units. They quickly determined that dealing in drugs would bring the highest profits with literally no risk in Russia."

"Alfa Bank's connections with drug dealers were revealed since autumn 1991 — since the moment of the appointment of Pyotr Aven a minister of foreign trade. At that time, a large channel of heroin transit was established from Burma -through Laos - Vietnam - to the Far East."

"From the Far East, the drugs were transported to the central part of Russia as if sugar or flour cargo, then they were forwarded to Germany."

"P.P.S. Sometimes the taking out of the drugs was carried out with the help of some [of] Gaydar's ministers - in their luggage."

"In 1993-1994, there were attempts by the so-called 'Chess-player' (the head of the Columbian drug cartel Cali) to launder and legalize large amounts of criminal money in Russia."

"P.S. The first attempts of the Columbian drug money laundering were discovered in Russia 4-5 years ago (1990-1991) and had some connection with the so called "red mercury" (Gaidar was said to be involved)." SDA ¶91

**Plaintiffs' Response:**

A. These statements are inadmissible hearsay. *See* Fed. R. Evid. 802.

B.  In addition, the quotations are accurate as far as they go, but there is other material

omitted.  Moreover, because the author and source of information are unknown and were

unknown to Defendants, the statements are not material.

C.  The term "KGB Major Report" is inaccurate and misleading.  *See* response to no. 4.

**83**.  **Defendants' Assertion:**

> The KGB major's report also described the Siberian sugar poisoning incident, with
> citizens becoming "intoxicated" by drugs sold by a railway worker, who had stolen a sack
> of sugar from a railcar.  SDA ¶91.

**Plaintiffs' Response:**

A.  This statement is inadmissible hearsay.  *See* Fed. R. Evid. 802.

B.  As phrased, the assertion assumes the existence of a sugar poisoning incident.  In fact,

the sugar poisoning incident never occurred.  *See* Morenko Decl. at ¶¶ 7-8.

C.  To the extent this statement implies the KGB Major was the source of the allegations

it is incorrect.  *See* Palmer Tr. at 105:18-106:13.

D.  The term "KGB Major Report" is inaccurate and misleading.  *See* response to no. 4.

**84.**  **Defendants' Assertion:**

> According to the KGB major, it was later "ascertained that the 'sugar' cargo belonged to
> the firm Alfa-Eco … a branch of Alfa-Bank."  SDA ¶91.

**Plaintiffs' Response:**

A.  See response to no. 83.

B.  Defendants misstate the record by attempting to represent that

*See* Palmer Tr. at 252:20 – 253:15.

**85.**  **Defendants' Assertion:**

> The KGB major reported that "criminal investigations were instituted – but were quickly

stopped." SDA ¶91.

**Plaintiffs' Response:**

A. *See* response to no. 83.

B.

*See* Palmer Tr. at 252:20 – 253:15.

86.    **Defendants' Assertion:**

Royce believed that the information provided by the KGB major corroborated the allegations about Plaintiffs in the FSB report. SDA ¶95.

**Plaintiffs' Response:**

A. For the reasons set forth in Response 83(c), to the extent the factual assertion is

intended to imply the major was the source of the information, this statement is false.

B. There is more than sufficient evidence in the record for the trier of fact to conclude

that Royce did not have such a belief. *See* response to no. 70; *see also* Pls.' Mem. at 11-16, 40-

42.

87.    **Defendants' Assertion:**

Royce also believed that the allegations were corroborated by the previous news reports about Plaintiffs. SDA ¶95.

**Plaintiffs' Response:**

There is more than sufficient evidence in the record for the trier of fact to conclude that

Royce did not have such a belief. *See* Pls.' Mem. at 21.

88.    **Defendants' Assertion:**

Royce wanted more information about the KGB major and asked Palmer to tell him his identity, as he wanted to talk to the KGB major for himself. SDA ¶96.

**Plaintiffs' Response:** This assertion of material fact cannot be accepted on summary judgment. The record demonstrates too many discrepancies between the testimony of Royce and Palmer concerning their interactions leading up to and after publication of the Article. *See* Kaplan Report at 79-95 (discussing in detail the Royce/Palmer relationship). For example:

A. Palmer testified that he would not provide Royce with any non-public information. *See* Palmer Tr. at 32:22 – 33:3 ("[A]nd also, I told him [Royce] up front – other than something that was public – I would never discuss anything about from where or who I got information."). But both Royce and Palmer testified that Palmer gave Royce some information of a kind that would be forbidden if this other piece of testimony were true. *See* Royce Tr. at 328:8-338:2, Palmer Tr. at 50:7 – 11; 68:2 – 9;118:17 – 119:3; 143:15 – 144:1.

