# BOWMAN DECLARATION EXHIBIT 11

80432.0
JBbmc

1

1        UNITED STATES DISTRICT COURT

2        FOR THE DISTRICT OF COLUMBIA

3

4

5  - - - - - - - - - - - - -x

6  OAO ALFA-BANK, et al.,          :

7           Plaintiffs,            :

8      vs.                         :    Case Number

9  CENTER FOR PUBLIC               :    1:00CV02208 (JDB)

10  INTEGRITY, et al.,             :

11           Defendants.           :

12  - - - - - - - - - - - - -x

13

14        VIDEO DEPOSITION OF KNUT S. ROYCE

15

16

17                    Washington, DC

18                    Thursday, March 28, 2002

19

20

21  REPORTED BY:

22      JULIE BAKER

215

<u>CERTIFICATE OF NOTARY PUBLIC & REPORTER</u>

I, **JULIE BAKER**, the officer before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn; that the testimony of said witness was taken in shorthand and thereafter reduced to typewriting by me or under my direction; that said deposition is a true record of the testimony given by said witness; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and, further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

_____
Notary Public in and for the
District of Columbia

My Commission Expires        OCTOBER 4, 2002

1          Q     During this conversation or this meeting,

2    did you ask the Russian-American specialist what he

3    thought of the credibility of the letter to the

4    Duma, and in particular the credibility of the

5    allegation that Mr. Fridman had been involved in

6    drugs since a student in the 1980s?

7          A     I recall I did.  He told me that he had no

8    knowledge himself -- Mr. Fridman or Aven being

9    involved in drugs.  He didn't have that knowledge.

10   He did have knowledge of their alleged involvement

11   with the Solntsevo organized crime group.

12         Q     He told you that?

13         A     Yes.

14         Q     Is there any particular reason that your

15   notes do not record or appear to record the

16   Russian-American specialist's statement that he had

17   no new knowledge himself regarding Mr. Fridman's

18   drug activities?

19         A     Let me see.  I don't see any reference in

20   these notes of his claim that he had no personal

21   awareness of Aven and Fridman being involved in

22   narcotics.  I don't find it here, but that is the

1  best of my recollection, that he personally didn't

2  know of that.

3      Q    I believe you said, and correct me if I'm

4  wrong, that he did have knowledge of organized crime

5  activities on the part --

6      A    Specifically the Solntsevo group out of

7  Moscow, Solntsevo group, organized crime group.

8      Q    He had knowledge with regard to that group

9  or he had knowledge with regard to that group --

10     A    With regard to that group's involvement

11 with Alfa Bank.

12     Q    What did he tell you in that regard?

13     A    That it was a business relationship, a

14 close relationship.

15     Q    Anything else?

16     A    No, but they did more than break bread

17 occasionally.

18     Q    Did he tell you what the nature of the

19 business was that they were conducting?

20     A    Yeah.  I'm going by recollection now.

21     Q    It's not in your notes?

22     A    It's not in these notes.  There is

1    say -- I don't see former FSB source so I'm assuming

2    it's a current FSB source.  I'm sorry.

3        Q    Where it says "I asked status," the "I" is

4    referring to the Russian-American specialist?

5        A    Yes.

6        Q    The comment "put away for better day," was

7    it your understanding that's what the

8    Russian-American specialist's FSB source told him?

9        A    That's right.

10       Q    Did you and the Russian-American

11   specialist have any discussion or conversation about

12   why the investigation had been put away for a better

13   day?

14       A    I recall that we did, and his response was

15   that the political and governmental structures in

16   Russia at that time made it very difficult, if

17   unlikely, for the FSB to pursue the allegations,

18   that they would pursue it at some other date when

19   the politics and the governmental environments had

20   changed somewhat.  I did not get into the various

21   reasons of what was required within the Russian

22   government or body politic to change.

1    message on the fax sheet, Exhibit 19, from the top

2    aide says "I would still recommend looking into the

3    Duma archives for further actions on Ilyushin's

4    part."  Do you see that?

