# BOWMAN DECLARATION EXHIBIT 15

1



**АРБИТРАЖНЫЙ СУД г. МОСКВЫ**
**ИМЕНЕМ РОССИЙСКОЙ ФЕДЕРАЦИИ**
**РЕШЕНИЕ**

« 10»  июля 2003 г.                                         Дело №  А40-49954/02-21-494

Арбитражный суд в составе:
Судьи          Высокинской О.А.

С участием сторон:
от 1,2,3,4 истцов – Любарская Г.В. дов от 25.10.2002г., 4-от 19.11.2002г.,3- дов от
01.03.2003г., 4-  Кульков Е.А. дов 25.10.2002г.
от ответчика «МАПТ- Медиа» - Коршикова М.В. дов от 14.01.2003г.
эксперты : Сафонова Ю.А., Кара-Мурза Е.С.

рассмотрев в судебном заседании дело по иску      Авена П.О., Фридмана М.М., ОАО
«Альфа-Банк», ООО «Альфа-Эко»

к ответчикам   ЗАО «МАПТ-медиа», Лурье О.А.

о защите деловой репутации, пресечении действий ответчиков по злоупотреблению
свободой средств массовой информации и правами журналиста, взыскании убытков
в размере 172.271,85 фунтов стерлингов (в рублевом эквиваленте), морального
вреда – 250.000 долларов США (в рублевом эквиваленте).


     УСТАНОВИЛ:          Иск заявлен о защите деловой репутации, пресечении
действий ответчиков по злоупотреблению свободой массовой информации и
правами журналиста и взыскании убытков в размере 172.271,85 фунтов стерлингов
(в рублевом эквиваленте), а также морального вреда – 250.000 долларов США (в
рублевом эквиваленте).


     В судебном заседании сторонами были заявлены следующие ходатайства.

     Истцами- Авеном П.О., Фридманом М.М., ОАО «Альфа-Банк», ООО «Альфа-
Эко» заявлено ходатайство об изменении предмета иска и размера исковых
требований в части понесенных истцом расходов на оплату независимого
расследования Компанией «Кролл», настаивая на признания этого требования
требованием о возмещении судебных издержек, т.е. расходов, понесенных для
осуществления как самозащиты, так и защиты в судебном порядке законных прав и
интересов. К расходам, понесенным истцом, последний ходатайствовал отнести
1 757 820,61руб., составляющих сумму НДС , оплаченную за Компанию «Кролл»,
по платежному поручению от 23.01.2003г. № 00005.
     Ходатайство истца судом удовлетворено  в порядке ст.49 АПК РФ, что
отражено в протоколе судебного заседания.

P0009238

Кроме того, истцами было заявлено требование о возмещении судебных расходов, связанных с оплатой услуг представителя- адвоката, в сумме 374 206,90руб.

Ответчик- ЗАО «МАПТ -медиа», заявил ходатайство о назначении повторной экспертизы и вызове в качестве свидетеля в заседание Арбитражного суда Депутата Государственной думы В.И. Илюхина.

Заявленные ходатайства судом отклонены в связи с отсутствием обстоятельств, являющихся основанием для назначения повторной экспертизы и вызова свидетеля, что отражено в протоколе судебного заседания.

Истцы поддержали исковые требования в полном объеме, заявив, что требования о защите деловой репутации, пресечении действий ответчиков по злоупотреблению свободой средств массовой информации, правами журналиста и взыскании убытков, а также морального вреда, предъявлены ими с учетом уточнения исковых требований, принятых судом, согласно определению от 02.04.2003г., которым конкретизированы требования каждого из истцов – Авена П.О., Фридмана М.М., ОАО «Альфа-Банк», ООО «Альфа-Эко» относительно сведений, изложенных в статье О.А.Лурье под заголовком «Альфа» Групповой портрет», опубликованной в № 25 от 06.07.1999 г. газеты «Версия», а также в статье под заголовком «Криминальное чтиво по-русски», опубликованной в № 19 газеты «Версия» от 20.05.2002 г.; требование о взыскании 172.271,85 фунтов стерлингов в рублевом эквиваленте на день исполнения решения и 1.757.820,61 рублей в возмещение судебных издержек, относящихся на счет убытков истца и затраченных ОАО «Альфа-Банк» на получение доказательств несоответствия действительности. распространенных ответчиками сведений, порочащих деловую репутацию истцов, а также требование о взыскании расходов на оплату услуг адвоката в сумме 374.206 рублей 90 копеек в возмещение расходов по оплате услуг адвоката четырех истцов, дополнительно заявленные в настоящем заседании.

Иск заявлен двумя физическими и двумя юридическими лицами Авеном П.О., Фридманом М.М., ОАО «Альфа-Банк», ООО «Альфа-Эко» о признании несоответствующими действительности и порочащими деловую репутацию истцов сведений, распространенных журналистом Лурье О.А. в двух номерах газеты «Версия», учредителем которой является ЗАО «МАПТ-медиа»: в номере 25 от 06.07.1999 г., в котором опубликована статья под заголовком: «Герой нашего времени!» «Альфа «Групповой портрет», имеющим подзаголовок «Альфа» участвовала в организации транзита наркотиков из Юго-Восточной Азии через Россию в Европу», и в номере 19 от 20.05.2002 г., в котором опубликовано интервью с анонимным «офицером западных спецслужб» под названием «Криминальное чтиво по-русски».

Настаивая на удовлетворении исковых требований, истцы утверждали, что в этих публикациях ответчиками ЗАО «МАПТ-медиа» и Лурье О.А. распространены сведения о совершении Авеном П.О. и Фридманом М.М. тяжких преступлений (об их участии в организации транзита наркотиков из Юго-Восточной Азии через Россию в Европу; о противозаконных контактах с международными авантюристами и связях с криминалом; об участии во встрече с представителем колумбийских наркобаронов и о достижении договоренности о «закачке» в «Альфа-Банк» денежных средств из оффшорных зон; о махинациях Фридмана М.М. с ваучерами и других противоправных действиях), а в отношении компаний «Альфа-Банк» и

«Альфа-Эко» - об осуществлении ими противозаконной деятельности (выполнении «Альфа-Эко» операций, связанных с наркотиками; об отмывании через «Альфа-Банк» денег от преступного международного наркобизнеса; о том, что деятельность этих структур представляет угрозу национальной безопасности ряда стран.

В частности, истцы считают несоответствующими действительности и порочащими их деловую репутацию следующие сведения, распространенные в № 25 газеты «Версия» от 06.07.1999 г. в статье под заголовком «Герой нашего времени!» «Альфа» - Групповой портрет», имеющей подзаголовок «Альфа» участвовала в организации транзита наркотиков из Юго-Восточной Азии через Россию в Европу»:

1. В отношении истца П.О. Авена

«В период учебы в МГУ П.О.Авен был руководителем музыкального студенческого клуба и обзавелся многочисленными знакомствами в той молодежной среде (музыкальная «тусовка», богема и т.п.), где формировался потребительский рынок наркотиков. Благодаря этому привлек внимание криминальных элементов, имел контакты с «авторитетами».

«В результате (того, что П.О. Авен занимался решением проблемы долгов) П.О.Авен заработал хорошие комиссионные на продаже долга Ганы.»

«По свидетельству работников Министерства внешнеэкономических связей, Петр Авен, возглавляя министерство, не стеснялся брать комиссионные и даже дорогие подарки за содействие иностранным компаниям и российским предприятиям в заключении и осуществлении внешнеторговых сделок.»

«Особенно жестко он (П.О. Авен) контролировал выход на рынок оружия, допуская туда только тех, кто был связан с ним.»

«В 1991-1992 годах Петра Авена разрабатывало 6-е управление КГБ МБ РФ по материалам хищения в крупных размерах, нанесения стране крупного ущерба и по преступным связям со спецслужбами Израиля. В 1992 году бывший министр безопасности доложил материалы президенту Б. Ельцину, в результате чего 22 декабря 1992 года Петр Авен был уволен с поста министра.»

«Согласно этим же оперативным данным, П.О.Авен участвовал в организации транзита наркотиков из Юго-восточной Азии через Россию в Европу.»

«В конце 1993 года в Вене состоялась встреча П.О. Авена с представителем колумбийских наркобаронов Гильберто Родригесом Орехуэлом, известным под кличкой Шахматист. В частности, была достигнута договоренность о «закачке» в «Альфа-Банк» денежных средств из оффшорных зон (Багамы, Гибралтар) для их вложения в экономику России путем скупки акций российских предприятий.»

2. В отношении истца М.М. Фридмана.

«Бауманская группировка была в тот период единственной из столичных ОПГ, серьезно работавшей с наркотиками и постоянно расширявшей масштабы своих операций. Рынок сбыта наркотиков формировался в среде студенческой и творческой молодежи, рок-фанов хиппи, панков, проституток и т.п. В этих кругах у

P0009240

Фридмана были обширные связи, которые представляли несомненный интерес с точки зрения «бауманской бригады» и были задействованы с обоюдной выгодой.»

«Также Михаил Фридман участвовал в организации транзита наркотиков из Юго-Восточной Азии через Россию в Европу.»

«Фридман занимался ваучерными махинациями. В результате только этих махинаций с ваучерами глава «Альфа-Групп» увеличил свое личное состояние примерно на 30-40 млн.долларов.»

3. В отношении истца ОАО «Альфа- Банк».

«В конце 1993 года в Вене состоялась встреча П.О.Авена с представителем колумбийских наркобаронов Гильберто Родригесом Орехуэлом, известным под кличкой Шахматист. В частности, была достигнута договоренность о «закачке» в «Альфа-Банк» денежных средств из оффшорных зон (Багамы, Гибралтар) для их вложения в экономику России путем скупки акций российских предприятий.»

4. В отношении истца ООО «Альфа-Эко».

«Из оперативных разработок следует, что тайные операции, связанные с наркотиками, в рамках консорциума выполняет компания «Альфа-Эко».

Кроме того, истцы считают несоответствующими действительности и порочащими деловую репутацию Фридмана М.М., и деловую репутацию ОАО «Альфа-Банк» и ООО «Альфа-Эко», распространенные Лурье О.А. в статье под заголовком «Криминальное чтиво по-русски», опубликованной в № 19 газеты «ВЕРСИЯ» от 20.05.2002 г., (учредителем которой является ЗАО «МАПТ-медиа»), сведения: о связях Фридмана М.М. с криминалом; о существовании структуры «Альфа-Групп», представляющей угрозу национальной безопасности ряда стран; о связи Альфы с преступными авторитетами.

Кроме того, истцы просят признать злоупотреблением правами журналиста и правами СМИ действия ответчиков – ЗАО «МАПТ-медиа» и Лурье О.А. по распространению ими непроверенных сведений, не соответствующих действительности, порочащих истцов и содержащих обвинения в совершении тяжкого преступления, осуждаемого мировым сообществом. В качестве способа защиты своей деловой репутации и пресечения действий ответчиков создающих угрозу нарушения прав истцов по распространению в дальнейшем оспариваемых истцами сведений, истцы просят обязать ЗАО «МАПТ-медиа» опубликовать в газете «Версия» опровержение и запретить ЗАО «МАПТ-медиа» и Лурье О.А. впредь распространять об истцах опровергнутые сведения и признать названные действия ответчиков ЗАО «МАПТ-медиа» и Лурье О.А. злоупотреблением правами журналистов и средствами массовой информации (СМИ).

Так же истцы претендуют на возмещение ответчиками морального вреда путем взыскания с ответчика ЗАО «МАПТ-медиа» в пользу Авена П.О. 100 000 долларов США в рублевом эквиваленте на дату исполнения решения.; в пользу Фридмана М.М. - 100 000 долларов США в рублевом эквиваленте на дату исполнения решения, а с ответчика Лурье О.А. 25 000долларов США в рублевом эквиваленте на дату исполнения решения. в пользу Авена П.О. и - 25 000 долларов США в рублевом эквиваленте на дату исполнения решения в пользу Фридмана М.М.

P0009241

Обосновывая размер морального вреда, истцы отмечают, что вопрос о защите деловой репутации имеет для Авена П.О. и Фридмана М.М. принципиальное значение, поскольку за многие года работы в качестве первых лиц крупных компаний, выведенных в число ведущих предприятий России, истцы широко известны в предпринимательских кругах как в России, так и за рубежом.

По заявлению истца- Петр Авен – является членом Совета директоров Альфа-Банка и его Президентом, а также – Председателем Совета директоров двух других компаний и занимается общественной деятельностью, будучи членом Попечительского Совета Российской Экономической Школы и членом Попечительского Совета Большого театра.

Далее истец пояснил, что Фридман М.М. в течение многих лет избирается Председателем Совета директоров ОАО "Альфа-Банка" – одного из крупнейших в России частных коммерческих банков, входящих в число наиболее надежных. Его имя приобрело такую же, как и у Авена П.О., известность успешного предпринимателя и надежного партнера. Михаил Фридман является также членом Совета директоров четырех крупных компаний и в качестве общественного деятеля известен как Вице-президент Российского Еврейского Конгресса и член Российского Союза Промышленников и Предпринимателей.

