# BOWMAN DECLARATION
# EXHIBIT 16

Арбитражный суд города Москвы

По делу № А 40-49954/02-21-494

Истец: ОАО «Альфа - банк»,

ООО «Альфа - Эко».

П. О. Авен, М. М.Фридман

Ответчики:  1) ЗАО «МАПТ - медиа»,

2) Автор спорных статей: Олег Анатольевич Лурье

## ПИСЬМЕННЫЕ ОБЪЯСНЕНИЯ СУДУ

( в порядке ст. ст. 41, 64, 81 АПК РФ)

Истцы обратились в суд с иском о защите деловой репутации, возмещении убытков  и компенсации морального вреда в связи с публикациями в газете «Совершенно секретно - Версия» оспариваемых ими статей автора О.А. Лурье: «Альфа. Групповой портрет» (№ 25 от 6-12 июля 1999 года) и «Криминальное чтиво по-русски» (№ 19 от 20-26 мая 2002 года).

В  исковом  заявлении  утверждается,  что  указанные  статьи «распространяют  порочащие  истцов,  не  соответствующие  действительности сведения, умаляющие деловую репутацию» всех перечисленных выше истцов: граждан П.О. Авена и М.М. Фридмана, юридических лиц ОАО «Альфа - банк» и ООО « Альфа - Эко».

Ответчик не согласен с заявленными требованиями и просит суд отказать в иске в полном объеме по следующим материально-правовым основаниям.

Согласно ст. 152 ГК РФ и разъяснениям, данным Постановлением Пленума ВС № 11 от 18.08.92г. *«О некоторых вопросах, возникающих при рассмотрении судами дел о защите чести и достоинства граждан, также деловой репутации граждан и юридических лиц»,* опровержению подлежат лишь не соответствующие действительности и порочащие сведения, распространенные о гражданине или юридическом лице».

Указанная норма закреплена в ст. 43 Федерального закона  № 2124-1  от 27.12.91 г.«О средствах массовой информации», в которой говорится о том, что право на опровержение возникает в случае распространения не просто недостоверных сведений, а недостоверных и порочащих сведений одновременно.

Постановление Пленума ВС № 11 дало четкое определение порочащих сведений  —  «это  не  соответствующие  действительности  сведения, содержащие  утверждения  о  нарушении  гражданином  или  юридическим лицом  действующего  законодательства  или  моральных  принципов  (о совершении  нечестного  поступка,  неправильном  поведении  в  трудовом коллективе,  быту  и  другие  сведения,  порочащие  производственно-хозяйственную и общественную деятельность, деловую репутацию и т.п.), которые умаляют честь и достоинство гражданина либо деловую репутацию гражданина или юридического лица».

Таким образом, из определения порочащих сведений, данного в Постановлении Пленума ВС № 11, следует, что опровержению подлежат лишь **сведения как утверждения об имевших место фактах в отношении конкретного физического или юридического лица.**

Такое же толкование понятия «сведения» дает и Определение Конституционного Суда РФ от 27 сентября 1995 г. «Об отказе в принятии жалобы гражданина Козырева Андрея Владимировича», в котором в частности сказано: «При рассмотрении в судах общей юрисдикции дел о защите чести и достоинства надлежит решать,...как отграничить распространении **недостоверной фактической информации** от политических оценок и возможно ли их опровержение по суду». Из этого следует, что Конституционный Суд РФ под сведениями понимает именно распространение сообщений о свершившихся фактах, а не предположения, вопросы, суждения и оценки.

Таким образом, для принятия законного обоснованного решения суду необходимо выяснить, какие именно сведения распространены ответчиками, какие конкретно сведения требуют опровергнуть истцы, , какие конкретно сведения распространены о каждом из истцов, в какой форме, являются ли спорные сведения порочащими и каков предмет доказывания по иску?

Понятие деловой репутации, которую требуют защитить истцы, также дано в Постановлении пленума Верховного Суда РФ № 11 от 18.08.92 г. как одно из **условий успешной деятельности юридических лиц.** Это определение полностью соответствует толкованию, данному понятию «репутация» в Толковом словаре русского языка С.И. Ожегова на с.677: «репутация – приобретаемая кем-либо или чем-либо общественная оценка, общее мнение о качествах, достоинствах и недостатках». (Толковый словарь русского языка под редакцией С.И. Ожегова и Н.Ю.Шведова, Москва, 1997 г. издание Института Русского Языка им. В.В. Виноградова Российской Академии Наук).

Из приведенных выше определений следует, что деловая репутация – это общественная оценка профессиональной деятельности, в нашем случае – деятельности истцов П.О. Авена, М.М. Фридмана, ОАО «Альфа - банк» и ООО «Альфа - Эко».

Таким образом, ущерб, если он нанесен деловой репутации гражданина или юридического лица, должен иметь проявление в виде затруднений в его предпринимательской деятельности и эти затруднения должны быть не просто связаны, а вызваны именно действиями ответчиков. В нашем случае – распространением в газете «Совершенно секретно - Версия» сведений, которые требуют признать недостоверными и порочащими их деловую репутацию ОАО «Альфа - банк», ООО «Альфа - Эко», П.О. Авен и М. М. Фридман.

Полагаем, что факт причинения ущерба деловой репутации и причинно-следственная связь с публикациями спорных сведений газетой «Версия» должны быть также доказаны истцами. В их обязанности входит также доказывание

размера причиненного ответчиками материального ущерба, который они требуют возместить.

В Постановлении президиума Высшего Арбитражного Суда РФ от 01.12.98 г. № 813/98 указано, что «...юридическое лицо не может испытывать физических или нравственных страданий. Ему невозможно причинить моральный вред. Право на компенсацию морального вреда предоставлено только физическому лицу». Понятие морального вреда имеет отношение только к физическим лицам, поскольку согласно ст. 151 ГК РФ и определению, данному в Постановлении Пленума Верховного Суда РФ № 10 от 20.12.94 г. (п.2 ) под «моральным вредом понимаются нравственные и/или физические страдания, причиненные действиями, посягающими на принадлежащие гражданину от рождения или в силу закона нематериальные блага». В Постановлении № 10 также сказано, что «суду необходимо выяснить, чем подтверждается факт причинения потерпевшему нравственных или физических страданий, при каких обстоятельствах и какими действиями они нанесены, степень вины причинителя, какие нравственные и физические страдания перенесены потерпевшим» (п.1) Размер компенсации зависит от характера и объема причиненных истцу нравственных или физических страданий, степени вины ответчика в каждом конкретном случае степень нравственных или физических страданий оценивается судом с учетом фактических обстоятельств причинения морального вреда и индивидуальных особенностей потерпевшего ( п.8).

Таким образом, истцы П.О. Авен и М.М. Фридман обязаны доказать сам факт перенесения ими нравственных или физических страданий, а также обосновать заявленный ими размер компенсации морального вреда.

Президиум Высшего Арбитражного Суда РФ в Информационном письме от 23.09.99 г. № 46 «Обзор практики разрешения арбитражным судом споров, связанных с защитой деловой репутации» в п. 2 указал: «Статьей 152 ГК РФ предусмотрено, что юридическое лицо, в отношении которого распространены сведения, не соответствующие действительности вправе наряду с опровержением таких сведений требовать возмещения убытков, причиненных распространением таких сведений».   В п.10 указанного письма    также установлено: «Требования о возмещении убытков подлежат удовлетворению, если истец докажет, что они возникли вследствие распространения сведений, не соответствующих действительности».

Таким образом, на истца   ОАО «Альфа-банк», представившего суду документы якобы подтверждающие его убытки, возложена обязанность доказать причинно-следственную связь между распространением спорных сведений газетой «Совершенно секретно - версия» и расходами на проведение исследований компанией-нерезидентом   «Кролл», если они действительно оплачены «Альфа - банком».

