Arbitration Court of the City of Moscow
Case # A40-49954/02-21-494
Plaintiff: OAO Alfa Bank
OOO Alfa Echo
P.O. Aven, M.M. Fridman
Defendants: 1) ZAO MAPT-Media
2) Oleg Anatolievich Lourie, author of the contested articles

### WRITTEN CLARIFICATIONS FOR THE COURT
(Pursuant to Article 41, 64, 81 of the Arbitration Procedural Code
of the Russian Federation)

The plaintiffs filed a lawsuit with regard to protection of their business reputation, loss recovery and moral damage caused by the publication in the newspaper Sovershenno Secretno - *Versija* of the contested articles "Alfa Group Portrait" (# 25 dated July 6-12, 1999) and "Criminal Pulp Fiction Russian Style", (Issue # 19 dated May 20-26.2002), which were authored by O.A. Lourie.

The lawsuit claim contends that the above referenced articles "disseminate untrue information that is damaging to the business reputation of the plaintiffs that are referenced above: citizens P.O. Aven and M.M. Fridman and entities: OAO Alfa Bank and OOO Alfa Echo.

The defendant disagrees with the claims and requests the court to reject the entire claim amount based upon the following materials and legal grounds.

Pursuant to Article 152 of the RF Civil Code and the clarifications "*On some issues that arise in court hearings of cases devoted to protection of business reputation of citizens and legal entities*" dated 08.18.92, the Plenary Meeting of the Supreme Court of the Russian Federation, "only such disseminated information that is untrue to life and contains damaging facts about a citizen or entity is subject to retraction".

This norm is codified in Article 43 of Federal Law #2123-1 on the Mass Media dated 12.27.91, which says that the right to retraction arises in the event when both untrue and damaging information has been disseminated rather than just untrue information.

Resolution # 11 of the Plenary Meeting of the Supreme Court contains a clear definition of damaging information: "**This is information which is not true to life and which contains allegations that an individual or an entity has violated applicable laws or ethical principles** (like a dishonest act, wrong conduct at a place of work or in everyday life and other information, which is damaging to the economic and social activities and operations and business reputation, etc.) that belittles the honor and dignity of a citizen or an entity."

P0009091

1

Therefore, it follows from the definition contained in Resolution # 11 of the Plenary Meeting of the Supreme Court that only such **information that alleges that facts with regard to an individual or an entity did take place is subject to retraction.**

The same definition of "information" is contained in the Decision of the RF Constitutional Court dated September 27, 1955 "On dismissing the complaint filed by citizen Andrei Vladimirovich Kozyrev", which among other things says that in "In hearing cases related to protection of honor and dignity the courts of general jurisdiction should make decisions… how they can distinguish between dissemination of untrue factual information and political evaluation and whether it is possible to retract this information in compliance with the court decision". Therefore, the RF Constitutional Court believes that it is the dissemination of messages about facts that allegedly have taken place rather than suppositions, questions, judgements and evaluations that refer to this type of information.

Thus, to make a legally grounded decision the court should find what specific information has been disseminated by the defendants, and what specific information should be retracted in accordance with the demand made by the plaintiffs. Also, what specific information was disseminated with regard to each of the plaintiffs and in what form it was disseminated and whether this contested information is damaging and what should be proven with regard to the claim.

The definition of business reputation that the plaintiffs want to protect may also be found in Resolution # 11 of the Plenary Meeting of the RF Supreme Court dated 08.18.92, which defines it as one **of the conditions for successful operations of entities.** This definition is fully consistent with the interpretation of the notion "reputation" in the Defining Dictionary of the Russian Language by S.I. Ozhegov (See Page 677 "reputation is a social evaluation of somebody or something, common opinion on the qualities, merits and demerits". (Defining Dictionary of the Russian Language by S.I. Ozhegov and N.Y. Shvedov, Moscow, 1997, publication of the V.V. Vinogradov Institute of the Russian Language of the Russian Academy of Science).

From the above referenced definitions it follows that business reputation is a social evaluation of professional activities, which in our case is the operations of the plaintiffs P.O. Aven, M.M. Fridman, OAO Alfa Bank and OOO Alfa Echo.

Thus, if damage is caused to the business reputation of an individual or a legal entity, it must be revealed in the form of difficulties in his/its business operations and these difficulties must be caused by the actions of the defendants rather than connected with the actions of the defendants. In our case it is the information that was disseminated in the newspaper *Versija* - Sovershenno Secretno. The OAO Alfa Bank, OOO Alfa Echo, P.O. Aven and M.M. Fridman demand that the court should recognize this information as untrue and damaging to their business reputation.

We believe that the plaintiffs should prove the fact of causing damage to their business reputation and the cause and effect connection between the damage and the publication of the contested information in the newspaper *Versija*. We also believe that they are obliged to prove

P0009092

the amount of moral damage caused by the defendants that they want to recover.

Resolution # 813/98 of the Presidium of the RF Supreme Arbitration Court, dated 12.1.98 says, "a legal entity is unable to experience physical or moral sufferings. One cannot cause it moral damage. Only an individual shall be granted the right to moral damages". The notion of moral damage reefers to individuals alone, as according to the definition contained in Resolution # 10 of the Plenary Meeting of the RF Supreme Court dated 12.20.94 (Sec. 2) by **"moral damage we mean moral and/or physical sufferings**", caused by actions that encroach on immaterial benefits that belong to a citizen by right of his birth or by law". Resolution # 10 also says that "the court should find proof of the fact of causing moral or physical suffering, the circumstances and the actions that caused it, the degree of guilt of the person who caused this suffering and what **exactly sufferings were caused to the victim** (Sec.1). The compensation amount depends on the nature and the amount of plaintiff's moral and physical sufferings, the extent of the defendant's fault in each specific case. The extent of moral and physical suffering is evaluated by the court, taking into account the actual circumstances of causing moral damage and the individual characteristics of the victim. (Sec. 8).

Thus, the plaintiffs P.O. Aven and M.M. Fridman are obliged to prove the fact of their moral and physical sufferings and submit grounds for the amount of the compensation for moral suffering they demand.

The Presidium of the RF Supreme Arbitration Court in its Information letter # 46 (Sec. 2) "Review of practical decisions made by arbitration courts in disputes related to protecting business reputation" indicates that "Article 152 of the RF Civil Code stipulates that a legal entity that has suffered from the dissemination of untrue information has **the right to demand a compensation of its losses caused by the dissemination of this information** alongside with its retraction. Section 10 of the letter also says "The demand of compensation of losses shall be satisfied if the plaintiff succeeds in proving that these losses occurred as a result of disseminating untrue information".

Therefore the plaintiff OAO Alfa Bank that submitted to the court the documents allegedly proving its losses shall be obliged to prove the cause and effect connection between the dissemination of the contested information by the newspaper Sovershenno Secretno - *Versija* and the expenses for the investigation conducted by the non-resident Kroll Company, if these expenses were really paid for by the Alfa Bank.

P0009093

3

In describing his position the plaintiff shall proceed from the entirety of the above referenced law norms, interpretations and data provided by the RF Supreme Arbitration Court and the RF Supreme Court and the juridical analysis of contested fragments of the lawsuit and evidence available in this case.

Let us review claims related to the first contested article authored by O.A. Lourie "Hero of Our Time! Alfa. Group Portrait" (# 25 dated July 6-12, 1999).

