# BOWMAN DECLARATION
# EXHIBIT 17



**АРБИТРАЖНЫЙ СУД г. МОСКВЫ**
Именем Российской Федерации

**ПОСТАНОВЛЕНИЕ**
арбитражного суда апелляционной инстанции

г. Москва
22 сентября 2003 г.                                     Дело № А40-49954/02-21-494–

Арбитражный суд г. Москвы в составе:
Председательствующего Кузьминской Н.Ю.
Судей     Веденовой В.А., Дзюбы Д.И.
при ведении протокола судебного заседания помощником судьи Кастальской М.Н.
при участии:
от истцов Любарская Г.В. по дов. от 25.10.2002г. ордер от 22.09.03г. №254, по дов. от
25.10.03г. ордер от 22.09.2003г. №254, и 19.11.2002г. №102-Б20/02, ордер от
22.09.2003г. №254, Кульков Е.А. по дов. от 25.10.2002г. №01/1768Д
от ответчиков Коршикова М.В. по дов. от 23.05.202г. №8/н, Мирзоев С.Б. ордер от
19.09.2003г. № 16
Рассмотрев в судебном заседании апелляционные жалобы ЗАО «МАПТ-МЕДИА»,
Лурье О.А.
на решение от 10.07.2003 по делу № А40-49954/02-21-494
Арбитражного суда г. Москвы,
принятое Высокинской О.А.
по иску Авена П.О., Фридмана М.М., ОАО «Альфа-Банк», ООО «Альфа-Эко»
к ЗАО «МАПТ-МЕДИА», Лурье О.А.
о защите деловой репутации

УСТАНОВИЛ: Авен П.О., Фридман М.М., ОАО «Альфа-Банк», ООО «Альфа-Эко»
обратились с иском к ЗАО «МАПТ-МЕДИА», Лурье О.А. о признании не
соответствующими действительности и порочащими их деловую репутацию, и
опровержении, путем опубликования в газете «ВЕРСИЯ» в течение 10 дней после
вынесения решения суда, распространенных в статье Лурье О.А. под заголовком
«Герой нашего времени!» «Альфа» групповой портрет» (имеющей подзаголовок
«Альфа» участвовала в организации транзита наркотиков из Юго-Восточной Азии
через Россию в Европу»), опубликованной в № 25 от 06.07.1999г. газеты «Версия»
(учредителем которой является ЗАО «МАПТ-МЕДИА»), следующих сведений:

«Альфа» участвовала в организации транзита наркотиков из Юго-восточной
Азии через Россию в Европу».

«Сегодня у нас не один, а целых три героя – Петр Авен, Михаил Фридман и Герман Хан. Три богатыря русского капитализма. Или трехглавая гидра отечественной мафии?».

«В период учебы в МГУ П.О. Авен был руководителем музыкального студенческого клуба и обзавелся многочисленными знакомствами в той молодежной среде (музыкальная «тусовка», богема и т.п.), где формировался потребительский рынок наркотиков. Благодаря этому привлек внимание криминальных элементов, имел контакты с «авторитетами».

«В феврале 1992 года Петр Авен был назначен министром внешнеэкономических связей РФ... В результате Авен заработал хорошие комиссионные на продаже долга Ганы...»

«...Петр Авен, возглавляя министерство, не стеснялся брать комиссионные и даже дорогие подарки за содействие иностранным компаниям и российским предприятиям в заключении и осуществлении внешнеторговых сделок. Его возможности в этом отношении определялись тем, что он держал в своих руках все вопросы, касающиеся выдачи необходимых лицензий. Особенно жестко он контролировал выход на рынок оружия, допуская туда только тех, кто был связан с ним».

«В 1991-1992 годах Петра Авена разрабатывало 6-е управление КГБ МБ РФ по материалам хищения в крупных размерах, нанесения стране крупного ущерба и по преступным связям со спецслужбами Израиля. В 1992 году бывший министр безопасности доложил материалы президента Б. Ельцину, в результате чего 22 декабря 1992 года Петр Авен был уволен с поста министра».

«...в круг его знакомых входили О. Квантришвили и И.Кобзон, криминальные авторитеты С.Тимофеев (Сильвестр) и А.Петров (Петрик), международные авантюристы Марк Рич и Григорий Лучанский. Согласно ... оперативным данным, П.О. Авен участвовал в организации транзита наркотиков из Юго-восточной Азии через Россию в Европу».

«В конце 1993 года в Вене состоялась встреча П.О. Авена с представителем колумбийских наркобаронов Гильберто Родригесом Орехуэлом, известным под кличкой Шахматист. В частности, была достигнута договоренность о «закачке» в «Альфа-Банк» денежных средств из оффшорных зон (Багамы, Гибралтар) для их вложения в экономику России путем скупки акций российских предприятий».

«В 1985 году на М.Фридмана, молодого корыстного дельца, умело использовавшего свои многочисленные знакомства, вышла «Бауманская бригада» - наиболее агрессивная преступная группировка Москвы 80-х годов. Бауманская группировка была в тот период единственной из столичных ОПГ, серьезно работавшей с наркотиками и постоянно расширявшей масштабы своих операций. Рынок сбыта наркотиков формировался в среде студенческой и творческой молодежи, рок-фанов хиппи, панков, проституток и т.п. В этих кругах у Фридмана были обширные связи, которые представляли несомненный интерес с точки зрения «бауманской бригады» и были задействованы с обоюдной выгодой».

2

P0009120

«…Михаил Фридман участвовал в организации транзита наркотиков из Юго-Восточной Азии через Россию в Европу. Среди его связей были замечены И.Кобзон и О. Квантришвили, криминальные авторитеты С.Тимофеев (Сильвестр) и А.Петров (Петрик), международные авантюристы Марк Рич и Григорий Лучинский».

«Фридман занимался ваучерными махинациями…В результате только этих махинаций с ваучерами глава «Альфа-Групп» увеличил свое личное состояние».

…Тайные операции, связанные с наркотиками, выполняет компания «Альфа-Эко» в рамках консорциума «Альфа-Групп», первыми лицами в которых являются П. Авен и М.Фридман.

…Причиной отравления (группового отравления жителей г.Хабаровска сахаром) стало попадание в сахар большой дозы наркотических веществ. Было установлено, что контейнеры, в которых перевозился сахар, перед этим арендовала «Альфа-Эко» и они использовались для транспортировки груза в адрес фирмы «Harmaty and C» (о которой ответчик Лурье О.А. написал, что она участвует в международном наркобизнесе и отмывании наркодолларов);

кроме того, истцы просили признать несоответствующими действительности и порочащими деловую репутацию Фридмана М.М., и деловую репутацию ОАО «Альфа-Банк» и ООО «Альфа-Эко», распространенные Лурье О.А. в статье под заголовком «Криминальное чтиво по-русски», опубликованной в № 19 газеты «ВЕРСИЯ» от 20.05.2002 г., (учредителем которой является ЗАО «МАПТ-МЕДИА»), сведения: о связях Фридмана М.М. с криминалом; о существовании структуры «Альфа-Групп», представляющей угрозу национальной безопасности ряда стран; о связи Альфы с преступными авторитетами;

Также истцами заявлено требование об обеспечении защиты их гражданских прав на деловую репутацию путем признания действий ответчиков злоупотреблением правами журналиста и правами СМИ, а также о пресечении действий, создающих угрозу нарушения прав истцов в дальнейшем, путем запрещения ЗАО «МАПТ-МЕДИА» и Лурье О.А. распространять вышеперечисленные сведения;

Кроме того, истцы просили взыскать в возмещение морального вреда с ЗАО «МАПТ-МЕДИА» в пользу Авена П.О. 100.000 долл. США, в пользу Фридмана М.М. 100.000 долл. США, с журналиста Лурье О.А. в пользу Авена П.О. 25.000 долл. США (эквивалент в рублях), в пользу Фридмана М.М. 25.000 долл. США (эквивалент в рублях), а также взыскать солидарно с ответчиков в пользу ОАО «Альфа-Банк» 172.271,85 фунтов стерлингов (эквивалент в рублях) в возмещение убытков, причиненных распространением несоответствующих действительности и порочащих деловую репутацию истцов сведений (л.д. 3 – 23 т.1).

До принятия судом решения, ОАО «Альфа-Банк» уточнило размер требований в части взыскания солидарно с ответчиков судебных издержек, понесенных ОАО «Альфа-Банк» при оплате работы Компании «Кролл» с учетом НДС в размере 1.757.820,61 рублей (л.д. 51-55 т.2).

3

P0009121

До принятия судом первой инстанции решения, истцами - Авеном П.О., Фридманом М.М., ОАО «Альфа-Банк», ООО «Альфа-Эко» изменен предмет иска и размер исковых требований в части понесенных истцом расходов на оплату независимого расследования Компанией «Кролл», исходя из того, что к данному требованию о возмещении расходов, понесенных для осуществления как самозащиты, так и защиты в судебном порядке законных прав и интересов относится 1 757 820,61руб., составляющих сумму НДС , оплаченную за Компанию «Кролл», по платежному поручению от 23.01.2003г. № 00005(л.д. 1-9 т.3, л.д. 55-59 т.4). Кроме того, истцами было заявлено требование о возмещении судебных расходов, связанных с оплатой услуг представителя- адвоката, в сумме 374 206,90руб.

Решением от 10.07.2003 иск удовлетворен в части признания несоответствующими действительности и порочащими деловую репутацию Авена П.О. распространенные в статье Лурье О.А. в номере 25 от 06.07.1999 г. под заголовком «Герой нашего времени!» «Альфа» - Групповой портрет» (имеющим подзаголовок «Альфа» участвовала в организации транзита наркотиков из Юго-Восточной Азии через Россию в Европу») следующих сведений:

- «В период учебы в МГУ Авен был руководителем музыкального студенческого клуба и обзавелся многочисленными знакомствами в той молодежной среде (музыкальная «тусовка», богема и т.п.), где формировался потребительский рынок наркотиков. Благодаря этому привлек внимание криминальных элементов, имел контакты с «авторитетами».

- «В результате (того, что Авен занимался решением проблемы долгов) Авен заработал хорошие комиссионные на продаже долга Ганы».

- «По свидетельству работников Министерства внешнеэкономических связей, Петр Авен, возглавляя министерство, не стеснялся брать комиссионные и даже дорогие подарки за содействие иностранным компаниям и российским предприятиям в заключении и осуществлении внешнеторговых сделок».