B. Palmer set out specific ground rules between himself and Royce.

> When I first started talking to Knut, I set out ground rules, and that is that I never wanted to be quoted, I never wanted to be referred to. I didn't want any of my information referred to. It was background. And also, I told him up front that I would never – other than something that was public, I would never discuss anything about where or from whom I got information.

Palmer Tr. at 32:18-33:3. When Palmer saw that he and the "KGB Major Report" had been referred to and quoted in the Article, he informed Royce he was angry with what he believed to be Royce's violation of their agreement. *See* Palmer Tr. at 81:4-15; 163:12-17. Palmer says Royce told him he thought the ground rules had changed and that is why he published information from Palmer in the Article. *See* Palmer Tr. at 81:9-15.

Royce, however, testified that the call was about a completely different subject. Royce said Palmer never complained to him about the manner in which Royce had used the "KGB Major Report" or the fact that the Article referred to Palmer. *See* Royce Tr. at 469:7 – 471:1; 485:10-486:1. Royce also said there was no discussion of the ground rules. *See* Royce Tr. at

470:7-14; 475:1-3.  According to Royce, the purpose of the call was not to discuss the Article at

all but to follow-up regarding "other aspects of the Alfa/Aven/Fridman episodes .. largely having

to do with the  Bank of New York case."  *See* Royce Tr. at 464:2-11.  Predictably, Royce has no

notes of the conversation.  *See* Royce Tr. at 463:4-6.  These discrepancies call into question the

accuracy of any factual description between the conversations of Royce and Palmer.

89.   **Defendants' Assertion:**

> Palmer made clear that he had no intention of providing such information to Royce.  SDA
> ¶97.

**Plaintiffs' Response:**  For the reasons set forth in response  to no. 88, this assertion of

material fact cannot be accepted on summary judgment.

90.   **Defendants' Assertion:**

> Because of their sensitive nature, there were many specifics about the KGB major,
> , and the information the KGB major provided to
> Palmer that Palmer would not disclose to Royce.  SDA ¶99.

**Plaintiffs' Response:**

A.  For the reasons set forth in response to no. 88, this assertion of material fact cannot be

accepted on summary judgment.

B.  Furthermore, this statement is not material.  What is material is that

and Royce never asked Palmer

Plaintiffs or the allegations against Plaintiffs.  *See* Palmer Tr. at 104:19-105:7;

109:7-12; 119:21-122:19; 153:8-14; 228:16-229:6; 252:20-253:15

91.   **Defendants' Assertion:**

> Palmer provided Royce with some details about the KGB major's background, including
> that he had worked with two KGB founded banks and had been assigned to the
> counterintelligence branch of the KGB.  SDA ¶100.

**Plaintiffs' Response:** This statement is based on testimony from Royce. The

information allegedly provided by the KGB Major is inadmissible hearsay and double hearsay.

*See* Fed. R. Evid. 802, 805.

**92.   Defendants' Assertion:**

Royce asked Palmer whether he thought the KGB major and his accusations about the
Plaintiffs were credible.  SDA ¶101.

**Plaintiffs' Response:** The material cited by Defendants does not support the assertion

that Royce asked Palmer whether the accusations about Plaintiffs were credible. *See* Palmer Tr.

at 30:11-31:14; 114:9-12; Royce Tr. at 290:1-15.  Palmer was asked by Royce what he thought of

the major, not what he thought of the allegations against Plaintiffs. *See* Palmer Tr. at 31:7-14.

**93.   Defendants' Assertion:**

Palmer told Royce that the KGB major "had given me various other items of information
that appeared to be very accurate, that he seemed to be who he said he was, and that I had
seen nothing in the information to indicate he was anything other than who he said he
was and his information was accurate."  SDA ¶102.

**Plaintiffs' Response:**

A. For the reasons set forth in response to no. 88, this assertion of material fact cannot be

accepted on summary judgment.

B. To the extent this assertion is offered to support the proposition that Palmer vouched

for the credibility of the allegations about Plaintiffs, it is not true.  The record makes clear that

this statement was given in response to Royce's question about what Palmer thought of the

major, not what he thought of the allegations against Plaintiffs.  Indeed, the sentence quoted by

Defendants begins: "And then the question of what did I think of *the person,* and I told him that

this person had given me various other items of information that appeared to be very accurate,

that he seemed to be who he said he was, and that I had seen nothing in the information to

35

indicate he was anything other than who he said he was and his information was accurate."

Palmer Tr. at 31:7-14 (emphasis supplied).

### 94.   **Defendants' Assertion:**

Palmer told Royce that he had seen references to Plaintiffs' criminal activities in the media, and that he had never heard the allegations refuted.  SDA ¶104.