5         A    Right.

6         Q    Had you discussed with the top aide prior

7    to your receipt of the so-called FSB report his

8    recommendation about looking into the Duma archives?

9         A    I don't believe so, because I didn't have

10   access to the Duma archives.

11        Q    Do you recall discussing at any point in

12   time, either before or after your receipt of the FSB

13   report, the Duma archives and what the top aide

14   thought you might find there?

15        A    Not in a substantive way.  I would have

16   recalled that.  And I think if there had been

17   substantive discussions about all this, I would have

18   commemorated in note form.  At that point -- well.

19        Q    If you want to add to your --

20        A    No, no.

21        Q    The end of the document, it says -- I'm

22   talking about Exhibit 19, the fax cover sheet, it

80432.0
JB

192

1    says "P.S. Please don't take this article as the

2    gospel."

3         A    Right.

4         Q    What did you understand that to mean?

5         A    Precisely what it says, that don't assume

6    that every bit of information is accurate, that this

7    was not a part of the New Testament or Old

8    Testament.  As in anything that comes out of Russia,

9    be a little careful.

10         Q    Where he uses -- "he," the top aide, uses

11    the term "this article," did you understand that to

12    be referring to the FSB report?

13         A    To a report rather than an article, right.

14         Q    Do you recall having any discussions with

15    the top aide, between the time you received the

16    so-called FSB report and the date the article was

17    published, about the comment at the end of Exhibit

18    19 that says "please don't take this article as the

19    gospel"?

20         A    In fact, I believe that after I got this,

21    we spoke very briefly.  I assured him I take nothing

22    as gospel and thank you for the advice.

1      Q      Does that exhaust your recollection of the

2    conversation, or was there anything else to it?

3      A      It was as brief as that.  We didn't go

4    into a lot of details of why and why not.  He was

5    not a primary source.  He was an assistant, an aide

6    who would fax me material and bright fellow, but

7    didn't have the background of the Russian-American

8    specialist.

9      Q      Did you ever discuss the last line of the

10   cover sheet in Exhibit 19 that says "please don't

11   take this article as the gospel" with the

12   Russian-American specialist?

13     A      Not in those words, but there was some

14   discussion of certainly how credible is this.  There

15   was some discussion of that and his reply was, I

16   think generally, that he just didn't know how

17   credible all of the information was in there because

18   based on other information he had he couldn't

19   substantiate, for instance, the narcotics

20   allegations but other things in there were -- indeed

21   rang true to other things he had tracked.

22     Q      Was this conversation before or after you

1   had received the so-called FSB report?

2        A     Those conversations were, I believe,

3   before I had received the FSB report, yeah.  It may

4   have been in reference to the FSB report as it

5   appeared in the newspaper.

6        Q     If I could summarize, you asked the

7   Russian-American specialist how credible is this

8   information?

9        A     Yeah.

10        Q     And he responded he just didn't know and

11   at least with respect to the drug allegations --

12        A     Right.

13        Q     -- he did not have any knowledge to

14   substantiate that?

15        A     Right, right.

16        Q     Okay.  You received the -- strike that.

17   Let me do this instead.  Let's go back to the

18   so-called FSB report, Exhibit 17.  The first

19   sentence states "this memo contains excerpts from a

20   letter sent from an anonymous group of Federal

21   Security Bureau agents to the head of the national

22   security commission, Victor Ivanovich Ilyushin."  Do

1   you see that?

2        A    Yes.

3        Q    Prior to the publication of the article,

4   were you able to determine or did you determine who

5   the author of that sentence was or, for that matter,

6   the first paragraph on the FSB report?

7        A    The proceeding which is not part of the

8   report?

9        Q    Right.  The paragraph that begins with the

10  language "this memo" and ends with "federal

11  authorities in Moscow."

12       A    Again, this was an addition, proceeding

13  notes to whoever the report had been translated for.

14       Q    How do you know that?

15       A    Because it was not -- this entire document

16  was not prepared for me.

17       Q    Would it be fair to say you're assuming

18  that's who it was prepared for?