Кроме того, возглавляемый Авеном П.О. и Фридманом М.М. Альфа-Банк имеет отделения во всех регионах России. Деловая репутация "Альфа-Банка", как одного из крупнейших и надежнейших банков России, в котором работают более пяти с половиной тысяч человек, размер активов "нетто" которого постоянно и значительно увеличивается, – сложилась в результате политики развития Банка, вырабатываемой Президентом Банка Авеном П.О. и Председателем Совета директоров Фридманом М.М. "Альфа-Банк" использует самые передовые банковские технологии. Он обеспечивает "вливание" крупных инвестиций в предпринимательскую деятельность. Только за 2001 год ОАО «Альфа-Банк» заплатил в бюджеты различных уровней, как налогоплательщик 393.064.477 рублей.

Учитывая вышеизложенное, истец заявил, что распространение таких сведений средством массовой информации, общий тираж которой составляет около 200.000 экземпляров), направлено на дискредитацию деловой репутации Авена П.О. и Фридмана М.М и в силу тяжести содержащихся в них обвинений не может не причинить серьезных нравственных страданий.

Кроме того, истцы просят взыскать солидарно с ЗАО «МАПТ-медиа» и Лурье О.А. в пользу ОАО «Альфа- Банк» 172.271,85 фунтов стерлингов в рублевом эквиваленте на день исполнения решения и 1.757.820,61 рублей в возмещение убытков, причиненных распространением ответчиками несоответствующих действительности и порочащих деловую репутацию истцов сведений. Истец уточнил исковые требования в этой части, указав, что для защиты своей деловой репутации, опороченной ответчиками, ОАО «Альфа-Банк» был вынужден в порядке самозащиты права и в целях сбора доказательств, опровергающих измышления ответчиков, обратиться за независимым расследованием во всемирно известную, авторитетную международную компанию «Кролл», выводы которой предъявлены реальным и потенциальным партнерам ОАО «Альфа-Банк» на международном рынке финансовых услуг и одновременно используются для обоснования исковых требований при обращении в арбитражный суд.

По утверждению истца, расходы на оплату работы «Кролл» по независимому расследованию составили 172.271,85 фунтов стерлингов и 1.757.820,61рублей, из которых 172.271,85 фунтов стерлингов являются непосредственной платой за работу, а 1.757.820,61рублей составляют НДС, что удостоверяется счетом-фактурой от 30.09.02 г № 1408596, а также сообщением SWIFT о совершении платежа от 15.01.03г. №IS00572066 от 15.01.03г. и платежным поручением от 23.01.03г. № 00005.

По мнению истцов, названные денежные средства относятся к расходам на самозащиту права и на сбор доказательств в обоснование иска, что позволяет их квалифицировать одновременно и как убытки, понесенные стороной для восстановления своего права, и как судебные издержки, перечень которых, в силу ст.106 АПК РФ не является ограничительным, ибо судебные издержки, понесенные стороной на защиту (самозащиту) нарушенного права, охватываются понятием убытков, и являются неотъемлемой частью таковых. (ст.15 ГК РФ). В обоснование своей позиции Истец сослался на определение Конституционного суда РФ, который признал, что расходы, понесенные лицом на восстановление своего нарушенного права, квалифицируемые ГК РФ как убытки, включают в себя также все судебные расходы, право на возмещение которых как прямо предусмотрено, так и не предусмотрено нормами процессуального права, но отвечает конституционно-правовому смыслу государственных гарантий прав граждан и юридических лиц. (Определение от 20.02.2002 г. № 22-0 по жалобе ОАО «Большевик».).

Кроме того, истцы указали на то, что защита их интересов в Арбитражном суде г. Москвы осуществлялась адвокатом, расходы на оплату услуг которого в соответствии с договором об оказании юридической помощи от 01.03.2003 с учетом сложности дела, квалификации адвоката, его фактических трудозатрат, уровня среднерыночного вознаграждения высоко квалифицированного адвоката-цивилиста, а также значимости для истцов, как юридических, так и для физических лиц, требований о защите деловой репутации, с которой непосредственно связаны деловая активность, стабильность работы и прибыль компаний, составили 374.206,90 рублей.

Ответчик Лурье О.А. в судебное заседание не явился, отзыва и возражений по иску не представил, извещен надлежащим образом о месте и времени судебного разбирательства, в связи с чем, спор рассматривается в порядке ст.ст.123,156 АПК РФ.

Ответчик – ЗАО «МАПТ-медиа», иск не признал, ссылаясь на необоснованность требований истца по тем мотивам, что статья Лурье О.А. в № 25 газеты «Версия» от 06.07.1999 г. под заголовком «Герой нашего времени!» «Альфа» - «Групповой портрет», имеющем подзаголовок «Альфа» участвовала в организации транзита наркотиков из Юго-Восточной Азии через Россию в Европу», представляет собой цитирование запроса Председателя Комитета по безопасности Госдумы РФ В.И. Илюхина руководству МВД о проверке деятельности истцов и что указанное обстоятельство, по мнению ответчика, освобождает журналиста и учредителя СМИ от ответственности за распространенные процитированные сведения, а, следовательно, и от обязанности доказывать их достоверность.

P0009243

Ответчик настаивает на том, что в спорных статьях не содержатся утверждений о противоправной деятельности истцов и, поэтому изложенные в них сведения не являются порочащими.

Ответчики так же указали на недоказанность истцами наличия затруднений в профессиональной деятельности истцов и нравственных страданий, размера морального вреда; полагают, что расходы, произведенные ОАО «Альфа-Банк» на оплату услуг компании «Кролл», не могут быть квалифицированы как убытки, так как истцы не доказали наличия причинной связи между этими расходами и спорными публикациями. Кроме того, ответчик указал, что данные расходы не могут квалифицироваться и как судебные издержки, поскольку, согласно ст.152 ГК РФ, истец не обязан доказывать несоответствие действительности распространенных о нем сведений.

Ответчик возражает против удовлетворения требования о возмещении расходов на оплату услуг адвоката истцов, т.к. считает не доказанным факт оплаты услуг и соответствие их размера требованиям п.2 ст.110 АПК РФ.

Кроме того, ответчики отказались от раскрытия имени анонимного интервьюера во второй публикации в № 19 газеты «Версия» под заголовком «Криминальное чтиво-по-русски».

Ответчики считают, что отсутствие в статье «Криминальное чтиво-по-русски» конкретных наименований юридических лиц свидетельствует о том, что данная публикация не относится к ОАО «Альфа- Банку», ООО «Альфа- Эко», и поэтому, указанным истцам в этой части иска следует отказать.

Определением Арбитражного суда г. Москвы от 02.04.2003г. по ходатайству истцов была назначена филологическая экспертиза по делу. Экспертиза была поручена Российскому общественному объединению «Гильдия лингвистов-экспертов по документационным и информационным спорам (ГЛЭДИС)». Судом перед экспертами поставлены следующие вопросы:

1. Содержится ли негативная информация (сведения) об П.О. Авене, М.М. Фридмане, об ОАО «Альфа- Банк», ООО «Альфа- Эко» в статьях О.А. Лурье под заголовком «Альфа» Групповой портрет», опубликованной в № 25 от 06.07.99г. газеты «Версия», а также в статье под заголовком «Криминальное чтиво по-русски», опубликованной в № 19 газеты «Версия» от 20.05.2002г. ?

2. Какова композиционная структура текста статей (статьи); какие художественные приемы использует автор и как они влияют на читательское восприятие героев публикации ?

3. Если такая информация (сведения) содержатся, то в какой форме: в форме утверждения, в форме предположения или в какой либо иной?

4. Если такая информация (сведения) содержится, то каков (каковы) источники (источники) этой информации (сведений)?

5. Что такое цитирование? Каковы признаки цитирования и цитат в тексте?

6. Есть ли в названных вопросе № 1 текстах цитирование и цитаты?

На основании проведенных исследований эксперты представили заключение, содержащее следующие ответы на поставленные вопросы:

1. В статье Олега Лурье «Альфа» Групповой портрет», опубликованной в газете «Версия» № 25 (49) от 6-12 июля 1999г., и в статье Олега Лурье «Криминальное чтиво по- русски», опубликованной в газете «Версия» № 19 (192) от 20-26 мая 2002г., содержится негативная информация (сведения) об П.О. Авене, о. М.М. Фридмане, об ОАО «Альфа- Банк, ООО «Альфа- Эко». Эта негативная

информация содержится в высказываниях, перечисленных в исследовательской части заключения в ответе на вопросы 1,3.

2. «Альфа» Групповой портрет»- информационно-критическая статья расследовательского характера (но не журналистское расследование как таковое), а «Криминальное чтиво по-русски» относится к жанру проблемного интервью. Композиция статьи «Альфа» Групповой портрет», во водной части которой автор задает два вопроса о роли героев публикации, позволяет говорить, что вся статья-аргументы к положительному ответу на вопрос, являются ли герои публикации (Авен, Фридман, Хан) трехглавой гидрой отечественной мафии. Иного ответа исходя из материалов статьи читатель сделать не может, так как в статье представлена негативная информация о героях публикации и о компаниях, которые они возглавляют. Статья «Криминальное чтиво по-русски» композиционно представляна небольшим введением, текстом интервью (двусоставный текст: вопросы- ответы), заключением (представлен одним абзацем). Эксперты не могут ответить на вопрос, как композиция статей влияет на читательское восприятие : для ответа на данный вопрос должно быть проведено специальное социологическое исследование. Более подробно жанровая специфика и композиционная структура статей представлены в исследовательской части заключения.

3. Негативная информация (сведения) об П.О. Авене, о .М. Фридмане, об ОАО «Альфа- Банк», ООО «Альфа-Эко» (см. Ответ на вопрос 1) дана в форме утверждения.

4. В качестве источников негативной информации о названных в вопросе № 1 лицах (юридических и физических) в исследуемых публикациях автором статей Олегом Лурье называются материал Комитета Госдумы РФ по безопасности и анонимный представитель западных спецслужб. Некоторые высказывания принадлежат самому автору публикаций Олегу Лурье.

5. Цитирование- это приведение цитаты, цитат в тексте. Цитата- точная, дословная выдержка из какого-либо текста, высказывания. Цитата опознается в тексте по формальным показателям- пунктуационному оформлению. Для того, чтобы признать какой-либо фрагмент текста цитатой по сути (содержательно), необходимо: 1) иметь первичный (цитируемый) текст; 2) иметь вторичный текст- текст, где приведена (приведены) цитата (цитаты).

6. В статье Олега Лурье «Альфа» Групповой портрет» есть фрагменты текста, пунктуационно оформленные как цитаты. Некоторые из этих фрагментов являются цитатами и формально, и содержательно. Однако анализ текста показал, что автор не во всех фрагментах соблюдает правила работы с чужим материалом и правила оформления цитат. Ряд фрагментов являются искаженными цитатами: они не полностью совпадают с первичным текстом. Информация в них не может быть сочтена аутентичной. В статье Олега Лурье «Криминальное чтиво по-русски» не содержится цитат, нет цитирования. Этот текст сам является первичным.

Рассмотрев материалы дела, выслушав объяснения представителей сторон, исследовав материалы дела, оценив представленные доказательства, в т.ч. заключение экспертов, статьи, содержащие оспариваемые сведения, приложения к письму Председателя Комитета по безопасности ГД РФ от 26.11.97 № З.15.-2216, материалы компании «Кролл» и другие, суд установил следующее:

В соответствии со ст.152 ГК РФ граждане и юридические лица вправе требовать по суду опровержения порочащих их деловую репутацию сведений, если лицо, распространившее такие сведения, не докажет, что они соответствуют действительности. Поскольку деловая репутация является одним из непременных

условий успешной деятельности граждан и юридических лиц, она охраняется законом и в силу ст.150 ГК РФ подлежит защите в судебном порядке.

Порочащими, как разъяснил Пленум Верховного Суда РФ в п.2 Постановления № 11 от 18.08.92 г. (в редакции от 21.12.93 г. № 11, от 25.04.95 г. № 6) г. «О некоторых вопросах, возникающих при рассмотрении судами дел о защите деловой репутации граждан и юридических лиц», являются не соответствующие действительности сведения, содержащие утверждения о нарушении гражданами или юридическими лицами действующего законодательства или моральных принципов (о совершении нечестного поступка, а тем более – преступления, о неправильном поведении и другие сведения, порочащие производственно-хозяйственную или общественную деятельность), которые умаляют деловую репутацию гражданина или юридического лица.

В оспариваемых публикациях содержится порочащая истцов информация, которая чернит их деловую репутацию, в связи с явно отрицательными характеристиками Авена П.О. и Фридмана М.М., утверждениями о совершении ими тяжких преступлений, о связях и контактах с криминальными элементами, о злоупотреблении Авеном П.О. своим служебным положением в период работы в качестве Министра внешнеэкономических связей; о преступных связях Авена П.О. со спецслужбами Израиля, об участии П.О.Авена и М.М. Фридмана в организации транзита наркотиков из Юго-Восточной Азии через Россию в Европу; о том, что тайные операции, связанные с наркотиками, в рамках консорциума выполняет компания «Альфа-Эко»; о том, что М.М. Фридман занимался ваучерными махинациями; о том, что «Альфа-Групп» состоит из многочисленных компаний, которые отмывают незаконно заработанные деньги и приобретают новые компании на деньги, полученные в результате мошенничества; о том, что деятельность таких структур как «Альфа-Групп» представляет угрозу национальной безопасности ряда стран; о том, что «Альфа-Групп» связана с криминалом.

Ответчики настаивали, что отсутствие в статье «Криминальное чтиво по-русски» конкретных наименований юридических лиц свидетельствует о том, что данная публикация не относится к ОАО «Альфа-Банк», ООО «Альфа-Эко», и поэтому указанным истцам в этой части должно быть отказано в иске.