Ответчик при изложении своей позиции по иску будет исходить из совокупности приведенных выше норм материального права, толкований, данных Высшим Арбитражным Судом РФ и Верховным Судом РФ, юридического анализа спорных фрагментов искового заявления и имеющихся в деле доказательств.

Рассмотрим исковые требования по первой спорной статье автора О.А. Лурье «Альфа. Герой нашего времени» ( № 25 от 6-12 июля 1999 года).

Важно отметить, что спорная статья в целом не содержит сведений в форме утверждения, так как в самом начале статьи автор предупреждает читателей о том, что в его распоряжении «оказался ... запрос председателя думского комитета по безопасности руководству МВД. Илюхин предлагает **милиционерам проверить имеющуюся у комитета информацию** о деятельности Авена, Фридмана и Хана. К своему запросу депутат Илюхин приложил обширное досье на троицу. Материалы этого досье мы использовали при подготовке статьи» ( с.8,колонка 1, абзац 4).

В самом конце статьи, в ее части, озаглавленной «Последний вопрос» автор пишет: «Ужасно хочется, чтобы руководство МВД России, куда уже два года назад направил свой запрос господин Илюхин дало бы официальный ответ - не только Илюхину, но и газете, - какие действия были предприняты милицией, дабы проверить факты, изложенные в запросе комитета по безопасности. Сменяются правительства, уходят прежние милицейские начальники, приходят новые. Но ответа на запрос нет. Забыли? Молчание порождает слухи... А может, и не было никакой проверки вовсе? А может, запрос депутата Илюхина – это политическая провокация фракции коммунистов, которые хотят опорочить российских капиталистов как класс? Быть может, три честных бизнесмена оклеветаны депутатом Илюхиным?... Поэтому ответ необходим. Чтобы журналисты зря не трепали имена честных людей - если Илюхин лжет» ( с.9, колонка 5, абзац 3 ).

Отсюда следует, что утверждения автора состоят только в том, на дату написания первой статьи и подписания номера газеты в печать (6-12 июля 1999 года) объективно существовал запрос председателя комитета Государственной Думы по безопасности В.И.Илюхина в адрес руководителя МВД Куликова и что на дату публикации статьи ответа по существу получено не было. Таким образом, предметом доказывания по данному делу является сам факт существования запроса депутата Государственной Думы В.И.Илюхина, факт направления его в МВД и отсутствие ответа на дату публикации, а также достоверное воспроизведение фрагментов приложенных к запросу материалов, направленных на проверку.

Автор не обязан доказывать соответствие действительности той информации, которую просит проверить депутат В.И. Илюхин, поскольку проверка сведений, изложенных в его запросе относится к компетенции правоохранительных органов.

На вопрос адвоката Коршиковой к представителям истцов, читали ли их доверители всю статью целиком, был получен ответ, что это им не известно, они оспаривают лишь отдельные фрагменты. Из этого ответа следует, что истцы игнорируют смысл статьи в целом и основывают свои исковые требования на вырванных из контекста фрагментах.

В первоначальном исковом заявлении истцы указывали фрагменты, которые в последствии в заявлении об уточнеии исковых требований (без даты) они не требовали опровергнуть:

1) *Фразу, вынесенную на с. 9 статьи: "Альфа" участвовала в организации транзита наркотиков из Юго-Восточной Азии через Россию в Европу".*

Из содержания статьи следует, что речь идет о трех главных героях статьи П. О. Авене, М.М. Фридмане и Г. Хане, исключая истцов ОАО «Альфа-банк» и ООО « Альфа - Эко»? В самом начале статьи в колонке 1, абзац 2 автор говорит: *«Сегодня у нас не один, а целых три героя. Три богатыря русского капитализма. Или трехглавая гидра отечественной мафии? Эта троица более известна под именем «Альфа».*

Спорная фраза является цитатой из запроса депутата Государственной Думы РФ В.И. Илюхина (с. 4, абзац 3): «...М. Фридман и П. Авен участвовали...в *организации транзита наркотиков из Юго-Восточной Азии через Россию в Европу».* Она приведена автором в качестве краткого изложения основного содержания запроса В.И. Илюхина, самого важного для общественных интересов фрагмента этого запроса, который и послужил причиной и основным материалом для написания статьи. Именно потому, что этот текст не авторский, а фактически цитата из запроса, спорная фраза заключена в огромные кавычки. Так средство оформления статьи указывает на ее основное содержание...

2) *Истцы требуют опровергнуть авторскую фразу: «...Сегодня у нас не один, а целых три героя. Три богатыря русского капитализма. Или трехглавая гидра отечественной мафии?»*

Указанные сведения не являются порочащими, так как последнее предложение является образным выражением, завершается вопросительным знаком, а потому не может быть расценено как порочащие сведения, поскольку в нем отсутствуют утверждения о нарушении истцами П.О. Авеном и М.М. Фридманом норм законодательства или морали. Кроме того, эти сведения не относятся к ОАО «Альфа-банку» и ООО «Альфа - Эко».

В заявлении об уточнении исковых требований истцы эти фрагменты в просительной части не указали, что требуют опровергнуть эти фрагменты, поэтому они приведены в этом тексте для иллюстрации того факта, что содержание спорной статьи О.Лурье построено на основе материалов, направленных на проверку депутатом В.И. Илюхиным, и содержит в себе вопрос, а не утверждения об их достоверности.

5

Далее в соответствии с определением суда от 18 марта 2003 года истцы уточнили исковые требования, только по следующим фрагментам из искового заявления:

*3) Фрагменты искового заявления с 2 по 8 относятся только к истцу П.О.Авену.*

3."В период учебы в МГУ Авен был руководителем музыкального студенческого клуба и обзавелся многочисленными знакомствами в той молодежной среде (музыкальная "тусовка", богема и т.п.), где и формировался потребительский рынок наркотиков. Благодаря этому привлек внимание криминальных элементов, имел, контакты с «авторитетами». Одновременно попал в поле зрения правоохранительных органов."

4. *"В феврале 1992 года Петр Авен был назначен министром внешнеэкономических связей РФ... –* этот фрагмент в предмете отсутствует. Истцы требуют опровергнуть только фразу: «В результате Авен заработал хорошие комиссионные на продаже долга Ганы...

5."...Петр Авен, возглавляя министерство, не стеснялся брать комиссионные и даже юрогие подарки за содействие иностранным компаниям и российским предприятиям в заключении и осуществлении внешнеторговых сделок» . В уточненных требованиях добавлена фраза « По свидетельству работников Министерства».

*«Его возможности в этом отношении определялись тем, что он держал в своих руках все вопросы, касающиеся выдачи необходимых лицензий» -в уточненных требованиях фраза отсутствует.*

Истцы требуют опровергнуть :«Особенно жестко он контролировал выход на рынок оружия, допуская туда только тех, кто был связан с ним.»;

6."В 1991-1992 годах Петра Авена разрабатывало 6-е управление КГБ МБ РФ по материалам хищения в крупных размерах, нанесения стране крупного ущерба и по преступным связям со спецслужбами Израиля..., в результате чего 22 декабря 1992 года Петр Авен был уволен с поста министра."; В уточненных требованиях добавлена фраза: В 1992 году бывший министр безопасности доложил материалы президенту Б.Ельцину.

7.*"..в круг его знакомых входили О. Квантришвили и И. Кобзон, криминальные авторитеты С.Тимофеев (Сильвестр) и А.Петров (Петрик), международные авантюристы Марк Рич и Григорий Лучанский.* В уточненном исковом заявлении без даты этот фрагмент отсутствует.