It should be pointed out that the **contested article generally does not contain information presented in the form of statements,** as in the very beginning of the article the author warns the readers that he happened to have at his disposal "a **query** made by **Ilyukhin,** Chairman of the Duma Security Committee, addressed to the top officials of the Ministry of the Interior. **Ilyukhin suggests that police officers should verify the information** related to Aven, Fridman and Khan's operations **that is available in the committee.** Deputy Ilyukhin enclosed in his query a sizable file on the three people. We have used the materials of this file in the preparatory work in writing this article". (p. 8, column 1, paragraph 4).

At the very end of the article in the part entitled "Last Question" the author writes "I so much **want the top men of the Russian Ministry of the Interior to respond officially to the request sent by Mr. Ilyukhin two years ago. I also want them to respond to the newspaper too, saying what measures were taken by the police to verify the facts that are listed in the Security Committee request for information. Governments come and go, police chiefs come and go and new chiefs get the job, and yet there is no answer to the request. Could they have forgotten about the whole thing? Silence breeds rumors… But, perhaps, the law enforcement agents did not verify the facts at all? Perhaps, the request made by Parliamentarian Ilyukhin was just a provocation staged by the communist faction, as the communists would like very much to discredit the entire class of the Russian capitalists? Or, perhaps, Parliamentarian Ilyukhin just wanted to attack the good names of the three honest businessmen with slander?… That is why we need to hear the reply, so that the journalists did not flaunt the names of honest people, if Ilyukhin tells lies."** (p. 9, column 5, paragraph 3).

It follows from the above referenced paragraph that the author says that as of the date of his writing the first article and signing the newspaper issue to send it to the print shop (July 6-12, 1999) the query by **Ilyukhin,** Chairman of the Duma Security Committee, addressed to Kulikov, head of the Ministry of the Interior, and that as of the date of the article publication no response had been received. Thus, the fact that needed to be proven in this cases was the fact of the existence of the query made **Ilyukhin,** Chairman of the Duma Security Committee, the fact that the query was sent to the Ministry of the Interior and the absence of the response as of the date of the publication, and also the correct reproduction of the fragments of the materials enclosed in the query that were to be verified.

The author is not obliged to prove that the information that Deputy **Ilyukhin** requests them to verify is true to life, as the verification of the information contained in the query is the prerogative of the law enforcement agencies.

P0009094

4

To attorney Korshkova's question whether the plaintiffs' legal counsels have read the entire article they responded saying that it was unknown to them and that they would like to contest only separate fragments. It follows from their response that the plaintiffs **ignored the sense of the entire article and base their claims on the fragments that are taken out of the context.**

In their original claim the plaintiffs indicated the fragments that later in their application for adjusting their claims (undated) they never asked to be refuted:

1) *The phrase on p. 9 of the article: "Alfa was involved in organizing the transit of illegal drugs from the Southeast Asia to Europe via Russia".*

From the contents of the article it follows that the author speaks about the three main heroes of the article: **P.O. Aven, M.M. Fridman and G. Khan**, excluding the plaintiffs OAO Alfa Bank and OOO Alfa Echo. At the very beginning of the article in column 1, paragraph 2 the author says: "*Today we are going to talk about not one but three heroes: Petr Aven, Michail Fridman and German Khan. Three epic heroes of Russian capitalism, or, perhaps, a three-headed dragon of the Russian Mafia? This troika is more known under the name "Alfa".*

Another contested phrase is a quotation from the query made by **Ilyukhin**, a State Duma Deputy (p. 4 paragraph 3): "... *M. Fridman and P. Aven were involved in drug trafficking from the Southeast Asia via Russia to Europe.*" The author uses this phrase summarizing the main contents of V.I. Ilyukhin's query, the most important fragment of this query in terms of social interests, which served as the main material for writing his article and was the reason why he wrote it. As this text is not generated by the author, in fact, it is a quotation from the query, the contested phrase is included in big quotation marks, therefore, the punctuation in the article is indicative of its main contents.

2) The plaintiffs demand that the following phrase should also be refuted: "*Today we are going to talk about not one but three heroes: Petr Aven, Michail Fridman and German Khan. Three epic heroes of Russian capitalism, or, perhaps, a three-headed dragon of the Russian Mafia?*" This information is not damaging, as the last sentence is an idiomatic expression and ends with a question mark, therefore, it cannot be regarded as damaging information, as it lacks a statement with regard to the violation by the plaintiffs of the norms of law or ethics. In addition, this information does not refer to the OAO Alfa Bank and the OOO Alfa Echo.

In their application on adjusting the lawsuit claims the plaintiffs did not list these fragments in the request part and did not say that they demanded that these fragments should be refuted, therefore, they are quoted in this text to illustrate the fact that the contents of the contested article authored by O.A. Lourie are based on the materials sent for verification by Deputy Ilyukhin and the article contains a question rather than a statement of their truth.

P0009095

Further on in accordance with the court decision dated March 18, 2003 the plaintiffs adjusted their claims but only with regard to the following fragments of their lawsuit:

*3) Fragments 2-8 of the claim refer only to Plaintiff P.O. Aven:*

3. When he was a student of the Moscow State University P.O. Aven was president of a students music club and had numerous contacts among the young people (music fans, bohemian guys, etc). That was also the environment where a market for illegal drugs was being shaped at the time. As a result Aven got into the focus of attention of some criminal elements and he had some contacts with their "leaders". At the same time he also got in the focus of attention of law enforcement agencies.

4. *In February 1992 Petr Aven was appointed Minister of Foreign Economic Relations of RF...* - this fragment is not mentioned in the claim. The plaintiffs demand that only the phrase: "As a result Aven received good commission money when he managed to sell Ghana's debt" should be refuted."

5. "When Petr Aven headed the ministry he was unscrupulous and was not ashamed to get commissions and accept valuable gifts for his assistance to foreign and domestic companies in signing deals and carrying out foreign economic transactions." In their adjusted demands they added the phrase "According to the words of the employees of the Ministry". . *"His jurisdiction included all the questions related to issuing the required licenses" - the adjusted demands do not include this phrase.*
The plaintiffs' demand that the following phrase should be refuted: "He was especially tough when he controlled access to the sales of arms, he allowed access to this market only to those players who were connected to him."

6. "In 1991-1992 the 6[th] Department of the KGB of the Security Ministry of the Russian Federation investigated Petr Aven's activities using the following materials: big embezzlements of money, causing big damage to the country and criminal connections with the Israeli intelligence services. In 1992 the former security minister reported about the materials to President B. Yeltsin and as a result Petr Aven was dismissed from his ministerial position on December 22, 1992."

7. *"...Among the people he knew were O. Kvantrishvili and J. Kobzon, criminal leaders S. Timofeev (Sylvester) and A. Petrov (Petrik), international adventurers Mark Rich and Gregory Luchansky."* **The adjusted demands do not include this phrase.**
The plaintiffs demand that the following phrase should be refuted: " According to the operative data contained in investigation reports, P. Aven was involved in illegal drug trafficking from the South East Asia via Russia to Europe."

8. "Late in 1993 in Vienna P.O. Aven met Gilberto Rodrigues Orehuel, a Colombian drug lord, who was also known under the nickname of "Chess player". Specifically, they reached an agreement on "pumping money into" the Alfa Bank from some offshore zones (like the

P0009096

6

Bahamas and Gibraltar) to be invested in the Russian economy through the acquisition of stock issued by Russian enterprises".

All these fragments of the claim have been intentionally taken out of the context of the article, as all of them were included in quotation marks and were preceded by the following text: **"From the materials of the Security Committee of the RF State Duma"** (p.8, column 2, paragraph 2). The author even apologizes before the readers: " I need to ask the readers' forgiveness for using so many quotations in my story." (p. 9, column 5, paragraph 2).