- «Особенно жестко он (Авен) контролировал выход на рынок оружия, допуская туда только тех, кто был связан с ним».

- «В 1991-1992 годах Петра Авена разрабатывало 6-е управление КГБ МБ РФ по материалам хищения в крупных размерах, нанесения стране крупного ущерба и по преступным связям со спецслужбами Израиля. В 1992 году бывший министр безопасности доложил материалы президента Б. Ельцину, в результате чего 22 декабря 1992 года Петр Авен был уволен с поста министра».

- «Согласно этим же оперативным данным, П. Авен участвовал в организации транзита наркотиков из Юго-восточной Азии через Россию в Европу».

- «В конце 1993 года в Вене состоялась встреча П. Авена с представителем колумбийских наркобаронов Гильберто Родригесом Орехуэлом, известным под кличкой Шахматист. В частности, была достигнута договоренность о «закачке» в «Альфа-Банк» денежных средств из оффшорных зон (Багамы, Гибралтар) для их вложения в экономику России путем скупки акций российских предприятий».

4

Кроме того, иск удовлетворен в части признания несоответствующими действительности и порочащими деловую репутацию Фридмана М.М. распространенные в статье Лурье О.А. в номере 25 от 06.07.1999 г. под заголовком «Герой нашего времени» «Альфа» Групповой портрет» (имеющим подзаголовок «Альфа» участвовала в организации транзита наркотиков из Юго-Восточной Азии через Россию в Европу») следующих сведений:

- «Рынок сбыта наркотиков формировался в среде студенческой и творческой молодежи, рок-фанов хиппи, панков, проституток и т.п.  В кругах у Фридмана были обширные связи, которые представляли несомненный интерес с точки зрения «бауманской бригады» и были задействованы с обоюдной выгодой».

- «Михаил Фридман участвовал в организации транзита наркотиков из Юго-Восточной Азии через Россию в Европу».

- «Фридман занимался ваучерными махинациями. В результате только этих махинаций с ваучерами глава «Альфа-Групп» увеличил свое личное состояние примерно на 30-40 млн. долларов».

Иск удовлетворен также в части признания несоответствующими действительности и порочащими деловую репутацию ОАО «Альфа-Банк» распространенные в статье Лурье О.А. в номере 25 от 06.07.1999 г. под заголовком «Герой нашего времени» «Альфа» Групповой портрет» (имеющим подзаголовок «Альфа» участвовала в организации транзита наркотиков из Юго-Восточной Азии через Россию в Европу») следующих сведений:

- «В конце 1993 года в Вене состоялась встреча П. Авена с представителем колумбийских наркобаронов Гильберто Родригесом Орехуэлом, известным под кличкой Шахматист. В частности, была достигнута договоренность о «закачке» в «Альфа-Банк» денежных средств из оффшорных зон (Багамы, Гибралтар) для их вложения в экономику России путем скупки акций российских предприятий».

Суд первой инстанции также признал несоответствующими действительности и порочащими деловую репутацию ООО «Альфа-Эко» распространенные в статье Лурье О.А. в номере 25 от 06.07.1999 г. под заголовком  «Герой нашего времени!» «Альфа» Групповой портрет» (имеющим подзаголовок «Альфа» участвовала в организации транзита наркотиков из Юго-Восточной Азии через Россию в Европу») следующие сведения: « Из оперативных разработок следует, что тайные операции, связанные с наркотиками, в рамках консорциума выполняет компания «Альфа-Эко».

А также признал несоответствующими действительности и порочащими деловую репутацию Фридмана М.М., и деловую репутацию ОАО «Альфа-Банк» и ООО «Альфа-Эко», распространенные Лурье О.А. в статье под заголовком «Криминальное чтиво по-русски», опубликованной в № 19 газеты «ВЕРСИЯ» от 20.05.2002 г., (учредителем которой является ЗАО «МАПТ-МЕДИА»), сведения: о связях Фридмана М.М. с криминалом; о существовании структуры «Альфа-Групп», представляющей угрозу национальной безопасности ряда стран; о связи Альфы с преступными авторитетами.

5

Кроме того, суд первой инстанции обязал ЗАО «МАПТ-МЕДИА» как учредителя газеты «ВЕРСИЯ» опубликовать опровержение несоответствующих действительности и порочащих Авена П.О., Фридмана М.М., ОАО «Альфа-Банк» и ООО «Альфа-Эко» сведений, указанных в п. 1-5 решения. А также взыскал с ЗАО «МАПТ-МЕДИА» в пользу Авена П.О. 3 000 000руб.в возмещение морального вреда, с ЗАО «МАПТ-МЕДИА» в пользу Фридмана М.М. 3 000 000руб. в возмещение морального вреда, с Лурье О.А. в пользу Авена П.О. 750 000 руб. в возмещение морального вреда, с Лурье О.А. в пользу Фридмана М.М. 750 000руб. в возмещение морального вреда, с ЗАО «МАПТ-МЕДИА» и Лурье О.А. солидарно в пользу ОАО «Альфа-Банк» 172.271,85фунт стерлингов в рублевом эквиваленте по курсу ЦБ РФ на день возмещение судебных расходов, с ЗАО «МАПТ-МЕДИА» и Лурье О.А. солидарно в пользу ОАО «Альфа-Банк» 60 000 руб. в возмещение расходов по оплате услуг адвоката, с ЗАО «МАПТ-МЕДИА» и Лурье О.А. в пользу ОАО «Альфа-Банк» судебные расходы – госпошлину в размере 100 000 руб., с ЗАО «МАПТ-МЕДИА» и Лурье О.А. в пользу ОАО «Альфа- Банку» расходы, связанные с проведением экспертизы, в размере 8 400 руб.

В остальной части иска отказано (л.д. 71-79 т.4).

ЗАО «МАПТ-МЕДИА» подана апелляционная жалоба, в которой ответчик просит отменить принятое решение в полном объеме и принять новое решение, об отказе в иске полностью, полагая, что судом первой инстанции неверно установлены юридически значимые обстоятельства по делу, что привело к неполном выяснению фактов, имеющих юридическое значение по делу, судом неверно истолкованы нормы материального права, что привело к принятию необоснованного решения, кроме того, суд первой инстанции неправомерно отнес расходы на оплату услуг детективной фирмы «Кролл» к судебным издержкам, а также не полностью учел результаты проведенной по делу филологической экспертизы (л.д. 113-120 т.4).

Лурье О.А. подана апелляционная жалоба, в которой просит отменить принятое решение полностью и прекратить производство по делу, полагая, что судом первой инстанции неполно выяснены фактические обстоятельства дела, выводы суда также не соответствуют фактическим обстоятельствам дела, вопросы, поставленные перед экспертами, привлеченными для филологической экспертизы, судом поставлены неточные и неполные, что привело к неточной оценке распространенных сведений, а также суд неправильно применил закон к сложившимся правоотношениям (л.д. 147-150 т.4).

В судебном заседании представитель ответчика ЗАО «МАПТ-МЕДИА» поддержал доводы, изложенные в апелляционной жалобе.

Представитель Лурье О.А. поддержал доводы, изложенные в апелляционной жалобе.

Представитель истцов Авена П.О., Фридмана М.М., ОАО «Альфа-Эко» отзыва не представил, устно пояснив, что возражает против доводов апелляционных жалоб ответчиков, по основаниям, изложенным в письменных объяснениях.

6

Дело рассмотрено судом апелляционной инстанции в порядке ст.ст. 266, 268 АПК РФ. Суд апелляционной инстанции, обсудив доводы апелляционной жалобы, не находит оснований для ее удовлетворения.

Суд апелляционной инстанции, исследовав и оценив в совокупности имеющиеся в деле доказательства и объяснения сторон, находит, что суд первой инстанции на основании установленных данных пришел к правильным выводам и удовлетворил исковые требования в части признания несоответствующими действительности и порочащими деловую репутацию истцов распространенные в статье Лурье О.А. в номере 25 от 06.07.1999 г. под заголовком «Герой нашего времени!» «Альфа» - Групповой портрет» (имеющим подзаголовок «Альфа» участвовала в организации транзита наркотиков из Юго-Восточной Азии через Россию в Европу») следующих сведений:

- «В период учебы в МГУ Авен был руководителем музыкального студенческого клуба и обзавелся многочисленными знакомствами в той молодежной среде (музыкальная «тусовка», богема и т.п.), где формировался потребительский рынок наркотиков. Благодаря этому привлек внимание криминальных элементов, имел контакты с «авторитетами».

- «В результате (того, что Авен занимался решением проблемы долгов) Авен заработал хорошие комиссионные на продаже долга Ганы».

- «По свидетельству работников Министерства внешнеэкономических связей, Петр Авен, возглавляя министерство, не стеснялся брать комиссионные и даже дорогие подарки за содействие иностранным компаниям и российским предприятиям в заключении и осуществлении внешнеторговых сделок».

- «Особенно жестко он (Авен) контролировал выход на рынок оружия, допуская туда только тех, кто был связан с ним».

- «В 1991-1992 годах Петра Авена разрабатывало 6-е управление КГБ МБ РФ по материалам хищения в крупных размерах, нанесения стране крупного ущерба и по преступным связям со спецслужбами Израиля. В 1992 году бывший министр безопасности доложил материалы президенту Б. Ельцину, в результате чего 22 декабря 1992 года Петр Авен был уволен с поста министра».

- «Согласно этим же оперативным данным, П. Авен участвовал в организации транзита наркотиков из Юго-Восточной Азии через Россию в Европу».

- «В конце 1993 года в Вене состоялась встреча П. Авена с представителем колумбийских наркобаронов Гильберто Родригесом Орехуэлом, известным под кличкой Шахматист. В частности, была достигнута договоренность о «закачке» в «Альфа-Банк» денежных средств из оффшорных зон (Багамы, Гибралтар) для их вложения в экономику России путем скупки акций российских предприятий».

- « Рынок сбыта наркотиков формировался в среде студенческой и творческой молодежи, рок-фанов хиппи, панков, проституток и т.п. В кругах у Фридмана были

7

обширные связи, которые представляли несомненный интерес с точки зрения «бауманской бригады» и были задействованы с обоюдной выгодой».

- « Михаил Фридман участвовал в организации транзита наркотиков из Юго-Восточной Азии через России в Европу».

- «Фридман занимался ваучерными махинациями. В результате только этих махинаций с ваучерами глава «Альфа-Групп» увеличил свое личное состояние примерно на 30-40 млн. долларов».