**Plaintiffs' Response**:  The material cited by Defendants does not support the assertion

that Palmer had seen references to Plaintiffs' alleged criminal activities in the media before his

conversation with Royce; it was only "since this" (i.e., since Palmer's conversation with Royce)

that he claimed to have seen such references. *See* Palmer Tr. at 111:6-8.  Additionally,

Defendants' characterization of Palmer's testimony is selective and  misleading because it

doesn't reflect Palmer's acknowledgment that the allegations "could have been" refuted.  The

relevant parts of the exchange cited by Defendants are as follows:

Q: Did Mr. Royce ever ask you, prior to publication of the article, what you knew about my clients or what information you had about my clients, independent of Exhibit 100 ["KGB Major Report"].

A:  I believe he did, yes.

.....

Q: How did you respond to that?

A:  Same way I responded to you, that subsequent to my retirement in 1994, the only information I have, other than this, is other references in the media.  And, in fact, *since this*, I've seen several references to this material, about organized crime ties and, to a lesser extent, the allegations on the drug connection.  And basically, I've never seen it refuted before this case. *It could have been,* but I'm not aware of it.

Palmer Tr. at 109:13-110:22.  (emphasis supplied).

### 95.   **Defendants' Assertion:**

Royce knew that Palmer had no doubt that the KGB major was who he said he was and that he "knew what he was talking about."  SDA ¶108.

36

**Plaintiffs' Response:** This statement is misleading in a number of respects.

A.                                                        Thus, whatever Palmer may have

concluded about the accuracy of the major's knowledge, it did not include anything about

Plaintiffs. *See* Palmer Tr. at 104:19-105:7; 109:7-12; 119:21-122:19; 153:8-14.

B.

Palmer Tr. at 50:17-51:16; 57:14-20; 59:21-60:4.

**96.    Defendants' Assertion:**

SDA ¶107.

**Plaintiffs' Response:** To the extent any of this material is offered to support the

proposition that Palmer was vouching for the accuracy of the allegations against Plaintiffs, the

record does not support this statement.

*See* Palmer Tr. at 118:21-119:3; 119:21-122:19; 228:16-229:6.

Palmer only said the major was credible, not that the information the major delivered about

Plaintiffs, was credible. *See* Palmer Tr. 31:7-14. Further, because Palmer requested and the

Court agreed that he not be questioned about his experience as a CIA employee, Defendants

cannot selectively make use of statements Palmer made about that experience. *See* 3/11/03

Order (106).

**97.    Defendants' Assertion:**

Royce knew that "Mr. Aven and Fridman have been the subject of numerous articles, Alfa-Bank and Tyumen as well, and the various officials of those firms. The total body of information that was available at that time gave [him] a measure of comfort as well and provided a backdrop for [him] believing that the specific allegations indeed were credible." SDA ¶120.

**Plaintiffs' Response:**  There is more than sufficient evidence in the record for the trier of

fact to conclude that Defendants did not have such a belief. *See* response 86(B).

## 98. **Defendants' Assertion:**

Royce thought that the FSB and KGB major reports were independently created because of their differing origins, both in time and place. SDA ¶123.

### **Plaintiffs' Response:**

A. *See* response 86(B).

B. Professor Kaplan is not aware "of any journalism standard or principle that states

because defamatory and scurrilous allegations are repeated, it is okay to report them." *See*

Kaplan Report at 9.

C. Royce knew the KGB had become the FSB because, at the very least, Palmer had

explained it to him, so the assertion that Royce thought the KGB and FSB were separate sources

is contradicted by Royce's own knowledge. *See* Palmer Tr. at 145:2-21; Royce Tr. at 348:6-10;

406:10-14.

D. The terms "FSB Report" and "KGB Major Report" are inaccurate and misleading.

*See* response to no. 4.

## 99. **Defendants' Assertion:**

Royce found the information provided to Palmer by the KGB major to be credible because it "had been given to somebody totally unrelated who was not a journalist who was not part of any compromat arrangements and that [Palmer] deemed to be credible." SDA ¶123.

### **Plaintiffs' Response:**

A. *See* response 86(B).

B. The assertion also is nonsensical.

*See* Palmer Tr. at 105:18-106:13.  Defendants cannot

claim that the "KGB Major Report" was credible because it was given to an assertedly credible

person

100.   **Defendants' Assertion:**

Heller had no doubt about the sources for the Article's allegations about the Plaintiffs:
"[f]rom the moment the article was reported, written and published, I've always been
confident, entirely confident in the sources, that they were corroborated and independent,
and in the truth of the reporting.  That's never been a question to me, either then or now."
SDA ¶125.

**Plaintiffs' Response:**  Heller did not meet or speak with the Russian-American specialist

or Palmer.  *See* Heller Tr. at 103:16-22, 431:14-18.  He did not recall the substance of any

conversations with Royce about the "FSB Report," and had no recollection of any discussions

concerning the veracity of the authors of that document.  *Id.* at 150:20-151:8, 159:17-160:1.