19       A    I think it was more an assumption.

20  Remember, there were elliptical conversations on the

21  pedigree of the report.  He told me he thinks he has

22  the report and might get his hands on the report and

80432.0
JB

196

1    that was it.

2         Q     For the record, I'm going to read the

3    second sentence of that paragraph into the record

4    which states "although we have been unable to

5    determine the veracity of the allegations made in

6    the letter, our sources confirm that they may be the

7    basis for an ongoing investigation by the federal

8    authorities in Moscow."

9              Did you ever attempt to find out prior to

10   the date the article was published who had written

11   that initial paragraph on page 1 of the so-called

12   FSB report?

13        A     Who specifically, no, but it tracked very

14   closely with what the Russian-American specialist

15   had told me, that he had tried a year before to

16   ascertain that he had learned that there was an

17   investigation, and he had tried to determine from

18   the FSB what the status of that investigation was

19   and he had been told it was put aside for some other

20   date.

21        Q     Prior to publication of the article, did

22   you ask the Russian-American specialist whether he

CR80438.0
BMS

216

1              UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF COLUMBIA

3

4                                    ORIGINAL

5    - - - - - - - - - - - - -x

6    OAO ALFA-BANK, et al.,      :

7            Plaintiffs,        :     Case Number

8        vs.                    :     1:00CV02208 (JDB)

9    CENTER FOR PUBLIC           :

10   INTEGRITY, et al.,          :

11           Defendants.        :

12   - - - - - - - - - - - - -x

13

14        VIDEO DEPOSITION OF KNUT S. ROYCE

15                Volume II

16

17                        Washington, DC

18                        Friday, March 29, 2002

19

20

21   REPORTED BY:

22     BRENDA SMONSKEY

ACE-FEDERAL REPORTERS, INC.

Nationwide Coverage

202-347-3700        800-336-6646        410-684-2550

CR80438.0
BMS

217

1     Deposition of KNUT S. ROYCE, called for further

2  examination pursuant to notice of deposition, on

3  Friday, March 29, 2002, in Washington, DC, at the

4  offices of Levine, Sullivan & Koch, 1050 17th

5  Street, N.W., Suite 800, at 9:06 a.m., before BRENDA

6  SMONSKEY, a Notary Public within and for the

7  District of Columbia, when were present on behalf of

8  the respective parties:

9

10          JONATHAN S. SPAETH, ESQ.

11          JOSHUA TOLL, ESQ.

12          Akin, Gump, Strauss, Hauer & Feld

13          133 New Hampshire Avenue, N.W.

14          Washington, D.C. 20036

15          202-887-4452

16          On behalf of Plaintiffs

17

18

19

20                              --continued--

21

22

CR80438.0
BMS

218

1    APPEARANCES (CONTINUED):

2

3            MICHAEL D. SULLIVAN, ESQ.

4            Levine, Sullivan & Koch

5            1050 17th Street, N.W., Suite 800

6            Washington, D.C. 20036

7            202-508-1116

8            On behalf of Defendants

9

10

11      ALSO PRESENT:   LARRY FLOWERS, Video Operator

12

13

14

15

16

17

18

19

20

21

22

## CERTIFICATE OF NOTARY PUBLIC & REPORTER          459

I,   BRENDA M. SMONSKEY ,   the officer before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn; that the testimony of said witness was taken in shorthand and thereafter reduced to typewriting by me or under my direction; that said deposition is a true record of the testimony given by said witness; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and, further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

*Brenda Smonskey*
_____
Notary Public in and for the
District of Columbia

My Commission Expires        APRIL 30, 2006

1    Siberian city became poisoned after they had eaten

2    heroin-laced sugar that had been shipped in a

3    railcar container leased to Alfa-Eko; right?

4        A    Right.

5        Q    Further down on page 4 in the middle of

6    the page, you tell your readers, citing the FSB

7    report, that a top Alfa official met with the head

8    of the Cali drug cartel; correct?

9        A    That's correct.

10       Q    And if you turn to page 5, to the first

11   full paragraph, you tell your readers, citing the

12   FSB report, that top officials of the Alfa Group

13   cooperated with a number of Russian crime

14   organizations; correct?