Однако, журналист Лурье О.А. в статье «Герой нашего времени!» «Альфа» - Групповой портрет, как это прямо следует из названия статьи и ее содержания, понимает под «Альфой» ОАО «Альфа-Банк» и ООО «Альфа-Эко» и связывает с ними имя Авена П.О. (Президента ОАО «Альфа-Банк») и Фридмана М.М. (Председателя Совет Директоров ОАО «Альфа-Банк») и даже называет П.О Авена Президентом консорциума «Альфа-Групп», а Фридмана – Председателем Совета Директоров (что не соответствует действительности). Поэтому содержащиеся в статье «Криминальное чтиво по-русски» сведения суд считает порочащими деловую репутацию как ОАО «Альфа-Банк» и ООО «Альфа-Эко», так  и Фридмана М.М., являющихся первыми лицами компании, в наименовании которой имеется слово «Альфа».

Анализ содержательно-смысловой направленности спорных текстов, а также отсутствие в структуре истцов юридического лица под именем «Альфа» и «Альфа-Групп» - позволяют сделать вывод о том, что спорные публикации напрямую

P0009246

затрагивают законные права, интересы и деловую репутацию истцов- Авена П.О., Фридмана М.М., ОАО «Альфа- Банк» и ООО «Альфа-Эко».

По делу проведена филологическая экспертиза, подтвердившая наличие в спорных публикациях, негативных сведений, изложенных в форме утверждения. Опрошенные эксперты, кандидат филологических наук, доцент факультета журналистики МГУ Кара-Мурза Е.С. и кандидат филологических наук доцент Института русского языка РАН Сафонова Ю.А. подтвердили выводы экспертного заключения в ходе судебного заседания.

Порочащие истцов сведения, распространенные ответчиками в спорных публикациях, не соответствуют действительности и подлежат опровержению. В силу ст.152 ГК РФ на ответчиках лежит бремя доказывания достоверности распространенных сведений. Ответчики кроме ссылки на никем не подписанное приложение к письму В.И. Илюхина, содержащее не проверенные данные, не представили доказательств соответствия их действительности. В силу презумпции невиновности (п.1 ст.49 Конституции РФ) распространенные ответчиками сведения об истцах, содержащие обвинения в совершении тяжкого преступления, могут подтверждаться только доказательствами особого рода – вступившим в законную силу приговором суда. Такие доказательства ответчики суду не представили.

Истцы – Авен П.О. и Фридман М.М. – к уголовной ответственности не привлекались. Не имеется и вступивших в законную силу приговоров суда, которыми были бы установлены факты использования компаний ОАО «Альфа-Банк» и ООО «Альфа-Эко» для отмывания денег от наркобизнеса либо от иной преступной деятельности.

Письмом ФСБ РФ от 13.08.99 г. № К-л5402 удостоверяется, что в ФСБ России не имеется сведений об участии группы компаний «Альфа» и ее руководителей в преступных операциях, торговле наркотиками и в связях с организованной преступностью, и что «ссылки в средствах массовой информации на материалы КГБ-ФСБ по данному вопросу не правомерны».

МВД России письмом от 16.02.2000 г. за № 1/2680 удостоверило, что оно не располагает фактами противоправной деятельности граждан Фридмана М.М. и Авена П.О.

Письмом ГУВД г. Москвы УВД Центрального административного округа 2-го РУВД 6-го отдела милиции от 16.02.2000 года № 193 подтверждается, что в отношении Фридмана М.М. и Авена П.О. уголовные дела никогда не возбуждались, они к административной ответственности не привлекались, под судом и следствием не находились; никаких компрометирующих материалов в отношении них не имеется.

Истцы представили суду также письма ГУ по экономическим преступлениям МВД РФ, Управления по незаконному обороту наркотиков МВД РФ, Управления по г.Москве и Московской области ФБС РФ и Регионального управления по организованной преступности ГУВД МВД РФ за 1995 год о том, что оперативно-розыскные мероприятия в отношении должностных лиц и сотрудников «Альфа-Эко» не проводились, и они правонарушений экономической направленности не совершали.

P0009247

11

По делу не имеется предусмотренных законом оснований для освобождения журналиста и учредителя СМИ от ответственности за распространение порочащих истцов и не соответствующих действительности сведений. Перечень оснований освобождения от ответственности, установленный ст.57 Закона РФ «О СМИ», является исчерпывающим и ограничительным. Письмо Комитета безопасности ГД РФ и приложения к этому письму не относятся к числу обстоятельств, освобождающих учредителя СМИ и журналиста от ответственности за распространение сведений, не соответствующих действительности и порочащих деловую репутацию истцов, независимо от того, цитируются ли эти сведения дословно или нет.

В письме Комитета по безопасности ГД РФ от 26.11.97 г. сведений о противоправной деятельности истцов не содержится. В нем изложена только просьба о проверке материалов, приложенных к этому письму (на 9 листах). Сами материалы представляют собой письмо анонима на 9 листах, которое направлялось Комитетом ГД в МВД специально для проверки изложенных в нем фактов на соответствие действительности. До настоящего времени правоохранительными органами не подтверждено соответствие действительности изложенных в анонимном письме порочащих истцов фактов. В связи с этим содержащаяся в анонимном письме негативная информация об истцах не имеет юридического значения и не может быть использована для распространения другими лицами, в т.ч. редакцией СМИ и журналистом.

В силу п.2 ст.49 Закона РФ «О СМИ» журналист обязан проверять достоверность сообщаемой им информации, особенно, когда она содержит сведения о совершении преступных действий конкретными лицами, поскольку гражданин может быть признан виновным только по приговору суда, вступившему в законную силу. При осуществлении профессиональной деятельности журналист обязан уважать права, законные интересы, честь и достоинство граждан и организаций, на что прямо указано в ст.49 Закона РФ «О СМИ». Поэтому журналист и СМИ не вправе публиковать сведения, содержащие утверждения о совершении конкретными лицами преступления, до установления вины этих лиц приговором суда.

Ответчики – журналист и редакция СМИ, учредителем которого является ЗАО «МАПТ-медиа» - распространили не соответствующие действительности, порочащие истцов сведения до проверки этих сведений правоохранительными органами и установления вины этих лиц приговором суда.

Возражения ответчика о том, что статья Лурье О.А. в № 25 газеты «Версия» от 06.07.1999 г. под заголовком «Герой нашего времени!» «Альфа» - «Групповой портрет», имеющая подзаголовок «Альфа» участвовала в организации транзита наркотиков из Юго-Восточной Азии через Россию в Европу», представляет собой цитирование запроса Председателя Комитета по безопасности Госдумы РФ В.И. Илюхина руководству МВД о проверке деятельности истцов и что указанное обстоятельство по мнению ответчика, освобождает журналиста и учредителя СМИ от ответственности за распространенные процитированные сведения, а, следовательно, и от обязанности доказывать их достоверность, судом признаны несостоятельными и необоснованными.

Арбитражным судом по ходатайству ответчиков была запрошена Госдума РФ о том, направлялся ли такой запрос Илюхиным В.И. руководству МВД РФ. Из Госдумы РФ получена копия письма от 26.11.97 г. за № 3.15.-2216 за подписью

P0009248

Председателя Комитета по безопасности В.И.Илюхина на имя Заместителя Председателя Правительства РФ Министра внутренних дел Куликова А.С. о направлении поступивших в Комитет по безопасности материалов «в отношении ряда коммерческих структур и некоторых ответственных должностных лиц» с просьбой поручить проверить изложенные в них обстоятельства. Приложения к этому письму значатся на 9-ти листах. Однако, они Госдумой РФ с копией письма Илюхина В.И. суду не представлены.

Представленные ответчиками суду материалы, по их утверждению, полностью аутентичны приложениям к указанному письму от 26.11.97 г. № 3.15.-2216 и переданы им лично В.И. Илюхиным. Истцы не оспаривают аутентичность материалов и факт их передачи В.И. Илюхиным ответчикам, считая эти обстоятельства не имеющими существенного значения для рассматриваемого дела.

Анонимные материалы, источник получения которых не может быть назван и установлен и которые содержат компрометирующие других лиц непроверенные сведения, не могут и не должны цитироваться журналистом с учетом прав и обязанностей журналиста, изложенных в ст.ст.47 и 49 Закона РФ «О СМИ» и недопустимости в силу ст.51 Закона РФ «О СМИ» использования средств массовой информации для распространения компромата и слухов под видом достоверных сообщений (к которым относятся и анонимные сообщения). Поэтому дословное цитирование журналистом отдельных фрагментов анонимных материалов, приложенных к письму Комитета ГД, само по себе не освобождает ответчиков от ответственности за распространение порочащих истцов и не соответствующих действительности сведений. Дословно цитируя фрагменты анонимного письма и обозначая их кавычками, журналист заботится о соблюдении авторских прав анонима (ч.1 ст.42 Закона РФ «О СМИ») и заведомо нарушает права истцов на доброе имя и защиту деловой репутации, обнародуя не проверенные порочащие их факты.

Сведения, порочащие истцов и не соответствующие действительности ответчики распространили вновь, спустя два года после первой спорной публикации, - в № 19 газеты «Версия» от 20.05.2002 г., содержащей интервью с анонимом – западным офицером спецслужб под названием «Криминальное чтиво – по-русски».

Ответчики отказались от раскрытия имени анонимного интервьюера во второй публикации в № 19 газеты «Версия» под заголовком «Криминальное чтиво– по-русски». Отказ ответчиков назвать лицо, предоставившее информацию для статьи, противоречит ч.2 ст.41 Закона РФ «О СМИ». С учетом такого отказа Арбитражный суд при разрешении дела исходит из того, что источником информации, распространенной в статье «Криминальное чтиво–по-русски», является сам журналист. Поэтому именно журналист и учредитель СМИ несут ответственность за распространение не соответствующих действительности порочащих истцов сведений. В подтверждение факта получения им интервью от реально существующего, но не называемого им лица, ответчик Лурье О.А. ссылался в предварительном судебном заседании на аудиозапись его беседы с анонимным интервьюером и перевод интервью стенограммы на русский язык. Арбитражный суд считает, что при сохранении журналистом в тайне лица, у которого взято интервью, нельзя идентифицировать запись на аудио носителе применительно к интервьюеру. Поэтому в качестве доказательства по делу не могут быть допущены аудиозапись

P0009249

журналистом анонимного интервью, ее стенограмма и перевод. Не имеют значения доказательств и материалы Конгресса США, ФБР и других органов США, на которые ссылался ответчик Лурье О.А., поскольку в анонимном интервью нет ссылки на эти документы. Кроме того, эти документы не отвечают требования АПК РФ о представлении письменных доказательств в подлиннике или в форме надлежащим образом заверенной копии и о том, что документ, полученный в иностранном государстве, признается в арбитражном суде письменным доказательством, если он легализован в установленном законом порядке (п.п. 6,8 ст.75 АПК РФ),

Анализ имеющихся документов позволяет суду сделать вывод о том, что журналист намеренно усиливает восприятие читателями как достоверных распространенных им порочащих истцов сведений, используя для этого такие словосочетания, как: «По свидетельству работников Министерства внешнеэкономических связей»; «Согласно этим же оперативным данным»; «Из оперативных разработок следует»; а в отношении анонимного интервьюера, что он занимает «Не последнее место в одной из западных спецслужб»,

Не является основанием для освобождения ответчиков от ответственности заявление журналиста в статье «Криминальное чтиво по-русски» о том, что он не берет на себя ответственность утверждать, что все прозвучавшие в статье серьезные обвинения в адрес истцов имеют под собой реальную основу, поскольку журналист в силу прямого указания закона не вправе распространять непроверенные им факты, порочащие граждан и юридических лиц и подрывающие их деловую репутацию.

На основании изложенного, требования истца о защите деловой репутации, о признании несоответствующими действительности и порочащими деловую репутацию Авена П.О. Фридмана М.М. ОАО «Альфа-Банк», ООО «Альфа-Эко» сведений содержащихся в статьях газеты «Версия», опубликованных в номере 25 от 06.07.1999 г., под заголовком: «Герой нашего времени!» «Альфа «Групповой портрет», имеющим подзаголовок «Альфа» участвовала в организации транзита наркотиков из Юго-Восточной Азии через Россию в Европу», и в номере 19 от 20.05.2002 г., под названием «Криминальное чтиво по-русски» признаются обоснованными и подлежащими удовлетворению.

Кроме того, ЗАО «МАПТ-медиа», как учредитель газеты «Версия» обязан опубликовать опровержение несоответствующих действительности и порочащих Авена П.О. Фридмана М.М. ОАО «Альфа-Банк», ООО «Альфа-Эко» сведений, указанных выше.

Так же подлежат удовлетворению исковые требования ОАО «Альфа-Банк» о возмещении убытков в виде судебных издержек и морального вреда, причиненного распространением ответчиками не соответствующих действительности и порочащих деловую репутацию истцов сведений в размере 172 271,85 фунтов стерлингов в рублевом эквиваленте ЦБ РФ на день платежа и 7 500 000руб. соответственно в связи со следующим.

Судом установлено, что ОАО «Альфа-Банк» действительно затратило значительные средства на защиту своей и других истцов деловой репутации путем поручения компании «Кролл» проведения расследования на предмет установления соответствия действительности изложенных в двух спорных публикациях Лурье О.А. фактов, порочащих истцов.