Истцы требуют опровергнуть : «Согласно этим же оперативным данным, П.Авен участвовал в организации транзита наркотиков из Юго-Восточной Азии через Россию в Европу.";

8. "В конце 1993 года в Вене состоялась встреча П. Авена с представителем колумбийских наркобаронов Гильберто У Родригесом Орехуэлом, известным под кличкой Шахматист. В частности, была достигнута договоренность о "закачке" в "Альфа-Банк" денежных средств из оффшорных зон (Багамы,

P0009096

Гибралтар) для их вложения в экономику России путем скупки акций российских предприятий".

Все эти фрагменты искового заявления намеренно вырваны истцами из контекста статьи, так как все они заключены в кавычки и всем им предшествует текст: «Из материалов комитета по безопасности Государственной Думы РФ» (с.8, колонка 2, абзац 2). Автор даже приносит извинения читателям: «Остается попросить прощение у читателей за обилие цитат» (с.9, колонка 5, абзац 1).

В материалах дела имеется приобщенная автором Олегом Лурье копия запроса депутата Государственной Думы РФ В. И. Илюхина № 3.15-2216 от 26.11.97 г. в адрес заместителя председателя Правительства РФ – Министра Внутренних дел Куликова А.С.,и приложенных к запросу материалов, в которых с.8 имеется фрагмент 3, процитированный в статье, фрагменты 4, 5 и 6 – на с.8, а на с. 4 – фрагмент 7, фрагмент 8 - на с. 9.( с указанием на оперативные данные).

Автор дословно изложил содержание запроса. То, что приобщенная копия запроса идентична приложенным к запросу материалам, подтверждается следующими доказательствами.

На адвокатский запрос от 21.05.2003г. № 79 был получен ответ № 136/390 от 22.05.2003г. за подписью председателя комитета по безопасности Государственной думы Илюхина В.И. с приложениями: копия запроса №3.15-2216 от 26.11.1997г. в адрес МВД, копия запроса 3.15-2216 26.11.1997г. в ФСБ, копии материалов, которые Илюхин просил проверить, и копию ответа на запрос депутата из МВД.

В ответе на адвокатский запрос Виктор Иванович Илюхин сообщает: *«Из МВД был получен ответ за подписью первого заместителя министра Васильева, копию которого прилагаю, из ФСБ РФ ответа не последовало. Исходя из объема, направленной для проверки информации о противоправной деятельности коммерческих структур консорциума Альфа и ряда его ответственных должностных лиц, в том числе П.О. Авена и М.М. Фридмана, совершенно очевидно, что фактически проверка не проводилась и ответа на запрос комитету по безопасности ГД РФ по существу компетентные органы не дали.»*

Обсуждение вопроса о правомерности этого запроса выходит за рамки настоящего судебного процесса. Однако считаю необходимым отметить, что как депутат Государственной Думы РФ В.И. Илюхин реализовал свое право на депутатский запрос, предусмотренное ст.14 федерального закона № 3-фз от 08.05.94 г. «О статусе члена Совета Федераций и статусе депутата Государственной Думы Федерального собрания Российской Федерации», в которой предусмотрена обязанность должностного лица, которому направлен запрос дать ответ на него в письменной форме не позднее, чем через тридцать дней со дня его получения» (п.3 ст.14). Форма депутатского запроса никакими документами не регламентирована, запрос имеет свободную форму изложения.

7

имеет номер и дату. И хотя на документе не стоит название «запрос», тот, факт, что он является таковым подтверждается ответом из МВД

Повторно **ходатайствуем** о допросе свидетеля В.И.Илюхина, который подтвердит суду факт направления этого запроса, а также факт получения формального (а не по существу) ответа на него, а также обстоятельства, побудившие его отнестись серьезно к представленному сообщению и направить его на проверку.

При указанных обстоятельствах, полагаем, что ответчики доказали, что спорные фрагменты статьи 3-8 содержатся в запросе депутата Государственной Думы РФ с требованием проверить информацию, имеющую общественное значение, то есть **сведения изложены автором достоверно.**

Журналист О. Лурье действовал при этом в рамках закона «О средствах массовой информации», не злоупотреблял правами журналиста и не нарушал ст. 51 закона «О СМИ».

Ответчик О.А. Лурье реализовал свои конституционные права, предусмотренные ст.29 Конституции РФ, согласно которой каждому гарантируется свобода мысли и слова, каждый имеет право свободно искать, получать, передавать, производить и распространять информацию любым законным способом. Перечень сведений, составляющих государственную тайну, определяется федеральным законом. Гарантируется свобода массовой информации. Цензура запрещается.

**Полагаем, что в требовании об опровержении по фрагментам 3-8 истцу П.О. Авену должно быть отказано по ст. 152 ГК РФ с учетом толкований, данных в документах Верховного Суда РФ и Высшего Арбитражного Суда РФ.**

В требовании о компенсации морального вреда в сумме ~~150~~ тысяч долларов Истцу П.О. Авену должно быть также отказано, так как ответчики не распространяли о нем порочащих сведений. Кроме того, истец ничем не доказал сам факт умаления его деловой репутации, не привел в качестве доказательства ни одного факта, когда его предпринимательская деятельность была бы затруднена в результате публикации спорной статьи, не обосновал сумму компенсации морального вреда.

Более того, в газете «Коммерсантъ» от 07.03.2003 года опубликовано интервью истца П.О. Авена, в котором он заявил: «Мы, кстати, сейчас подали на «Версию» и Лурье в суд по этому же материалу. Нам надоело просто. Но на нашей жизни в России этот бред никак не отражался». Оригинал газеты приобщен к материалам арбитражного дела.

Указанное заявление свидетельствует о том, что сам истец П.О. Авен никаких затруднений в предпринимательской деятельности не испытывал, его иск подан необоснованно, а большая сумма компенсации якобы причиненного ему морального вреда служит средством наказать газету и журналиста за то, что они сделали достоянием третьих лиц содержание

8

депутатского запроса, а не компенсировать причиненные страдания, что противоречит норме ст. 151 ГК РФ.

*4) Фрагменты искового заявления 9-12 относятся только к истцу М.М. Фридману, который требует признать несоответствующими действительности и опровергнуть следующие фразы.*

9) «В 1985 году на М. Фридмана, молодого корыстного дельца, умело использующего свои многочисленные знакомства, вышла "Бауманская бригада" - наиболее агрессивная преступная группировка Москвы 80-х годов» - в уточненных требованиях отсутствует.

Далее представители истцов, не наделенные полномочиями по представлению интересов кого-либо из Баумнской группировки, просят опровергнуть сведения: «Бауманская группировка была в тот период единственной из столичных ОПГ, серьезно работавшей с наркотиками и постоянно расширявшей масштабы своих операций. Рынок сбыта наркотиков формировался в среде студенческой и творческой молодежи, рок - фанов, хиппи, панков, проституток и т.п.».

В заявлении об уточнении требований имеется также фрагмент: «В этих кругах у Фридмана были обширные связи, которые представляли несомненный интерес с точки зрения "Бауманской бригады" и были задействованы с обоюдной выгодой".

Фраза «В дальнейшем деятельность Михаила Фридмана неразрывно связана с деятельностью "Альфа-групп"» - в уточненных требованиях фраза не оспаривается.

10) "...Михаил Фридман участвовал в организации транзита наркотиков из Юго-Восточной Азии через Россию в Европу».