---

The case file contains a copy of query # 3.15-2216 dated 11.26.97 sent by V.I. Ilyukhin, a State Duma deputy, submitted by author Oleg Lourie. The query is addressed to A.S. Kulikov, Deputy of the RF Government Chairman and the Minister of the Interior. The materials enclosed in the query contain page 8 that carries Fragment 3 that was quoted in the article and also Fragments 4, 5, and 6. p. 4 carries Fragment 7, while Fragment 8 is on p. 9 (with the indication of the operative data).

The author related the query contents verbatim. The following evidence proves that the submitted copy is identical to the copy contained in the materials:

In response to Lawyer inquiry # 79, dated 05.21.2003 we received Response # 136/390 dated 05.22.2003 signed by V.I. Ilyukhin, Chairman of the State Duma Security Committee, with the following enclosures: a copy of the query # 315-2216 dated 11.26.1997 that was addressed to the Ministry of the Interior; a copy of the query 315-2216 dated 11.26.1997 that was addressed to the FSB; copies of the materials that Ilyukhin asked them to verify and a copy of the response to the deputy's query from the Ministry of the Interior.

**In his response to the lawyer's inquiry Victor Ivanovich Ilyukhin says the following:** *"From the Ministry of the Interior we received a response signed by minister Vasiliev's first deputy and I attached this copy, however, we never received any response from the FSB. Given the amount of information on the unlawful activities of the Alfa Consortium and some of its top managers, including P.O. Aven and M.M. Fridman, that needed to be verified, it is obvious that in fact, they never verified it and the well-informed agency never sent any response to the query made by the Security Committee of the State Duma."*

The discussion of the issue whether this query was made in accordance with the rules and regulations is outside the jurisdiction of this court hearing. However, I think I should point out that as a State Duma deputy V.I. Ilyukhin resorted to his right to send a deputy's query, which is envisaged in Article 14 of Federal Law # 3-FZ *On the status of a member of the Federal Council and the status of a deputy of the State Duma of the Federal Assembly of the Russian Federation* dated 05.08.94. The law says that an official must respond in writing to a query no later than thirty days since the receipt of the query (Sec. 3 Article 14). The form of a deputy query is not restricted by any documents, a query may be written freely but it must contain a number and a date.

**P0009097**

Bahamas and Gibraltar) to be invested in the Russian economy through the acquisition of stock issued by Russian enterprises".

All these fragments of the claim have been intentionally taken out of the context of the article, as all of them were included in quotation marks and were preceded by the following text: **"From the materials of the Security Committee of the RF State Duma"** (p.8, column 2, paragraph 2). The author even apologizes before the readers: " I need to ask the readers' forgiveness for using so many quotations in my story." (p. 9, column 5, paragraph 2).

---

The case file contains a copy of query # 3.15-2216 dated 11.26.97 sent by V.I. Ilyukhin, a State Duma deputy, submitted by author Oleg Lourie. The query is addressed to A.S. Kulikov, Deputy of the RF Government Chairman and the Minister of the Interior. The materials enclosed in the query contain page 8 that carries Fragment 3 that was quoted in the article and also Fragments 4, 5, and 6.  p. 4 carries Fragment 7, while Fragment 8 is on p. 9 (with the indication of the operative data).

The author related the query contents verbatim. The following evidence proves that the submitted copy is identical to the copy contained in the materials:

In response to Lawyer inquiry # 79, dated 05.21.2003 we received Response # 136/390 dated 05.2?.2003 signed by V.I. Ilyukhin, Chairman of the State Duma Security Committee, with the following enclosures: a copy of the query # 315-2216 dated 11.26.1997 that was addressed to the Ministry of the Interior; a copy of the query 315-2216 dated 11.26.1997 that was addressed to the FSB; copies of the materials that Ilyukhin asked them to verify and a copy of the response to the deputy's query from the Ministry of the Interior.

**In his response to the lawyer's inquiry Victor Ivanovich Ilyukhin says the following:**
*"From the Ministry of the Interior we received a response signed by minister Vasiliev's first deputy and I attached this copy, however, we never received any response from the FSB. Given the amount of information on the unlawful activities of the Alfa Consortium and some of its top managers, including P.O. Aven and M.M. Fridman, that needed to be verified, it is obvious that in fact, they never verified it and the well-informed agency never sent any response to the query made by the Security Committee of the State Duma."*

The discussion of the issue whether this query was made in accordance with the rules and regulations is outside the jurisdiction of this court hearing.  However, I think I should point out that as a State Duma deputy V.I. Ilyukhin resorted to his right to send a deputy's query, which is envisaged in Article 14 of Federal Law # 3-FZ *On the status of a member of the Federal Council and the status of a deputy of the State Duma of the Federal Assembly of the Russian Federation* dated 05.08.94.  The law says that an official must respond in writing to a query no later than thirty days since the receipt of the query (Sec. 3 Article 14).  The form of a deputy query is not restricted by any documents, a query may be written freely but it must contain a number and a date.

P0009097

7

Though the document is not actually entitled "Query", the fact that it is a query is proven by the response sent by the Ministry of the Interior.

Therefore, **once again we request** that witness V.I. Ilyukhin should be questioned by the court, as he will confirm to the court that he had sent this query and the fact that he had received a formal (not a factual) response to it and also those circumstances that made him so concerned about this message that he had sent it for verification.

In these circumstances we believe that the defendants succeeded in proving that the query sent by the deputy of the RF State Duma actually contains contested fragments 3-8 of the article and that it was sent alongside with the demand that this information should be verified, as it is of social nature. In other words, the **author described information that was true to life.**

In addition, journalist O. Lourie had acted in compliance with the law "On the Mass Media", he did not abuse the rights of a journalist and did not violate the law on the mass media.
Defendant O.A. Lourie used his constitutional right granted him in Article 29 of the RF Constitution. The Article guarantees to each individual freedom of thought and speech and says that each individual has the right to seek, receive, pass along, produce and disseminate information by any legal means. A list of information that constitutes state secrets is contained in the federal law. The law guarantees the freedom of the press and forbids censorship.
**We believe that the court should reject the demand made by Plaintiff P.O. Aven, which is related to the retraction of Fragments 3-8 pursuant to Article 152 of the RF Civil Code and the interpretations contained in the documents of the RF Supreme Court and the RF Supreme Arbitration Court.**

We also believe that the court should reject the demand made by Plaintiff P.O. Aven, which is related to moral damages in the amount of ~~150~~ 125 thousand dollars, as the defendant had not disseminated damaging information about him. In addition, the plaintiff failed to prove the fact that his business reputation was belittled, never submitted any evidence that his business operations were inconvenienced in any way as a result of publishing the contested article and never presented any arguments in support of the amount of moral damages.
In addition, the issue of the newspaper *Kommersant* dated 03.07.2003 carried an interview with plaintiff P.O. Aven where he said, "We have sued Versija and Lourie about this material. We were just sick and tired of it. However, **their ravings never affected our life in Russia.**" The original issue has been filed together with other materials of this case.
**This statement can be viewed as evidence of the fact that plaintiff P.O. Aven has never experienced any difficulties in his business operations; his lawsuit is not grounded and a big amount of moral damages is just a way to punish the newspaper and the journalist for disclosing the contents of a deputy's query to third parties rather**

P0009098

8

than making up for the sufferings it has caused, which is in violation of Article 151 of the
RF Civil Code.