- «В конце 1993 года в Вене состоялась встреча П. Авена с представителем колумбийских наркобаронов Гильберто Родригесом Орехуэлом, известным под кличкой Шахматист. В частности, была достигнута договоренность о «закачке» в «Альфа-Банк» денежных средств из оффшорных зон (Багамы, Гибралтар) для их вложения в экономику России путем скупки акций российских предприятий.»;

в части признания несоответствующими действительности и порочащими деловую репутацию Фридмана М.М., и деловую репутацию ОАО «Альфа-Банк» и ООО «Альфа-Эко», распространенные Лурье О.А. в статье под заголовком «Криминальное чтиво по-русски», опубликованной в № 19 газеты «ВЕРСИЯ» от 20.05.2002 г., (учредителем которой является ЗАО «МАПТ-МЕДИА»), сведения: о связях Фридмана М.М. с криминалом; о существовании структуры «Альфа-Групп», представляющей угрозу национальной безопасности ряда стран; о связи Альфы с преступными авторитетами. А также в части обязания ЗАО «МАПТ-МЕДИА» как учредителя газеты «ВЕРСИЯ» опубликовать опровержение несоответствующих действительности и порочащих Авена П.О., Фридмана М.М., ОАО «Альфа-Банк» и ООО «Альфа-Эко» вышеуказанных сведений и взыскания с ЗАО «МАПТ-МЕДИА» в пользу Авена П.О. 3 000 000 руб. в возмещение морального вреда, с ЗАО «МАПТ-МЕДИА» в пользу Фридмана М.М. 3 000 000руб. в возмещение морального вреда, с Лурье О.А. в пользу Авена П.О. 750 000 руб. в возмещение морального вреда, с Лурье О.А. в пользу Фридмана М.М. 750 000руб. в возмещение морального вреда, с ЗАО «МАПТ-МЕДИА» и Лурье О.А. солидарно в пользу ОАО «Альфа-Банк» 172.271,85фунт стерлингов в рублевом эквиваленте по курсу ЦБ РФ на день возмещение судебных расходов, с ЗАО «МАПТ-МЕДИА» и Лурье О.А. солидарно в пользу ОАО «Альфа-Банк» 60 000 руб. в возмещение расходов по оплате услуг адвоката, с ЗАО «МАПТ-МЕДИА» и Лурье О.А. в пользу ОАО «Альфа-Банк» судебные расходы – госпошлину в размере 100 000 руб., с ЗАО «МАПТ-МЕДИА» и Лурье О.А. в пользу ОАО «Альфа- Банк» расходы, связанные с проведением экспертизы, в размере 8 400 руб. Данные выводы суда первой инстанции основаны на анализе содержательно-смысловой направленности спорных текстов, мотивированы, соответствуют обстоятельствам и материалам дела и основаны на законе.

Довод ответчиков о том, что судом первой инстанции не полностью учтены результаты проведенной по делу филологической экспертизы, а само экспертное заключение содержит противоречие в ответах на вопросы, поставленные судом, не может быть признан судом апелляционной инстанции обоснованным, поскольку, как видно из материалов дела, определением Арбитражного суда г. Москвы от 02.04.2003г. (л.д. 31-32 т.3) по ходатайству истцов была назначена филологическая экспертиза по делу. Экспертиза была поручена Российскому общественному

8

P0009126

объединению «Гильдия лингвистов- экспертов по документационным и информационным спорам (ГЛЭДИС)». Судом перед экспертами были поставлены следующие вопросы:

1. Содержится ли негативная информация (сведения) об П.О. Авене, М.М. Фридмане, об ОАО «Альфа- Банк», ООО «Альфа- Эко» в статьях О.А. Лурье под заголовком «Альфа» Групповой портрет», опубликованной в № 25 от 06.07.99г. газеты «Версия», а также в статье под заголовком «Криминальное чтиво по-русски», опубликованной в № 19 газеты «Версия» от 20.05.2002г. ?

2. Какова композиционная структура текста статей (статьи); какие художественные приемы использует автор и как они влияют на читательское восприятие героев публикации?

3. Если такая информация (сведения) содержатся, то в какой форме: в форме утверждения, в форме предположения или в какой либо иной?

4. Если такая информация (сведения) содержится, то каков (каковы) источник (источники) этой информации (сведений)?

5. Что такое цитирование? Каковы признаки цитирования и цитат в тексте?

6. Есть ли в названных вопросе № 1 текстах цитирование и цитаты?

На основании проведенных исследований эксперты представили заключение (л.д. 50-75 т.3), содержащее следующие ответы на поставленные вопросы:

1. В статье Олега Лурье «Альфа» Групповой портрет», опубликованной в газете «Версия» № 25 (49) от 6-12 июля 1999г., и в статье Олега Лурье «Криминальное чтиво по-русски», опубликованной в газете «Версия» № 19 (192) от 20-26 мая 2002г., содержится негативная информация (сведения) об П.О. Авене, о. М.М. Фридмане, об ОАО «Альфа- Банк, ООО «Альфа- Эко». Эта негативная информация содержится в высказываниях, перечисленных в исследовательской части заключения в ответе на вопросы 1,3.

2. «Альфа» Групповой портрет» - информационно-критическая статья расследовательского характера (но не журналистское расследование как таковое), а «Криминальное чтиво по-русски» относится к жанру проблемного интервью. Композиция статьи «Альфа» Групповой портрет», во водной части которой автор задает два вопроса о роли героев публикации, позволяет говорить, что вся статья-аргументы к положительному ответу на вопрос, являются ли герои публикации (Авен, Фридман, Хан) трехглавой гидрой отечественной мафии. Иного ответа исходя из материалов статьи читатель сделать не может, так как в статье представлена негативная информация о героях публикации и о компаниях, которые они возглавляют. Статья «Криминальное чтиво по-русски» композиционно представлена небольшим введением, текстом интервью (двусоставный текст: вопросы- ответы), заключением (представлен одним абзацем). Эксперты не могут ответить на вопрос, как композиция статей влияет на читательское восприятие : для ответа на данный вопрос должно быть проведено специальное социологическое исследование. Более

9

подробно жанровая специфика и композиционная структура статей представлены в исследовательской части заключения.

3. Негативная информация (сведения) об П.О. Авене, о М.М. Фридмане, об ОАО «Альфа- Банк», ООО «Альфа-Эко» (см. Ответ на вопрос 1) дана в форме утверждения.

4. В качестве источников негативной информации о названных в вопросе № 1 лицах (юридических и физических) в исследуемых публикациях автором статей Олегом Лурье называются материал Комитета Госдумы РФ по безопасности и анонимный представитель западных спецслужб. Некоторые высказывания принадлежат самому автору публикаций Олегу Лурье.

5. Цитирование- это приведение цитаты, цитат в тексте. Цитата- точная, дословная выдержка из какого-либо текста, высказывания. Цитата опознается в тексте по формальным показателям – пунктуационному оформлению. Для того, чтобы признать какой-либо фрагмент текста цитатой по сути (содержательно), необходимо: 1) иметь первичный (цитируемый) текст; 2) иметь вторичный текст-текст, где приведена (приведены) цитата (цитаты).

6. В статье Олега Лурье «Альфа» Групповой портрет» есть фрагменты текста, пунктуационно оформленные как цитаты. Некоторые из этих фрагментов являются цитатами и формально, и содержательно. Однако анализ текста показал, что автор не во всех фрагментах соблюдает правила работы с чужим материалом и правила оформления цитат. Ряд фрагментов являются искаженными цитатами: они не полностью совпадают с первичным текстом. Информация в них не может быть сочтена аутентичной. В статье Олега Лурье «Криминальное чтиво по-русски» не содержится цитат, нет цитирования. Этот текст сам является первичным.

Указанное экспертное заключение было оглашено в судебном заседании и исследовано судом первой инстанции путем вызова в судебное заседание экспертов, дачи ими необходимых пояснений и ответов на вопросы участвующих в деле лиц и суда, при этом, явившиеся в судебное заседание эксперты – кандидат филологических наук, доцент факультета журналистики МГУ Кара-Мурза Е.С. и кандидат филологических наук, доцент Института русского языка РАН Сафонова Ю.А. подтвердили выводы экспертного заключения в ходе судебного заседания.

Суд первой инстанции дал надлежащую оценку названному экспертному заключению в совокупности с иными материалами дела и обоснованно признал его доказательством того, что в спорных публикациях имеют место негативные сведения, изложенные в форме утверждения, оценка, данная судом первой инстанции соответствует материалам дела. При таких обстоятельствах, суд первой инстанции пришел к обоснованному выводу о том, что в оспариваемых публикациях содержится порочащая истцов информация, которая порочит их деловую репутацию, в связи с явно отрицательными характеристиками Авена П.О. и Фридмана М.М., утверждениями о совершении ими тяжких преступлений, о связях и контактах с криминальными элементами, о злоупотреблении Авеном П.О. своим служебным положением в период работы в качестве Министра внешнеэкономических связей; о преступных связях Авена П.О. со спецслужбами Израиля, об участии П.О. Авена и

10

P0009128

М.М. Фридмана в организации транзита наркотиков из Юго-Восточной Азии через Россию в Европу; о том, что тайные операции, связанные с наркотиками, в рамках консорциума выполняет компания «Альфа-Эко»; о том, что М.М. Фридман занимался ваучерными махинациями; о том, что «Альфа-Групп» состоит из многочисленных компаний, которые отмывают незаконно заработанные деньги и приобретают новые компании на деньги, полученные в результате мошенничества; о том, что деятельность таких структур как «Альфа-Групп» представляет угрозу национальной безопасности ряда стран; о том, что «Альфа-Групп» связана с криминалом. Данный вывод суда первой инстанции мотивирован, соответствует материалам дела и основан на законе.

Довод ответчиков о том, что отсутствие в статье «Криминальное чтиво по-русски» конкретных наименований юридических лиц свидетельствует о том, что данная публикация не относится к ОАО «Альфа-Банк», ООО «Альфа-Эко», и поэтому данным истцам в этой части иска должно быть отказано, не соответствует фактическим обстоятельствам дела, поскольку журналист Лурье О.А. в статье «Герой нашего времени!» «Альфа» - Групповой портрет», как это прямо следует из названия статьи и ее содержания, понимает под «Альфой» ОАО «Альфа-Банк» и ООО «Альфа-Эко» и связывает с ними имя Авена П.О. (Президента ОАО «Альфа-Банк») и Фридмана М.М. (Председателя Совет Директоров ОАО «Альфа-Банк») и даже называет П.О Авена Президентом консорциума «Альфа-Групп», а Фридмана – Председателем Совета Директоров (что не соответствует действительности). Поэтому содержащиеся в статье «Криминальное чтиво по-русски» сведения суд первой инстанции правомерно и обоснованно признал порочащими деловую репутацию как ОАО «Альфа-Банк» и ООО «Альфа-Эко», так и Фридмана М.М., являющихся первыми лицами компании, в наименовании которой имеется слово «Альфа».