He never saw or discussed the fax cover sheet with Royce or anyone else at CPI.  *Id.* at 172:9-

174:10.  He did not recall the substance of any conversation with Royce about the "KGB Major

Report," or that he ever discussed Palmer with Royce.  *Id.* at 185:4-6, 194:18-195:1; 186:8-10.

Thus, Heller had no valid basis for this statement.  The sole basis for his belief was Royce and, in

fact, Heller was misled by Royce as shown by the fact that when Heller called Rory Davenport

of Fleishman-Hillard for comment, he falsely told Davenport that the allegations against

Plaintiffs came from "the highest level of U.S. and Russian intelligence sources", *see* Pls.' Ex.

101, Heller Tr. at 153:2-19, a statement that Royce, and perhaps other representatives of CPI,

knew was false.

**101.**   **Defendants' Assertion:**

Heller spoke with Vladimir Lechtman, one of the Akin, Gump attorneys who said on background that his firm knew the principals of Tyumen and Alfa and that the organized crime and drug allegations were far "off the mark." SDA ¶128.

**Plaintiffs' Response:**

A. This statement is based on an e-mail from Heller to Royce regarding a conversation

with Lechtman. As such, the statement is inadmissible hearsay. *See* Fed. R. Evid. 802.

B. The identification of this source by name during discovery is a violation of

Defendants' journalistic obligations and demonstrates that Defendants violated their promises to

sources when they thought it would help them and refused when it might hurt them.

C. Furthermore, Defendants mischaracterize their own document. They leave out that

Lechtman said "*totally* off the mark." *See* Pls.' Ex. 102 (emphasis supplied).

D. The material cited by Defendants does not indicate what information about the Article

Heller shared with Lechtman. *See* Id.; Heller Tr. at 241:8-22.

**102.**   **Defendants' Assertion:**

Lechtman referred Heller to Rory Davenport ("Davenport"), Tyumen's senior account executive at Fleishman-Hillard, who told Heller that his firm had done a due diligence check on Tyumen, and that the firm had "no concerns" about their Russian client. SDA ¶128.

**Plaintiffs' Response:**

**103.**   **Defendants' Assertion:**

Defendants also wanted to reach an English-speaking contact in Moscow who could speak for Alfa and who was knowledgeable about the history of Alfa Bank and Alfa Eco. SDA ¶131.

**Plaintiffs' Response:** The statement is incorrect. Defendants were seeking only a

routine denial, not any comment or information. *See* Kaplan Report at 6, 19, 20, 23.

**104.** **Defendants' Assertion:**

Davenport told Heller to call Fleishman-Hillard's contact, Alfa Bank's CFO Alexandr Tolchinsky ("Tolchinsky"), and to direct his questions about the criminal allegations to Tolchinsky.  SDA ¶133.

**Plaintiffs' Response:**  The material cited by Defendants does not support the statement.

*See* Davenport Tr. at 203:21-204:9 and Pls.' Ex. 103 (cited in SDA ¶133).

**105.** **Defendants' Assertion:**

Royce called Tolchinsky at Alfa Bank's offices in Moscow and told him that CPI was preparing an article that would include allegations that Plaintiffs had a cooperative arrangement with organized crime, and had been involved in narcotics trafficking.  SDA ¶¶134, 135.

**Plaintiffs' Response:**  Tolchinsky does not recall being asked, and believes that he was

not asked, about allegations concerning Aven and Fridman.  Tolchinsky Tr. at 75:1-15.

Furthermore, in the materials cited by Defendants, Royce, citing his own failure to take notes of

the discussion, admits he cannot remember whether he asked about Aven or Fridman.  *See* Royce

Tr. at 381:15-382:2.

**106.** **Defendants' Assertion:**

Royce mentioned the heroin "poisoning" episode, as well as the allegation that a top Alfa official had met the "Chess-player" to devise a scheme to launder drug money.  SDA ¶136.

**Plaintiffs' Response:**  This statement is false.

A. As phrased, the statement assumes these events occurred, which they did not.  *See*

Tolch. Decl. at ¶¶ 14 - 15; Fridman Decl. at ¶ ¶ 12 - 14; Aven Decl. at ¶ ¶ 15, 18, 20; Morenko

Decl. at ¶ ¶ 7-8.

B. Royce admitted that in this conversation he misrepresented his source document in

two ways.  First, he stated that  it contained the word "heroin" when it did not.  *See* Pls.' Ex. 2;

Second, he said that it referred to a "top Alfa official" when the document says "Aven."  Pls.' Ex.

2. The apparent purpose of these misstatements was to avoid revealing potential weaknesses in

the source documents and to obtain flat denials. *See* Kaplan Report at 6, 19, 20, 23; Kaplan Decl.

at ¶ 7.  Further, it was Royce's purpose to obtain a routine denial, not to provoke a situation

where the Plaintiffs would realize that Royce was about to go to press with specific charges that

they could refute. *See* Tolch. Tr. at 40:10-13; 44:22-45:4; 62:19-63:5; 75:2-15; Kaplan Report at

33-37 and Kaplan Decl. at ¶ 7.  If Royce had mentioned Aven or Fridman by name, Tolchinsky

would have recommended Royce talk to Aven and Fridman. *See* Tolchinsky Decl. at ¶ 13, 18.