15       A    That's right.

16       Q    Now, you did not tell your readers that

17   the FSB report contained a statement in the very

18   first paragraph on page 1 that, quote, "We have been

19   unable to determine the veracity of the allegations

20   made in the letter," did you?

21           MR. SULLIVAN:  Object to the form.  I

22   think that misstates -- I don't think the testimony

1    is that that paragraph was part of the text of the

2    FSB report.  I think what he has described is that

3    paragraph comes from the people who provided the FSB

4    report.

5             MR. SPAETH:  He doesn't know that.

6             MR. SULLIVAN:  I think that's what he

7    testified his understanding was --

8             THE WITNESS:  Yes.

9             MR. SULLIVAN:  -- when we talked

10   yesterday.

11            BY MR. SPAETH:

12       Q    That language appears on the first page in

13   the very first paragraph of the document that has

14   been labeled the FSB report; correct?

15       A    It is not part of the FSB report.

16       Q    Whether or not it is part of the FSB

17   report, you did not inform your readers that there

18   was language on the document labeled the FSB report

19   that states, "We have been unable to determine the

20   veracity of the allegations made in the letter."

21   Did you?

22       A    You have asked me before who wrote that,

CR80438.0
BMS

309

1    his sources, a human source, the matter of whether

2    they are Jewish or not.  I don't know whether you

3    are intending to mean human source or documentary

4    source.

5              MR. SPAETH:  I really meant either.

6              MR. SULLIVAN:  If that helps.

7              BY MR. SPAETH:

8         Q    Did any of your sources tell you verbally

9    that Mr. Aven and Mr. Fridman were Jewish?

10        A    I don't recall whether they did.  It would

11   not be something that would stick in the mind.

12        Q    Any time prior to publication of the

13   article, did you discuss with anyone whether

14   Mr. Ilyukhin had a reputation for being a rabid

15   anti-Semite?

16        A    No.

17        Q    Did you do any kind of research on

18   Mr. Ilyukhin any time before the article was

19   published?

20        A    I believe it was limited to LEXIS-NEXIS

21   and perhaps the conversation I had with the

22   Russian-American specialist, "is this a real guy, is

CR80438.0
BMS

310

1    he really chairman of that particular committee at

2    the Duma."  This was a letter to him.  It was not a

3    letter from him.  So there was more import in trying

4    to determine who the authors were rather than who

5    the recipient was.  But I think that was --

6         Q    Did you ever consider that the motivations

7    of the person or persons who authored the FSB report

8    might be related to the predilections of the person

9    to whom they were sending it?

10        A    No.

11        Q    Do you specifically recall doing a

12   LEXIS-NEXIS search on Mr. Ilyukhin?

13        A    I'm sure I punched in his name in various

14   permutations in LEXIS-NEXIS.

15        Q    During the period from July 25 to August

16   2, 2000, did you have access to the Internet?

17        A    Yes.

18        Q    During the period from August 25 -- strike

19   that.

20             During the period from July 25 to August

21   2, 2000, did you conduct any research on the

22   Internet with respect to Mr. Ilyukhin?

CR80438.0
BMS

311

1      A     I don't recall.

2      Q     Is today the first time you heard that

3   somebody may consider Mr. Ilyukhin to be a rabid

4   anti-Semite?

5      A     No.  I'm trying to recall, but several

6   months ago somebody had mentioned that.  I don't

7   recall the context.  But that I have heard since

8   then a description of him as that I have a

9   recollection.

10     Q     With that information in mind, has that

11  changed your opinion at all with respect to the

12  credibility of the allegations in the FSB report

13  concerning the alleged criminal activities on the

14  part of my clients?

15     A     It has not.

16     Q     I would like to direct your attention to

17  the article, Exhibit 5, specifically to page 3.  The

18  fifth paragraph down from the top states, "The

19  allegations were contained in a report delivered in

20  1997 by anonymous officials from the FSB (the

21  Russian equivalent of the FBI) to the National

22  Security Committee of the Duma or lower house of

CR80438.0
BMS

437

1    within one of these file folders?