P0009250

По заявлению истцов, выбор ими этой компании продиктован ее широкой известностью и безупречной репутацией в мировом бизнес-сообществе.

Заключением компании «Кролл», которая провела собственное расследование, удостоверена несостоятельность обвинений истцов, содержащихся в статьях Лурье О.А. от 06.07.1999 г. и от 20.05.2002 г. В связи с этими выводами «Кролл» приняла на себя обязательство направлять соответствующие письма всем заинтересованным лицам, как работающим, так и намеренных работать с истцами.

Суд принимает заключение компании «Кролл» как одно из доказательств, подтверждающих несоответствие действительности порочащих репутацию истцов сведений, опубликованных в спорных статьях. При этом суд исходит из того, что предусмотренная ст.152 ГК РФ обязанность ответчика доказывать соответствие распространенных сведений действительности не лишает истца права представлять суду иные доказательства своей правоты, в том числе полученные за плату, поскольку такие доказательства и способ их получения не противоречат закону.

Доводы ответчиков о том, что из представленных истцами документов не усматривается причинно-следственная связь между спорными публикациями и понесенными расходами на оплату услуг компании «Кролл» суд считает несостоятельными. Истцами доказан факт оказания услуг компанией «Кролл» ОАО «Альфа-Банк», а также то, что предметом этих услуг являлось расследование с целью установления достоверности или недостоверности сведений, распространенных ответчиками, что подтверждается письмами компании «Кролл» от 08.02.2002, от 19.03.2002, от 19.06.2002, от 07.10.2002, 16.10.2002

Расходы ОАО «Альфа-Банк» на оплату услуг «Кролл», составляющие 172.271,85 фунт стерлингов (в рублевом эквиваленте) суд рассматривает как судебные издержки, связанные с рассмотрением настоящего дела. Оплата подтверждается счетом-фактурой от 30.09.02 г № 1408596, а также сообщением SWIFT о совершении платежа от 15.01.03г. №IS00572066 от 15.01.03г. и платежным поручением от 23.01.03г. № 00005.

Требование о взыскании 1 757 820,61руб., составляющих сумму НДС, уплаченную ОАО «Альфа-Банк» за компанию нерезидента «Кролл» по платежному поручению от 23.01.2003г. № 00005, удовлетворению не подлежит в связи с отсутствием доказательств принадлежности названной суммы к судебным издержкам, понесенным истцами для осуществления самозащиты права и в целях сбора доказательств, опровергающих измышления ответчиков, поскольку из представленного платежного поручения и назначения платежа не усматривается, что платеж был произведен за проведенное компанией «Кролл» расследование.

При распространении в средствах массовой информации не соответствующих действительности и порочащих граждан и юридических лиц сведений размер компенсации морального вреда определяется с учетом характера публикации и ее содержания, степени распространения недостоверных сведений и других, заслуживающих внимания обстоятельств.

Авен П.О. и Фридман М.М. претендуют на возмещение им морального вреда в размере 250 000 (двухсот пятидесяти тысяч) долларов США, по 100 000долларов США в рублевом эквиваленте каждому с ЗАО «МАПТ- медиа» и 25 000долларов

P0009251

США в рублевом эквиваленте с журналиста Лурье О.А. с учетом общественной оценки нарушенных прав истцов, степени вины ответчиков, допустивших явные злоупотребления правами журналиста; серьезности обвинений истцов в совершении тяжких преступлений, осуждаемых человечеством; тяжести наступивших последствий; сферы распространения несоответствующих действительности порочащих деловую репутацию истцов сведений. Все эти факты были учтены арбитражным судом при разрешении вопроса о возмещении морального вреда и его размере.

Содержащиеся в спорных статьях сведения подводят читателей к выводу о том, что Авен П.О. и Фридман М.М. являются участниками мафии, находятся в деловых контактах с международными преступниками, занимаются наркобизнесом и организуют «отмывание» преступного капитала через ОАО «Альфа-Банк», а через ООО «Альфа-Эко» - транзит наркотиков.

Распространение таких сведений направлено на дискредитацию деловой репутации Авена П.О. и Фридмана М.М и в силу тяжести содержащихся в них обвинений не может не причинить нравственных страданий.

С учетом характера спорных публикаций и распространением через них не проверенных и не подтвержденных сведений об участии Авена П.О. и Фридмана М.М. в совершении особо опасных преступлений, что подрывает их деловую репутацию на российском и международном рынке банковских услуг, и квалифицируется судом как злоупотребление правами СМИ и журналиста, - суд считает обоснованными исковые требования Авена П.О. и Фридмана М.М. о возмещении морального вреда в названном истцами размере. Возмещение морального вреда производится путем взыскания с ответчиков ЗАО «МАПТ- медиа» и О.А. Лурье заявленной суммы в российских рублях в соответствии с требованиями ст.317 ГК РФ, согласно которой денежные обязательства должны быть выражены в рублях.

Требования о возмещении судебных расходов, связанных с оплатой услуг адвоката, подлежат удовлетворению в соответствии со ст.110 АПК РФ, согласно которой расходы на оплату услуг представителя, понесенные лицом, в пользу которого принят судебный акт, взыскиваются арбитражным судом с другого лица, участвующего в деле. Факт оказания услуг и выплаты вознаграждения подтвержден документально, а именно: договором от 01.03.2003г. и документами, подтверждающими перечисление вознаграждения и получение его адвокатом, однако, учитывая, что названные расходы взыскиваются судом в разумных пределах, суд уменьшает размер возмещения расходов на оплату услуг адвоката до 60 000руб.

Требования об обеспечении защиты гражданских прав истцов на деловую репутацию в виде признания действий ответчиков- ЗАО «МАПТ- медиа» и Лурье О.А.- злоупотреблением правами журналиста и правами СМИ, а также о пресечении действий, создающих угрозу нарушения прав истцов в дальнейшем путем запрещения ЗАО «МАПТ- медиа» и журналисту Лурье О.А. распространять сведения, признанные судом несоответствующими действительности и порочащими деловую репутацию истцов, удовлетворению не подлежат, поскольку выбранный истцом способ защиты гражданских прав должен соответствовать ст.12 ГК РФ, однако, признание действий ответчиков- ЗАО «МАПТ- медиа» и Лурье О.А.- злоупотреблением правами журналиста и правами СМИ не является способом защиты гражданского права и защиты деловой репутации, и, кроме того, суд не

P0009252

вправе выносить решения о запрещении ЗАО «МАПТ- медиа» и журналисту Лурье О.А. в будущем осуществлять определенные действия относительно рассмотренных требований, в т.ч. распространение сведений, аналогичных изложенным в статьях под заголовками «Герой нашего времени! «АЛЬФА» Групповой портрет» имеющий подзаголовок «Альфа» участвовала в организации транзита наркотиков из Юго-Восточной Азии через Россию в Европу», опубликованной в № 25 , «Криминальное чтиво по-русски», опубликованной в № 19 газеты «Версия».

При рассмотрении вопроса о распределении судебных расходов, суд исходил из следующего:

Фактически расходы по оплате госпошлины, услуг фирмы «Кролл», стоимости экспертизы и услуг адвоката на ведение дела в арбитражном суде понес ОАО «Альфа- Банк» по соглашению всех истцов по делу, в связи с чем, удовлетворенные судом требования о взыскании денежных средств по требованиям подлежат взысканию в пользу ОАО «Альфа Банк» с ЗАО «МАПТ-медиа» и Лурье О.А. солидарно.

Оплата стоимости экспертизы производится с депозитного счета Арбитражного суда г. Москвы на счет Гильдии лингвистов- экспертов по документационным и информационным спорам в соответствии со счетом от 22.04.2003г. № 5 в сумме 8 400руб. с последующим отнесением затраченных ОАО «Альфа- Банк» денежных средств на ответчиков.

На основании изложенного, руководствуясь ст.ст. 1-4, 13, 27, 46, 64, 101, 106, 108-110, 123,156,167-171, 174-176 АПК РФ и ст.ст.11, 12, 14, 15, 150, 151, 152 ГК РФ, суд,

Р Е Ш И Л :

1. Признать несоответствующими действительности и порочащими деловую репутацию Авена П.О. распространенные в статье Лурье О.А. в номере 25 от 06.07.1999 г. под заголовком «Герой нашего времени!» «Альфа» - Групповой портрет» (имеющим подзаголовок «Альфа» участвовала в организации транзита наркотиков из Юго-Восточной Азии через Россию в Европу») следующие сведения:

- «В период учебы в МГУ Авен был руководителем музыкального студенческого клуба и обзавелся многочисленными знакомствами в той молодежной среде (музыкальная «тусовка», богема и т.п.), где формировался потребительский рынок наркотиков. Благодаря этому привлек внимание криминальных элементов, имел контакты с «авторитетами».

- «В результате (того, что Авен занимался решением проблемы долгов) Авен заработал хорошие комиссионные на продаже долга Ганы.»

- «По свидетельству работников Министерства внешнеэкономических связей, Петр Авен, возглавляя министерство, не стеснялся брать комиссионные и даже дорогие подарки за содействие иностранным компаниям и российским предприятиям в заключении и осуществлении внешнеторговых сделок.»

- «Особенно жестко он (Авен) контролировал выход на рынок оружия, допуская туда только тех, кто был связан с ним.»

- «В 1991-1992 годах Петра Авена разрабатывало 6-е управление КГБ МБ РФ по материалам хищения в крупных размерах, нанесения стране крупного ущерба и по преступным связям со спецслужбами Израиля. В 1992 году бывший министр безопасности доложил материалы президента Б. Ельцину, в результате чего 22 декабря 1992 года Петр Авен был уволен с поста министра.»

- «Согласно этим же оперативным данным, П.Авен участвовал в организации транзита наркотиков из Юго-восточной Азии через Россию в Европу.»

- «В конце 1993 года в Вене состоялась встреча П.Авена с представителем колумбийских наркобаронов Гильберто Родригесом Орехуэлом, известным под кличкой Шахматист. В частности, была достигнута договоренность о «закачке» в «Альфа-Банк» денежных средств из оффшорных зон (Багамы, Гибралтар) для их вложения в экономику России путем скупки акций российских предприятий.»

2. Признать несоответствующими действительности и порочащими деловую репутацию Фридмана М.М. распространенные в статье Лурье О.А. в номере 25 от 06.07.1999 г. под заголовком «Герой нашего времени» «Альфа» Групповой портрет» (имеющим подзаголовок «Альфа» участвовала в организации транзита наркотиков из Юго-Восточной Азии через Россию в Европу») следующие сведения:

- « Рынок сбыта наркотиков формировался в среде студенческой и творческой молодежи, рок-фанов хиппи, панков, проституток и т.п.  В кругах у Фридмана были обширные связи, которые представляли несомненный интерес с точки зрения «бауманской бригады» и были задействованы с обоюдной выгодой.»

- « Михаил Фридман участвовал в организации транзита наркотиков из Юго-Восточной Азии через России в Европу.»

- «Фридман занимался ваучерными махинациями. В результате только этих махинаций с ваучерами глава «Альфа-Групп» увеличил свое личное состояние примерно на 30-40 млн.долларов.»

3. Признать несоответствующими действительности и порочащими деловую репутацию ОАО «Альфа-Банк» распространенные в статье Лурье О.А. в номере 25 от 06.07.1999 г. под заголовком «Герой нашего времени» «Альфа» Групповой портрет» (имеющим подзаголовок «Альфа» участвовала в организации транзита наркотиков из Юго-Восточной Азии через Россию в Европу») следующие сведения:

- «В конце 1993 года в Вене состоялась встреча П.Авена с представителем колумбийских наркобаронов Гильберто Родригесом Орехуэлом, известным под кличкой Шахматист. В частности, была достигнута договоренность о «закачке» в «Альфа-Банк» денежных средств из оффшорных зон (Багамы, Гибралтар) для их вложения в экономику России путем скупки акций российских предприятий.»

4. Признать несоответствующими действительности и порочащими деловую репутацию ООО «Альфа-Эко» распространенные в статье Лурье О.А. в номере 25 от 06.07.1999 г. под заголовком  «Герой нашего времени» «Альфа» «Групповой портрет» (имеющим подзаголовок «Альфа» участвовала в организации транзита наркотиков из Юго-Восточной Азии через Россию в Европу») следующие сведения:

P0009254

- «Из оперативных разработок следует, что тайные операции, связанные с наркотиками, в рамках консорциума выполняет компания «Альфа-Эко».

5. Признать несоответствующими действительности и порочащими деловую репутацию Фридмана М.М., и деловую репутацию ОАО «Альфа-Банк» и ООО «Альфа-Эко», распространенные Лурье О.А. в статье под заголовком «Криминальное чтиво по-русски», опубликованной в № 19 газеты «ВЕРСИЯ» от 20.05.2002 г., (учредителем которой является ЗАО «МАПТ-медиа»), сведения: о связях Фридмана М.М. с криминалом; о существовании структуры «Альфа-Групп», представляющей угрозу национальной безопасности ряда стран; о связи Альфы с преступными авторитетами.

6. Обязать ЗАО «МАПТ-медиа» как учредителя газеты «ВЕРСИЯ» опубликовать опровержение несоответствующих действительности и порочащих Авена П.О., Фридмана М.М., ОАО «Альфа-Банк» и ООО «Альфа-Эко» сведений, указанных в п. 1-5 решения.

7. Взыскать с ЗАО «МАПТ-медиа» в пользу Авена П.О. 3 000 000руб. в возмещение морального вреда.