Фраза «Среди его связей были замечены И.Кобзон и О.Квантришвили, криминальные авторитеты С.Тимофеев (Сильвестр) и А.Петров (Петрик), международные авантюристы Марк Рич и Григорий Лучанский."- в уточненных требованиях отсутствует;

11) "Фридман занимался ваучерными махинациями... В результате только этих махинаций с ваучерами глава "Альфа-групп" увеличил свое личное состояние примерно на 30-40 миллионов долларов."

12) "Схема ваучерных операций выглядела так: аккумулируя приватизационные чеки населения (в общей сложности было собрано более 2 млн. чеков), компания, именовавшая себя в тот период Чековым инвестиционным фондом, скупала значительные, нередко контрольные пакеты акций промышленных предприятий (их число превысило 160). Затем эти акции по заниженной цене были проданы нескольким оффшорным фирмам, принадлежащим Михаилу Фридману - председателю совета директоров "Альфа - групп" и "Альфа - Банка". Позднее акции перепродавались по гораздо более высоким ценам, разница практически целиком шла в доход Фридмана, а рядовые

9

акционеры ЧИФа получали мизерные дивиденды» - из уточненных требований изъята следовательно истцы считают ее достоверной и не порочащей деловую репутацию М.М.Фридмана.

Все спорные фрагменты статьи за исключением фразы: "Фридман занимался ваучерными махинациями»... также являются цитатами из запроса В.И.Илюхина. Эти спорные фрагменты также заключены в кавычки, всем им предшествует текст : «Из материалов комитета по безопасности Государственной Думы РФ» (с.9, колонка 2, абзац 4).

В той же копии запроса В.И.Илюхина № 3.15-2216 от 26.11.97 г. приобщенной Олегом Лурье на с. 6 имеется спорный фрагмент 9, приведенный в статье, фрагменты 10 – на с.4, фрагмент 12 - на с.2. Автор дословно изложил содержание запроса.

Единственная авторская фраза фрагмент11 "Фридман занимался ваучерными *махинациями...*», является кратким изложением фрагмента 12, так как в самом материале, приложенном к запросу и в тексте статьи имеется фраза: «В результате только этих *махинаций* глава Альфа - групп увеличил свое личное состояние на 30-40 миллионов долларов». Таким образом, определение действий М.Фридмана как махинаций дано в самом материале, приложенном к запросу, это не является мнением или утверждением журналиста.

Полагаем, что в исковых требованиях М. М. Фридману по фрагментам 8-12 быть отказано по ст. 152 ГК РФ, а также должно быть отказано в компенсации морального вреда по той же причине: не доказан факт причинения ущерба его деловой репутации, отсутствуют какие-либо затруднения в результате публикации в газет «Совершенно секретно-версия», не доказан факт причинения страданий, необоснованна сумма компенсации морального вреда.

*5) Следующие исковые требования истцов основаны на фрагментах текста:*

13) «Тайные операции, связанные с наркотиками, в рамках консорциума выполняет компания "Альфа - Эко". В уточнении исковых требований добавлена фраза: Из оперативных разработок следует, что ( далее спорная фраза).

В своем заявлении истцы комментируют: «...при этом автором утверждается что Петр Авен является президентом консорциума "Альфа-Групп", а Михаил Фридман – председателем совета директоров, что означает утверждение об их участии в операциях с наркотиками», однако таких сведений статья объективно не содержит, этот вывод истцов не основан на реальном тексте.

В заявлении об уточнении исковых требований следующий фрагмент текста отсутствует: «... Причиной отравления (группового отравления жителей г.

10

Хабаровска сахаром) стало попадание в сахар большой дозы наркотических веществ. Было установлено, что контейнеры, в которых перевозился сахар, перед этим арендовала "Альфа-Эко" и они использовались для транспортировки груза в адрес фирмы "Наппаlу С". Это означает,что истец ООО «Альфа-эко» указанные сведения не оспаривают.

Истцам П. О. Авену, М. М. Фридману и ОАО «Альфа-банк» должно быть отказано по этому фрагменту, поскольку речь идет об одном только ООО «Альфа - Эко».

Полагаем, что у суда также нет оснований и для удовлетворения требований истца ООО «Альфа - эко», так как указанные фрагменты текста также предваряются сообщением на с. 9 колонка 4 абзац 2: **«Из материалов комитета по безопасности Государственной Думы РФ».**

Первый фрагмент является косвенным цитированием следующего текста на с. 5 приложения к запросу В. И. Илюхина № 3.15-2216 от 26.11.97 г. в адрес Министра Внутренних дел А.С. Куликова : «Компания «Альфа-Эко» выполняет в рамках консорциума «Альфа-групп» тайные операции, связанные с наркотиками.

Полагаем, что ООО «Альфа - Эко» должно быть отказано в исковых требованиях о признании сведений не соответствующими действительности и опубликовать опровержение должно быть отказано на основании ст. 152 ГК РФ. Требование о компенсации убытков ООО «Альфа-Эко» не заявляла.

*б) Истец ОАО «Альфа-банк» заявил лишь одно требование по спорной статье О.Лурье «Альфа. Групповой портрет».*

**Истец требует опровергнуть фрагмент текста:** "В конце 1993 года в Вене состоялась встреча П. Авена с представителем колумбийских наркобаронов Гильберто У Родригесом Орехуэлом, известным под кличкой Шахматист. В частности, была достигнута договоренность о "закачке" в "Альфа-Банк" денежных средств из оффшорных зон (Багамы, Гибралтар) для их вложения в экономику России путем скупки акций российских предприятий".

Кроме того, что указанный фрагмент является цитатой из материалов, приложенных к запросу В.И. Илюхина, он не может быть оценен как порочащие сведения, поскольку не содержит утверждений о совершении «Альфа-банком» противозаконных или аморальных действий. Важно, что в этом фрагменте не содержится утверждений, что деньги «Альфа-банком» были получены, что они имеют криминальное происхождение, что они были использованы на скупку акций российских предприятий с нарушением законодательства.

В исковых требованиях ОАО «Альфа-банк» по первой статье должно быть отказано в полном объеме на основании ст. 152 ГК РФ.

Требование о компенсации убытков, заявленное ОАО «Альфа - банк» должно быть отклонено по первой статье, так как при отсутствии порочащих сведений, в принципе не может быть причинно - следственной связи с убытками, которые якобы понес ОАО «Альфа – банк» для восстановления своей деловой репутации.

P0009101

*7) Критика доводов истцов по первой спорной статье «Альфа. Групповой портрет».*

7.1    Истцы утверждают, что публикацией статьи О. Лурье «Альфа. Групповой портрет» ответчики большим тиражом распространили сведения о совершении истцами тяжких преступлений, а компаниями «Альфа-Банк» и «Альфа – Эко» -осуществлении противозаконной деятельности. Однако, этот довод полностью опровергается содержанием статьи, центральная тема которой – не утверждение о совершении преступлений, а требование провести надлежащую проверку сведений и ответить на запрос депутата Государственной Думы РФ В.И. Илюхина и  вопросы газеты.

7.2. Истцы неправомерно в обоснование своей позиции приводят ст. 57 закона «О СМИ», так как в ней речь идет о порочащих сведениях, а в юридическом смысле сведения, которые в целом не содержат утверждений не являются порочащими, то есть ответчики порочащих сведений не распространяли.

7.3. Истцы необоснованно утверждают, что учредитель и издатель газеты «Совершенно секретно - Версия» ЗАО «МАПТ - медиа» и журналист О. А. Лурье не выполнил требований закона «О СМИ» и не проверили распространяемую информацию.

Закон «О СМИ» возлагает обязанность проверять распространяемую информацию исключительно на журналиста – ст. 49 п. 2 . Эту обязанность журналист выполнил, о чем свидетельствует полное совпадение текстов статьи с текстом запроса В.И. Илюхина № 3.15-2216 от 26.11.97 г. в адрес  Министра внутренних дел Куликова А.С.