**4) Lawsuit Fragments 9-12 refer only to plaintiff M.M. Fridman, who demands that the
court should recognize and refute the following phrases:**

9) *"In 1985 the Bauman Brigade, one of the most aggressive criminal groups in Moscow,
contacted M. Fridman, a young money-loving dealer who was very good at using his numerous
contacts."*   The adjusted demands do not contain this phrase.

Next the plaintiffs' legal counsels, who do not have powers of attorney from any member
of the Bauman Group, ask the court to refute the following information:

"At that time the Bauman Brigade was the only Moscow organized crime group that was
seriously involved in illegal drugs and was constantly expanding its operations.  The market for
illegal drugs was being shaped among the students and artistic youth, rock fans, hippies, punks,
prostitutes, etc."

The application with adjusted demands also contains the following fragment: "Fridman had
numerous contacts in these circles and, undoubtedly, the Bauman Brigade was very interested in
his connections.  The contact with the brigade turned out to be mutually beneficial."

The phrase "Later Michail Fridman's work is strongly connected with the Alfa Group
operations" is not contested in the adjusted demands.

10) "Michail Fridman was involved in the organization of illegal drug trafficking from
the South East Asia via Russia to Europe."

The phrase "Among the people he knew were J. Kobzon and O. Kvantrishvili and,
criminal leaders S. Timofeev (Sylvester) and A. Petrov (Petrik), and international adventurers
Mark Rich and Gregory Luchansky" is not included in the adjusted demands.

11) "Fridman was also involved in voucher fraud. As a result of these voucher schemes
alone the Alfa Group Chairman had added approximately 30-40 million dollars to his personal
assets."

12) "The voucher scheme looked like this.  Having accumulated vouchers from people
(they collected a total of more than 2 million vouchers) the Check Investment Fund Company,
that was the name of the company back then, purchased a considerable amount of stock and quite
often control interest in industrial enterprises (more than 160 enterprises).  Then this stock was
sold at a lower price to some offshore companies owned by Michail Fridman, Alfa Group and
Alfa Bank Chairman of the Board of Directors. Still later this stock was sold at a much higher
price and the difference in prices practically constituted the revenue for Fridman, while the

P0009099

Check Investment Fund ordinary stockholders got only miserly dividends" has been taken out of the adjustment demands, therefore, the plaintiffs believe it is true to life and is not damaging to M.M. Fridman's business reputation.

All the contested fragments with the exception of the phrase "Fridman was also involved in voucher fraud..." are also quotations from V.I. Ilyukhin's query. The author uses quotation marks for these contested fragments and all of them are preceded by the text: "From the materials of the Security Committee of the RF State Duma" (p. 9, column 2, paragraph 4)

The same copy of V.I. Ilyukhin's query # 3.15-2216 dated 11.26.97 submitted by Oleg Lourie contains contested fragment 9 that is quoted in the article, and fragments 10 (p. 4) and 12 (p.2). The author related verbatim the query contents.

The only phrase that belongs to the author is Fragment 11: " Fridman was also involved in voucher fraud..." summarizes Fragment 12, as the material attached to the query and the text of the article contain the following phrase: **"As a result of these voucher schemes alone the Alfa Group Chairman had added 30-40 million dollars to his personal assets."** Thus, the definition of M. Fridman's actions as schemes was given in the materials enclosed with the query, and is not the journalist's opinion or statement.

**We believe that the court should reject the demand made by M.M. Fridman, which is related to retraction of Fragments 8-12 pursuant to Article 152 of the RF Civil Code, the court should also reject his demand related to moral damages for the same reason: the fact that his business reputation has been damaged is not proven, he was not inconvenienced as a result of the publication carried in the newspaper "Sovershenno Secretno-Versija, the fact of causing moral sufferings has not been proven and the amount of moral damages is not grounded.**

**5) The following lawsuit demands made by the plaintiffs are based on the fragments of the text:**

13) "Within the consortium it was the Alfa Echo Company that is involved in secret operations with illegal drugs." In their adjusted demands they added the phrase: "It follows from the operative materials that" (and next comes the contested phrase).

In their application the plaintiffs say: "the author claims that Petr Aven is the president of the Alfa Group Consortium and Michail Fridman is the Chairman of the board of directors, which means their involvement in the operations with illegal drugs", however, the article does not contain this factual information and this conclusion of the plaintiffs is not based on the actual text.

The adjusted claims do not contain the following text fragment: "Many citizens (of Khabaravsk) were poisoned when they consumed sugar.

P0009100

10

In the course of the food poisoning investigation it was found that the cause of poisoning was a big dose of illegal drugs contained in the sugar. It was also established that the containers used for transporting the sugar had been used previously by the Alfa Echo. The Alfa Echo had used them to transport a shipment addressed to the Harmaty and Co." It means that the plaintiff OOO Alfa Echo does not contest this information.

We believe that the court should reject the demands made by plaintiffs P.O. Aven, M.M. Fridman and OAO Alfa Bank, as this passage refers only to OOO Alfa Echo.

We also believe that the court should not satisfy the demand of plaintiff OOO Alfa Echo, as the above referenced textual fragments are also preceded by the message on p. 9 column 4 paragraph 2: **"From the materials of the Security Committee of the RF State Duma"**.

The first fragment is the indirect quoting of the following text on p. 5 of the attachment to V.I. Ilyukhin's query # 3.15-2216 dated 11.26.97 addressed to A.S. Kulikov, Minister of the Interior: " Within the consortium it is the Alfa Echo Company that is involved in secret operations with illegal drugs."

We also believe that the court should not satisfy the demand of OOO Alfa Echo related to recognizing this information as not true to life and publishing a retraction pursuant to Article 152 of the RF Civil Code. Alfa Echo never made a demand related to compensation for their losses.

6) Plaintiff OAO Alfa Bank has made only one demand related to O. Lourie's contested article "Alfa. Group Portrait".

The plaintiff demands a retraction of the following textual fragment: "Late in 1993 in Vienna P.O. Aven met Gilberto Rodrigues Orehuel, who represented Colombian drug lords and was known under the nickname of "Chess player". Specifically, they reached an agreement on "pumping money into" the Alfa Bank from some offshore zones (like the Bahamas and Gibraltar) to be invested in the Russian economy through the acquisition of stock issued by Russian enterprises".

---

In addition, the above referenced fragment is a quotation from the materials attached to V.I. Ilyukhin's query and it cannot be qualified as damaging information, as it does not contain allegations related to any illegal or immoral actions performed by the Alfa Bank. It is important that this fragment does not contain statements that Alfa Bank had received the money, that the money was of criminal origin and that it was used to purchase Russian enterprises in violation of law.

**Pursuant to Article 152 of the RF Civil Code the court should reject the entire demand of the OAO Alfa Bank related to the first article.**

The OAO Alfa Bank demand with regard to the compensation for their losses should be rejected as far as the first article, as in the absence of damaging information in principle it is impossible to establish a cause and effect connection between the losses suffered allegedly by the OAO Alfa Bank in restoring their business reputation.

P0009101

11

7) Critique of the plaintiffs' arguments related to the first contested article "Alfa. Group Portrait"

**7.1 The plaintiffs claim that by publishing O. Lourie's article  "Alfa. Group Portrait" the defendants disseminated information related to serious crimes perpetrated by the plaintiffs and illegal operations of the Alfa Bank and Alfa Echo Companies.  However, this argument is fully refuted by the contents of the article,** whose central theme is a demand to verify the information and respond to the query made by RF State Duma Deputy V.I. Ilyukhin rather than an allegation of crime.