Довод ответчиков о том, что статья Лурье О.А. в № 25 газеты «Версия» от 06.07.1999 г. под заголовком «Герой нашего времени!» «Альфа» - «Групповой портрет», имеющая подзаголовок «Альфа» участвовала в организации транзита наркотиков из Юго-Восточной Азии через Россию в Европу», представляет собой цитирование запроса Председателя Комитета по безопасности Госдумы РФ В.И. Илюхина руководству МВД о проверке деятельности истцов и что указанное обстоятельство, по мнению ответчиков, освобождает журналиста и учредителя СМИ от ответственности за распространенные процитированные сведения, а, следовательно, и от обязанности доказывать их достоверность, судом первой инстанции правильно признаны несостоятельными и необоснованными, поскольку как видно из материалов дела, ответчиками в подтверждение данного довода были представлены ксерокопии писем от 26.11.97 г. № 3.15.-2216 с приложением на 9-ти листах (л.д.126-138 т. 3) , по утверждению ответчиков, полностью аутентичных оригиналам и переданным им лично В.И. Илюхиным. Судом первой инстанции по ходатайству ответчиков был направлен соответствующий запрос (л.д. 108-109 т.2), в ответ на который в дело представлена копия письма от 26.11.97 г. за № 3.15.-2216 о направлении поступивших в Комитет по безопасности материалов «в отношении ряда коммерческих структур и некоторых ответственных должностных лиц» с просьбой поручить проверить изложенные в них обстоятельства (л.д. 151-152 т.2).

В связи с вышеизложенным, вывод суда первой инстанции о том, что дословное цитирование журналистом отдельных фрагментов анонимных материалов,

11

приложенных к письму Комитета ГД, само по себе не освобождает ответчиков от ответственности за распространение порочащих истцов и не соответствующих действительности сведений и дословно цитируя фрагменты анонимного письма и обозначая их кавычками, журналист заботится о соблюдении авторских прав анонима (ч.1 ст.42 Закона РФ «О СМИ»), чем заведомо нарушает права истцов на доброе имя и защиту деловой репутации, обнаружив не проверенные порочащие их факты, судом апелляционной инстанции признан законным и обоснованным, поскольку, анонимные материалы, источник получения которых не может быть назван и установлен и которые содержат компрометирующие других лиц непроверенные сведения, не могут и не должны цитироваться журналистом с учетом прав и обязанностей журналиста, изложенных в ст.ст.47 и 49 Закона РФ «О СМИ» и недопустимости в силу ст.51 Закона РФ «О СМИ» злоупотребления правами журналиста для распространения информации с целью опорочить гражданина или отдельные категории граждан. Свобода мнения и убеждения не дает права на распространение порочащих и не соответствующих действительности сведений.

В силу ст. 152 ГК РФ, обязанность доказывания соответствия действительности распространенных сведений лежит на ответчиках, которыми факт соответствия действительности распространенных спорных сведений не доказан какими-либо достоверными доказательствами.

Более того, как следует из материалов дела, сведения, порочащие истцов и не соответствующие действительности ответчики распространили вновь, спустя два года после первой спорной публикации, - в № 19 газеты «Версия» от 20.05.2002 г., содержащей интервью с анонимом – западным офицером спецслужб под названием «Криминальное чтиво – по-русски». При этом, ответчики отказались от раскрытия имени анонимного интервьюера во второй публикации в № 19 газеты «Версия» под заголовком «Криминальное чтиво–по-русски».

Таким образом, учитывая отказ ответчиков назвать лицо, предоставившее информацию для статьи, что противоречит ч.2 ст.41 Закона РФ «О СМИ», источником информации, распространенной в статье «Криминальное чтиво–по-русски», является сам журналист, в соответствии с чем, именно журналист и учредитель СМИ несут ответственность за распространение не соответствующих действительности порочащих истцов сведений. Отказ ответчиков назвать лицо, предоставившее информацию для статьи, противоречит ч.2 ст.41 Закона РФ «О СМИ».

Довод ответчиков о том, что в факт получения интервью от реально существующего, но не называемого лица, Лурье О.А. подтверждает аудиозаписью его беседы с анонимным интервьюером и переводом интервью стенограммы на русский язык (л.д. 158 – 175 т. 2), не может быть принят судом апелляционной инстанции во внимание, поскольку при сохранении журналистом в тайне лица, у которого взято интервью, нельзя идентифицировать запись на аудио носителе применительно к интервьюеру. Кроме того, такие доказательства не отвечают требованиям п.п. 6,8 ст. 75 АПК РФ.

При таких обстоятельствах, суд первой инстанции правомерно и обоснованно удовлетворил требования истцов о защите деловой репутации, о признании

P0009130

несоответствующими действительности и порочащими деловую репутацию Авена П.О. Фридмана М.М. ОАО «Альфа-Банк», ООО «Альфа-Эко» сведений содержащихся в статьях газеты «Версия», опубликованных в номере 25 от 06.07.1999 г., под заголовком: «Герой нашего времени!» «Альфа «Групповой портрет», имеющим подзаголовок «Альфа» участвовала в организации транзита наркотиков из Юго-Восточной Азии через Россию в Европу», и в номере 19 от 20.05.2002 г., под названием «Криминальное чтиво по-русски». А поскольку ЗАО «МАПТ-МЕДИА», является учредителем газеты «Версия», суд первой инстанции правомерно обязал его опубликовать опровержение несоответствующих действительности и порочащих Авена П.О. Фридмана М.М. ОАО «Альфа-Банк», ООО «Альфа-Эко» сведений, указанных выше.

Согласно ст. 152 ГК РФ, истцы вправе требовать опровержения спорных сведений и возмещения в связи с посягательством на деловую репутацию имущественного ущерба (Постановление Верховного суда РФ от 20.12.94г. №10).

Суд первой инстанции правомерно удовлетворил требования о возмещении убытков в виде судебных издержек и морального вреда, причиненного распространением ответчиками не соответствующих действительности и порочащих деловую репутацию истцов сведений в размере 172 271,85 фунтов стерлингов в рублевом эквиваленте ЦБ РФ на день платежа и 7 500 000 руб. соответственно, поскольку материалами дела подтверждены действительные затраты значительных средств на защиту деловой репутации путем поручения компании «Кролл» проведения определенных действий и осуществление конкретной деятельности на предмет установления соответствия действительности изложенных в двух спорных публикациях Лурье О.А. фактов, порочащих истцов, исходя из возможности совершения названным лицом таких действий и деятельности.

Расходы на оплату услуг «Кролл», составляющие 172.271,85 фунтов стерлингов (в рублевом эквиваленте) подтверждены счетом-фактурой от 30.09.02 г № 1408596 (л.д.64, 78 т.2), а также сообщением SWIFT о совершении платежа от 15.01.03г. №IS00572066 от 15.01.03г. (л.д. 57 т.2) и платежным поручением от 23.01.03г. № 00005 (л.д. 56 т.2).

В заключении компании «Кролл», которая провела собственное исследование обстоятельств, содержатся сведения о несостоятельности обвинений истцов, содержащихся в статьях Лурье О.А. от 06.07.1999г. и от 20.05.2002г. В связи с этими выводами «Кролл» приняла на себя обязательство направлять соответствующие письма всем заинтересованным лицам, как работающим, так и намеренных работать с истцами.

В силу со ст. 152 ГК РФ обязанность ответчика доказывать соответствие распространенных сведений действительности не лишает истца права представлять суду иные доказательства в обоснование требований, в том числе полученные за плату, поскольку такие доказательства и способ их получения не противоречат закону (ст. 64 АПК РФ).

Доводы ответчиков о том, что из представленных истцами документов не усматривается причинно-следственная связь между спорными публикациями и

13

понесенными расходами на оплату услуг копании «Кролл», суд апелляционной инстанции считает несостоятельными, поскольку факт оказания услуг компанией «Кролл» истцу ОАО «Альфа-Банку» доказан, а также подтверждено, что предметом этих услуг являлось расследование, с целью установления согласно обычаям делового оборота достоверности или недостоверности спорных сведений, распространенных ответчиками, о чем свидетельствуют письма компании «Кролл» от 08.02.2002г., от 19.03.2002г. (л.д. 59-86 т.1), от 19.06.2002г. (л.д. 87-97 т.1), от 07.10.2002г. (л.д. 98-104 т.1) и от 16.10.2002г. (л.д. 105-107 т.1).

Довод ответчиков о том, что судом первой инстанции необоснованно взыскан моральный вред в указанном размере, не может быть признан судом апелляционной инстанции обоснованным, поскольку при распространении в средствах массовой информации не соответствующих действительности и порочащих граждан и юридических лиц сведений размер компенсации морального вреда определяется с учетом характера публикации и ее содержания, степени распространения недостоверных сведений и других, заслуживающих внимания обстоятельств (ст.ст. 151, 152 ГК РФ, п.5 Постановления Пленума ВС РФ от 20.12.94г. №10).

Исковые требования Авена П.О. и Фридмана М.М. о возмещении им морального вреда в размере 250 000 долларов США, по 100 000 долларов США в рублевом эквиваленте каждому с ЗАО «МАПТ-МЕДИА» и 25 000 долларов США в рублевом эквиваленте с журналиста Лурье О.А. с учетом общественной оценки нарушенных прав истцов, степени вины ответчиков, допустивших явные злоупотребления правами журналиста; серьезности обвинений истцов в совершении тяжких преступлений, осуждаемых человечеством; тяжести наступивших последствий; сферы распространения несоответствующих действительности порочащих деловую репутацию истцов сведений правомерно и обоснованно удовлетворены судом первой инстанции. Приведенные в обоснование требования при разрешении вопроса о возмещении морального вреда и его размере доводы были проверены судом первой инстанции. Выводы суда первой инстанции о наличии правовых оснований для удовлетворения иска в части взыскания морального вреда в присужденной денежной сумме обоснованны и соответствуют материалам дела и обстоятельствам спора.