**107.    Defendants' Assertion:**

> Tolchinsky responded to Royce's inquiries by denying each allegation Royce raised with
> him and dismissing the charges as "nonsense."  SDA ¶137.

> **Plaintiffs' Response:**  Tolchinsky recalls that the allegations were presented as a package

and does not recall that they were presented individually. *See* Tolch. Tr. at 65:6-12.

**108.    Defendants' Assertion:**

> Tolchinsky described the allegations as "the same rumor, [recycled] over and over again."
> SDA ¶139.

> **Plaintiffs' Response:**  Tolchinsky merely signaled his acceptance of Defendants'

characterization of the conversation. *See* Tolch. Tr. at 64:17-65:1.

**109.    Defendants' Assertion:**

> Speaking on a "not-for-attribution" basis, Tolchinsky told Royce that these negative
> stories had appeared previously in the "obscure yellow press of Russia."  SDA ¶140.

> **Plaintiffs' Response:**  This statement is incorrect.  Tolchinsky was emphatic that he

could not have used "not-for-attribution" (it was not in his vocabulary).  Instead he told Royce

the material was "off the record." *See* Tolch. Tr. at 40:14-41:21; 77:14-78:9.

**110.    Defendants' Assertion:**

> When asked for specifics, Tolchinsky said that similar allegations had been made in the

1990s in a Russian publication *Den.* SDA ¶141.

**Plaintiffs' Response:**  This statement is inaccurate and incomplete in multiple respects.

A.  The testimony cited by Defendants shows that Tolchinsky volunteered this information to Royce, rather than being asked for it.  *See* Tolch. Tr. at 40:14-41:12; 42:8-44:7.

B.  What Tolchinsky said was that these allegations were published in various obscure Russian publications from the mid-90s, one of which was *Den,* a right wing ultra-communist paper read by 500 people of nationalistic views.  *See* Tolch. Tr. at 67:18-69:4.  He also informed Royce that these allegations were Kompromat – a term with which Royce was familiar.  *See* Tolch. Tr. at 73:16-74:2; Royce Tr. at 383:1-384:20.

**111.   Defendants' Assertion:**

Tolchinksy told Royce that representatives of a competing company, whom he refused to identify, had wanted to take over the commodities trade, and planted these allegations to harm Alfa. SDA ¶142.

**Plaintiffs' Response:**  This statement is inaccurate in multiple respects:

A.  Tolchinsky did not provide this information as fact, he provided it as an off-the-record "hypothesis" because he had not been employed by Alfa-Bank at the time of the alleged commercial dispute.  He suggested that Royce talk to people in the market to confirm whether his hypothesis was true.  *See* Tolch. Tr. at 76:18-77:13; *see also id.* at 42:8-43:2.

B.  Tolchinsky was clear that his information was based on  rumors  and that he was not referring to a particular company.  *See* Tolch. Tr. at 78:10-80:5.

**112.   Defendants' Assertion:**

Tolchinsky recommended that Royce call other journalists to learn more about the failings of the Russian yellow press. SDA ¶144.

**Plaintiffs' Response:**  This statement is inaccurate.  Tolchinksy did not recommend that Royce call other "journalists" or anyone else to learn more about the failings of the Russian

yellow press. He explained the Russian yellow press to Royce and suggested that Royce do

more research and talk to other people in the "market" – a far wider category – to confirm

whether the hypothesis he had given Royce, i.e., that allegations of criminal activity on the part

of Alfa-Bank had been planted in the yellow press by commercial competitors, was true. *See*

Tolch. Tr. at 40:14-44:7; 76:1-77:13.

113.   **Defendants' Assertion:**

> Several people were involved in preparing the Article prior to publication. SDA ¶¶44,
> 152, 154, 161, 165.

> **Plaintiffs' Response:** There is no concrete meaning to the word "several" such that

Plaintiffs can respond in a meaningful way. As such, the phrase lacks any probative value and is

not material.

114.   **Defendants' Assertion:**

> Richard Prince ("Prince"), as editor of the *Public i,* shepherded the story through its
> development, and served as copy editor. SDA ¶152.

> **Plaintiffs' Response:** This statement is in dispute.

A. Royce testified that "Prince was on vacation for much, if not most, of that period."

*See* Royce Tr. at 69:1-69:6.