2        A    I think it was.  I don't know for a fact.

3    There were some documents -- there were several

4    documents that I kept on the side of my desk.  I had

5    a very large desk, and it had a lot of papers and

6    documents and news clippings and what have you.

7              So I did the logical.  I went through the

8    material that was in files that were labeled

9    appropriately that would relate to this, and I did a

10   search then of some of the other parts of my desk

11   where some of the material may be.

12             I believe I looked at the computer to see

13   what was in there during that period of time, but as

14   I report things out, if I'm going to use it on a

15   story, I tend to print.  I make paper copies of

16   everything because I'm not used to going back and

17   forth in a computer to see what's in there.

18             At any rate, I responded to this in the

19   best way I could, checking the files.  And I think

20   the early request was more specific than a later

21   request, as I recall.

22        Q    Take a look at --

ACE-FEDERAL REPORTERS, INC.

Nationwide Coverage

202-347-3700          800-336-6646          410-684-2550

CR80438.0
BMS

438

1          MR. SULLIVAN:  I don't know if you want

2    this or not.  Hopefully this will clarify for you.

3    I notice that your request here, did you guys make

4    any request earlier than this or is this the first

5    one?

6          MR. SPAETH:  That's the first one.

7          MR. SULLIVAN:  It is dated January 2001.

8    I think the suit started -- I think you filed in

9    like September.

10          Like I say, he was instructed when we were

11    first retained to gather up all the documents before

12    anything happens to them.  I think what he is

13    describing to you, he did it at the request of

14    counsel.  I think it was done before your thing ever

15    hit the --

16          THE WITNESS:  I turned it over.  I'm

17    sorry.

18          BY MR. SPAETH:

19     Q     Let me ask you this.  Take a look at

20    Exhibit 19.

21     A     The cover sheet?

22     Q     Yes.  As maintained by you, was the cover

CR80438.0
BMS

439

1   sheet attached to the FSB report?

2        A    It was not.  I found the cover sheet

3   separately later on.  It was not attached to

4   anything.

5        Q    When did you find the cover sheet?

6        A    I found it after the original delivery.

7   In fact, I think I found it when I was cleaning out

8   my desk.  Once every six months I clean out the top

9   of my desk or I can't see above it.  Or this could

10  have been when I was cleaning out my desk after

11  being reduced in force.  But it was in the process

12  of cleaning out my desk.

13           I think I found this and some other things

14  that had been on top of my desk but lying

15  underneath, newspapers and other reports.  There

16  were pounds, several pounds of documents on top of

17  my desk.

18       Q    So you did not -- your testimony is that

19  you did not locate Exhibit Number 19 in connection

20  with the initial document-gathering process?

21       A    That's correct.

22       Q    Do you recall specifically what other

CR80438.0
BMS

440

1    documents you located at the time that you located

2    Exhibit 19?

3        A    Whatever documents that I saw or pieces of

4    paper that even remotely had a bearing on the

5    request for documents that I found at the time that

6    I was cleaning out my desk, I brought them over

7    here.  I don't recall what other articles or pieces

8    of paper or whatever.

9        Q    Do you have an explanation for why your

10   initial document-gathering efforts did not turn up

11   Exhibit 19?

12       A    Yes.  This one was hidden under a pile of

13   other papers on top of my desk.  It was when I was

14   cleaning out my desk that I found it.

15       Q    Could I direct your attention for a moment

16   to Exhibit 20, please, which is CPI's initial

17   interrogatory responses, not the supplemental ones.

18       A    20.

19       Q    What exhibit number do you have?

20       A    20.

21       Q    Okay, good.  Let me direct your attention

22   to interrogatory 20.  It appears near the bottom of

1       I HEREBY CERTIFY that I have read this

2   transcript of my deposition and that this transcript

3   accurately states the testimony given by me, with

4   the changes or corrections, if any, as noted.