8. Взыскать с ЗАО «МАПТ-медиа» в пользу Фридмана М.М. 3 000 000руб. в возмещение морального вреда.

9. Взыскать с Лурье О.А. в пользу Авена П.О. 750 000 руб. в возмещение морального вреда.

10. Взыскать с Лурье О.А. в пользу Фридмана М.М. 750 000руб. в возмещение морального вреда.

11. Взыскать с ЗАО «МАПТ-медиа» и Лурье О.А. солидарно в пользу ОАО «Альфа-Банк» 172.271,85фунт стерлингов в рублевом эквиваленте по курсу ЦБ РФ на день возмещение судебных расходов.

12. Взыскать с ЗАО «МАПТ-медиа» и Лурье О.А. солидарно в пользу ОАО «Альфа-Банк» 60 000 руб. в возмещение расходов по оплате услуг адвоката.

13. Взыскать с ЗАО «МАПТ-медиа» и Лурье О.А. в пользу ОАО «Альфа-Банк» судебные расходы – госпошлину в размере 100 000 руб.

14. Взыскать с ЗАО «МАПТ-медиа» и Лурье О.А. в пользу ОАО «Альфа-Банк» расходы, связанные с проведением экспертизы, в размере 8 400 руб.

15. В остальной части иска отказать.

16. Перечислить с депозитного счета Арбитражного суда г. Москвы на счет Гильдии лингвистов- экспертов по документационным и информационным спорам за проведение экспертизы 8 400руб. согласно представленному счету от22.04.2003г. № 5 (справка прилагается)

17.Вернуть с депозитного счета Арбитражного суда г. Москвы на счет ОАО «Альфа- Банк» излишне уплаченную сумму за проведение экспертизы в размере 1 600руб.

18. Вернуть с депозитного счета Арбитражного суда г. Москвы на счет ЗАО «МАПТ- медиа» 6 000руб.

19. Возвратить ОАО «Альфа- Банк» излишне уплаченную госпошлину в размере 638 590руб.

Решение может быть обжаловано в месячный срок в апелляционную инстанцию Арбитражного суда.

Судья                                                        О.А. Высокинская
31.07.2003г.

1

ARBITRATION COURT OF THE CITY OF MOSCOW
IN THE NAME OF THE RUSSIAN FEDERATION

July 10, 2003                                        Case # A40-49954/02-21-494

Arbitration Court
In the presence of:
Judge              O.A. Vysokinskaya

With the participation of the parties:
On behalf of 1, 2, 3, 4 plaintiffs: G.V. Lyubarskaya, power of attorney dated 10.25.2002; 4 -
dated 11.19.2002; 3 - power of attorney dated 03.01.2003; 4 - E.A. Kulkov, power of attorney
dated 10.25.2002.
On behalf of the defendant MAPT- Media - M.V. Korshikova, power of attorney dated
01.14.2003
Experts: Y.A. Safonova, E.S. Kara-Murza.

Having heard in a court hearing a lawsuit filed by P.O. Aven, M.M. Fridman, OAO Alfa Bank
and OOO Alfa Echo

Against the defendants ZAO MAPT-Media and O.A. Lourie

Re: protection of business reputation, suppression of the actions of the defendants in abusing
mass media sources and journalist rights, loss recovery in the amount of 172 271.85 pounds of
sterling (in the ruble equivalent) and moral damages in the amount of 250 000 US dollars  (in the
ruble equivalent).

HAS ESTABLISHED THE FOLLOWING: The lawsuit was filed with regard to protection of
business reputation, suppression of the actions of the defendants in abusing mass media sources
and journalist rights, loss recovery in the amount of 172 271.85 pounds of sterling (in the ruble
equivalent) and moral damages in the amount of 250 000 US dollars  (in the ruble equivalent).

During the court hearing the parties made the following requests:

        The plaintiffs: P.O. Aven, M.M. Fridman, OAO Alfa Bank and OOO Alfa Echo made a
request with regard to changing the amount contained in the lawsuit in the part that describes the
plaintiff's expenses related to the payment for the independent investigation carried out by the
Kroll Company, insisting that this claim should be recognized as court expenses, that is the
expenses incurred in connection with self-protection and protection of legal rights and interests in
the course of a legal action.  The plaintiff insisted that the VAT payment in the amount of 1 757
820.61 rubles paid for the Kroll Company (Payment Order # 00005, dated 01.23.2003) should be
also regarded as litigation expenses.

        Pursuant to Article 49 of the Arbitration Procedural Code of the RF, the court satisfied
the plaintiff's request, which is reflected in the court hearing records.

**P0009238**

2

In addition, the plaintiffs also made a demand related to the reimbursement of their litigation expenses in the amount of 374 206.90 rubles, the fee paid to their attorney.

The defendant: ZAO MAPT-Media made a request related to conducting a second expert evaluation and serving a subpoena to V.I. Ilyukhin, a Deputy of the State Duma, requiring him to appear as a witness in the Arbitration Court hearing.
The court declined these requests, as it found no circumstances that required a repeated expert evaluation and serving a subpoena to the witness, which is also reflected in the court hearing records.

The plaintiffs supported their lawsuit claims in their full amounts, having said that they made their demands related to protection of their business reputation, suppressing the actions of the defendants in abusing mass media sources and the journalist's rights, loss recovery and moral damages in view of adjusted lawsuit claims accepted by the court under the court determination dated 04.02.2003, which specified the demands of each plaintiff: P.O. Aven, M.M. Fridman, OAO Alfa Bank and OOO Alfa Echo with regard to the information contained in the article entitled "Alfa Group Portrait" authored by O.A. Lourie and published in the newspaper *Versija* Issue # 25 dated 07.06.1999 and also the article entitled "Criminal Pulp Fiction Russian Style", published in the newspaper *Versija* Issue # 19 dated 05.20.2002;  the demand related to the recovery of 172 271.85 pounds of sterling (in the ruble equivalent on the day of the writ execution) and 1 757 820.61 rubles as reimbursement of litigation expenses that are regarded as the plaintiff's losses, which have been paid by the OAO Alfa Bank to obtain proof of the fact that the information distributed by the defendants was not true to life and damaging to the plaintiffs' business reputation; and also a demand related to the recovery of expenses in the amount of 374 206 rubles and 90 kopecks, a fee for the attorney's services for four plaintiffs, an adjusted amount added to their expenses in the course of this court hearing.

The lawsuit has been filed on behalf of two individuals: P.O. Aven and M.M. Fridman and two legal entities: OAO Alfa Bank and OOO Alfa Echo in connection that demanded that the court should recognize that the information disseminated by Journalist O.A. Lourie in the two issues of the *Versija* newspaper founded by the ZAO MAPT-Media was not true to life.  This is Issue # 25 dated 07.06.1999 that carried an article entitled "Hero of Our Time! Alfa Group Portrait", subtitled "Alfa was involved in drug trafficking from South-East Asia via Russia to Europe", and Issue # 19, dated 05.20.2002, which carried an interview with an anonymous "officer of the Western special services and entitled "Criminal Pulp Fiction Russian Style".

Insisting on the satisfaction of their lawsuit claims, the plaintiffs claimed that in these publications the defendants ZAO MAPT-Media and O.A. Lourie disseminated information related to serious crimes committed by P.O. Aven and M.M. Fridman (their involvement in the organization of illegal drug trafficking from South-East Asia via Russia to Europe; their illegal contacts with international adventurers and their connections with the criminal world; their meeting with a representative of the Colombian drug lords and their agreements on "pumping" money from offshore zones into the Alfa Bank; M.M. Fridman's voucher fraud and other illegal actions). With regard to the Alfa Bank Company and the Alfa Echo

**P0009239**

Company, this information contained such allegations as illegal activities (Alfa Echo's operations with illegal drugs, laundering through the Alfa Bank the money coming from transnational criminal drug businesses, and the allegation that the operations of these two companies pose a threat to the national security of several countries.

Specifically, the plaintiffs believe that the following information distributed in Issue # 25 of *Versija* dated 07.06.1999 that carried an article entitled "Hero of Our Time! Alfa Group Portrait" subtitled "Alfa was involved in drug trafficking from South-East Asia via Russia to Europe", was not true to life and was damaging to their business reputation:

1.    With regard to Plaintiff P.O. Aven.
    "When he was a student of the Moscow State University P.O. Aven was president of a students music club and had numerous contacts among the young people (music fans, bohemian guys, etc). That was also the environment where a market for illegal drugs was being shaped at the time. As a result Aven got into the focus of attention of some criminal elements and he had some contacts with their "leaders".

    "As a result (of P.O. Aven's involvement in solving the problem of debt) P.O. Aven received good commission money when he managed to sell Ghana's debt".

    "According to the words of the employees of the Ministry of Foreign Economic Relations, when Petr Aven headed the ministry he was unscrupulous and was not ashamed to get commissions and accept valuable gifts for his assistance to foreign and domestic companies in signing deals and carrying out foreign economic transactions."

    "He was especially tough when he controlled access to the sales of arms, he allowed access to this market only to those players who were connected to him."

    "In 1991-1992 the 6[th] Department of the KGB of the Security Ministry of the Russian Federation investigated Petr Aven's activities using the following materials: big embezzlements of money, causing big damage to the country and criminal connections with the Israeli intelligence services. In 1992 the former security minister reported about the materials to President B. Yeltsin and as a result Petr Aven was dismissed from his ministerial position on December 22, 1992."

    "According to the operative data contained in investigation reports, P. O. Aven was involved in illegal drug trafficking from the South East Asia via Russia to Europe."

    "Late in 1993 in Vienna P.O. Aven met Gilberto Rodrigues Orehuel, a Colombian drug lord, who was also known under the nickname of "Chess player". Specifically, they reached an agreement on "pumping money into" the Alfa Bank from some offshore zones (like the Bahamas and Gibraltar) to be invested in the Russian economy through the acquisition of stock issued by Russian enterprises".

2.    With regard to Plaintiff M.M. Fridman.
    "At that time the Bauman Brigade was the only Moscow organized crime group that was seriously involved in illegal drugs and was constantly expanding its operations. The market for illegal drugs was being shaped among the students and artistic youth, rock fans, hippies, punks, prostitutes, etc.                                                      **P0009240**

4

Fridman had numerous contacts in these circles and, undoubtedly, the Bauman Brigade was very interested in his connections.  The contact with the brigade turned out to be mutually beneficial."

"Michail Fridman was also involved in the organization of illegal drug trafficking from the South East Asia via Russia to Europe."

"Fridman was also involved in voucher fraud. As a result of these voucher schemes alone the Alfa Group Chairman had added approximately 30-40 million dollars to his personal assets."

3.    With regard to Plaintiff OAO Alfa Bank.
   "Late in 1993 in Vienna P.O. Aven met Gilberto Rodrigues Orehuel, who represented Colombian drug lords and was known under the nickname of "Chess player".  Specifically, they reached an agreement on "pumping money into" the Alfa Bank from some offshore zones (like the Bahamas and Gibraltar) to be invested in the Russian economy through the acquisition of stock issued by Russian enterprises".

4.    With regard to Plaintiff OOO Alfa Echo.

   "It follows from the operative materials that within the consortium it was the Alfa Echo Company that is involved in secret operations with illegal drugs."

   In addition, the plaintiffs believe that the following information distributed by O.A. Lourie the article "Criminal Pulp Fiction Russian Style" printed in VERSIJA Issue # 19 dated 05.20.2002, (the newspaper founded by ZAO MAPT-Media) is not true to life and is damaging to the business reputation of OAO Alfa Bank and OOO Alfa Echo; M.M. Fridman's connections with the criminal world; that the existence of the Alfa Group poses a threat to the national security of several countries; Alfa's connections with criminal leaders.

   In addition, the plaintiffs have made a request that the defendants' (ZAO MAPT-Media and O.A. Lourie) actions should be qualified as abuse of the rights of a journalist and the rights of the mass media sources, as they distributed unverified information that was not true to life and was damaging to the plaintiffs and contained accusations of a grave crime, which is denounced by the world community.  As a means of protecting their business reputation and suppressing the defendants' actions that may violate the plaintiffs' rights in the future by further dissemination of the information contested by the plaintiffs, the plaintiffs requested that the court should force ZAO MAPT-Media and O.A. Lourie to publish a retraction in the *Versija* and forbid ZAO MAPT-Media and O.A. Lourie to distribute the retracted information about the plaintiffs.  They also demanded that the court should qualify the actions of ZAO MAPT-Media and O.A. Lourie as an abuse of the rights of journalists and mass media sources (MMS).

   Also, the plaintiffs made claims of moral damages and insisted on the recovery of 100 000 US dollars (in the ruble equivalent on the day of the writ execution) from the defendant ZAO MAPT-Media to be paid to P.O. Aven and the recovery of 100 000 US dollars (in the ruble equivalent on the day of the writ execution) from the defendant ZAO MAPT-Media to be paid to M.M. Fridman.  They also insist that the defendant O.A. Lourie should pay 25 000 US dollars (in the ruble equivalent on the day of the writ execution) to P.O. Aven and 25 000 US dollars (in the ruble equivalent on the day of the writ execution) to M.M. Fridman, respectively.

**P0009241**

Giving their grounds for the amount of moral damages, the plaintiffs pointed out that the issue of protecting their business reputation is of crucial importance for P.O. Aven and M.M. Fridman, as in the numerous years of their work as top ranking people in big companies that they have led to become the leading companies in Russia, the plaintiffs are well known both in Russia and abroad.