Полагаем, что все исковые требования всех истцов в полном объеме по статье «Альфа. Групповой портрет» подлежат отклонению.

II.    Исковые   требования   по   второй   публикации   Лурье   О.А. "Криминальное чтиво по-русски"(№19   от 20.05.2002 г.) заявлены только Фридманом М.М., ОАО "Альфа-Банк" и ООО "Альфа-Эко".

1) Истцы необоснованно утверждают, что ответчики «...осуществили повторное распространение порочащих истцов и не соответствующих действительности сведений, путем публикации в статьи». На самом деле никакого повторного распространения информации не было, ответчиками была опубликована новая статья ни по форме, ни по названию, ни по содержанию не повторяющая первую. Публикация осуществлена  в форме интервью «с одним из руководителей ведущей и весьма известной спецслужбы», взятом на условиях полной анонимности, что исключает для ответчика О.А. Лурье возможность раскрытия имени источника (ст. 41 п. 2, ст. 49 п. 4 закона «О СМИ»).

P0009102

Тот факт, что такая беседа состоялась подтверждается магнитофонной записью беседы, расшифровку и перевод которой приобщены к материалам дела. Согласно устным объяснениям О.Лурье, которые также являются одним из видов доказательств по ст. 64 и 81 АПК РФ, он взял это интервью у бывшего сотрудника ФБР США во время своей командировки в США в 2001 году. Косвенным подтверждением является статья «Наш человек в ФБР», опубликованная в «Новой газете» 28.06.2001 года, копия которой приобщена к делу.

Из расшифровки беседы следует, что вопросы автора статьи носят общий характер вопросов о «ситуации с российской финансовой преступностью», а ответы иллюстрируются его собеседником примерами из деятельности «Альфа-групп». *(транскрипта и расшифровка беседе с переводом на русский язык приобщены к материалам дела)*.

В этой второй статье также имеется авторский текст, который изначально предваряет интервью.

Автор на с. 4 , колонка 1, абзац 1 предупреждает читателя: *«На западе целый ряд самых мощных спецслужб весьма серьезно занимается исследованием такого феномена, как российская международная преступность. Естественно, что при этом в поле зрения попадают и крупные финансовые группировки. И именно поэтому я попросил прокомментировать ситуацию с российской финансовой преступностью одного из бывших западных очень высокопоставленных чиновников, который долгое время являлся одним из руководителей ведущей и весьма известной спецслужбы и занимался именно «русской проблемой». Конечно, разница в юридической оценке законности или незаконности тех или иных участников финансового рынка, настороженность по отношению к российскому бизнесу сыграли свою роль в формировании мнения нашего собеседника, и его обвинения не могут быть приняты как истина в последней инстанции. Ведь любое обвинение должно быть доказано судом. Понимая серьезность прозвучавших обвинений, мы предупреждаем читателя, что не берем на себя ответственность утверждать, что все они имеют под собой реальную основу, а предлагаем своеобразный взгляд «из-за бугра».*

Смысл этого важного фрагмента статьи состоит в том, что в ответ на заданные автором общие вопросы прозвучали ответы, хотя и высокопоставленного в прошлом, но все-таки чиновника одной из западных спецслужб, которые в прямом смысле являются его мнением, а не истиной в последней инстанции, так как оно сформировано под влиянием многих субъективных факторов, таких как разница в юридической оценке, предвзятость по отношению к российским предпринимателям. В конце публикации на с. 4 колонка 4 последний абзац автор вновь сообщает читателю, что информация, полученная от его собеседника не может быть воспринята как безусловно

13

достоверная: «Интересно, есть ли у наших правоохранительных органов подобные сведения об «Альфе»? И насколько они соответствуют действительности?»

2) Тем не менее истцы, скорее всего не прочитавшие статью целиком, игнорируют указанные фрагменты статьи и в первоначальном исковом заявлении требуют опровергнуть следующие фрагменты статьи:

*1) Первый спорный фрагмент:*   «Деятельность таких структур, как «Альфа-Групп» ... представляет угрозу национальной безопасности ряда стран.». В уточнении исковых требований это требование сформулировано как : признать не соответствующими действительности   сведения ...о существовании структуры «Альфа-групп», представляющей угрозу национальной безопасности ряда стран».

Указанная фраза прозвучала в развитие ответа на предыдущий вопрос автора: «*А как насчет международной деятельности российских бизнесменов?*» Собеседник дает ответ, содержание которого не оспаривается истцами, суть которого состоит в том, что многие крупные финансовые и промышленные группы не являются чисто российскими. В пример приводится *«Альфа - групп», о которой сказано, что «...ее основная часть состоит из многочисленных зарубежных компаний в разных странах мира. Через такие сложные структуры уходят деньги из России».* Важно при этом отметить, что собеседник не утверждает, что такой увод денег незаконен. Далее автор задает вопрос: *«Как на это смотрят на западе?»* и получает ответ: «Деятельность таких **структур, как «Альфа – Групп» да и некоторых других российских структур** представляет собой угрозу национальной безопасности ряда стран». Из контекста интервью следует, что собеседник высказывает мнение по вопросам международной экономики, то есть о том, что даже вполне легальный перевод денежных средств международными компаниями представляет собой угрозу национальной безопасности тех стран, в которых они получают прибыль и откуда переводят ее в свои зарубежные структуры. При этом последствия такого явления одинаковы практически для всех стран (России, Великобритании, США и др.), где объективно существует отток из страны крупных финансовых средств.

Спорный фрагмент вырван истцами из контекста статьи. На самом деле он представляет собой суждение собеседника автора интервью, то есть соавтора статьи, который имеет право на высказывание своего мнения в прессе и не является порочащими истцов сведениями еще и потому, что никто из них конкретно в этом фрагменте не назван. Речь идет об «Альфа - Групп», которая не является юридическим лицом, а следовательно, не обладает ни самой деловой репутацией в юридическом смысле как неимущественным правом, ни правом обращаться за защитой этого неимущественного права в суд. При этом каждый из Истцов обладает своей собственной деловой репутацией и распространение сказанного на каждого из них в отдельности юридически безграмотно. Согласно

14

ст. 151 ГК РФ сведения должны быть распространены именно об Истце, а не о третьем лице, в названии которого есть сходная часть.

Полагаем, что по этому первому фрагменту второй статьи в исковых требованиях всем истцам должно быть отказано на основании ст. 152 ГК РФ.

2) *Следующий спорный фрагмент в первоначальном исковом заявлении,* который требуют опровергнуть истцы: "В структурах Альфы ... везде сплошные махинации". В заявлении об уточнении исковых требований отсутствует.

Тем не менее считаю возможным пояснить, что он также вырван из контекста. На самом деле реально опубликован следующий ответ собеседника: *«В структурах «Альфы», например в компаниях группы «Краун» и подконтрольных офшорных компаниях работают местные граждане, часто бывшие высокопоставленные правительственные чиновники. Такие, как англичанин Джозеф Мосс, - найдите его биографию, занятная история. Или Эллиот Спитц - гражданин США. С ним много фирм связано и в прошлом и в настоящем, кстати, в том числе на Украине. И везде сплошные махинации».*

Из полного текста фрагмента следует, что речь идет о махинациях в фирмах, связанных в прошлом и настоящем с неким гражданином США Эллиотом Спитцем. Эти фирмы никак не названы, о них не сказано ничего кроме того, что они неким образом имеют отношение к Э. Спитцу. Речь не идет об истцах, а потому эта информация не подлежит опровержению по ст. 152 ГК РФ.