**7.2 The plaintiffs are wrong when in support of their position they refer to Article 57 of the Law on Mass Media, as this article refers to damaging information.  In the juridical sense information that does not contain statements is not damaging, in other words, the defendants did not disseminate damaging information.**

**7.3 The plaintiffs made an ungrounded claim that the ZAO MAPT-media, the founder and publisher of the newspaper Sovershenno Secretno-Versija and journalist O.A. Lourie were not in compliance with the Law on Mass Media as they did not verify the distributed information.**
       **The Law on Mass Media says that it is the duty of a journalist alone to verify the information distributed by him - Article 49, Sec. 2.** The journalist is in compliance with this requirement and the fact is supported by evidence that the text of the article and the text of V.I. Ilyukhin's query # 3.15-2216 dated 11.26.97 sent to the Minister of the Interior A.S. Kulikov are fully identical.
       **We believe that all the claims with regard to the article "Alfa. Group Portrait" made by all the plaintiffs should be rejected in their full amounts.**

       II. M.M. Fridman, OAO Alfa Bank and OOO Alfa Echo made **claims with regard to the second publication authored by O.A. Lourie "Criminal Pulp Fiction Russian Style"** (Issue # 19 dated 05.20.2002).

       1) The plaintiffs made groundless claims saying that by publishing this article the defendants "once again disseminated the information that was damaging to the plaintiffs and was not true to life".  In fact, there was no repeated dissemination of information, as the defendants published a new article, which was new both in its form and its name; and the contents were not similar to the contents of the first article.  The publication was in the form of an interview "with one of the high ranking agents in a leading and fairly well known special services".  He agreed to be interviewed on condition of full anonymity, therefore, defendant O.A. Lourie cannot reveal the name of his source (Article 41, Sec. 2, Article 49 Sec. 4 of the Law on Mass Media).

P0009102

The fact that this conversation did take place is supported by an audiotape, its transcript and translation that are submitted to the court.  According to O. Lourie's oral explanations, which are also regarded as evidence pursuant to Articles 64 and 81 of the RF APC, he interviewed a former employee of the US FBI during his business trip to the USA in 2001.  The article "Our Man in the

FBI" published in *Novaya Gazeta* on 06.28.2001 may serve as indirect evidence and a copy of this article has been submitted to the court in evidence.

From the interview transcript it follows that the author's questions are of general nature and they are questions related to "the situation with financial crimes in Russia", and his interlocutor illustrates his answers with examples from the Alfa Bank operations. *[The audiotape, its transcript and translation into Russian have been submitted to the court as part of the case file. (Signature) 07.10.03* - Handwritten comment]

The second article also contains the author-generated text, which precedes the interview.

On p. 4 column 1 paragraph 1 the author warns the reader: *"Western special agencies are seriously involved in investigating and researching the phenomenon of Russian international crime. It is only natural that they focus their attention on major financial groups. That is why I asked one of the former high ranking officers in the West to comment on Russian financial crime. This officer had served as one of the directors in a major renowned special service and studied "the Russian problem".*

*Of course, the difference in the legal assessment of the lawfulness or unlawfulness of certain players in the financial market and his cautious attitude towards Russian business have played their role in shaping the opinions of my interlocutor, so his accusations should not be regarded as Gospel truth. Any accusation should be proved in the course of a court hearing, however, it would be interesting to know the opinion of a person who was among those who were in charge when he had worked in a Western special service. Given the seriousness of these accusations, we would like to warn the readers that we cannot claim responsibly that all these accusations are well grounded. We are just offering to them a peculiar viewpoint from abroad.*

This important fragment of the article means that in response to the author's general questions the ex top ranking official of one of Western special services gave his answers, which constitute his opinion rather than Gospel truth, as his opinion had been shaped by a number of subjective factors, such as differences in juridical evaluation and a biased attitude towards Russian entrepreneurs. At the end of the publication on p. 4 column 4, last paragraph the author once again informs the reader that the information received from his interlocutor should not be perceived as truth without any reservations:

**P0009103**

" I wonder if our law enforcement agencies have this information about Alfa and how true to life it is? "

13

2) However, the plaintiffs, who in all probability never read the entire article, chose to disregard the above referenced fragments of the article and in their original claim they demanded that the following fragments of the article should be refuted:

1) ***First contested fragment***: "The operations of <u>such companies as the Alfa Group</u> ... pose a threat to the national security of several countries." In the adjusted claims this demand was worded as follows: "recognize as untrue the information ... on the existence of the Alfa Group Company that poses a threat to the national security of several countries."

    This phrase was said in response to the preceding question asked by the author: *"And how about transnational operations of Russian entrepreneurs?"*
The interlocutor gave his answer whose contents are not contested by the plaintiffs and the essence of it is in that numerous major financial and industrial groups are not essentially Russian. As an example he used the Alfa Group saying, *"its bulk is comprised of numerous companies in various countries of the world. Money is exported from Russia through these complex structures."* It is important that the interlocutor does not claim that this export of money is illegal. Next the author asks the question: *"And how do they regard it in the West?"* and the answer is "The operations of **the Alfa Group and some other Russian companies** pose a threat to the national security of several countries." From the context of the interview it follows that the interlocutor expresses his opinion on the issues of the world economy, in other words, he says that even legal transfers of money by transnational companies pose a threat to the national security of those countries where they generate their profit and from where they transfer it to their foreign affiliations and subsidiaries. Practically, the consequences of this phenomenon are similar for all nations (Russia, the United Kingdom, the USA and others) where one may encounter export of money out of the country.
    The plaintiffs isolated the contested fragment from the context of the article. In fact, this fragment is a judgement of the interlocutor, who converses with the author during the interview, in other words, he is the co-author of the article, who has the right to express his opinion in the press. This fragment is not damaging to the plaintiffs, as none of them is specifically mentioned in this fragment. The author mentions the Alfa Group, which is not a legal entity and, consequently, it does not have a business reputation, which in the juridical sense is goodwill, nor does it have the right to seek court protection of this goodwill. Each of the plaintiffs has his business reputation and extrapolating the above referenced to each of them specifically would be wrong from the juridical point of view.

**P0009104**

Pursuant to Article 152 of the RF Civil Code (CC) it is the information about a plaintiff rather than a third party that should be disseminated, though in this case the name of the third party contains the same word.

14

We believe that the court should reject the demands of all plaintiffs related to the first fragment of the second article pursuant to Article 152 of the RF Civil Code.

2) *The next contested fragment in the original claim* that the plaintiffs demand to be refuted: "In Alfa companies... everywhere you can find only fraud ". However the adjusted claims do not contain this fragment.

However, I would like to explain that this fragment has also been isolated from the context. In fact, the following answer provided by the interlocutor was actually published: *"Some Alfa companies, for instance the Crown Group and the offshore companies controlled by them, employ local citizens and very often they are former top ranking governmental officials, such as Joseph Moss, a Briton. Look up his bio data, it is very interesting. Or Elliott Spitz, a US citizen. He is connected to many firms both in the past and in the present, including those in Ukraine. And everywhere you can find only fraud."*

From the complete text of the fragment it follows that the author speaks about the fraud in the companies that were connected in the past and are connected now with a certain US citizen Elliott Spitz. The names of these companies are not mentioned and the author says nothing else about them with the exception of the fact that they are connected with E. Spitz. **He does not speak here about the plaintiffs, therefore, this information is not subject to retraction pursuant to Article 152 of the RF CC.**

3) **Next the plaintiffs' original claims demand that the third fragment of the text should be refuted:**

- "And what do you know about the connections between Russian entrepreneurs and criminals?
- Oh, there are more than enough of them. We are well aware of them and some contacts are audio- and videotaped. As far as the Alfa Group is concerned, it is a very sensitive issue. Do you think Fridman acts all alone? Let's forget about Fridman for a second. Look at the recent interview given by Belunov, a.k.a. Lenya Macintosh. You will understand many things then. There is also Ivankov and others. Now let's come back to Alfa. In addition to Russia and Kazakhstan, their connections go much farther to Ukraine, the Czech Republic, Austria, the USA, and the United Kingdom. Some offshore companies, banks, including American banks, have active connections with the people that are called criminal lords." However, the application with the adjusted claims lists this demand as follows: "to recognize as untrue and refute the information about the connections of M. Fridman with criminals and Alfa's connections with criminal lords."