Распространение упомянутых сведений, не соответствующих действительности, значительно ущемляет права и законные интересы истцов, существенно отражается на деловой репутации Авена П.О. и Фридмана М.М. Присужденный размер морального вреда определен судом исходя из материалов дела с учетом обстоятельств дела явно свидетельствующих о перенесенных истцами нравственных страданиях. Вывод суда первой инстанции о размере подлежащем возмещению морального вреда мотивирован.

С учетом характера спорных публикаций и распространением не проверенных и не подтвержденных сведений об участии Авена П.О. и Фридмана М.М. в совершении особо опасных преступлений, что подрывает их деловую репутацию на российском и международном рынке банковских услуг, суд первой инстанции пришел к обоснованному выводу о злоупотреблении правами СМИ и журналиста.

14

судом первой инстанции путем взыскания с ответчиков ЗАО «МАПТ-МЕДИА» и О.А. Лурье заявленной суммы в российских рублях.

Требования о возмещении судебных расходов, связанных с оплатой услуг адвоката, судом первой инстанции правомерно удовлетворены в соответствии со ст.110 АПК РФ, согласно которой расходы на оплату услуг представителя, понесенные лицом, в пользу которого принят судебный акт, взыскиваются арбитражным судом с другого лица, участвующего в деле. Факт оказания услуг и выплаты вознаграждения подтвержден документально, а именно: договором от 01.03.2003г. (л.д. 62-64 т.4) и документами, подтверждающими перечисление вознаграждения и получение его адвокатом (л.д. 60-61 т.4), однако, учитывая, что названные расходы взыскиваются судом в разумных пределах, суд первой инстанции правомерно уменьшил размер возмещения расходов на оплату услуг адвоката до 60 000 руб.

Учитывая изложенное, заслушав представителей сторон, исследовав имеющиеся в деле доказательства, суд апелляционной инстанции находит, что решение от 10.07.2003г. законно и обоснованно.

Расходы по государственной пошлине относятся на ответчиков в соответствии со ст. 110 АПК РФ.

Руководствуясь ст.ст. 110, 266, 268, 269, 271 АПК РФ,

ПОСТАНОВИЛ:

решение от 10.07.2003г. по делу №А40-49954/02-21-494 оставить без изменения, апелляционные жалобы ЗАО «МАПТ-МЕДИА», Лурье Олега Анатольевича – без удовлетворения.

Председательствующий                         Н.Ю. Кузьминская

Судьи:                                       В.А. Веденова

                                             Д.И. Дзюба

Изг. 29.09.03г.
Кастальская

15

P0009133

**ARBITRATION COURT OF THE CITY OF MOSCOW**
**In the Name of the Russian Federation**

**DECISION**
**Of the Appellate Division of the Arbitration Court**

September 22, 2003                              Case # A40-49954/02-21-494

The Arbitration Court of the City of Moscow
In the presence of:
Presiding Judge N.Y. Kuzminskaya
Judges V.A. Vedenova and D.I. Dzyuba
Judge assistant M.N. Kastalskaya, also took notes of the court hearing
With the participation of:
On behalf of the plaintiffs: G.V. Lyubarskaya, power of attorney dated 10.25.2002; Order # 254
dated 09.22.03; power of attorney dated 10.25.03, Order # 254 dated 09.22.03, ; Order # 102-
B20/02, dated 11.19.2002;; Order # 254 dated 09.22.03; E.A. Kulkov, power of attorney #
01/1768D dated 10.25.2002.
On behalf of the defendants: M.V. Korshikova, power of attorney #8/n dated 05.23.2002; S.B.
Mirzoev, Order # 16 dated 09.19.2003.

Having heard in a court hearing the appeals filed by ZAO MAPT-Media and O.A. Lourie
appealing the decision of the Moscow Arbitration Court
dated 07.10.2003, Case # A40-49954/02-21-494
made by O.A. Vysokinskaya
related to the lawsuit filed by P.O. Aven, M.M. Fridman, OAO Alfa Bank and OOO Alfa Echo
against ZAO MAPT-Media and O.A. Lourie
Re: Protection of business reputation

HAS ESTABLISHED THE FOLLOWING: P.O. Aven, M.M. Fridman, the OAO Alfa Bank and
the OOO Alfa Echo filed a lawsuit against ZAO MAPT-Media and O.A. Lourie requesting the
court to recognize the information disseminated in the article entitled "Alfa Group Portrait, Hero
of Our Time" (subtitled Alfa was involved in organizing drug trafficking from South-East Asia
via Russia to Europe) authored by O.A. Lourie and published in the newspaper *Versija* Issue # 25
dated 07.06.1999 as untrue information, which is damaging to their business reputation and
oblige the defendants to publish a retraction of the following information in the Versija
newspaper within 10 days after the court decision (the Versija newspaper is founded by ZAO
MAPT Media):

        "Alfa was involved in organizing drug trafficking from South-East Asia via Russia to
Europe."

                                        P0009119

1

"Today we are going to talk about not one but three heroes: Petr Aven, Michail Fridman and German Khan. Three epic heroes of Russian capitalism, or, perhaps, a three-headed dragon of the Russian Mafia."

"When he was a student of Moscow State University Aven was president of a students music club and had many contacts among the young people (music fans, bohemian guys, etc). That was also the environment where a market for illegal drugs was being shaped at the time. As a result Aven was in the focus of attention of some criminal elements and he had some contacts with their "leaders".

In February 1992 Petr Aven was appointed Minister of Foreign Economic Relations of the Russian Federation... As a result Aven received good commission money when he managed to sell Ghana's debt..."

"...when Petr Aven headed the ministry he was not scrupulous and received commission money and accepted valuable gifts for his assistance to foreign and domestic companies in signing deals and carrying out foreign economic transactions. His jurisdiction included all the questions related to issuing the required licenses and that was where he saw his opportunity. He was especially tough when he dealt with those transactions that involved the sales of weapons, he allowed only those players to enter that market who were connected to him."

"In 19991-1992 the 6th Department of the KGB of the Russian Federation investigated Petr Aven's activities using the following materials: big embezzlements of money, causing big damage to the country and criminal connections with the Israeli intelligence services. In 1992 the former security minister reported the materials to President Yeltsin an as a result Petr Aven was fired from his job as a minister."

"Among the people he knew were O. Kvantrishvili and J. Kobzon, criminal leaders S. Timofeev (Sylvester) and A. Petrov (Petrik), international adventurers Mark Rich and Gregory Luchansky. According to the investigation reports P. Aven was involved in drug trafficking from the Southeast Asia via Russia to Europe."

"Late in 1993 in Vienna Aven met Gilberto Rodrigues Orehuel, who was known under the name of "Chess player". They reached some agreements, including money transfers to the Alfa Bank from some off-shore zones (the Bahamas and Gibraltar) for investing it in the Russian economy and purchase stock issued by the Russian enterprises."

"In 1985 the Bauman Brigade, one of the most aggressive criminal groups in Moscow, contacted M. Fridman, a young money-loving dealer who was very good at using his numerous contacts. The Bauman Brigade was the only Moscow group that was seriously involved in illegal drugs and was constantly extending its operations. At that time the market for illegal drugs was being shaped among students and artistic youngsters, rock fans, hippies, punks and prostitutes. Fridman had numerous contacts among them and his connections, undoubtedly, attracted the Bauman Brigade. The contact with the brigade turned out to be mutually beneficial."

P0009120

2

"Michail Fridman was also involved in drug trafficking from the Southeast Asia via Russia to Europe. Among the people he knew were J. Kobzon and O. Kvantrishvili and, criminal leaders S. Timofeev (Sylvester) and A. Petrov (Petrik), and international adventurers Mark Rich and Gregory Luchansky."

"Fridman was also involved in voucher schemes... As a result of these schemes the Alfa Group Chairman had increased his personal assets."

"...Within the Alfa Consortium headed by P. Aven and M. Fridman it is the Alfa Echo that is involved in secret operations with illegal drug trafficking."

...Numerous cases of food poisoning among the citizens of Khabaravsk were caused by a big dose of narcotics found in sugar. In the course of the food poisoning investigation it was established that the containers used for transporting the sugar had been used previously by the Alfa Echo. The Alfa Echo had used them to transport a shipment addressed to the Harmaty and C (Defendant O.A. Lourie writes that this company is involved in the international narcotics business and laundering drug money);

In addition the plaintiffs requested the court to recognize the following information disseminated in the article entitled "Criminal Pulp Fiction Russian Style", published in the newspaper *Versija* Issue # 19 dated 05.20.2002 as untrue information that is damaging to the business reputation of M.M. Fridman, the OAO Alfa Bank and the OOO Alfa Echo. (the Versija newspaper has been founded by ZAO MAPT Media): M.M. Fridman's connections with the criminal world, the existence of the Alfa Group that poses a threat to the national securities of some countries and Alfa's connections with criminal lords;

The plaintiffs also demanded that the court should protect their civil right to having a business reputation by qualifying the defendants' actions as abuse of the rights of a journalist and a media source and suppressing the actions that pose a threat and might violate the plaintiffs' rights in the future by forbidding ZAO MAPT Media and O.A. Lourie to disseminate the above referenced information;

In addition, the plaintiffs made claims of moral damages and insisted on the recovery of 100 000 US dollars in the ruble equivalent from the defendant ZAO MAPT-Media to be paid to P.O. Aven and the recovery of 100 000 US dollars in the ruble equivalent from the defendant ZAO MAPT-Media to be paid to M.M. Fridman. They also insisted that the defendant O.A. Lourie should pay 25 000 US dollars (in the ruble equivalent) to P.O. Aven and 25 000 US dollars (in the ruble equivalent) to M.M. Fridman, respectively. They also requested that the court should oblige ZAO MAPT-Media and O.A. Lourie collectively to pay in favor of the OAO Alfa Bank 172 271.85 pounds (in the ruble equivalent) in recovery of the losses caused by the defendants' dissemination of untrue information, which was damaging to the business reputation of the plaintiffs (File P.3-23, V.1).

Before the court issued its decision the OAO Alfa Bank adjusted the amount of their claim in the part related to the recovery from both defendants of the court expenses in the amount of 1 757 820.61 rubles (including VAT) incurred by the OAO Alfa Bank in paying for the work performed by the Kroll Company (File P.51-55, V.2).