B. Also, to the extent the word "shepherded" is intended to imply that Prince had any

substantive role in the development of the Article, it is inaccurate. Prince described his role as

making sure that those who were supposed to approve the article approved it. He disclaimed any

substantive role in the process. Prince Tr. at 14:4-15; 59:6-60:16. *See also id.* at 53:3-10

(admitting that he had never seen the "FSB Report" before); *id.* at 56:7:11 (no recollection of

hearing the term "FSB Report" in connection with drafting, reviewing, editing, and publication

of the Article); *id.* at 56:12-17 (no recollection that Royce told him anything about the documents

he was relying upon for the allegations against Plaintiffs).

**115.**   **Defendants' Assertion:**

In particular, Prince had discussions with Royce and Heller about the progress of their investigation, including the sources for the information in the story, and he reviewed and commented on drafts of the Article.  SDA ¶153.

**Plaintiffs' Response:**  This statement is inaccurate.  As indicated above, Prince's role was simply to be kept apprised of the progress of the Article.  "My role in processing the story was not to go into great detail or much detail about any of these points.  That role was left to others."  *See* Prince Tr. at 58:1-13.  "My role was simply to be – was to be apprised of the progress that he [Royce] and Chuck Lewis were making on getting the story ready."  *See* Prince Tr. at 59:6-21.  The testimony also demonstrates that Prince has no recollection of discussing the sources of the story with Royce and Heller and, in fact, Prince admitted that he had not seen either the "FSB Report" or the "KGB Major Report" prior to publication of the Article.  *See* Prince Tr. at 93:10-93:16.

**116.**   **Defendants' Assertion:**

The Article was "fact checked" by Peter Smith ("Smith").  SDA ¶154.

**Plaintiffs' Response:**  Smith testified to reading a draft of the Article and marking it up with suggestions and queries.  *See* Smith Tr. at 68:5-70:19.  Smith gave his marked up copy to Prince, as was his ordinary practice.  *See* Smith Tr. at 71:9-17.  But Smith professed not to remember most of the markings and Defendants did not produce his marked up copy during discovery, claiming that it had been destroyed (this document was the *only* document sought by Plaintiffs that Defendants said was unavailable).  *See* Smith Tr. at 95:6-96:15; 99:18-100:17; Pls.' Ex. 35; Pls.' Ex. 104.  Applying the appropriate inferences from the fact that this draft was not produced, one can assume the information contained therein would be detrimental to Defendants.  *See* Pls.' Mem. at 44-45.  For example, the testimony indicates that Smith may have noted the absence of the word heroin in the "reports" and discussed the issue with Royce and Heller.  *See*

45

Smith Tr. at 93:6-18.  Also, Smith told Royce that the "FSB Report" was anti-Semitic.  *See*

Smith Tr. at 101:7-18; 106:16-107:6.

**117.   Defendants' Assertion:**

> Smith read the FSB report and the KGB major report to ensure that the Article fairly and
> accurately recounted their contents, paying close attention to each of the criminal
> allegations. SDA ¶155.

> **Plaintiffs' Response:**  This statement cannot be accepted on summary judgment for the

reasons set forth in response to no. 116.  *See also* Pls. Mem. at 44-45.  The terms "FSB Report"

and "KGB Major Report" are inaccurate and misleading.  *See* response to no. 4.

**118.   Defendants' Assertion:**

> Smith told Royce and Heller that he detected an anti-Semitic tone in the FSB report.
> SDA ¶156.

> **Plaintiffs' Response:**  The term "FSB Report" is inaccurate and misleading.  *See*

response to no. 4.

**119.   Defendants' Assertion:**

> Royce responded to Smith's concern by telling him that because anti-Semitism was an
> unfortunate yet typical feature of that era in Russia, he viewed the fact that Smith
> perceived that tone in his reading of the FSB report to be a further "indication of
> authenticity."  SDA ¶156.

> **Plaintiffs' Response:**

> A. This statement is inadmissible hearsay as the cited materials come from Smith's

deposition.  SDA ¶156 cites to Smith Tr. at 101:7-18 and 106:16-107:6.

> B. The cited material does not support the statement that Royce said anti-Semitism was

"unfortunate" or claimed such anti-Semitism to be a "further" indication of authenticity.  *See*

Smith Tr. at 101:7-18; 106:16-107:6.

> C. *See* response to no. 70.

> D. The term "FSB Report" is inaccurate and misleading.  *See* response to no. 4.

**120.**   **Defendants' Assertion:**

Royce and Heller were "persuaded that the documents were reliable, that the allegations in them were corroborated by one another and gave a solid basis for the story."  SDA ¶156.

**Plaintiffs' Response:**

A. This statement is inadmissible hearsay.  SDA ¶156 cites to two portions of *Smith's*

testimony.  *See* Fed. R. Evid. 802.

B. At most, this statement proves that Royce and Heller convinced Smith that they were

persuaded that the documents were reliable.  Royce, however, could not have been so persuaded.

*See* response 86(B).