5

6

7                               X _____

8

9

10

11  Subscribed and sworn to before me this _24th_ day of

12  _April_____, 20 _02_

13

14

15

16                               X _Carrie L. Washington_

17                                    Notary Public

18

19  My commission expires: _____.

20      My Commission Expires May 14, 2004

21

22

459

1            UNITED STATES DISTRICT COURT

2           FOR THE DISTRICT OF COLUMBIA

3

4   - - - - - - - - - - - - - - - x

5   OAO ALFA-BANK, ZAO ALFO-ECO,         :

6   MIKHAIL FRIDMAN, and PYOTR AVEN,     :

7            Plaintiffs,               : Case No.

8   vs.                                : 1:00CV02208(JDB)

9   CENTER FOR PUBLIC INTEGRITY,         :

10  KNUT ROYCE, and NATHANIEL HELLER,   :

11           Defendants.               :

12  - - - - - - - - - - - - - - - x

13

14          DEPOSITION OF KNUT S. ROYCE

15

16                     Volume III

17

18                     Washington, DC

19                     Friday, July 11, 2003

20

21  REPORTED BY:

22     JULIE BAKER, RPR CRR


ACE-FEDERAL REPORTERS, INC.
Nationwide Coverage
202-347-3700          800-336-6646          410-684-2550

## CERTIFICATE OF NOTARY PUBLIC & REPORTER                495

I, JULIE BAKER, RPR, CRR, the officer before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn; that the testimony of said witness was taken in shorthand and thereafter reduced to typewriting by me or under my direction; that said deposition is a true record of the testimony given by said witness; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and, further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

_Julie Baker_
Notary Public in and for the
District of Columbia

My Commission Expires:          OCTOBER 15, 2007

466

1        Q    Other than discussing other aspects or

2   avenues of inquiry that you were interested in with

3   Mr. Palmer during this conversation, do you have a

4   recollection of discussing anything else with him?

5        A    Nothing that I can specifically recall,

6   no.

7        Q    Do you recall, during this conversation

8   we've been discussing or in any conversation you had

9   postpublication with Mr. Palmer, Mr. Palmer

10  expressing, in words or in substance, surprise that

11  there was a reference to him and/or to what we've

12  called the KGB major report in the article?

13       A    I don't have a firm recollection of such a

14  discussion.  I recall vaguely that he may have been

15  a little nervous.  That in itself is not unusual.

16       Q    When you say he -- which I'm assuming is

17  Mr. Palmer?

18       A    Mr. Palmer, right.

19       Q       -- was a little nervous, on what are you

20  basing that statement?

21       A    Again, hard to pin down.  This is an

22  impression that I remember.  It's not in itself a

1   conversation than the first one?

2       A    Again, I can't pin it to one conversation

3   or the next day's conversation.  I just can't, but I

4   know I have a recollection that somehow I conveyed

5   to him that the Bank of New York was another avenue

6   I was interested in pursuing.

7       Q    Did he supply you with any information in

8   response to that?

9       A    Not that I recall, no.

10      Q    Is it a fair characterization of your

11  initial postpublication conversation with Mr. Palmer

12  that you did not have the impression or

13  understanding that Mr. Palmer was upset or angry

14  with you?

15      A    Upset and angry are pretty loaded terms.

16  I don't recall it as such.  Again, I have an

17  impression that there was some nervousness but not

18  beyond that.

19      Q    Do you recall Mr. Palmer telling you

20  during the initial postpublication conversation that

21  you had misused the KGB major report in any way?

22      A    I don't recall a conversation like that,

493

1     I HEREBY CERTIFY that I have read this

2   transcript of my deposition and that this transcript

3   accurately states the testimony given by me, with

4   the changes or corrections, if any, as noted.

5

6

7                              X _____

8

9

10

11   Subscribed and sworn to before me this 4th day of

12   August    , 20 03    .

13

14

15

16                         X _Carrie L. Washington_

17                              Notary Public

18

19

20                              My Commission Expires May 14, 2004

21   My commission expires: _____.

22

ACE-FEDERAL REPORTERS, INC.
Nationwide Coverage
202-347-3700          800-336-6646          410-684-2550