In accordance with the statement made by the plaintiff, P.O. Aven is a member of the Alfa Bank Board of Directors and the bank President, and also chairman of the boards of directors of two other companies, who is involved in social activities as a member of the Trusteeship Board of the Russian School of Economics and a member of the Bolshoi Theatre Trusteeship Board.

Next, the plaintiff explained that M.M. Fridman had been elected and reelected Chairman of the OAO Alfa Bank Board of Directors for many years, and his bank is one of the major private commercial banks in Russia and also one of the most reliable ones. His name is as well known as P.O. Aven's name and he enjoys the reputation of a successful entrepreneur and a reliable partner. Michail Fridman is also a member of the boards of directors of four major companies and is well known as a social figure: he is the Vice President of the Russian Jewish Congress and a member of the Russian Union of Industrialists and Entrepreneurs.

In addition, the Alfa Bank headed by P.O. Aven and M.M. Fridman has its branches and affiliations in all the regions of Russia. The business reputation of the Alfa Bank as one of the biggest and most reliable banks of Russia with more than 5.5 thousand employees and constantly growing net assets, has been shaped as a result of the bank business development strategy that was developed by P.O. Aven, bank President and M.M. Fridman, Chairman of the bank Board of Directors. The Alfa Bank is making use of the most sophisticated banking technologies. It ensures "injections" of major investments in business operations. In 2001 alone the OAO Alfa Bank paid 393 064 477 rubles in all types of taxes.

Given the above referenced facts, the plaintiff said that disseminating this information in a mass media source whose circulation is about 200 000 copies was aimed at discrediting P.O. Aven and M.M. Fridman's business reputation, and the grave accusations contained in the articles had caused serious moral suffering.

In addition, the plaintiffs request that the court should oblige ZAO MAPT-Media and O.A. Lourie collectively to pay in favor of the OAO Alfa Bank 172 271.85 pounds in the ruble equivalent on the day of the writ execution and 1 757 820.61 rubles in recovery of the losses caused by the defendants' dissemination of untrue information, which was damaging to the business reputation of the plaintiffs. The plaintiff adjusted his lawsuit demands in this part, having specified that to protect their business reputation that was vilified by the defendants and as a measure of self-defense and collecting evidence refuting the defendants' stories, the OAO Alfa Bank had to turn to the world renowned and well-respected Kroll Company, which conducted its own independent investigation and presented the results of this investigation before actual and potential partners of the OAO Alfa Bank in the world financial services market. These results are also used as grounds for their claims contained in the lawsuit filed with the arbitration court.

**P0009242**

According to the plaintiff, expenses related to the payment for the investigative work performed by the Kroll Company were in the amount of 172 271.85 pounds and 1 757 820.61 rubles, out of which 172 271.85 pounds were paid directly to the company for their work, while 1 757 820.61 rubles constitute a VAT, which is supported by Invoice # 1408596 dated 09.30.02 and by SWIFT message # IS00572066 on the disbursement of the payment dated 01.15.03 and Payment Order # 00005 dated 01.23.03.

In the opinion of the plaintiffs, the above referenced amounts should be counted as expenses incurred in connection with the self-defense of their rights and collection of evidence in support of the lawsuit, they may be qualified both as losses, suffered by the party to restore their right and as court expenses whose list, pursuant to Article 106 of the Arbitration Procedural Code is not restrictive, as legal expenses incurred by a party in defense  (self-defense) of its rights can be classified as losses and are an inalienable part of these losses. (Article 15 of the Civil Code of the RF).  In support of his claim, the plaintiff cited the ruling of the RF Constitutional Court, which recognized that the expenses incurred by an individual in order to restore his violated rights which are qualified by the Civil Code of the RF as losses, also include all litigation expenses, and though the issue of the recovery of these expenses is envisaged directly and indirectly in the procedural rules and regulations, this recovery is in compliance with the constitutional and state guarantees of rights of citizens and legal entities.  (Definition # 22-0 dated 02.20.2002, the complaint of the OAO Bolshevik).

In addition, the plaintiffs indicated that their attorney represented their interests in the Arbitration Court, and the expenses related to the fee for his services provided under a legal assistance agreement dated 03.01.2003 were in the amount of 374 206.90 rubles, given the case complexity, the attorney's qualifications, the actual work done, the average market fees for services provided by a highly qualified civil law attorney and also the importance for the plaintiffs, both individuals and legal entities, of their demands of protecting their business reputation, as their actual business operations, stable work conditions and the company profits depended on their business reputation.

Defendant O.A. Lourie did not show up for the court hearing and did not submit his response or objections to the lawsuit.  He had been duly notified of the time and venue of the court hearing, therefore, the dispute was heard in compliance with Articles 123 and 156 of the RF Arbitration Procedural Code.

Defendant ZAO MAPT- Media rejected the lawsuit on the grounds that the plaintiff's demands were ungrounded, as O.A. Lourie's article published in Issue # 25 dated 07.06.1999 entitled "Hero of Our Time! Alfa Group Portrait" subtitled "Alfa was involved in drug trafficking from South East Asia via Russia to Europe" quoted from an inquiry made by V.I. Ilyukhin, Chairman of the Duma Security Committee.  This inquiry was sent to the high ranking officials in the Ministry of the Interior and contained a request to verify the plaintiffs' operations.  In the opinion of the defendant, this circumstance does indemnify the journalist and the media source founder and holds them harmless for distributing the above referenced information and, consequently, relieves them of the obligation to prove the authenticity of this information.

P0009243

The defendant insists that the contested articles do not contain statements related to the plaintiffs' illegal activities and, therefore, the information contained in them is not discrediting.

The defendants also indicated that the plaintiffs had failed to provide evidence of their business difficulties, moral sufferings and the amount of moral damage; they believe that the expenses incurred by the OAO Alfa Bank in paying for the services provided by the Kroll Company cannot be qualified as losses, as the plaintiffs failed to prove the cause and effect connection between these expenses and the contested publications.  In addition, the defendant indicated that these expenses cannot be qualified as litigation expenses, as pursuant to Article 152 of the RF Civil Code, the plaintiff is not required to prove the fact that the distributed information about him is not true to life.

The defendant objects to satisfying the claim related to the recovery of the expenses incurred in paying the fee of the plaintiffs' attorney, as he believes that the fact of paying the fee is not sufficiently proven and the fee amount is not consistent with the requirements contained in Sec. 2 Article 110 of the RF Arbitration Procedural Code.

In addition, the defendants refused to reveal the name of the anonymous individual, who was interviewed for the second publication in the newspaper *Versija* Issue # 19 entitled "Criminal Pulp Fiction Russian Style".

The defendants believe that the article entitled "Criminal Pulp Fiction Russian Style" does not contain any concrete names of legal entities, this publication does not contain any references to OAO Alfa Bank and OOO Alfa Echo and, therefore, the court should reject the claim of these two plaintiffs in their part of the lawsuit.

In compliance with the determination of the Arbitration Court of the City of Moscow, a linguistic expert evaluation was conducted in this case.  The court instructed the Guild of Linguistic Experts in Document and Information Disputes (GLEDIS), a Russian non-governmental association, to carry out an expert evaluation.  The court raised the following questions to be answered by the experts:

1.  Do O.A. Lourie's articles entitled "Alfa Group Portrait" and published in the newspaper *Versija* issue # 25 dated 07.06.99 and the article entitled "Criminal Pulp Fiction Russian Style", published in the newspaper *Versija* issue # 19 dated 05.20.2002, contain any negative information (data) about P.O. Aven, M.M. Fridman, OAO Alfa Bank and OOO Alfa Echo?
2.  What is the compositional structure of the text of the articles (article), what literary devices are used by the author and how do they affect the reader's perception of the heroes of the publications?
3.  If they do contain this information (data), then in what manner does the author use it, in the form of a supposition or any other manner?
4.  If they do contain this information (data), then what is the source (sources) of this information (data)?
5.  What is quoting?  What are the signs of quoting and quotations in the text?
6.  Do the articles referenced in Question #1 contain quoting and quotations?

The experts carried out this research and submitted to the court their opinion that contained the answers to the raised questions:

1.  O.A. Lourie's articles entitled "Alfa Group Portrait" and published in the newspaper *Versija* issue # 25 dated 07.06.99 and the article entitled "Criminal Pulp Fiction Russian Style", published in the newspaper *Versija* issue # 19 dated 05.20.2002, do contain negative information (data) about P.O. Aven, M.M. Fridman, OAO Alfa Bank and OOO Alfa Echo.  This negative information is contained in the

P0009244

utterances that are listed in the research part of the opinion in their answers to Questions 1, 3.

2. "Alfa Group Portrait" is an informative and critical article of investigative nature (however, it is not a journalist's investigation as such), while "Criminal Pulp Fiction Russian Style" is written in the genre of a problem interview.  The composition of the article "Alfa Group Portrait" is as follows: in the introductory part the author asks two questions with regard to the role played by the heroes of the publication and this allows us to say that the entire article constitutes arguments in favor of a positive answer to the question whether the publication heroes (Aven, Fridman and Khan) are a three headed dragon of the Russian Mafia.  Judging from the materials of the article the reader cannot give any other answer, as the article contains negative information about the heroes of this publication and the companies headed by them.  Compositionally, the article "Criminal Pulp Fiction Russian Style" consists of a small introduction, the text of the interview (two-component text consisting of questions and answers) and a conclusion (made in just one paragraph).  The experts were unable to answer the question how the composition of these articles might affect the reader's perception: to answer this questions they should conduct a special sociological survey.  See the research part of the opinion for more details related to the specifics of the genre and the compositional structure of these articles.

3. Negative information (data) about P.O. Aven, M.M. Fridman, OAO Alfa Bank and OOO Alfa Echo (See answer to Question 1) is provided in the form of a statement.

4. As his sources of negative information (legal entities and individuals) listed in Question #1, Oleg Lourie, the author of the evaluated articles, mentions the materials of the Security Committee of the State Duma of the RF and an anonymous officer of the Western special services.  Some utterances are made by Oleg Lourie, the author of these publications.

5. Quoting is incorporating quotations in the text.  A quotation is an exact, verbatim excerpt from some text or utterance.  A quotation can be identified by its formal signs - punctuation, quotation marks.  To identify some fragment of the text as a quotation (with regard to its contents) one should have: 1) the original (quoted) text, 2) and the secondary text where the quotation (quotations) is used.

6. Oleg Lourie's article "Alfa Group Portrait" contains some textual fragments whose punctuation is that of quotations.  Some of these fragments are quotations and can be identified both formally and by their content.  However, the analysis of the text has revealed that the author does not always follow the rules of attributing material to other people and the formal rules of punctuation.  A number of fragments are distorted quotations, as they do not fully coincide with the original text.  Information contained in them cannot be considered authentic.  Oleg Lourie's article  "Criminal Pulp Fiction Russian Style" does not contain quotations, there is no quoting in it.  The text of this article is fully original.

Having considered the materials of the case, having heard the explanations of the parties' attorneys, having studied the case materials, having evaluated the submitted evidence, including the opinion of experts, the articles containing the contested information and Appendix # 3.15.-2216 to the letter of the Chairman of the RF State Duma Security Committee dated 11.26.97, having studied the materials provided by the Kroll Company and other materials, the court has established the following:

Pursuant to Article 152 of the Civil Code of the RF, citizens and legal entities have the right to demand retraction of the information that is discrediting their business reputation unless

P0009245

a person who distributed this information proves that this information is true to life. Since business reputation is one of sine qua non conditions for successful business operations of these persons and legal entities, it is protected by law and pursuant to Article 150 of the RF Civil Code is subject to legal protection.

In Sec. 2 of Resolution # 11"On some issues that arise in court hearings of cases devoted to protection of business reputation of citizens and legal entities" dated 08.18.92, the Plenary Meeting of the Supreme Court of the Russian Federation (#11 - reviewed 12.21.93, #6 reviewed 04.25.95) clarified that discrediting information is the information, which is not true to life and which contains statements related to violations of applicable laws or ethical principles perpetrated by citizens or legal entities (acts of dishonesty or crimes, misconduct and other information discrediting their industrial, economic or social activities) that belittle the business reputation of a citizen or a legal entity.

The contested publications do contain information that is discrediting for the plaintiffs, that damages their business reputation, as one can find openly negative characteristics of P.O. Aven and M.M. Fridman and statements with regard to serious crimes perpetrated by them; their connections with criminal elements; P.O. Aven's abuse of his official position when he was a Minister of Foreign Economic Relations; P.O. Aven's criminal connections with the Israeli Special Services; P.O. Aven and M.M. Fridman's involvement in organizing drug trafficking from Southeast Asia via Russia to Europe; that within the consortium it is the Alfa Echo Company that is involved in secret illegal drug operations; that M.M. Fridman was involved in voucher fraud; that the Alfa Group consists of numerous companies that are engaged in illegal money laundering and acquire new companies with the money received as a result of fraud; that the operations of such companies like the Alfa Group pose a threat to the national security of several countries; that the Alfa Group is connected with the criminal world.

The defendants insisted that the article "Criminal Pulp Fiction Russian Style" does not contain any concrete names of any legal entities and this publication does not contain references to the OAO Alfa Bank, the OOO Alfa Echo and, therefore, the plaintiffs' claim with regard to this part of the lawsuit should be rejected.