3) *Далее истцы в первоначальном исковом заявлении требуют опровергнуть третий фрагмент текста:*

- «А что известно о связях российских коммерсантов с криминалом?»
- «(!) Этих связей предостаточно. Мы об этом хорошо знаем, а некоторые контакты зафиксированы на аудио и видео. А по "Альфа - Групп" - это очень деликатный вопрос. Вы что думаете, что Фридман сам по себе? На секунду забудем о Фридмане. Посмотрите на недавнее интервью – Белунова - Лени Макинтоша. Вам все будет ясно. Есть Иванько. Есть другие. Теперь об "Альфе": ее связи помимо России и Казахстана простираются значительно дальше - Украина, Чехия, Австрия, США, Великобритания. Некоторые оффшоры, банки, американские в том числе, активно связаны с людьми, именуемыми преступными авторитетами". В заявлении об уточнении исковых требований это требований звучит как : «признать несоответствующими действительности и опровергнуть сведения о связях Фридмана М.м. с криминалом, о связи Альфы с преступными авторитетами».

Из текста этого спорного фрагмента следует, что он не содержит никаких утверждений о совершении Истцами поступков, противных нормам морали или нравственности, то есть не содержит порочащих сведений, а потому не подлежит опровержению по ст. 152 ГК РФ.

15

Исковые требования по этому фрагменту основаны на субъективном и весьма расширительном толковании его истцами, которое приведено в первоначальном исковом заявлении: «.. В контексте этого последнего фрагмента содержится утверждение о связи Фридмана М.М., "Альфа-Банка" и "Альфа - Эко" с криминалом, а, следовательно, - о преступном (противозаконном) характере их коммерческой деятельности. Это прямо следует как из самого вопроса "о связях российских коммерсантов с криминалом", так и из упоминания фамилии Фридмана М.М. и имени "Альфа" при ответе на этот вопрос».

Объективно никаких сведений о связи Фридмана с криминалом в тексте не содержится, а упоминания других истцов П.О. Авена, ОАО «Альфа - Банк» ООО «Альфа - Эко» нет вообще. Из риторического вопроса «Вы думаете Фридман сам по себе?» легко сделать вывод, что Фридман существует не в безвоздушном пространстве, он окружен людьми из Альфа-Групп, на вопрос о которой собеседник не дает ответа, не сообщает сведений порочащего характера. Это толкование приведено для подтверждения многовариантности выводов, которые можно сделать из одного и того же вопроса. При этом важно помнить, что суд не оценивает выводы и толкования, согласно ст. 152 ГК РФ суд обязан оценить только реально опубликованный текст, который явно не содержит никаких утверждений о противозаконной или аморальной деятельности М.М.Фридмана, а значит, не является порочащими сведениями.

Нет в этом спорном фрагменте и утверждений о связи Альфы с преступными авторитетами, как нет даже самого слова «авторитеты».

Суд должен согласно ст.152 ГК РФ оценить не толкования, данные истцами и не выводы, сделанные из текста, а конкретные сведения, и установить: являются они распространенными об истцах, имеют ли характер утверждений и содержит ли утверждения сведения о совершении истцами противоправных и аморальных поступков. Поскольку согласно ст. 44 закона «О средствах массовой информации» в случае принятия судом решения об опровержении «в опровержении должно быть указано, какие сведения не соответствуют действительности..».

В исковых требованиях в опровержении и компенсации морального вреда по этому третьему фрагменту также должно быть отказано на основании ст. 152 ГК РФ.

Важным обстоятельством является тот факт, что вторая статья «Криминальное чтиво по-русски» не содержит никаких сведений об истцах ОАО «Альфа-банк» или ООО «Альфа - Эко». Сами истцы в исковом заявлении на стр 7 утверждают, что в статье речь идет о несуществующем консорциуме «Альфа - групп».

Других требований ни в первоначальном исковом заявлении, ни в заявлении об уточнении исковых требований в просительной части не содержится.

## 3) Критика доводов истцов по второй спорной публикации

«Криминальное чтиво по-русски».

3.1. На с.7 искового заявления истцы пишут: «...ответчики намеренно именуют П.Авена "президентом" несуществующего "консорциума «Альфа - Групп») и называют сведения клеветническими. Тем не менее, истцы подали иск в защиту деловой репутации конкретных юридических и физических лиц, пренебрегая тем фактом, что о них в большинстве фрагментов статьи они вообще не упоминается.

3.2. Приведенные истцами доказательств в виде писем, датированных 1995 годом не являются доказательством какого-либо факта или опровержением каких-либо сведений из статей, так как они получены значительно раньше, чем опубликована первая спорная статья и раньше, чем был направлен запрос, датированный ноябрем 1997 года. Письма, датированные август 1999 года и февралем 2000 года, опровергаются ответом МВД на запрос депутата В.И. Илюхина, копия которого направлена в адрес суда по его запросу Комитетом по безопасности Государственной Думы. В ответе на запрос из МВД за подписью Васильева говорится, что « *в настоящее время имеется ряд уголовных дел, по которым проходят фирмы данного консорциума, в октябре текущего (1997г.) таможенными органами г.Москвы при досмотре груза, поступившего в адрес ООО «Альфа-Эко» из Республики Молдавия было обнаружено оружие и боеприпасы. По данному факту Московской - Рязанской прокуратурой возбуждено уголовное дело*».

3.3. Утверждения о заказном характере спорных публикаций не соответствуют действительности, а потому истцы не представили никаких доказательств.

3.4. Утверждение истцов о злоупотреблении ответчиками своими правами журналистов также опровергаются материалами дела и не имеют под собой реальных оснований.

3.5. Истцы ничем не доказали перечисленные в иске якобы наступившие для них последствия, проявившиеся в тиражировании порочащих сведений другими средствами массовой информации. Суду не представлен ни один экземпляр российской или зарубежной прессы, перепечатавшей статьи О. Лурье.

Кроме того, истцы даже не утверждали, что ответчики имели какое-либо отношение к тиражированию.

3.6. Несостоятелен довод истца «Альфа-банк» и о том, что Европейский банк реконструкции и развития (ЕБРР) отказался от сотрудничества с «Альфа – банком» именно вследствие распространения сведений в газете «Версия», а также о том, что Центр Общественной Интеграции обвинил истцов в криминальной деятельности, прямо ссылаясь на газету «Версия».

Никаких доказательств своих утверждений истцы суду не представили.

В то же время материалах дела имеется сообщение газеты «Коммерсант» от 13.12.2001 г. о том, *«что 12.12.2001г. газета «FINANCIAL TIMES» сообщила, что «резидент «Альфа-банка» выразил руководству ЕБРР протест по поводу сохранения банка в «черном списке» компаний, от сотрудничества с которыми*

17

*Европейский банк отказывается. Далее сообщалось, что «Альфа-банк» попал в «черный список» после дефолта 1998г., когда Европейский банк понес на территории России большие убытки».*

Этот факт исключает причинно-следственную связь между публикациями в газете «Совершенно секретно-версия» в 1999г. и 2002г. и отказом ЕБРР от сотрудничества с «Альфа-банком», посокольку дефолт произошел в 1998 году.

Таким образом, истец «Альфа-банк» не представили доказательств причинно-следственной связи между публикациями спорных статей О.Лурье в газете «Версия» и отказом от сотрудничества ЕБРР с ОАО «Альфа-банк».

Также ничем не подтвержден довод о том, что Центр Общественной Интеграции обвинил истцов в криминальной деятельности, прямо ссылаясь на газету «Версия». Суду даже не представлена копия этого доклада.

Все эти обстоятельства касаются только одного из истцов – ОАО «Альфа банк», другие истцы о каких-либо негативных последствиях, на ступивших в результате публикаций спорных статей в газете «Версия» не заявляли.