From the text of this contested fragment it follows that the fragment does not contain any allegations related to the plaintiffs' actions that defy ethical standards, in other words, it does not contain damaging information and, therefore, is not subject to retraction pursuant to Article 152 of the RF CC.

**P0009105**

The lawsuit claims against this fragment are based on the plaintiffs' subjective and expanded interpretation of this fragment, which is included in their original claim application: "The context of this fragment contains an allegation related to M.M. Fridman's, Alfa Bank and Alfa Echo connections with criminals, and, consequently, to the criminal (illegal) nature of the commercial operations. This directly follows from the question "about the connections between Russian entrepreneurs and criminals and the mention of M.M. Fridman's name and the name Alfa in the answer to the question".

Objectively, there is no information about Fridman's connections with criminals in the text and there is no mention of other plaintiffs: P.O. Aven, OAO Alfa Bank and OOO Alfa Echo. Proceeding from the rhetorical question "Do you think Fridman acts all alone?" it is easy to make a conclusion that Fridman does not live in a vacuum and that he is surrounded by the people from the Alfa Group. And the interlocutor does not answer the question about the Alfa Group and does not provide information of damaging nature. This interpretation is listed here to support the fact that one can have several options and make numerous conclusions from one and the same question. However, one should remember that the court does not evaluate conclusions and interpretations: pursuant to Article 152 of the RF CC the court must evaluate only the actually published text, which obviously does not contain any allegations related to illegal or immoral activities of M.M. Fridman and, therefore, is not regarded as damaging information.

The fragment does not contain any allegations related to Alfa's connections with criminal lords and it does not contain the word "lords".

Pursuant to Article 152 of the RF CC the court must evaluate **concrete information** rather than plaintiffs' interpretations and conclusions made on the basis of the text, and establish if they are disseminated about the plaintiffs, if their nature is that of statements and if the statements contain information about unlawful and immoral actions performed by the plaintiffs. Pursuant to Article 44 of the Law on Mass Media, in the event the court makes a decision about publishing a retraction, this retraction should indicate, which information is not true to life..."

Pursuant to Article 152 of the RF CC the court should also reject the demand with regard to retraction and moral damages based on the third fragment.

Also, the fact that the second article "Criminal Pulp Fiction Russian Style" does not contain any information about the plaintiffs OAO Alfa Bank and OOO Alfa Echo is an important factor. On page 7 of their claim the plaintiffs argue that the article describes a non-existent consortium Alfa Group.

The request part of the original and adjusted claims does not contain any other demands.

### 3) Critique of the plaintiffs' arguments related to the second contested publication

P0009106

16

**"Criminal Pulp Fiction Russian Style"**

3.1 On page 7 of the claim the plaintiffs write: "...the defendants intentionally call P. Aven the president of a non-existent Alfa Group Consortium and call this information libelous. However, the plaintiffs filed a lawsuit to protect the business reputation of specific legal entities and individuals, disregarding the fact that most fragments of the article do not contain any mention of these legal entities and individuals.

3.2 The evidence presented by the plaintiffs - letters dated by 1995 - cannot be regarded as proof of any information contained in the articles, nor does it refute it, as these letters were received much earlier than the date of the publication of the first article and before the query was sent, as the query is dated November 1977. The letters dated August 1999 and February 2000 are refuted by the response of the Ministry of the Interior to Deputy V.I. Ilyukhin's query, whose copy was submitted to the court by the State Duma Security Committee upon the request of the court. The Ministry of the Interior response to this request signed by Vasiliev says "*currently there is a number of criminal cases involving the companies of this consortium,* in *October this year (1977) the customs agents of the City of Moscow found arms and ammunitions when they inspected the cargo addressed to OOO Alfa Echo that arrived from the Republic of Moldavia. The Moscow-Ryazan Prosecutor's Office opened a criminal case in connection with this fact*".

3.3 Allegations that the contested publications have been commissioned are not true to life; therefore, the plaintiffs were unable to produce any evidence of the fact.

3.4 The plaintiffs' allegations related to the abuse of the rights of a journalist by the defendants are also groundless and refuted by the materials contained in the case file.

3.5 The plaintiffs were unable to prove by any facts the alleged consequences of the replication of the damaging information in other media sources. They never submitted to the court any issue of a Russian or foreign media source that reprinted Lourie's article.
In addition, the plaintiffs never claimed that the defendants were responsible for replications in any way.

3.6 The argument of the plaintiff Alfa Bank that the European Bank for Reconstruction and Development (EBRD) refused to cooperate with the Alfa Bank as a result of the dissemination of this information in the Versija newspaper and that the Center for Public Integrity accused the plaintiffs of criminal activities, directly referring to the Versija newspaper, does not hold water.
The plaintiffs were unable to produce any evidence of that in court.
However, the case file contains a message carried by the Kommersant newspaper on 13.12.2001 that "*on 12.12.2001 the newspaper FINANCIAL TIMES reported that the president of Alfa Bank expressed his protest to the EBRD in connection with listing his bank in the "black list" of companies, with which the European Bank refuses to cooperate.*

P0009107

17

*It went on to say that the Alfa Bank was blacklisted after the 1998 default when the European Bank suffered big losses in Russia.*

This fact proves that there is no cause and effect connection between the 1999 and 2002 publications in the newspaper *Sovershenno Secretno-Versija* and the refusal of the EBRD to cooperate with the Alfa Bank, as the default occurred in 1998.

Thus, the plaintiff Alfa Bank was unable to produce evidence of the cause and effect connection between the publication of the contested articles authored by O. Lourie in the Versija newspaper and the refusal of the EBRD to cooperate with the Alfa Bank. Also, there was no evidence proving the fact that the Center for Public Integrity had accused the plaintiffs of criminal activities, directly referring to the Versija newspaper. They never submitted to the court a copy of that report.

All these circumstances refer to the OAO Alfa Bank alone, as other plaintiffs never made any claims related to any negative consequences caused by the publication of the contested articles in the Versija newspaper.

The absence of proof in support of the arguments presented by the plaintiff Alfa Bank makes these arguments groundless, furthermore, they cannot be regarded as proof of negative consequences that occurred as a result of the publication of the contested articles in the Versija newspaper.

3.7   The court should also reject the demand related to the compensation of the expenses incurred in paying for the services of the Kroll Company **for the following reasons**:

The plaintiff OAO Alfa Bank alleges that they have paid for the independent investigation conducted by the Kroll Consulting Company in self-protection of their business reputation right violated by the publication of the contested articles in the Versija newspaper. However, this argument should be regarded as groundless, as there is no proof.

   1)   The documents submitted by the plaintiff contain **no** proof that the OAO Alfa Bank and Kroll signed an agreement. This agreement is non-existent, as they were unable to produce either the signed text of the agreement or correspondence between the two parties, or any written message to this effect sent on behalf of the Alfa Bank to Kroll. The copies of the documents submitted by the plaintiff Alfa Bank do not contain any written documents listing any indication of the subject of the agreement with the Kroll Company.