P0009121

3

Before the lower court issued its decision the plaintiffs P.O. Aven, M.M. Fridman, the OAO Alfa Bank and the OOO Alfa Echo adjusted their claim amount in the part related to the expenses incurred in paying for the independent investigation conducted by the Kroll Company. The plaintiffs acted on the presumption that their claim of the recovery of expenses incurred in the process of self-protection and judicial protection of their lawful rights and interests should also include the 1 757 820.61 rubles that constitute a VAT paid for the Kroll Company, which is supported Payment Order # 00005 dated 01.23.03 (File P.1-9, V.3, File P.55-59, V.4). In addition, the plaintiffs also demanded the recovery of their court expenses: the attorney's fees in the amount of 374 206.90 rubles.

The court decision dated 07.10.2003 satisfied their claim in that part which is related to recognizing the following information distributed in O.A. Lourie's article entitled "Hero of Our Time! Alfa Group Portrait" with a subtitle "Alfa was involved in drug trafficking from South-East Asia via Russia to Europe", published in Issue #25 dated 07.06.1999 as not true to life and damaging to the business reputation of P.O. Aven:

- "When he was a student of Moscow State University Aven was president of a students music club and had numerous contacts among the young people (music fans, bohemian guys, etc). That was also the environment where a market for illegal drugs was being shaped at the time. As a result Aven was in the focus of attention of some criminal elements and he had some contacts with their "leaders".

- "As a result (of P.O. Aven's involvement in solving the problem of debt) P.O. Aven received good commission money when he managed to sell Ghana's debt".

- "According to the words of the employees of the Ministry of Foreign Economic Relations, when Petr Aven headed the ministry he was unscrupulous and was not ashamed to get commissions and accept valuable gifts for his assistance to foreign and domestic companies in signing deals and carrying out foreign economic transactions."

- " He was especially tough when he dealt with those transactions that involved the sales of arms, he allowed only those players to enter that market who were connected to him."

- "In 1991-1992 the 6[th] Department of the KGB of the Security Ministry of the Russian Federation investigated Petr Aven's activities using the following materials: big embezzlements of money, causing big damage to the country and criminal connections with the Israeli intelligence services. In 1992 the former security minister reported about the materials to President B. Yeltsin and as a result Petr Aven was dismissed from his position as a minister on December 22, 1992."

- "According to the same operative data P. O. Aven was involved in illegal drug trafficking from the South East Asia via Russia to Europe."

- "Late in 1993 in Vienna P.O. Aven met Gilberto Rodrigues Orehuel, a Colombian drug lord, who was also known under the nickname of "Chess player". Specifically, they reached an agreement on "pumping money into" the Alfa Bank from some offshore zones (like the Bahamas and Gibraltar) to be invested in the Russian economy through the acquisition of stock issued by Russian enterprises".

P0009122

4

In addition, the claim has been satisfied in that part which refers to the following information distributed in O.A. Lourie's article entitled "Hero of Our Time! Alfa Group Portrait" with a subtitle "Alfa was involved in drug trafficking from South-East Asia via Russia to Europe", published in Issue #25 dated 07.06.1999, which was qualified as not true to life and damaging to the business reputation of M.M. Fridman:

> - "The market for illegal drugs was being shaped among students and artistic youth, rock fans, hippies, punks, prostitutes, etc. Fridman had numerous contacts in these circles and, undoubtedly, the Bauman Brigade was very interested in his connections. The contact with the brigade turned out to be mutually beneficial."

> - "Michail Fridman was involved in the organization of illegal drug trafficking from the South East Asia via Russia to Europe."

> - "Fridman was involved in voucher fraud. As a result of these voucher schemes alone the Alfa Group Chairman had added approximately 30-40 million dollars to his personal assets."

In addition, the claim has been satisfied in that part, which refers to the following information, distributed in O.A. Lourie's article entitled "Hero of Our Time! Alfa Group Portrait" with a subtitle "Alfa was involved in drug trafficking from South-East Asia via Russia to Europe", published in Issue #25 dated 07.06.1999, which was qualified as not true to life and damaging to the business reputation of the OAO Alfa Bank:

> - "Late in 1993 in Vienna P.O. Aven met Gilberto Rodrigues Orehuel, a Colombian drug lord, who was also known under the nickname of "Chess player". Specifically, they reached an agreement on "pumping money into" the Alfa Bank from some offshore zones (like the Bahamas and Gibraltar) to be invested in the Russian economy through the acquisition of stock issued by Russian enterprises".

The lower court also qualified as not true to life and damaging to the business reputation of the OOO Alfa Echo the following information distributed in O.A. Lourie's article entitled "Hero of Our Time! Alfa Group Portrait" with a subtitle "Alfa was involved in drug trafficking from South-East Asia via Russia to Europe", published in Issue #25 dated 07.06.1999: "It follows from the operative materials that within the Consortium it is the Alfa Echo that is involved in secret operations with illegal drugs."

It also qualified as not true to life and damaging to the business reputation of M.M. Fridman, the OAO Alfa Bank and the OOO Alfa Echo the following information distributed in O.A. Lourie's article entitled "Criminal Pulp Fiction Russian Style" published in Issue # 19 of the VERSIJA newspaper dated 05.20.2002 (founded by the ZAO MAPT-Media): M.M. Fridman's connections with the criminal world; the existence of the Alfa Group that poses a threat to the national securities of some countries and Alfa's connections with criminal lords.

P0009123

5

In addition, the lower court obliged the ZAO MAPT-Media as the founder of the VERSIJA newspaper to publish a retraction of the information listed in Sec. 1-5, as it is not true to life and is discrediting P.O. Aven, M.M. Fridman, the OAO Alfa Bank and the OOO Alfa Echo. The court also recovered from the ZAO MAPT-Media 3 000 000 rubles in moral damages in favor of P.O. Aven and 3 000 000 rubles - in favor of M.M. Fridman. It also obliged O.A. Lourie to pay 750 000 rubles to P.O. Aven and 750 000 rubles - to M.M. Fridman in moral damages. The court recovered in favor of the OAO Alfa Bank from the ZAO MAPT-Media and O.A. Lourie collectively 172 271.85 pounds in the ruble equivalent at the exchange rate of the Central Bank of the RF on the day of the recovery of court expenses. It also recovered in favor of the OAO Alfa Bank from the ZAO MAPT-Media and O.A. Lourie collectively 60 000 rubles as reimbursement of the attorney's fees; it from the ZAO MAPT-Media and O.A. Lourie collectively litigation expenses - the state tariff in the amount of 100 000 rubles to be paid to the OAO Alfa Bank. It also recovered in favor of the OAO Alfa Bank from the ZAO MAPT-Media and O.A. Lourie collectively the expenses in the amount of 8 400 rubles incurred in conducting the expert evaluation.

The court has rejected the rest of the lawsuit claims (File P.71-79, V.4).

The ZAO MAPT Media filed an appeal, in which the defendant requested the court to overturn the decision in the full amount of the claim and take a new decision, rejecting the full amount of the claim. The defendant claimed that the lower court incorrectly established the juridically meaningful circumstances of the case and, therefore, it did not review all the facts that are really meaningful in this case. They also said that the court had misinterpreted the norms of the law of substance, which resulted in taking an ungrounded decision. In addition, the lower court wrongfully qualified as court expenses the payment for the services of the Kroll Company detectives and disregarded the complete results of the linguistic evaluation that was conducted in this case (File P.113-120, V.4).

O.A. Lourie also filed an appeal, in which he requested the court to overturn the decision of the Moscow Arbitration Court and drop the case, saying that the lower court did not review the complete circumstances of the case and the court conclusions were inconsistent with the factual circumstances of the case. He also said that the questions posed by the court before the experts, who performed a linguistic evaluation, were not precise and complete, which resulted in an incorrect evaluation of the disseminated information. He also claimed that the court incorrectly applied the law to legal relations (File P.147-150, V.4).

During the court hearing the attorney representing the defendant ZAO MAPT-Media supported the arguments contained in the appeal.

The attorney representing O.A. Lourie also supported the arguments contained in the appeal.

The attorney representing the plaintiffs P.O. Aven, M.M. Fridman and the OAO Alfa Echo never submitted any response, however, during the hearing he said that he had his objections against the arguments contained in the defendants' appeals and he explained the grounds in his written clarifications.

P0009124

Pursuant to Articles 266, 268 of the RF APC, the court of the appellate division heard the case. Having reviewed the arguments contained in the appeal, the court did not find any grounds to satisfy the appeal.

Having reviewed the entire evidence and the explanations presented by the parties, having taken advantage of the established data, the court of the appellate division found that the lower court had arrived at the right conclusions when it satisfied the plaintiffs' claims in the part related to recognizing the following information disseminated in the article by O.A. Lourie entitled "Alfa Group Portrait, Hero of Our Time" (subtitled Alfa was involved in organizing drug trafficking from South-East Asia via Russia to Europe) as not true to life and damaging to the plaintiffs' business reputation:

- "When he was a student of Moscow State University Aven was president of a students music club and had numerous contacts among the young people (music fans, bohemian guys, etc). That was also the environment where a market for illegal drugs was being shaped at the time. As a result Aven was in the focus of attention of some criminal elements and he had some contacts with their "leaders".

- "As a result (of P.O. Aven's involvement in solving the problem of debt) P.O. Aven received good commission money when he managed to sell Ghana's debt".

- "According to the words of the employees of the Ministry of Foreign Economic Relations, when Petr Aven headed the ministry he was unscrupulous and was not ashamed to get commissions and accept valuable gifts for his assistance to foreign and domestic companies in signing deals and carrying out foreign economic transactions."

- " He was especially tough when he dealt with those transactions that involved the sales of arms, he allowed only those players to enter that market who were connected to him."

- "In 1991-1992 the 6[th] Department of the KGB of the Security Ministry of the Russian Federation investigated Petr Aven's activities using the following materials: big embezzlements of money, causing big damage to the country and criminal connections with the Israeli intelligence services. In 1992 the former security minister reported about the materials to President B. Yeltsin and as a result Petr Aven was dismissed from his position as a minister on December 22, 1992."

- "According to the investigation reports P. O. Aven was involved in illegal drug trafficking from the South East Asia via Russia to Europe."

- "Late in 1993 in Vienna P.O. Aven met Gilberto Rodrigues Orehuel, a Colombian drug lord, who was also known under the nickname of "Chess player". Specifically, they reached an agreement on "pumping money into" the Alfa Bank from some offshore zones (like the Bahamas and Gibraltar) to be invested in the Russian economy through the acquisition of stock issued by Russian enterprises".