**121.**   **Defendants' Assertion:**

Royce specifically "pointed out that these were two separate sources, separated in time from each other; one from the former KGB agent, one from the FSB.  That separation … made it unlikely that it was one bad source that was feeding both of them, and he was very emphatic .. He was emphatic that he believed that these allegations were true."  SDA ¶159.

**Plaintiffs' Response:**

A. This statement is inadmissible hearsay.  SDA ¶159 cites to *Smith's* testimony.  *See*

Fed. R. Evid. 802.

B. There is more than sufficient evidence in the record for the trier of fact to conclude

this was not so.  *See* response 86(B).

**122.**   **Defendants' Assertion:**

At the conclusion of this discussion, Smith felt that "all the questions and issues [he] had raised had been resolved."  SDA ¶160.

**Plaintiffs' Response:**

A. This statement is inadmissible hearsay.  *See* Fed. R. Evid. 802.

B. It is impossible to know what questions or issues were resolved without seeing Smith's comments on the draft, which Defendants have failed to produce. *See* Pls.' Mem. at 44-45.

C. Smith was not present at the conclusion of "this discussion", which continued after he left. Smith Tr. at 109:18-20. Additionally, all this statement shows is what Smith perceived, not what the underlying situation was.

**123.    Defendants' Assertion:**

> As Executive Director, Lewis was kept apprised of the progress of the reporting, reviewing drafts and discussing content and sourcing with Royce and Heller. SDA ¶161.

> **Plaintiffs' Response:**   Lewis was not kept fully apprised of the progress of the reporting.

A. Lewis did not see the two principal sources used in the story - the "FSB Report" or the "KGB Major Report" – and did not know about the cover sheet to the "FSB Report" that contained multiple warnings from the Russian-American specialist about verifying the allegations in the document. *See* Lewis Tr. at 78:2-5; 110:5-15; 139:21-140:3; *see also* Decl. Ex. M at 71-79 (Kaplan Report) (detailing the many breakdowns in CPI's editing process).

B. Royce had not told Lewis of the many reasons for disbelieving the documents. *See* response  86(B).

C. Royce had not told Lewis he did not call Soros despite the fact that Lewis had provided him with the phone number and given him the green light to make the call. *See* Royce Tr. at 237:17 – 240:16; Lewis Tr. at 150:9 – 151:4.

D. Nonetheless, after Lewis had learned all of these deficiencies he stated publicly, and incorrectly, that CPI got the story right. *See* Pls.' Ex. 106 at 10:15-11:1 (Remarks of Charles Lewis at "The Latest Perils in Libel and Newsgathering," 2003 IRE Annual Conference (June 5-8, 2003); transcript attached, audio recording on file with Plaintiffs' counsel).

124.   **Defendants' Assertion:**

Lewis knew that Royce "felt secure" about the sources for the allegations about the Plaintiffs.  SDA ¶162.

**Plaintiffs' Response:**

A. This statement is inadmissible hearsay.  *See* Fed. R. Evid. 802.  The declarant is

Lewis.  *See* SDA ¶162 (citing to excerpts from the Lewis deposition).

B. *See* response 86(B).

125.   **Defendants' Assertion:**

Lewis knew Royce had cultivated a network of sources in the law enforcement and intelligence community. SDA ¶163.

**Plaintiffs' Response:**  This statement is inadmissible hearsay.  *See* Fed. R. Evid. 802.

The declarant is Lewis.  *See* SDA ¶163 (citing to Lewis Tr. at 298:19-301:11).

126.   **Defendants' Assertion:**

Lewis approved the final draft Article for publication.  SDA ¶164.

**Plaintiffs' Response:**

127.   **Defendants' Assertion**:

Prior to publication, the Article was written or reviewed by the following – its authors Royce and Heller; interns Gil Shochat and Amy Zader; the *Public i* editor Prince; Smith; Executive Director Lewis; senior editor Bill Allison and veteran reporter Maud Beelman; and the Center's outside legal counsel.  SDA ¶¶44, 165.

**Plaintiffs' Response:**  The number of individuals who may have written and reviewed

the Article cannot and does not give rise to any inference that the Article was accurate or that

those supposedly reviewing the Article were aware of the facts.  All of these people, except for

Royce and possibly Heller, were unaware of the warnings provided by the Russian-American

specialist and the fact that Palmer had given the "KGB Major Report" to Royce on the condition

that he couldn't use it without independently verifying the information therein, and also appear to

have been under the mistaken impression that these were official government documents. *See*

Pls.' Ex. 4. They also might not have been aware of all the other reasons Royce had for

disbelieving the documents. *See* response 86(B).

**128.**   **Defendants' Assertion:**

> There was a consensus among the CPI staff members that the Article was well
> documented and credible, and ready to be published. SDA ¶126.