However, journalist O.A. Lourie in his article entitled "Hero of Our Time! Alfa Group Portrait" implies the OAO Alfa Bank and the OOO Alfa Echo when he says "Alfa" and associates the names of P.O. Aven (OAO Alfa Bank President) and M.M. Fridman (Chairman of the OAO Alfa Bank Board of Directors) with them, as one can see it from the title of the article and its contents. He even calls P.O. Aven "President of the Alfa Group Consortium", and Fridman - "Chairman of the Board of Directors", (which is not true to life). Therefore, the court believes that the information contained in the article entitled "Criminal Pulp Fiction Russian Style" discredits the business reputation of the OAO Alfa Bank and the OOO Alfa Echo, and also the business reputation of M.M. Fridman, as they are the top people in the company containing the word "Alfa" in its name.

The analysis of the contents and meaning of the contested texts, also the absence in the plaintiffs' structure of an entity called "Alfa" and "Alfa Group" led us to the conclusion that the contested publications directly affect the legal rights, interests and business reputation of the

P0009246

plaintiffs: P.O. Aven, M.M. Fridman, OAO Alfa Bank and OOO Alfa Echo.

The linguistic evaluation carried out in the case has confirmed the presence of negative information in the contested publications and the fact that the information is related in the form of statements. When asked, the experts E.S. Kara-Murza, MS, who has a master's degree in linguistics and is a docent of the School of Journalism of the Moscow State University, and Y.A. Safonova, MS, has a master's degree in linguistics and is a docent of the Russian Language Institute of the Russian Academy of Science, confirmed the conclusions of the expert opinion during the court hearing.

The discrediting information that was disseminated by the defendants is not true to life and is subject to retraction. Pursuant to Article 152 of the RF Civil Code, it is the defendants that shall bear the burden of proof of the authenticity of the distributed information. Except for the reference to the anonymous appendix to V.I. Ilyukhin's letter that contains unverified information, the defendants were unable to submit any other evidence to prove the authenticity of this information. In compliance with presumption of innocence (Sec.1 of the Constitution of the Russian Federation), the information about the plaintiffs that contains serious accusations of grave crimes, which was distributed by the defendants may be confirmed only by special evidence: a court verdict that is in effect. The defendants failed to submit this type of evidence to court.

The plaintiffs P.O. Aven and M.M. Fridman have never been charged with any crime. There are no court verdicts that are in effect that would have established the use of the OAO Alfa Bank and the OOO Alfa Echo for laundering drug money or any other criminal activities.

The RF FSB letter # K-l 5402 dated 08.13.99 confirms that the Russian FSB has no available information related to the involvement of the Alfa Group and its executives in criminal operations, drug trafficking and connections with organized crime and that "media references to the KGB-FSB materials on this issue are not lawful."

The Ministry of the Interior of Russia in its letter # 1/2680 dated 02.16.2000 confirmed that it did not have any available information related to any unlawful activities of citizens M.M. Fridman and P.O. Aven.

Letter # 193 of the Chief Department of the Interior of the Department of the Interior of the Central Administrative District of the 2nd District Department of the Interior Police Precinct 6 dated 02.16.2000 confirms that no criminal cases against M.M. Fridman and P.O. Aven have ever been opened and they have never been charged administratively, they have never been tried or investigated and there are no available compromising materials related to them.

The plaintiffs also submitted to the court the letters of the Chief Department of fighting economic crimes of the Ministry of the Interior of the RF, the Anti-drug Agency of the Ministry of the Interior of the RF, the Moscow and Moscow Region FSB Department and the Regional Department of fighting organized crime of the Chief Department of the Ministry of the Interior of the Russian Federation dated 1995. The letters confirm the fact that the Alfa Echo executives and employees have never been investigated and have never been involved in any operative or search measures and have never committed any economic crimes.        **P0009247**

In this case we see no legal grounds to believe that the journalist and the media source founder should be indemnified for disseminating the information that is discrediting the plaintiffs and is not true to life. The list of grounds for indemnifying a journalist contained in Article 57 of the Law of the RF on the Mass Media is comprehensive and restrictive. The letter of the RF State Duma Security Committee and the appendix to this letter cannot be viewed as the circumstances indemnifying the journalist and the media source founder for distributing the information that was not true to life and discrediting the plaintiffs' business reputation whether or not this information is quoted verbatim.

The letter of the RF State Duma Security Committee dated 11.26.97 does not contain any information with regard to the plaintiffs' unlawful activities. It only expresses a request to verify the materials contained in the appendix to the letter (9 pages). The materials constitute a 9-page anonymous letter that was sent from the State Duma to the Ministry of the Interior, requesting the ministry to verify the facts described in the letter and establish their authenticity. As of today the law enforcement agencies were unable to confirm the facts described in this anonymous letter, which discredit the plaintiffs. Therefore, the negative information contained in this letter is of no juridical significance and it cannot be distributed by other persons or entities, including the media editorial board and the journalist.

Pursuant to Sec. 2 Article 49 of the of the Law of the RF on the Mass Media, a journalist is supposed to verify the authenticity of the information he distributes, particularly when it contains facts of crimes committed by concrete individuals, as a citizen can be found guilty only in a court verdict that has become effective. When he is engaged in his professional work, a journalist must respect the rights, legal interests, honor and dignity of citizens and entities, which is explicitly stipulated in Article 49 of the Law of the RF on the Mass Media. Therefore, the journalist and the media source have no right to publish information that contains statements with regard to crimes committed by certain persons before they were found guilty in a court of law.

The defendants: the journalist and the editorial board of the media source founded by the ZAO MAPT-Media distributed untrue information that discredited the plaintiffs before the law enforcement agencies had verified this information and the court had found them guilty.

The defendant objected that O.A. Lourie's article entitled "Hero of Our Time! Alfa Group Portrait" with a subtitle "Alfa was involved in drug trafficking from South East Asia via Russia to Europe" constituted quoting from the request for information sent by V.I. Ilyukhin, Chairman of the RF State Duma Security Committee, to the high ranking officials of the Ministry of the Interior, where he requested them to verify these facts. In the defendant's opinion, this circumstance constitutes sufficient grounds to indemnify both the journalist and the media source founder for distributing the quoted information and, consequently, relieves them of the burden to prove the authenticity of this information. The court has found that the defendant's objections are ungrounded and unreasonable.

At the plaintiffs' request the Arbitration Court sent an inquiry to the RF State Duma and asked them whether V.I. Ilyukhin had actually sent his request for information to the Ministry of the Interior of the Russian Federation. The RF State Duma sent the court a copy of Letter # 3.15.-2216 dated 11.26.97 signed by

**P0009248**

12

V. I. Ilyukhin, Chairman of the Duma Security Committee, addressed to A.S. Kulikov, Deputy Chairman of the Government of the Russian Federation and RF Minister of the Interior. In his letter V.I. Ilyukhin asked him to verify the circumstances described in the materials sent to the Duma Security Committee, which were "related to a number of commercial companies and some high ranking officials". The letter contained an enclosure, a 9-page appendix. However, the RF State Duma never submitted this appendix to the court together with the copy of V.I. Ilyukhin's letter.

The defendants submitted to the court the materials that V.I. Ilyukhin had personally passed along to the defendant. They claim that these materials and the appendix to the above referenced Letter # 3.15.-2216 dated 11.26.97 are absolutely authentic. The plaintiffs do not contest the authenticity of the materials and the fact that V.I. Ilyukhin had personally passed them along to the defendants, as they believe that these circumstances are essential in this case.

In compliance with the rights and obligations of a journalist stipulated in Articles 47 and 49 of the Law of the RF on the Mass Media, a journalist cannot and should not quote from anonymous materials, whose source cannot be revealed and established, he cannot and should not quote from the materials that contain unverified information, which is compromising other persons. Article 51 of the Law of the RF on the Mass Media forbids the use of a media source with the aim of distributing compromising materials and rumors disguised as true statements (including anonymous statements and messages). Therefore, the fact that the journalist quoted verbatim some excerpts from the anonymous materials contained in the appendix to the letter of the State Duma Committee does not indemnify the defendants, as they distributed untrue information that was damaging to the plaintiffs. When the journalist quoted excerpts from the anonymous letter and used quotation marks he did care about the copyright of the anonymous source (Part 1 Article 42 of the Law of the RF on the Mass Media), however, he intentionally violated the plaintiffs' rights to a good name and protection of their business reputation when he made public the facts that are discrediting them.

Within two years since the first contested publication the defendants once again distributed untrue information that was damaging to the plaintiffs. They published an interview with an anonymous source, a Western special service officer, in the newspaper *Versija* issue # 19 dated 05.20.2002, which was entitled "Criminal Pulp Fiction Russian Style".

The defendants refused to reveal their anonymous source who was interviewed for the second publication in the newspaper *Versija* issue # 19, which was entitled "Criminal Pulp Fiction Russian Style". The defendants' refusal to reveal the name of the person that provided information for the article is in violation of Part 2 Article 41 of the Law of the RF on the Mass Media. Given their refusal to reveal their source, the Arbitration Court in making its decision on the case has proceeded from the assumption that it is the journalist himself who was the source of information distributed in the article "Criminal Pulp Fiction Russian Style". Therefore, it is the journalist and the media source founder that shall be held liable for distributing the information that is not true to life and is discrediting the plaintiffs. In support of the fact that he had interviewed a real person whose name he refused to reveal in the preliminary hearing, defendant O.A. Lourie mentioned a tape recording of the interview with his anonymous source and the Russian translation of the transcript of the interview. Given the fact that the journalist does not wish to reveal his source, the Arbitration Court believes that court is unable to identify the tape recording with the interviewee. Therefore, neither the audio tape of the interview with

P0009249

an anonymous source made by the journalist nor the interview transcript and its translation can be used in evidence in this case. The materials of the US Congress and the FBI and the materials of other US agencies referred to by defendant O.A. Lourie do not constitute essential evidence in this case, as the anonymous interview does not contain any references to these documents. In addition, these materials do not meet the requirements of the Arbitration Procedural Code of the RF related to providing original written evidence or its duly certified copy. A document from a foreign state shall not be recognized by the Arbitration court unless it is legalized in accordance with the procedure stipulated by law (Sec. 6 and 8, Article 75 of the RF Arbitration Procedural Code).

The analysis of available documents led the court to the conclusion that the journalist had intentionally tried to enhance the readers' perception that the information distributed by him was true and damaging for the plaintiffs. He intentionally used such phrases as "According to the words of the employees of the Ministry of Foreign Economic Relations", "According to these operative data", "It follows from these operative developments". He wrote about his anonymous interviewee "He was not far down in the hierarchy in one of the Western special services".

Though in his article "Criminal Pulp Fiction Russian Style" the journalist made a statement that he would not claim with the full degree of responsibility that all the serious accusations against the plaintiffs were supported by actual evidence, his statement cannot be used as a ground to indemnify the defendants, as in compliance with law a journalist has no right to distribute unverified facts, which discredit citizens and legal entities and damage their business reputation.

On the grounds of all the above referenced facts the court has recognized as grounded the plaintiffs' demand to protect their business reputation and recognize the information contained in the article carried in the newspaper *Versija* issue # 25 dated 07.06.1999 and entitled "Hero of Our Time! Alfa Group Portrait" with a subtitle "Alfa was involved in drug trafficking from South East Asia via Russia to Europe", and in Issue # 19, dated 05.20.2002 entitled "Criminal Pulp Fiction Russian Style" as not true to life and damaging to the business reputation of P.O. Aven, M.M. Fridman, OAO Alfa Bank and OOO Alfa Echo. The court believes that their claim should be satisfied.

In addition, the court imposed upon the ZAO MAPT-Media, the newspaper founder, a duty to publish a retraction of the above referenced information, which is not true to life and is discrediting P.O. Aven, M.M. Fridman, OAO Alfa Bank and OOO Alfa Echo.

The OAO Alfa Bank claim with regard to the recovery of their losses in the amount of 172 271.85 pounds in the RF Central Bank ruble equivalent on the day of the writ execution and 7 500 000 rubles respectively (litigation expenses and moral damage caused by the defendants when they disseminated information that was not true to life and was damaging to the plaintiffs' business reputation) shall be satisfied on the following grounds.

Th court has established that the OAO Alfa Bank really spent a considerable amount of money to protect its business reputation and the business reputation of other plaintiffs by retaining the Kroll Company to carry out an investigation to establish the authenticity of the facts contained in the two contested publications authored by O.A. Lourie that discredit the plaintiffs.

P0009250

14

According to the statement made by the plaintiffs, they selected this company because it is well known and has an impeccable reputation in the world business community.

The Kroll Company carried out its own investigation and established the fact that the accusations against the plaintiffs contained in the O.A. Lourie's articles dated 07.06.1999 and 05.20.2002 were groundless. Having arrived at these conclusions, the Kroll Company undertook to send out letters to this effect to all the stakeholders who are working with the plaintiffs or intend to work with the plaintiffs.

The court has accepted the opinion of the Kroll Company as one of the pieces of evidence that supports the fact that the information damaging to the plaintiffs made public in these contested articles was not true to life. In this case the court has proceeded from the assumption that though Article 152 of the RF Civil Code says that the defendant is obliged to prove the authenticity of the information distributed by him, this article does not deny the right of the plaintiff to submit to court additional evidence of his righteousness, including those data that were obtained for a fee, as this way of collecting evidence is not in violation of law.