Отсутствие доказательств доводов истца «Альфа-банк» не позволяет принять эти доводы как обоснованные и тем более расценивать их как доказательства негативных последствий, наступивших в результате публикации спорных статей в газете «Версия».

3.7. Требования о компенсации расходов на оплату услуг фирмы «Кролл» так же должно быть отклонено судом по следующим причинам.

Истец ОАО «Альфа-банк» утверждает, что оплатил независимое расследование консалтинговой компании «Кролл», проведенное в порядке самозащиты нарушенного спорными публикациями в газете «Версия» права на деловую репутацию. Однако, этот довод не может быть принят обоснованным, так как он попросту безодоказателен.

1) Из представленных истцом документов не следует, что между ОАО «Алфа-банк» и «Кролл» был заключен договор, поскольку такого документа нет ни в виде одного единого подписанного текста, ни в виде переписки между сторонами, так как отсутствует какое-либо письменное обращение от имени «Альфа-банка». В копиях документов, представленных истцом «Альфа-банк», вообще отсутствуют какие-либо письменные документы, содержащие хоть какие-либо указания на предмет договора с фирмой «Кролл», исходящие от «Альфа-банка».

На вопрос адвоката ЗАО «МАПТ-медиа» Коршиковой представителю «Альфа-банка» Кулькову, каков предмет договора, если он был заключен, Кульков ответить отказался. Таким образом, истец не доказал сам факт заключения договора, а также не доказал, что предметом договора были консалтинговые услуги фирмы «Кролл», связанные именно с публикациями в газете «Версия».

В материалах дела имеется копия Акта о предоставлении и приеме услуг от 30 сентября 2002 года, подписанного от имени Кролл директором Томми Хесби,

P0009108

а от имени ОАО «Альфа-банк» директором британского Представительства Саймоном Ройчем. В откором речь идет не о провеке каких-либо сведений на достверность, а о консалтинговых услугах. При этом сам отчет фирмы Кролл, содержащий сведения об оказанных консалтинговых услугах, отсутствует, что также не позволяет сделать вывод, что фирма Кролл по договору работала именно над проверкой сведений из газеты «Версия».

Из материалов, приложенных к исковому заявлению, следует:

1 – Счета-фактуры на оплату неких консалтинговых услуг выставлялись тольк ОАО «Альфа - банк», о котором ответчики не распространяли никаких порочащих сведений.

2 - Довод о том, что обращение к фирме «Кролл» явилось средством защиты деловой репутации всех истцов, полностью опровергается представленными «Альфа - банком» документами. Как указано в письме фирмы «Кролл» от 8 февраля 2002 года в адрес «Альфа – банка», причиной обращения послужило то, что *«Альфа – групп» в настоящее время обеспокоена некоторыми аспектами своей репутации, и задача фирмы «Кролл» «расследовать каждое обвинение в целях оценки его достоверности и найти его источник»* (стр. 1 письма от 8 февраля). То есть из письма фирмы «Кролл» следует, что «Альфа-банк» просит всего лишь оценить степень достоверности слухов, которые периодически оживают в прессе и установить их источник, но не сообщить о результатах расследования публично с целью восстановить деловую репутацию. Более того, все сообщения «Кролл» носят указание «Конфиденциально». Доказательств того, что фирма «Кролл» по результатам расследования направила некое сообщение, восстанавливающее чью-то деловую репутацию, некому партнеру, истцы не представили.

3 – В письме от 8 февраля 2002 года на с. 2 фирма «Кролл» пишет, какие слухи они смогли установить из открытых источников после проведения исследований в открытых и конфиденциальных источниках в Москве и Лондоне:

- Контрабанда наркотиками *(здесь и далее орфография сохранена- прим. Авт.).* Некоторые источники предположили, что Группа вывозила контрабандой героин из Южно-Восточной Азии, а согласно другим сведениям, что Группа занималась вывозом кокаина из Южной Америки. Одним из источников этих слухов был отчет за 1997 год, составленный ФСБ, хотя есть и более ранние указания на деятельность подобного рода. ( заметим в скобках, что источник – отчет ФСБ, а не статьи О.Лурье. вышедшая в свет в 1999 году и в 2002 году).

- Промывание денег: В конце 1999 года и в начале 2000 появились статьи, обвиняющие «Альфа-банк» вместе с Михаилом Фридманом, ТНК , Виктором Вексельбергом и другими в участии в схемах по промыванию денег с привлечением «Бэчк ов Нью-Йорк»;

- Насильственные действия: «Альфа Групп» или в частности Петр Авен предположительно связан со смертью Сергея Мажарова, который был убит в Париже в 1994 году, Наши исследователи нашли статьи в западной прессе,

19

связывающие ТНК и посредством нее «Альфа Групп» в привлечении вооруженных сил в Нижневартовске в ноябре последнего года.

- Коррупция: Предположения из публичных и частных источников о том, что Альфа Групп занималась политической коррупцией для осуществления своих замыслов, уже стало притчей во языцех с некоторыми вариациями….наиболее популярным эпизодом, с которым склонялось имя Группы при обвинениях в коррупции было банкротство Сиданко.

Далее в том же письме от 8 февраля 2002 года Кролл сообщает: «Помимо этих есть и другие, менее значительные слухи, которые можно счесть опасными или менее опасными: что Альфа первоначально финансировалась на деньги КГБ, например, что в конце 1980-х ее главные участники занимались продажей российского государственного имущества заграницей для личной выгоды членов Коммунистической партии; что Петр Авен является агентом израильской разведывательной службы; что Михаил Фридман в начале своей карьеры имел связи с лидерами организованных преступных групп из Осетии и Дагестана, что Группа была связана с Солнцевской преступной шайкой; или что господин Авен был уведен из Министерства торговли по подозрениям в растрате средств»(

Совершенно очевидно, что из того спектра сведений, указанных в письме фирмы Кролл следует, что предметом ее исследований не были конкретные сведения, изложенные в спорной статье О. Лурье «Альфа. Групповой портрет», которая вышла в свет в 1999 году и содержащей совершенно иные спорные фрагменты, и тем более не статья «Криминальное чтиво», опубликованная в мае 2002 года, уже после начала исследования фирмы Кролл и также не содержащая никаких перечисленных в письме Кролл фрагментов. А потому нет причинно-следственной связи между расходами на это расследование, которые понес ОАО «Альфа-банк» и спорными публикациями в газете «Версия».

Фирма «Кролл» в этом же письме честно предупреждает, что «…есть *определенная вероятность того, что даже простое исследование при проверке на соблюдение законодательных норм, выявит большинство из этих обвинений…».*

Но каковы результаты работы «Кролл» неизвестно, так как в приложениях к исковому заявлению отчет фирмы «Кролл» отсутствует, есть только Акт от 30 сентября 2002 года об оказании консалтинговых услуг.

Важно отметить, что в письме от 8 февраля 2002 года фирмы «Кролл» указано, что « Европейский банк реконструкции и развития продолжает отказываться от сотрудничества с «Альфа-банком». Хотя ЕБРР не дает оснований своего решения, Вы считает, что оно связано с подготовкой отчета по проверке на соблюдение законодательных норм в более широких рамках Альфа Групп, содержание которого может напоминать выводы вкратце указанные выше». Этот фрагмент письма Кролл подтверждает позицию ответчика ЗАО «МАПТ-медиа» о том, что не существует причинно-следственной связи между

P0009110

публикациями спорных статей в газете «Версия» и отказом ЕБРР от сотрудничества с Альфа-банком.