To the question "What was the subject of the agreement?" asked by Korshikova, the legal counsel for the ZAO MAPT-Media, Mr. Kulkov, the Alfa Bank legal counsel, refused to respond. Thus, the plaintiff failed to prove the very fact of signing this agreement and was unable to prove that the subject of the agreement was consulting services provided by the Kroll Company in connection with the publications in the Versija newspaper.

The case file contains a copy of a Protocol of providing and acceptance of services, dated September 30, 2002, signed by Mr. Tommy Hesby on behalf of Kroll.

P0009108

18

On behalf of the OAO Alfa Bank the Protocol is signed by Simon Roych, director of the British office. The protocol mentions consulting services rather than verification of any information. The file does not contain any report of the Kroll Company describing their consulting services, therefore, it is impossible to make a conclusion that the Kroll Company did the work under an agreement and verified the information disseminated by the Versija newspaper.

From the materials attached to the claim it follows:

1 - Only the OAO Alfa Bank sent invoices for certain consulting services, though the defendants never disseminated any damaging information about this bank.

2 - The argument related to contracting the Kroll Company to protect the business reputation of all the plaintiffs is fully refuted by the documents submitted by the Alfa Bank. Kroll's letter to the Alfa Bank dated February 8, 2002 says that the reason why they contracted Kroll was the fact that "*currently the Alfa Group is concerned with some aspects of its reputation and the task of the Kroll Company is to investigate each accusation and to assess how true it is and find its source.*" (Page 1 of the letter dated February 8). Therefore, it follows from the letter addressed to Kroll that the Alfa Bank requests them just to assess the degree of truth of the rumors that are periodically revived in the press and to establish their source. However, they do not request Kroll to publish the results of their investigation to restore their business reputation. Moreover, all the messages addressed to Kroll carry the word "Confidential". The plaintiffs were unable to produce any evidence of the fact that the Kroll Company had sent them any message describing the results of their investigation and restoring someone's business reputation or some partner's business reputation.

3 - On Page 2 of the letter dated February 8, 2002 the Kroll Company writes what rumors they were able to find in the open sources as a result of their investigation of open sources in Moscow and in London:

- Drug trafficking (*here and further on the spelling is that if the original - Author's note*). Some sources made suppositions that the Group had smuggled heroin from South East Asia, whereas according to other sources, the Group was involved in exporting cocaine from South America. **One of the sources of these rumors was the 1997 report made by FSB though there were earlier indications of this type of activities.** (Let me point out in parenthesis that the source was the FSB report rather than O. Lourie's articles published in 1999 and 2002).
- Money laundering: In late in 1999 and early in 2000 there were some articles that accused the Alfa Bank together with Michail Fridman, the TNK, Victor Vexelberg and others of participating in the money laundering schemes with the involvement of the Bank of New York.
- Violence: The Alfa Group, specifically Petr Aven, were allegedly involved in the death of Sergei Mazharov, who was murdered in Paris in 1994. Our investigators found articles in the

**P0009109**

**Western** press that connect the TNK and through the TNK the Alfa Group to bringing armed units to Nizhnevartovsk last November.

- Corruption: Suppositions from public and private sources related to the fact that the Alfa Group was involved in political corruption to implement their plans. This and some variations of this have already become a household word. For instance, the most popularly discussed episode mentioning the Group name was the accusation of corruption in Sidanco's bankruptcy.

The Kroll letter dated February 8 went on to say that "in addition to these rumors, there are other less important rumors that may be regarded as dangerous or less dangerous: that originally Alfa was funded with KGB's money, for instance, in the late 80s its main players were involved in the sales of Russian state-owned property abroad for the personal benefit of the members of the Communist party; that Petr Aven is an agent of the Israeli intelligence service; that early in his career Michail Fridman had connections with the leaders of the organized crime groups in Osetiya and Dagestan; that the Group was connected with the Solntsevo criminal gang; or that Mr. Aven was dismissed from the Trade Ministry on suspicion of embezzlement.

Obviously, it follows from all these data listed in the Kroll letter that they did not investigate the specific information related in the contested article by O. Lourie "Alfa. Group Portrait" that was published in 1999 and contained absolutely different contested fragments. Nor did they investigate the article "Criminal Pulp Fiction Russian Style", published in May 2002 after the Kroll Company had already started its investigation. The second article did not contain any of the fragments listed in the Kroll letter either. Therefore, there is no cause and effect connection between the expenses incurred by the OAO Alfa Bank as a result of this investigation and the contested publications in the Versija newspaper.

In their letter the Kroll Company honestly warns the reader "*it is quite probable that even a simple investigation in the process of verification of compliance with laws and regulations may reveal most of these accusations...*"

We do not have any knowledge of the results of Kroll's work, as the report of the Kroll Company is not attached to the claim. The only available document is the Protocol dated September 30, 2002 with regard to the provision of consulting services.

It should be pointed out that the Kroll letter dated February 8 says, "the European Bank for Reconstruction and Development continues to refuse to cooperate with the Alfa Bank. **Though the EBRD does not mention any grounds for their decision we believe that it is connected with the preparation of the report on the verification of the Alfa Group's broader compliance with laws and regulations and the contents of this report may look similar to the above referenced information.**"
This fragment from the Kroll letter supports the position of the defendant ZAO MAPT-Media that argues that there is no cause and effect connection between the publication of the contested articles in the Versija newspaper and the EBRD refusal to cooperate with the Alfa Bank.

P0009110

20

Just one Kroll's letter dated October 7, 2002 contains the assessment of the contested articles, authored by O. Lourie. However, this letter is confidential and is addressed personally to Fridman rather than the OAO Alfa Bank. It is definite that the letter contains no reference of those consulting services that had been provided to the Alfa Bank before, as the Protocol on the Provision and Acceptance of Services was signed back on September 30, 2002. About that time the Kroll Company sent the Alfa Bank their invoice # 1408596 in the amount of 172 271.85 pounds for their consulting services. This is exactly the same amount that the plaintiff OAO Alfa Bank wants to the defendants to pay.

The file does not contain any evidence that M.M. Fridman has incurred any personal expenses in connection with the work related to O. Lourie's contested articles done by the Kroll Company.

In addition, the expenses incurred by the Alfa Bank in paying the Kroll Company for their services cannot be recognized as expenses for restoring the reputation of the OAO Alfa Bank, as the Law on the Mass Media envisages a specific way of restoring business reputation, which is publishing a retraction (Articles 43, 44 of the Law on the Mass Media and Sec. 2 Article 152 of the RF CC).

Nor can these expenses be qualified as court expenses, as pursuant to Article 152 of the RF CC the plaintiff is not obliged to prove that the information that was disseminated about him was not true to life. Instead, he is just obliged to prove the fact of the dissemination of this information about him (Article 152 of the RF CC, Sec. 7 of the Resolution of the Supreme Court Plenary Meeting # 11 dated 08.18.92).

Thus, to prepare his case and present it in the arbitration court the plaintiff OAO Alfa Bank did not have to carry out its own investigation and pay for the services of the Kroll Company. First, because these services were not connected to O. Lourie's contested articles, and second, because the plaintiff is not obliged to prove the fact that the information that was disseminated about him was not true to life.

In answering the question posed by Korshikova, the legal counsel for the defendants, Kulkov, the legal counsel representing the OAO Alfa Bank, said that the investigation was required to dispel his doubts about his director' private lives.