- "The market for illegal drugs was being shaped among students and artistic youth, rock fans, hippies, punks, prostitutes, etc. Fridman had numerous contacts in these circles and,

P0009125

7

undoubtedly, the Bauman Brigade was very interested in his connections. The contact with the brigade turned out to be mutually beneficial."

- "Michail Fridman was involved in the organization of illegal drug trafficking from the South East Asia via Russia to Europe."

- "Fridman was involved in voucher fraud. As a result of these voucher schemes alone the Alfa Group Chairman had added approximately 30-40 million dollars to his personal assets."

- "Late in 1993 in Vienna P.O. Aven met Gilberto Rodrigues Orehuel, a Colombian drug lord, who was also known under the nickname of "Chess player". Specifically, they reached an agreement on "pumping money into" the Alfa Bank from some offshore zones (like the Bahamas and Gibraltar) to be invested in the Russian economy through the acquisition of stock issued by Russian enterprises".

The lower court also qualified as not true to life and damaging to the business reputation of M.M. Fridman, the OAO Alfa Bank and the OOO Alfa Echo the following information distributed in O.A. Lourie's article entitled "Criminal Pulp Fiction Russian Style" published in Issue # 19 of the VERSIJA newspaper dated 05.20.2002 (founded by the ZAO MAPT-Media): M.M. Fridman's connections with the criminal world; the existence of the Alfa Group that poses a threat to the national securities of some countries; Alfa's connections with criminal lords; the lower court obliged the ZAO MAPT-Media as the founder of the VERSIJA newspaper to publish a retraction of the above referenced untrue information which was discrediting P.O. Aven, M.M. Fridman, the OAO Alfa Bank and the OOO Alfa Echo and recover from the ZAO MAPT-Media 3 000 000 rubles as moral damages in favor of P.O. Aven and 3 000 000 rubles in favor of M.M. Fridman; also the recovery from O.A. Lourie of 750 000 rubles in favor of P.O. Aven and 750 000 rubles in favor of M.M. Fridman in moral damages; the recovery in favor of the OAO Alfa Bank from the ZAO MAPT-Media and O.A. Lourie collectively of 172 271.85 pounds in the ruble equivalent at the exchange rate of the Central Bank of the RF on the day of the recovery of court expenses; the recovery in favor of the OAO Alfa Bank from the ZAO MAPT-Media and O.A. Lourie collectively of 60 000 rubles as reimbursement of the attorney's fees and the recovery in favor of the OAO Alfa Bank from the ZAO MAPT-Media and O.A. Lourie collectively of litigation expenses - the payment of the state tariff in the amount of 100 000 rubles; the recovery in favor of the OAO Alfa Bank from the ZAO MAPT-Media and O.A. Lourie collectively of the expenses in the amount of 8 400 rubles incurred in conducting the expert evaluation. These conclusions of the lower court are based on the analysis of the contents and connotation of the contested texts, they are supported by rationale and are consistent with the circumstances and materials of the case and have a legal basis.

The court of the appellate division dismissed the defendants' arguments with regard to the fact that the lower court did not incorporate the complete results of the linguistic evaluation and that the expert evaluation was contradictory in that part where the experts provided answers to the questions posed by the court. By its decision dated 04.02.2003 the Arbitration Court of the City of Moscow satisfied the plaintiffs' request and commissioned a linguistic evaluation (See the case materials File P.31-32, V.3).

P0009126

The evaluation was to be performed by a Russian non-governmental association called the Guild of Linguistic Experts in documentation and information disputes (GLADIS). The court posed the following questions to be answered by the experts:

1. Do O.A. Lourie's articles entitled "Alfa Group Portrait" and published in the newspaper *Versija* issue # 25 dated 07.06.99 and the article entitled "Criminal Pulp Fiction Russian Style", published in the newspaper *Versija* issue # 19 dated 05.20.2002, contain any negative information (data) about P.O. Aven, M.M. Fridman, OAO Alfa Bank and OOO Alfa Echo?

2. What is the compositional structure of the text of the articles (article), what literary devices are used by the author and how do they affect the reader's perception of the heroes of the publications?

3. If they do contain this information (data), then in what manner does the author use it, in the form of a supposition or any other manner?

4. If they do contain this information (data), then what is the source (sources) of this information (data)?

5. What is quoting? What are the signs of quoting and quotations in the text?

6. Do the articles referenced in Question #1 contain quoting and quotations?

The experts carried out their research and submitted to the court their opinion that contained the following answers to the posed questions:

1. O.A. Lourie's article entitled "Alfa Group Portrait" published in the newspaper *Versija* issue # 25 dated 07.06.99 and the article entitled "Criminal Pulp Fiction Russian Style", published in the newspaper *Versija* issue # 19 dated 05.20.2002, do contain negative information (data) about P.O. Aven, M.M. Fridman, OAO Alfa Bank and OOO Alfa Echo. This negative information is contained in the utterances that are listed in the research part of the opinion in their answers to Questions 1, 3.

2. "Alfa Group Portrait" is an informative and critical article of investigative nature (however, it is not a journalist's investigation as such), while "Criminal Pulp Fiction Russian Style" is written in the genre of a problem interview. The composition of the article "Alfa Group Portrait" is as follows: in the introductory part the author asks two questions with regard to the role played by the heroes of the publication and this allows us to say that the entire article constitutes arguments in favor of a positive answer to the question whether the publication heroes (Aven, Fridman and Khan) are a three headed dragon of the Russian Mafia. Judging from the materials of the article the reader cannot give any other answer, as the article contains negative information about the heroes of this publication and the companies headed by them. Compositionally, the article "Criminal Pulp Fiction Russian Style" consists of a small introduction, the text of the interview (two-component text consisting of questions and answers) and a conclusion (made in just one paragraph). The experts were unable to answer the question how the composition of these articles might affect the reader's perception: to answer this questions they should conduct a special sociological survey.

P0009127

See the research part of the opinion for more information related to the specifics of the genre and the compositional structure of these articles.

3. Negative information (data) about P.O. Aven, M.M. Fridman, OAO Alfa Bank and OOO Alfa Echo (See answer to Question 1) is provided in the form of statements.

4. As his sources of negative information (legal entities and individuals) listed in Question #1, Oleg Lourie, the author of the evaluated articles, mentions the materials of the Security Committee of the State Duma of the RF and an anonymous officer of the Western special services. Some utterances are made by Oleg Lourie, the author of these publications.

5. Quoting is incorporating quotations in the text. A quotation is an exact, verbatim excerpt from some text or utterance. A quotation can be identified by its formal signs - punctuation, quotation marks. To identify some fragment of the text as a quotation (with regard to its contents) one should have: 1) the original (quoted) text, 2) the secondary text where the quotation (quotations) is used.

6. Oleg Lourie's article "Alfa Group Portrait" contains some textual fragments whose punctuation is that of quotations. Some of these fragments are quotations and can be identified both formally and by their contents. However, the analysis of the text has revealed that the author does not always follow the rules of attributing the material to other people and the formal rules of punctuation. A number of fragments are distorted quotations, as they do not fully coincide with the original text. Information contained in them cannot be considered authentic. Oleg Lourie's article "Criminal Pulp Fiction Russian Style" does not contain quotations, there is no quoting in it. The text of this article is fully original.

The above referenced expert evaluation was made public during the court hearing, the lower court studied it and subpoenaed the experts to the court hearing to present their clarifications and answer questions posed by the court and the parties to the lawsuit. The experts, who showed up for the hearing: E.S. Kara-Murza, MS, who has a master's degree in linguistics and is a professor of the School of Journalism of the Moscow State University, and Y.A. Safonova, MS, has a master's degree in linguistics and is a professor of the Russian Language Institute of the Russian Academy of Science, confirmed the conclusions of the expert opinion during the court hearing.

The lower court reviewed and assessed the above referenced expert evaluation together with other materials of the case and by its motivated decision admitted it as evidence of the fact that the contested publications contained negative information that was related in the form of statements, thus, arriving at a conclusion that the assessment of the lower court was consistent with the case materials. In these circumstances the lower court came to a well grounded conclusion that the contested publications did contain the information that was damaging to the plaintiffs' business reputation, as the text contained negative depictions of P.O. Aven and M.M. Fridman, allegations that they perpetrated serious crimes, it described their connections and contacts with criminals, P.O. Aven's abuse of his official position when he was Minister of Foreign Economic Relations; P.O. Aven's criminal connections with the Israeli special services;

P0009128

10

the involvement of P.O. Aven and M.M. Fridman in the organization of drug trafficking from the South East Asia to Europe via Russia; that within the consortium it was the Alfa Echo that was involved in the narcotics operations; that M.M. Fridman was involved in voucher schemes; that the Alfa Group consisted of numerous companies that were involved in money laundering and acquired new companies with the money they got as a result of fraud; that the operations of such corporations like Alfa posed a threat to the national security of some countries; that the Alfa Group was connected with the criminal world. This conclusion of the lower court has its rationale, is consistent with the case materials and is in compliance with law.

The defendants' argument that the article "Criminal Pulp Fiction Russian Style" does not contain any concrete names of any legal entities and, therefore, this publication does not refer to the OAO Alfa Bank and OOO Alfa Echo and the court should dismiss this part of the claim is inconsistent with the factual circumstances of the case, as in his article "Hero of Our Time! Alfa Group Portrait" journalist O.A. Lourie directly implies the OAO Alfa Bank and the OOO Alfa Echo and connects with them the names of P.O. Aven (the Alfa Bank President) and M.M. Fridman (the Chairman of the Alfa Bank Board of Directors) when he says "Alfa". It follows from the title of the article and its contents. He even calls P.O. Aven the President of the Alfa Group Consortium, and M.M. Fridman - Chairman of the Board of Directors (which is not true). Therefore, the lower court was right when it qualified the information contained in the article "Criminal Pulp Fiction Russian Style" as damaging to the business reputation of the OAO Alfa Bank, the OOO Alfa Echo and M.M. Fridman who is the top manager of the company that has the word "Alfa" as part of its name.