> **Plaintiffs' Response**:

A. This statement is inadmissible hearsay. The declarant is Royce. *See* Royce Tr. at

75:1-76:4 (cited by SDA ¶126).

B. To the extent this so called "consensus" existed, Royce knew it was based upon false

premises. *See* response 86(B).

**129.**   **Defendants' Assertion:**

> When the Article was posted on the *Public i* website on August 2, 2000, the Defendants
> had no doubt that the allegations of criminality about Plaintiffs were credible. SDA ¶166.

> **Plaintiffs' Response:**  There is more than sufficient evidence in the record for the trier of

fact to conclude that this was not the case. *See* response 86(B); Kaplan Report at 4-10; Kaplan

Decl. at ¶¶ 3-7, 9-11, 14-17, 24-25.


## PLAINTIFFS' RESPONSE TO DEFENDANTS' SUPPLEMENTAL STATEMENT OF MATERIAL FACTS NOT GENUINELY IN DISPUTE

Along with their "Renewed Motion for Summary Judgment", Defendants attached a

"Supplemental Statement of Material Facts Not Genuinely In Dispute" with nine proffered facts.

These statements all appear to be made in furtherance of Defendants' argument that Alfa-Eco is

not the real party in interest. None of these facts, however, are material.

1.      **Defendants' Supplemental Assertion:**

Plaintiff ZAO Alfa Eco was "a closed-joint stock company organized under the laws of the Russian Federation." Complaint ¶3.

**Plaintiffs' Response:** The statement is not "material." *See* Fed. R. Civ. P. 56. The only

relevant issues are (a) when Defendants learned that the wrong initials were being used to

describe Alfa-Eco; (b) whether Defendants objected to Plaintiffs' continued use of the wrong

initials pursuant to Fed.R.Civ.P. 17; and (c) whether Defendants were prejudiced by Plaintiffs'

continued use of the wrong initials. *See* Pls.' Mem. at 58-59. Plaintiffs fail to satisfy any of

these criteria. *See id.*

2.      **Defendants' Supplemental Assertion:**

In 1997, ZAO Alfa Eco was transformed into a limited liability company called "OOO Alfa Eco." Declaration of Elizabeth C. Kch, Ex. A (hereafter "Kock Decl.")

**Plaintiffs' Response:** *See* response to no. 1.

3.      **Defendants' Supplemental Assertion:**

On March 17, 1997, OOO Alfa Eco first registered to do business in the Russian Federation. Koch Decl., Ex. B.

**Plaintiffs' Response:** *See* response to no. 1.

4.      **Defendants' Supplemental Assertion:**

On September 14, 2000, the defunct joint stock company ZAO Alfa Eco purported to file the Complaint in this action alleging that, "[a]s a direct and proximate result of the Article," its "business ethics and business reputation … have been impugned." Complaint ¶20.

**Plaintiffs' Response:** *See* response to no. 1.

5.      **Defendants' Supplemental Assertion:**

Some time on or before June 27, 2001, plaintiff's counsel became aware that the Complaint had erroneously been filed on behalf of the wrong corporate entity, and began unilaterally substituting "OOO Alfa Eco" in the caption of certain pleadings. Koch decl., Ex. E.

**Plaintiffs' Response:** *See* response to no. 1.

6.     **Defendants' Supplemental Assertion:**

Despite having known of this error for nearly three years, Plaintiffs have never made any effort to substitute the proper plaintiff in this action.

**Plaintiffs' Response:** *See* response to no.1.

7.     **Defendants' Supplemental Assertion:**

The Article at issue was published on August 2, 2000.  Complaint ¶12.

**Plaintiffs' Response:** *See* response to no.1.

8.     **Defendants' Supplemental Assertion:**

As of December 2001, the Alfa Eco group of companies consisted of mare than 30 separate entities including "Eco Holding Limited," "OOO Alfa Eco Group," "OOO Alfa Eco," "Alfa Eco M," "Alfa Eco SPb," and numerous other corporate entities that bear the Alfa Eco name.  Koch. Decl., Ex. C, at 45.

**Plaintiffs' Response:** *See* response to no. 1.

9.     **Defendants' Supplemental Assertion:**

All of the companies within the Alfa Eco group are together known publicly as "Alfa Echo."  Koch Decl., Ex. D.

**Plaintiffs' Response:** *See* response to no. 1.

Dated: August 3, 2004                          Respectfully submitted,

Daniel Joseph, D.C. Bar No. 195842
Jonathan S. Spaeth, D.C. Bar No. 394921
Tobias E. Zimmerman, D.C. Bar No. 475202
Jeremy A. Paris, D.C. Bar No. 483276
AKIN GUMP STRAUSS HAUER & FELD LLP
1333 New Hampshire Ave, N.W.
Washington, D.C.  20036
(202) 887-4000
(202) 887-4288 FAX

ATTORNEYS FOR PLAINTIFFS