The court believes that defendants' arguments are ungrounded when the defendant says that in the documents submitted by the plaintiffs it is hard to see the cause and effect connection between the contested publications and the expenses incurred in paying for the services of the Kroll Company. The plaintiffs succeeded in proving the fact of the services provided by the Kroll Company for the OAO Alfa Bank and also the fact that they carried out their own investigation with the purpose of establishing the authenticity or unauthenticity of the information distributed by the defendants and this fact is supported by the Kroll Company letters dated 02.08.2002, 03.19.2002, 06.19.2002, 10.07.2002 and 10.16.2002.

The court regards as litigation expenses incurred in this case, the expenses of OAO Alfa Bank in the amount of 172 271.85 pounds (in the ruble equivalent) that were paid for the services of the Kroll Company. The payment is supported by Invoice # 1408596 dated 09.30.02 and by SWIFT message # IS00572066 on the disbursement of payment dated 01.15.03 and Payment Order # 00005 dated 01.23.03.

The claim with regard to the recovery of the VAT payment in the amount of 1 757 820.61 rubles paid by the OAO Alfa Bank for the nonresident Kroll Company (Payment order # 00005, dated 10.23.2003) shall be rejected, as the court found no evidence that this amount can be referred to litigation expenses incurred by the plaintiffs in the self-protection of their rights and in collecting evidence that refutes the defendants' stories. It is not clear from the payment order and the purpose of the payment that this payment was made for the investigation conducted by the Kroll Company.

In cases of dissemination through the mass media of unauthentic information that is damaging to citizens and legal entities the amount of moral damages is determined on the basis of the nature of the publication, its contents, the scope of dissemination of the untrue information and other important relevant circumstances.

P.O. Aven and M.M. Fridman claim to recover 250 000 (two hundred fifty thousand) US dollars in moral damages, 100 000 US dollars in the ruble equivalent to be paid by the ZAO MAPT-Media and 25 000 US dollars in the ruble equivalent each to be paid by journalist O.A.

P0009251

Lourie, respectively.  Here the following things should be taken into account: the violated rights of the plaintiffs, the degree of the defendants' guilt, the fact that the journalist obviously abused his journalist rights, the seriousness of the accusations against the plaintiffs who were accused of having committed grave crimes, which are denounced by the mankind, the gravity of the aftermath; and the area of distributing the untrue information that was damaging to the plaintiffs' business reputation.  The Arbitration Court has taken into account all these facts in deciding the issue of moral damages and the amount.

The information contained in the contested articles leads the readers to the conclusion that P.O. Aven and M.M. Fridman are the Mafia members and have contacts with transnational crime, that they are involved in illegal drug trafficking and the laundering of criminal capital through the OAO Alfa Bank, while they use the OOO Alfa Echo for drug trafficking.

The distribution of this information is aimed at discrediting the business reputation of P.O. Aven and M.M. Fridman and due to the seriousness of the accusations it contains did in fact cause moral sufferings.

Given the nature of the contested publications and the fact that they have been used to disseminate unverified and ungrounded information about the involvement of P.O. Aven and M.M. Fridman in grave crimes, which is damaging to their business reputation in the Russian and world banking markets, given the fact that the court has qualified these actions as abuse of the rights of the mass media and the rights of a journalist, the court believes that P.O. Aven and M.M. Fridman's claims with regard to moral damages in the amount referenced by the plaintiffs are grounded.  Moral damages shall be paid through the recovery from the defendants ZAO MAPT-Media and O.A. Lourie of the aforesaid amounts in the ruble equivalents in compliance with the requirements contained in Article 317 of the RF Civil Code, which stipulates that monetary liabilities shall be expressed in rubles.

Pursuant to Article 110 of the RF Arbitration Procedural Code, the claim of the recovery of the attorney's fees shall be satisfied, as Article 110 contains a provision that the expenses incurred in paying the attorney's fees by the person who won the case can be recovered from the other party upon the decision of the Arbitration Court.  The fact of provided services and the disbursement of payment has been proven by the Agreement dated 03.01.2003 and the documents supporting the payment transfer and the attorney's receipt.  Since the court believes that the recovery of these expenses should be within reasonable limits, the court has decreased the recovery of the attorney's fees and set the amount of 60 000 rubles.

The court has rejected the plaintiffs' claims in the part where they demanded that the court should recognize the actions of the defendants ZAO MAPT-Media and O.A. Lourie as abuse of the rights of a journalist and of a media source and that the court should suppress their actions that pose a threat to the plaintiffs' rights by forbidding the defendants to distribute the information that was recognized by the court as not true to life and discredited the plaintiffs' business reputation.  The plaintiffs made this claim as part of their demands to protect their civil rights, including the right to protect their business reputation.  The court rejected their claim, as the way of protecting civil rights chosen by the plaintiff must be in compliance with Article 42 of the RF Civil Code, however, recognizing the actions of the defendants ZAO MAPT-Media and O.A. Lourie as abuse of the rights of a journalist and of a media source does not constitute a means of protecting civil rights and business reputation.  In addition, the court is not authorized to

P0009252

make decisions that would forbid ZAO MAPT-Media and O.A. Lourie to perform certain actions with regard to the above referenced claims in the future, including distributing information, which is similar to the information contained in the article, entitled "Hero of Our Time! Alfa Group Portrait" with a subtitle "Alfa was involved in drug trafficking from South East Asia via Russia to Europe", published in Issue # 25 and the article entitled "Criminal Pulp Fiction Russian Style" published in Issue # 19 of the *Versija* newspaper.

In reviewing the issue related to the distribution of litigation expenses the court has proceeded from the following:

Actually, it was the OAO Alfa Bank that has incurred all the expenses in connection with paying state tariffs, the fee of the Kroll Company, the cost of the expert evaluation and the fee of the attorney who represented them in the Arbitration Court hearing. Such was the agreement among all the plaintiffs in this case. In view of these circumstances the money received as a result of the recovery sanctioned by the court shall be paid to the OAO Alfa Bank collectively by ZAO MAPT-Media and O.A. Lourie.

The payment for the expert evaluation is disbursed from the deposit account of the Arbitration Court of the City of Moscow and goes to the account of the Guild of Linguistic Experts in Documentary and Information Disputes, Invoice # 5 in the amount of 8 400 rubles dated 04.22.2003. These OAO Alfa Bank costs shall be recovered from the defendants.

Given the above referenced facts and pursuant to Articles 1-4, 13, 27, 46, 64, 101, 106, 108-110, 123, 156, 167-171, 174-176 of the Arbitration Procedural Code of the Russian Federation and Articles 11, 12, 14, 15, 150, 151, 152 of the Civil Code of the Russian Federation the court

## HAS RULED THE FOLLOWING:

1. To recognize the following information distributed in O.A. Lourie's article entitled "Hero of Our Time! Alfa Group Portrait" with a subtitle "Alfa was involved in drug trafficking from South-East Asia via Russia to Europe", published in Issue #25 dated 07.06.1999 as not true to life and damaging to the business reputation of P.O. Aven:

- "When he was a student of Moscow State University Aven was president of a students music club and had numerous contacts among the young people (music fans, bohemian guys, etc). That was also the environment where a market for illegal drugs was being shaped at the time. As a result Aven was in the focus of attention of some criminal elements and he had some contacts with their "leaders".

- "As a result (of P.O. Aven's involvement in solving the problem of debt) P.O. Aven received good commission money when he managed to sell Ghana's debt".

- "According to the words of the employees of the Ministry of Foreign Economic Relations, when Petr Aven headed the ministry he was unscrupulous and was not ashamed to get commissions and accept valuable gifts for his assistance to foreign and domestic companies in signing deals and carrying out foreign economic transactions."

- " He was especially tough when he dealt with those transactions that involved the sales of arms, he allowed only those players to enter that market who were connected to him."

**P0009253**

- "In 1991-1992 the 6[th] Department of the KGB of the Security Ministry of the Russian Federation investigated Petr Aven's activities using the following materials: big embezzlements of money, causing big damage to the country and criminal connections with the Israeli intelligence services.  In 1992 the former security minister reported about the materials to President B. Yeltsin and as a result Petr Aven was dismissed from his position as a minister on December 22, 1992."

- "According to the investigation reports P. O. Aven was involved in illegal drug trafficking from the South East Asia via Russia to Europe."

- "Late in 1993 in Vienna P.O. Aven met Gilberto Rodrigues Orehuel, a Colombian drug lord, who was also known under the nickname of "Chess player".  Specifically, they reached an agreement on "pumping money into" the Alfa Bank from some offshore zones (like the Bahamas and Gibraltar) to be invested in the Russian economy through the acquisition of stock issued by Russian enterprises".

2.    To recognize the following information distributed in O.A. Lourie's article entitled "Hero of Our Time! Alfa Group Portrait" with a subtitle "Alfa was involved in drug trafficking from South-East Asia via Russia to Europe", published in Issue #25 dated 07.06.1999 as not true to life and damaging the business reputation of M.M. Fridman:

- "At that time the Bauman Brigade was the only Moscow group that was seriously involved in illegal drugs and was constantly expanding its operations.  The market for illegal drugs was being shaped among students and artistic youth, rock fans, hippies, punks, prostitutes, etc.  Fridman had numerous contacts in these circles and, undoubtedly, the Bauman Brigade was very interested in his connections.  The contact with the brigade turned out to be mutually beneficial."

- "Michail Fridman was also involved in the organization of illegal drug trafficking from the South East Asia via Russia to Europe."

- ""Fridman was also involved in voucher fraud. As a result of these voucher schemes alone the Alfa Group Chairman had added approximately 30-40 million dollars to his personal assets."

3.    To recognize the following information distributed in O.A. Lourie's article entitled "Hero of Our Time! Alfa Group Portrait" with a subtitle "Alfa was involved in drug trafficking from South-East Asia via Russia to Europe", published in Issue #25 dated 07.06.1999 as not true to life and damaging the business reputation of the OAO Alfa Bank:

- "Late in 1993 in Vienna P.O. Aven met Gilberto Rodrigues Orehuel, a Colombian drug lord, who was also known under the nickname of "Chess player".  Specifically, they reached an agreement on "pumping money into" the Alfa Bank from some offshore zones (like the Bahamas and Gibraltar) to be invested in the Russian economy through the acquisition of stock issued by Russian enterprises".

4.    To recognize the following information distributed in O.A. Lourie's article entitled "Hero of Our Time! Alfa Group Portrait" with a subtitle "Alfa was involved in drug trafficking from South-East Asia via Russia to Europe", published in          **P0009254**

Issue #25 dated 07.06.1999 as not true to life and damaging the business reputation of the OOO Alfa Echo:
- "It follows from the operative materials that within the consortium it was the Alfa Echo that is involved in secret operations with illegal drugs."

5. To recognize the information related to M.M. Fridman's connections with the criminal world; the existence of the Alfa Group company that poses a threat to the national security of several countries; Alfa's connections with criminal bosses distributed in O.A. Lourie's article entitled "Criminal Pulp Fiction Russian Style" published in Issue # 19 of the VERSIJA newspaper dated 05.20.2002 (founded by the ZAO MAPT-Media) as not true to life and damaging the business reputation of M.M. Fridman and the business reputation of the OAO Alfa Bank and the OOO Alfa Echo.
6. To oblige the ZAO MAPT-Media as the founder of the VERSIJA newspaper to publish a retraction of the information listed in Sec. 1-5, as it is not true to life and is discrediting P.O. Aven, M.M. Fridman, OAO Alfa Bank and OOO Alfa Echo.
7. To recover from the ZAO MAPT-Media 3 000 000 rubles in favor of P.O. Aven in moral damages.
8. To recover from the ZAO MAPT-Media 3 000 000 rubles in favor of M.M. Fridman in moral damages.
9. To recover from O.A. Lourie 750 000 rubles in favor of P.O. Aven in moral damages.
10. To recover from O.A. Lourie 750 000 rubles in favor of M.M. Fridman in moral damages.
11. To recover in favor of the OAO Alfa Bank from the ZAO MAPT-Media and O.A. Lourie collectively 172 271.85 pounds in the ruble equivalent at the exchange rate of the Central Bank of the RF on the day of the writ execution.
12. To recover in favor of the OAO Alfa Bank from the ZAO MAPT-Media and O.A. Lourie collectively 60 000 rubles as reimbursement of the attorney's fee.
13. To recover in favor of the OAO Alfa Bank from the ZAO MAPT-Media and O.A. Lourie collectively litigation expenses - the payment of the state tariff in the amount of 100 000 rubles.
14. To recover in favor of the OAO Alfa Bank from the ZAO MAPT-Media and O.A. Lourie collectively the expenses in the amount of 8 400 rubles incurred in conducting the expert evaluation.
15. To reject the rest of the lawsuit claims.
16. To transfer from the deposit account of the Arbitration Court of the City of Moscow to the account of the Guild of Linguistic Experts in Documentary and Information Disputes 8 400 rubles in accordance with Invoice # 5 dated 04.22.2003 (see the enclosed certificate).
17. To transfer from the deposit account of the Arbitration Court of the City of Moscow to the account of the OAO Alfa Bank the excessive payment in the amount of 600 rubles for conducting the expert evaluation.
18. To pay back 6 000 rubles and transfer this amount from the deposit account of the Arbitration Court of the City of Moscow to the account of the ZAO MAPT-Media.
19. To reimburse the OAO Alfa Bank for the excessive state tariff payment in the amount of 638 590 rubles.

This decision can be appealed in the Appeal instance of the Arbitration Court within one month.
Judge                    [Signature]  O.A. Vysokinskaya
07.31.2003                                        **P0009255**