Только одно письмо фирмы Кролл от 07 октября 2002 года содержит оценку спорных статей О.Лурье. Однако, направлено оно не в ОАО «Альфа-банк», а лично и конфиденциально М.Фридману. Письмо явно не имеет отношения к тем консалтинговым услугам, которые были оказаны ОАО «Альфа-банк» ранее, поскольку еще 30 сентября 2002 года был подписан Акт о предоставлении и приеме услуг, и этим же числом фирмой Кролл «Альфа-банку» был выставлен счет-фактуры № 1408596 на сумму стоимости консалтинговых услуг в размере 172 271, 85 фунтов стерлингов, то есть именно на ту сумму, которую требует взыскать с ответчиков истец ОАО «Альфа-банк».

В деле отсутствуют какие-либо доказательства того, что лично М.М. Фридман понес какие-либо расходы по работе фирмы Кролл со спорными статьями О.Лурье.

Кроме того, понесенные «Альфа – банком» расходы на оплату услуг фирмы «Кролл» не могут быть признаны расходами на восстановление деловой репутации ОАО «Альфа – банк», поскольку Законом «О СМИ» предусмотрен конкретный способ восстановления деловой репутации - это публикация опровержения (ст. ст. 43,44 закона «О СМИ» и п.2 ст. 152 ГК РФ).

Невозможно признать эти расходы и судебными издержками, поскольку согласно ст. 152 ГК РФ истец не обязан доказывать несоответствие действительности распространенных о нем сведений, он обязан доказать лишь сам факт распространения сведений о нем (ст.152 ГК РФ., п. 7 Постановления Пленума ВС №11 от18.08.92г.)

Таким образом, для подготовки и ведения дела в арбитражном суде у Истца ОАО «Альфа-банк» объективно не было никакой необходимости в расследовании и в оплате услуг фирмы «Кролл»: во-первых, потому, что эти услуги не были связаны со спорными статьями О.Лурье, во-вторых, потому, что истец не несет обязанности по доказыванию не соответствия действительности спорных сведений.



Как пояснил на вопрос адвоката ответчика Коршиковой представитель ОАО «Альфа-банк» Кульков расследование необходимо было, чтобы развеять сомнения, которые возникли у него в отношении частной жизни его руководителей.

Таким образом, расходы, если таковые понес Альфа-банк на оплату неких консалтинговых услуг фирмы Кролл не могут быть признаны расходами, связанными с судебным разбирательством или убытками, наступившими в результате публикации спорных статей в газете «Совершенно секретно-версия», а потому и в требовании о компенсации убытков ОАО «Альфа-Банк» должно быть отказано.

3.3. Заявленное всеми истцами требование о компенсации их расходов на оплату услуг адвокатов также не может быть удовлетворено.

21

P0009111

Представленные документы в виде платежных поручений не являются подтверждением произведенных расходов по следующим причинам.

Ст. 5 п.4) федерального закона от 03.02.96 г. № 395-1 «О банках и банковской деятельности» относит к банковским операциям « расчеты по поручению ...юридических лиц, в том числе банков-корреспондентов по их банковским счетам».

В этой же статье 5 закона № 395-1 сказано: «Правила осуществления банковских операций ... устанавливаются Банком России в соответствии с федеральными законами».

Реализуя эти полномочия ЦБ РФ выпустил «Положение о безналичных расчетах в Российской Федерации» от 12 апреля 2000 года № 2-П ( с изм., внесенными решением Верховного Суда РФ от 06.11.2001 г. № ГКПИ 01-1369). В Положении в п.2.1.указано : «Банки осуществляют операции по счетам на основании расчетных документов», а в п.2.2. разъясняется, что «платежный документ – это распоряжение плательщика ( клиента банка) о списании денежных средств со своего счета и зачислении их на счет получателя». В Главе 3 Положения «Расчеты платежными поручениями» в п.3.1. дано определение: «Платежным поручением является распоряжение владельца счета обслуживающему его банку, оформленное расчетным документом, перевести определенную денежную сумму на счет получателя средств, открытый в этом же или другом банке».

Таким образом, Положение «О безналичных расчетах...» ЦБ РФ установило, что само платежное поручение является лишь распоряжением о переводе средств, но не подтверждением самого факта перевода.

Постановление пленума Высшего Арбитражного Суда РФ от 19.04.99 г. № 5 разъяснило, что «обязательство банка по платежному поручению считаются исполненным в момент надлежащего зачисления соответствующей денежной суммы на счет банка получателя...» Те же разъяснения содержит и Постановление от 28 марта 2000 года № 5479/ 99 в котором сказано, что « в соответствии с п.1 ст. 865 ГК РФ считается, что банк плательщика исполнил свои обязательства надлежащим образом после своевременного перечисления денежной суммы банку получателя средств для ее зачисления на счет лица, указанного в платежном поручении».

Каким документом подтверждается списание средств со счета плательщика? На этот вопрос отвечает Центральный Банк России в Письме «Вопросы по применению Положения Банка России «О безналичных расчетах в Российской Федерации» от 12 апреля 2001 года № 2-П : «списание денежных средств с банковского счета плательщика подтверждается выпиской со счета, выдаваемой на бумажном носителе и /или в электронном виде».

Таким образом, произведенный платеж подтверждается не просто платежным поручением, но и выпиской из банка об исполнении, в который направлено это поручение

22

Несколько позже, чем вышли эти документы ЦБ РФ, 18 октября 2001 года Высший Арбитражный Суд РФ письмом № С5-7/уп-1077 обязал арбитражные суды при приеме исковых заявлений в подтверждение оплаты госпошлины требовать выписку из лицевого счета клиента банка, в которой отражаются все проведенные операции.

Отсутствие выписок из банка, через который проводились платежи означает, что сам факт платежей не доказан.

Таким образом, истцы не выполнили требований ст. 65 АПК РФ, которая обязывает доказать их те обстоятельства, на которые истцы ссылаются в обоснование своих требований, то есть не доказан сам факт расходов, якобы произведенных истцами на оплату услуг адвоката.

Кроме того, представляется голословным и утверждение адвоката, что сумма 374 206 рублей 90 копеек не выходит за пределы разумной. В обоснование этого приведены следующие доводы: сложность дела, квалификация адвоката, фактические трудозатраты, уровень среднерыночного вознаграждения высококвалифицированного адвоката-цивилиста. Ни один из доводов не подкреплен никакими доказательствами, включая и довод о трудозатратах.

Итак, истцы выполнили только одну свою обязанность, возложенную на них ст. 152 ГК РФ, и с помощью ответчика, предоставившего оригинал газеты «Версия» доказали сам факт распространения спорных сведений. Однако, они не выполнили требования ст. 65 АПК РФ и не доказали причинения им спорными публикациями убытков, которые они требовали взыскать с ответчиков, и не доказали сам факт причинения ущерба деловой репутации.

Все эти обстоятельства являются основанием для отказа в иске в полном объеме по второй статье «Криминальное чтиво по-русски» на основании ст. 152 ГК РФ.

В связи с вышеизложенным, и на основании статей 43, 44, 47, 49,51 закона «О СМИ», с учетом разъяснений данных Постановлением Пленума Верховного суда №11 от 18.08.92, п.п. 2, 8 и 9, Информационного письма Президиума Высшего Арбитражного Суда РФ от 23.09.99 г. № 46, Постановлении Пленума Верховного суда № 10 от 20 декабря 1994 года, ст. 151, 152 ГК РФ, прошу суд в удовлетворении иска ОАО «Альфа – банк», ООО «Альфа – Эко», П.О. Авена, М. М. Фридмана к ЗАО «МАПТ - медиа» и автору отказать в полном объеме.

Представитель по доверенности
Адвокат МГКА                                                М. В. Коршикова

10.07.03г.

23

P0009113