Therefore, the expenses incurred by the Alfa Bank in connection with payment for certain consulting services provided by the Kroll Company cannot be qualified as expenses connected with the court hearing or losses that were suffered in connection with the publication of the contested articles in the newspaper *Sovershenno Secretno-Versija*, therefore, the court should reject the OAO Alfa Bank demand related to the compensation of their losses.

3.8 The demand of all the plaintiffs related to the compensation of their attorneys' fees couldn't be satisfied either.

P0009111

21

The submitted documents in the form of payment orders cannot be regarded as proof of incurred expenses for the following reasons:

Article 5 Sec. 4 of Federal law # 395-1 On the banks and banking operations dated 02.03.96 reefers to banking operations **"settlements... on behalf of legal entities, including correspondent banks and their banking accounts"**.

The same Article 5 of Federal law # 395-1 says "The rules for implementing banking operations are set by the Bank of Russia in compliance with federal laws."

Operating under these powers, the RF Central Bank issued "Provisions # 2-P on non-cash settlements in the Russian Federation" dated April 12, 2000 (amended by Decision # GKPI 01-1369 of the RF Supreme Court dated 11.06.2001). Sec. 2.1 of the Provisions says the following "The banks carry out their account operations on the basis of settlement documents", while Sec. 2.2 clarifies that **"a payment document is an order made by the payer (bank client) with regard to writing off money from his account and depositing it on the payee's account."** Sec 3.1 of Chapter 3 of the Provisions entitled "Settlements through payment orders" contains the following definition: "A payment order is a documented order made by the account owner to his bank ordering the bank to transfer a certain amount of money to the recipient's account opened in this bank or another bank."

Thus, the "Provisions on non-cash settlements..." of the RF Central Bank has ruled that a payment order is just an order to transfer funds rather than proof of the fact of the money transfer.

Resolution # 5 of the Plenary Meeting of the Supreme Arbitration Court dated 04.19.99 clarifies that "the bank obligations under a payment order are regarded as fulfilled at the moment when the relevant amount of money is duly deposited in the recipient's account..." Decision # 5479/99 dated March 28, 2000 contains similar clarifications saying that "pursuant to Sec.1 Article 865 of the RF CC, it is regarded that the payer's bank has fulfilled its obligation in due diligence after it has transferred the amount of money to the recipient's bank to be deposited in the account of the person indicated in the payment order."

What document constitutes proof of writing off money from the payee's account? The Central Bank of Russia answered this question in its letter "Issues related to the implementation of Provisions # 2-P on non-cash settlements in the Russian Federation" dated April 12, 2000: writing off funds from the payer's banking account is proven by the account statement, whose hard/electronic copy is issued to the account owner."

Therefore, the payment that was made is proven by the statement issued by the bank that received a payment order rather than by a payment order.

**P0009112**

Somewhat later after the RF Central Bank issued these document, on October 18, 2001 the RF Supreme Arbitration Court in its letter # C5-7/up-1077 ordered that upon the acceptance of claims arbitration courts should also ask for bank statements reflecting all the transactions as proof of payment of state fees and tariffs.

The absence of bank statements issued by the bank that processed the payments will signify that there is no evidence of payment.

Therefore, the plaintiffs were not in compliance with the requirements contained in Article 65 of the RF APC, which obliges them to present evidence of those circumstances the plaintiffs refer to in support of their demands. In other words, the fact of expenses allegedly incurred by the plaintiffs in connection with the attorney's fees has not been proven.

In addition, the attorney's argument that the amount of 374 206 rubles 90 kopecks is a reasonable fee seems to be ungrounded. He presented the following arguments: the case complexity, the attorney's qualifications, actual hours, and the average fees of highly qualified civil law attorneys in the market. None of these arguments is supported by any evidence, including the argument related to the hours of work.

Thus, the plaintiffs have implemented only one obligation under Article 152 of the RF CC and that was with the help of the defendant who submitted the original issue of the newspaper Versija, that is they proved the fact of disseminating the contested information. However, they failed to comply with the requirements of Article 65 of the RF APC and never proved any losses caused by the contested publications, those losses that they requested the court to recover from the defendants. Nor did they prove the fact of any damage caused to their business reputation.

**Pursuant to Article 152 of the RF CC, all these circumstances can serve as grounds for the court to reject the full amount of the claim related to the second article "Criminal Pulp Fiction Russian Style".**

**In connection with the above referenced arguments and pursuant to Articles 43, 44, 47, 49, 51 of the Law on Mass Media, mindful of the clarifications contained in Resolution # 11 of the Plenary Meeting of the Supreme Court dated 08.18.92, sec. 2, 8 and 9; Information Letter # 46 of the Presidium of the RF Supreme Arbitration Court, dated 09.23.99; Resolution # 10 of the Plenary Meeting of the RF Supreme Court dated December 20,94; Article 151, 152 of the RF CC I request the court to reject the full amount of the claim filed by the OAO Alfa Bank, OOO Alfa Echo, P.O. Aven and M.M. Fridman against ZAO MAPT-media and the author.**

M.V. Korshikova                    [Signature]

Lawyer, member of the Moscow Bar Association
Legal Counsel under the Power of attorney

**P0009113**

23

Somewhat later after the RF Central Bank issued these document, on October 18, 2001 the RF Supreme Arbitration Court in its letter # C5-7/up-1077 ordered that upon the acceptance of claims arbitration courts should also ask for bank statements reflecting all the transactions as proof of payment of state fees and tariffs.

The absence of bank statements issued by the bank that processed the payments will signify that there is no evidence of payment.

Therefore, the plaintiffs were not in compliance with the requirements contained in Article 65 of the RF APC, which obliges them to present evidence of those circumstances the plaintiffs refer to in support of their demands. In other words, the fact of expenses allegedly incurred by the plaintiffs in connection with the attorney's fees has not been proven.

In addition, the attorney's argument that the amount of 374 206 rubles 90 kopecks is a reasonable fee seems to be ungrounded. He presented the following arguments: the case complexity, the attorney's qualifications, actual hours, and the average fees of highly qualified civil law attorneys in the market. None of these arguments is supported by any evidence, including the argument related to the hours of work.

Thus, the plaintiffs have implemented only one obligation under Article 152 of the RF CC and that was with the help of the defendant who submitted the original issue of the newspaper Versija, that is they proved the fact of disseminating the contested information. However, they failed to comply with the requirements of Article 65 of the RF APC and never proved any losses caused by the contested publications, those losses that they requested the court to recover from the defendants. Nor did they prove the fact of any damage caused to their business reputation.

**Pursuant to Article 152 of the RF CC, all these circumstances can serve as grounds for the court to reject the full amount of the claim related to the second article "Criminal Pulp Fiction Russian Style".**

**In connection with the above referenced arguments and pursuant to Articles 43, 44, 47, 49, 51 of the Law on Mass Media, mindful of the clarifications contained in Resolution # 11 of the Plenary Meeting of the Supreme Court dated 08.18.92, sec. 2, 8 and 9; Information Letter # 46 of the Presidium of the RF Supreme Arbitration Court, dated 09.23.99; Resolution # 10 of the Plenary Meeting of the RF Supreme Court dated December 20,94; Article 151, 152 of the RF CC I request the court to reject the full amount of the claim filed by the OAO Alfa Bank, OOO Alfa Echo, P.O. Aven and M.M. Fridman against ZAO MAPT-media and the author.**

M.V. Korshikova                                    [Signature]

Lawyer, member of the Moscow Bar Association
Legal Counsel under the Power of attorney

P0009113