The lower court was also right when it qualified as inconsistent and ungrounded the defendants' argument related to the fact that O.A. Lourie's article entitled "Alfa Group Portrait, Hero of Our Time" (subtitled Alfa was involved in organizing drug trafficking from South-East Asia via Russia to Europe) published in the newspaper *Versija* Issue # 25 dated 07.06.1999 quoted the query made by V.I. Ilyukhin, Chairman of the Security Committee of the RF State Duma, which he addressed to the top officials of the Ministry of the Interior. In the defendants' opinion, this fact indemnified the journalist and the founder of the media source and held them harmless for having disseminated the quoted information. Consequently, they were not obliged to prove that this information was true. To support this argument the defendants presented Xeroxed copies of Letter # 3.15.-2216 dated 11.26.97 with a 9-page addendum (File P.126-138, V.3). The defendants claim that these copies are true copies of the original that V.I. Ilyukhin had personally passed to them. Upon the defendants' request, the lower court verified this information by making a relevant inquiry (File P.108-109, V.2) and received a copy of Letter # 3.15.-2216 dated 11.26.97, which supported the fact that the materials related to "certain companies and certain top officials and directors" that had been received by the Security Committee were sent for verification of the circumstances described in this letter (File P.151-152, V.2).

Given the above, the court of the appellate division qualified as legal and well-grounded the conclusion of the lower court that the journalist's verbatim quoting of separate fragments of anonymous materials appended to the State Duma letter does not indemnify the defendants, as

P0009129

11

they have disseminated untrue information that is damaging to the plaintiffs. The court believed that when the journalist quoted verbatim the fragments from the anonymous letter and put them in quotation marks, he took care of not violating the copyright of an anonymous writer (Part 1 Article 42 of the Law on the Mass Media). In doing so, he obviously violated the plaintiffs' rights to a good name and protection of their business reputation when he made public the unverified facts that were damaging to the plaintiffs. Articles 47 and 49 of the Law on Mass Media list the journalist's rights and obligations, and say that a journalist cannot and should not quote anonymous materials containing unverified information that is compromising other individuals and whose source he cannot reveal. Pursuant to Article 51 of the Law on Mass Media, a journalist cannot abuse his rights and disseminate information with the purpose of discrediting a citizen or certain sections of the population. Freedom of expressing one's opinion and one's convictions does not excuse a person from disseminating damaging and untrue information.

Pursuant to Article 152 of the RF Civil Code, it is the defendants who are required to prove the fact that the distributed information is true to life, if the fact that they have disseminated true information is not supported by some actual evidence.

Moreover, as it follows from the case materials, two years since the first contested publication the defendants once again disseminated untrue information that was damaging to the plaintiffs, this time it was an interview with an anonymous source, an officer of a Western special service, in the newspaper *Versija* issue # 19 dated 05.20.2002, which was entitled "Criminal Pulp Fiction Russian Style".

As the defendant refused to reveal the source that provided information for the article, violating Part 2 Article 41 of the Law of the RF on the Mass Media. Therefore, the journalist will be regarded as the source of the information distributed in the article "Criminal Pulp Fiction Russian Style". Therefore, it is the journalist and the media source founder that shall be held liable for distributing the information that is not true to life and is discrediting the plaintiffs. The defendants' refusal to reveal the name of the person that provided information for the article is in violation of Part 2 Article 41 of the Law of the RF on the Mass Media.

The court of the appellate division dismissed the defendants' argument that O.A. Lourie had interviewed a real but anonymous person whose identity Lourie refused to reveal, which is supported by a tape recording of his talk with the interviewee and the translation of its transcript into Russian (File P.158-175, V.2). The fact was dismissed, as the journalist chose not to reveal the source that he interviewed, therefore, the tape recording cannot be identified with the interviewee. In addition, this type of evidence does not meet the requirements of Sections 6, 8 of the RF APC.

In these circumstances the lower court was right when it satisfied the plaintiffs' demand to protect their business reputation and qualified the information contained in the article "Hero of Our Time! Alfa Group Portrait", subtitled "Alfa was involved in drug trafficking from South-East

P0009130

12

Asia via Russia to Europe" published in the Versija Issue # 25 dated 07.06.1999 and the article entitled "Criminal Pulp Fiction Russian Style", published in the newspaper *Versija* Issue # 19 dated 05.20.2002 as untrue and damaging the business reputation of P.O. Aven, M.M. Fridman, the OAO Alfa Bank and the OOO Alfa Echo.  As ZAO MAPT-Media is the founder of the Versija newspaper the lower court obliged them to publish a retraction of the above referenced untrue information that was damaging to P.O. Aven, M.M. Fridman, the OAO Alfa Bank and the OOO Alfa Echo.

Pursuant to Article 152 of the Civil Code of the RF, the plaintiffs have the right to demand a retraction of the contested information and material damages, as their business reputation has been discredited (Resolution # 10 of the Supreme Court of the Russian Federation, dated 12.20.94).

It was a rightful and lawful decision when the lower court satisfied the plaintiffs' claim and awarded them 172 271.85 pounds in the Central Bank ruble equivalent on the day of the payment and 7 500 000 rubles respectively in recovery of their losses in the form of court expenses and moral damage caused by the defendants' dissemination of untrue information that was damaging to the plaintiffs' business reputation, as the case materials contain evidence of considerable expenses incurred in protecting the plaintiffs' business reputation.  The plaintiffs retained the Kroll Company to perform specific work and activities to establish whether the damaging facts related by O.A. Lourie in his two contested publications were true to life, as they presumed that the above referenced company would be able to perform this type of work.

The expenses in the amount of 172 271.85 pounds (in the ruble equivalent), the amount that was paid for the services of the Kroll Company is supported by Invoice # 1408596 dated 09.30.02 and by SWIFT message # IS00572066 on the disbursement of payment dated 01.15.03 (File P.57, V.2) and Payment Order # 00005 dated 01.23.03 (File P.56, V.2).

The Kroll Company carried out its own investigation of the circumstances and presented its opinion saying that the accusations against the plaintiffs contained in the O.A. Lourie's articles dated 07.06.1999 and 05.20.2002 were groundless.  In connection with these conclusions, the Kroll Company undertook to send out letters to this effect to all the stakeholders who are working with the plaintiffs or intend to work with the plaintiffs.

Article 152 of the RF Civil Code says that the defendant is obliged to prove the authenticity of the information distributed by him, however, this article does not deny the right of the plaintiff to submit to court other evidence in support of his demands, including those data that were obtained for a fee, as this way of collecting evidence is not in violation of law (Article 64 of the RF APC).

The court of the appellate division dismissed the defendants' arguments related to the fact that from the documents submitted by the plaintiffs it is hard to see the cause and effect

P0009131

13

connection between the contested publications and the expenses incurred in paying for the services of the Kroll Company, as the fact of services provided by the Kroll Company to the plaintiff OAO Alfa Bank has been proven. Also, it has been proven that the services were provided in connection with the investigation aimed at establishing the authenticity or unauthenticity of the contested information, as the case may be in the world of business. This fact is supported by the Kroll Company letters dated 02.08.2002, 03.19.2002 (File P.59-86, V.1), 06.19.2002 (File P.87-97, V.1), 10.07.2002 (File P.98-104, V.1) and 10.16.2002 (File P.105-107 V.1).

The court of the appellate division dismissed the defendants' arguments related to the fact that the lower court was wrong when it awarded moral damages in the above referenced amount, as it believed the defendant's argument was not well-grounded, as in cases of the media dissemination of unauthentic information that is damaging to citizens and legal entities, the amount of moral damages is determined on the basis of the nature of the publication, its contents, the scope of dissemination of untrue information and other important relevant circumstances (Articles 151, 152 of the RF APC, Section 5 of the Resolution # 10 the Plenary Meeting of the Supreme Court of the Russian Federation dated 12.20.94.

The lower court was right when it awarded to P.O. Aven and M.M. Fridman moral damages in the amount of 250 000 USD, 100 000 USD in the ruble equivalent respectively recovered from ZAO MAPT Media and 25 000 USD in the ruble equivalent respectively - recovered from journalist O.A. Lourie, taking into account the social significance of the violated rights of the plaintiffs, the liability of the defendants that let the journalist abuse his rights; accusations of the plaintiffs of serious crimes that are condemned by mankind; the gravity of the aftermath and the media source, which disseminated the untrue information that was damaging to the plaintiffs. In solving the issue of moral damages, the lower court verified the demands and the arguments related to moral damage and the amount of moral damages and came to the conclusion that there were good legal grounds for awarding moral damages, as moral harm has been done and the awarded amount is well grounded and consistent with the case materials and the dispute circumstances.

The dissemination of the above referenced untrue information has significantly infringed the rights and lawful interests of the plaintiffs and has affected the business reputation of P.O. Aven and M.M. Fridman. The court determined the awarded amount of moral damages proceeding from the case materials that contained evidence of moral sufferings experienced by the plaintiffs. The decision of the lower court related to awarding moral damages is well grounded.

Given the nature of the contested publications and the fact that they have been used to disseminate unverified and ungrounded information about the involvement of P.O. Aven and M.M. Fridman in grave crimes, which undermines their business reputation in the Russian and the world banking markets, the lower court came to a well-grounded conclusion that the media source and the journalist had abused their rights.

P0009132

14

[Missing text in the original - Translator's note] the lower court ruled that this amount in Russian rubles be recovered from ZAO MAPT Media and O.A. Lourie.

Pursuant to Article 110 of the RF Arbitration Procedural Code, the lower court was right when it lawfully awarded the recovery of the attorney's fees, as Article 110 contains a provision that the expenses incurred in paying the attorney's fees by a person who won the case can be recovered from the other party upon the decision of the Arbitration Court. The fact of provided services and the disbursement of payment has been proven by documents: the Agreement dated 03.01.2003 (File P.62-64, V.4), and the documents supporting the payment transfer and the attorney's receipt (File P.60-61, V.4). Since the court believed that the recovery of these expenses should be within reasonable limits, the court decreased the recovery of the attorney's fees and set the amount of 60 000 rubles.

Given the above, having heard the party's attorneys, having reviewed the evidence available in this case, the court of the appellate division has found that the decision dated 07.10.2033 was legal and well grounded.

Pursuant to Article 110 of the RF APC the state fees shall be paid by the defendants.

Pursuant to Article 110, 266, 268, 269, 271 of the RF APC,

THE COURT HAS RULED THE FOLLOWING:

The decision dated 07.10.2033 in Case # A40-49954/02-21-494 shall remain unchanged and the appeals of ZAO MAPT-Media and Oleg Anatolievich Lourie shall be rejected.

N.Y. Kuzminskaya
Presiding Judge

Judges:
V.A. Vedenova
D.I. Dzyuba

Prepared 09.29.03
Kastalskaya

[Stamp- Illegible]

P0009133

15