**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**OAO ALFA BANK et al.,**

       **Plaintiffs,**

         **v.**

**CENTER FOR PUBLIC INTEGRITY**
**et al.,**

       **Defendants.**

**Civil Action No.  00-2208 (JDB)**

---

**MEMORANDUM OPINION**

Plaintiffs are two Russian businessmen and their companies who have sued the

defendants, a public interest organization and its reporters, for defamation for publishing an

article alleging that plaintiffs have connections to organized crime and have engaged in narcotics

trafficking.  Defendants have filed a motion for summary judgment in which they argue, among

other things, that plaintiffs are limited public figures, and that the evidence demonstrates as a

matter of law that defendants did not publish the piece with actual malice.  The Court agrees.

Although defendants' actions are not beyond reproach, they do not rise to the level of actual

malice that the Constitution demands in order to preserve a vibrant exchange of ideas on issues

of public concern.  For this reason, the Court grants defendants' motion for summary judgment

on all plaintiffs' claims.

**BACKGROUND**

I.      **The Rise of the Oligarchs**

This case traces its lineage to the turbulent days of the dissolution of the former Soviet Union.  When Boris Yeltsin assumed power in 1991, Russia lacked many of the institutions of a market economy and was in desperate need of capital.  The United States and international financial institutions such as the International Monetary Fund were willing to provide Russia with financial aid, but only on the strict condition that the country agreed to implement a series of rapid market reforms.  Yeltsin turned to a group of young economists and academics to implement the necessary changes to the Russian economy.

These reformers crafted a set of radical policies designed to privatize and liberalize the Russian economy at a quick pace.  As the privatization campaign went into effect, it became evident that the transition of the Russian economy had been sabotaged by corruption and collusion.  A group of individuals with close political connections to the Yeltsin government amassed enormous wealth and power through the wholesale transfer of prized state assets and shady deals with government officials.  These tycoons, known as "oligarchs," rose to power based in large measure on their ability to navigate and manipulate the rules of a corrupt and lawless post-Soviet Russian economy.  The government evinced little desire to enforce the rule of law, and organized crime syndicates rushed to fill the void, assuming a prominent presence in

the new Russia.[1]  As the oligarchs grew their wealth through back-room deals, the rest of the

country was thrust into a period of rampant poverty.[2]

The rise of the oligarchs and the deterioration of the Russian economy was the subject of

intense discussion in the United States and the rest of the world.  Policy makers debated the

causes and the potential cures of the various problems gripping Russia.  Western intelligence

agencies grew increasingly concerned that the country was becoming a haven for money

laundering, arms trafficking, and gun smuggling.[3]  The Director of the Federal Bureau of

Investigation estimated in testimony before Congress that the Russian mafia had taken control of

more than 70% of all Russian commercial enterprises and that most of the 2,000 banks in Russia

were "controlled by organized crime."[4]  Private investors lost billions upon the devaluation of the

_____

[1]  See, e.g., Decl. of Celeste Phillips, Ex. 407 at 3, 15 (1997 Center for Strategic and
International Studies report) ("The principal beneficiaries of privatization -- conducted at
'auctions' rigged in favor of pre-selected individuals or banks -- have been the [organized crime]
syndicates . . . . Russia is in danger of evolving into a criminal-syndicalist state -- a troika
comprised of gangsters, corrupt government bureaucrats, and certain crooked and sometimes
prominent businessmen who continue to accumulate vast amounts of wealth by promoting and
exploiting corruption and the vulnerabilities inherent in a society in transition.").

[2]  See Phillips Decl., Ex. 409 at 1 (Fall 1999 American Enterprise Institute report) ("[T]he
'reform' has brought poverty, alcoholism, and health care disaster.  Russia today is a handful of
thieving 'oligarchs' feasting amid general starvation."); Sullivan Decl., Ex. 258 at 1 (David Satter
testimony before U.S. House Committee on International Relations at a Hearing, Oct. 7, 1999)
("[I]n a few months, 99 per cent of the savings of the Russian population disappeared.  Persons
who had put money aside to buy a car or apartment or to pay for a wedding or funeral were left
with nothing.").

[3]  See, e.g., Phillips Ex. 407 at 6 (1997 Center for Strategic and International Studies
report) ("Western intelligence agencies believe that short and medium-range missiles have been
smuggled to customers in the Middle East . . . [and organized crime] groups also are facilitating
narcotics trafficking along new transit routes from major heroin-producing areas in Asia.").

[4]  Phillips Ex. 133 (May 30, 1998 Financial Post article).

ruble, reports surfaced that billions more in foreign aid had been diverted to private accounts

overseas, and many called for a reassessment of the United States' and the International Monetary

Fund's policies regarding the country.  Russia's devolution into a "criminal-syndicalist state" and

the proper response from the West was at the fore of policy discussions in the White House,[5] the

halls of Congress,[6] think tanks,[7] and in the press.[8]

------

[5] See, e.g., Phillips Decl., Ex. 270 (Oct. 2, 1998 Address of Secretary of State Madeleine K. Albright to U.S.-Russia Business Council) ("[W]e have been reexamining all our assistance programs, retargeting money where it can be used effectively to support economic and democratic reform."); Ex. 419 ¶ 29 ("I was told by senior White House staff that President Clinton and Vice President Gore became increasingly concerned about the Russian money laundering problem . . . . The U.S. government eventually made passage of a money-laundering law by Russia a major bilateral policy issue, raised at the highest levels of our respective governments.").

[6] See, e.g., Phillips Decl., Ex. 287 (Oct. 19, 1999 Chicago Tribune article) ("The chairman of the House International Relations Committee is demanding an accounting by Russian officials of 'the fantastic and growing corruption in their country.'"); Ex. 289 (Nov. 11, 1999 Australian Financial Review) ("The US Congress is largely hostile to the IMF, arguing that the Russian loans are dangerous because they encourage corruption.").

[7] See, e.g., Phillips Decl., Ex. 407 at 36 (Sept. 10, 1998 Center for Strategic and International Studies Report) ("We must ask if the IMF has even been a positive force in Russia."); Ex. 405 (April 28-30, 1999 Carnegie Endowment for International Peace Report) ("The main problem with the Russian transition to a market economy was that there was no radical reform, therefore rent-seeking became excessive, and the rent-seekers became too rich and powerful.  Consequently, they have bought Russian politics.").

[8] For a sample of the dozens of articles in major United States newspapers during this period, see Phillips Decl., Ex. 138 (August 5, 1999 New York Times article titled "The Russia Devolution"); Ex. 274 (Dec. 28, 1997 Washington Post article titled "Russia's 'People's Capitalism' Benefitting Only the Elite'"); Ex. 279 (Sept. 8, 1999 Washington Post article titled "Was the Looting of Russia Avoidable?"); Ex. 280 (Sept. 28, 1998 Washington Times article titled "Subsidizing the Kleptocracy"); Ex. 287 (Oct. 19, 1999 Chicago Tribune article titled "Republican chastises Russia for money schemes"); Ex. 291 (Sept. 22, 1999 Baltimore Sun article titled "Treasury Secretary Defends Financial Help to Russia").

Plaintiffs Mikhail Fridman and Pyotr Aven were two of the key players in the economic

transformation of Russia.[9]  Fridman is the founder and Chairman of the Alfa Group, a business

conglomerate that includes plaintiffs OAO Alfa Bank and ZAO Alfa Eco.  Fridman was involved

in the privatization of the Russian economy from the very beginning, when Alfa Bank won the

first auction for a state-owned company, acquiring the Bolshevik Biscuit Factory.  On the heels

of Yeltsin's re-election in 1996, the Russian government placed the Tyumen Oil Company on the

auction block.  Alfa Group obtained 40% of Tyumen at a fraction of the company's value,

allegedly relying on the company's allies at the highest levels of the Russian government.[10]

---

[9]  Plaintiffs do not dispute the above account of the post-Soviet economy inside this litigation, and indeed have openly described it in these terms outside this litigation.  See, e.g., Phillips Decl., Ex. 21 (Aven article describing the post-Soviet economy as "negotiable" and "highly criminalized," with "material resources and money obtainable by horse-trading with the government. . . . The whole thing amounted to a select group of businessmen being appointed millionaires (or even billionaires), with the idea that it would become the main sources of support for the current regime."); Aven Dep. at 177:14-178:3 (describing aspects of the privatization program as "pure stealing of Russian property"); Decl. Ex. 40 (July 22, 1994 Moscow News article) ("To become a millionaire in our country, it is not necessary to have a good head and specialized knowledge . . . .  It is enough to have active support in government, the parliament, local power structures and law enforcement agencies. . . .  In other words, you are appointed a millionaire as someone put it very aptly."); Decl. Ex. 323 (Aug. 29, 2003 Financial Times (London) Article) (quoting Fridman:  "Of course we benefitted  from events in the country over the past 10 years.  Of course we understand that the distribution of state property was not very objective.  But we used our chance, and people are angry about it. . . . The rules of business are quite different to western standards . . . . I don't want to lie and play this game.  To say one can be completely clean and transparent is not realistic.").

[10]  See Phillips Decl., Ex. 215 (July 2, 1997 Moscow Times article titled "Subsidiary Attacks Tyumen Oil Sale") ("Analysts greeted accusations [of a rigged auction for Tyumen] with little surprise, saying that if true, the Tyumen sale follows a long line of staged auctions that have prevented real competition for the purchase of stakes in Russia's most attractive enterprises."); Phillips Decl., Ex. 201 (July 3, 1997 Moscow Times article titled "Privatization Isn't Getting Any Cleaner") ("The clearest case so far involves the Tyumen Oil Co., where 40 percent of shares now in state hands have been put up for auction at a so-called investment tender.  The terms of this process have been encumbered with ridiculous conditions which virtually guarantee that Alpha Bank, a group with close ties to the Cabinet, will win.").

Several years later, Fridman obtained the remainder of Tyumen in another auction.  Fridman leveraged his Tyumen holdings in a series of deals that expanded his fortune and his power, and Alfa Group now possesses significant interests in the oil and banking sectors as well as Russia's largest television network and a series of supermarkets.  Aven Bank is the single largest privately owned bank in Russia.  According to Forbes magazine, Fridman is the third wealthiest man in Russia, and one of the hundred richest people in the world.[11]

Aven was one of the handful of elite academics who Yeltsin chose to steer the country on a course to privatization.[12]  Yeltsin appointed Aven to be his first Minister for Foreign Economic Relations.  Aven Dep. at 38:8-51:7.  Aven was tasked in particular with addressing the considerable problem of Russia's foreign debt, and he used his position to speak out on economic issues and the administration's reform agenda.  The Russian and international press reported on his words and actions closely.[13]  Following his departure from the ministry post in December 1992, Aven became the president of Alfa Bank, a position he continues to hold today.  He owns a 15% ownership stake in Alfa Bank, Tyumen, and two telecommunications companies.  Aven continues to write articles and speak to international bodies on economic reform in Russia, and

---

[11]  See Phillips Decl., Ex. 322 (Forbes.com 2004 print-out); see also Ex. 324 (Moscow Times Sept. 5, 2003 article noting that Fridman was the world's third wealthiest man under the age of 40).

[12]  Aven received a Ph.D. in economics from Moscow State University, and worked as an economic research scholar for more than a decade before assuming his post in the Yeltsin government.  Decl. of Pyotr Aven ¶¶ 7-8.

[13]  See Phillips Decl., Ex. 12 at 56:4-57:4 (Aven Dep.), Ex. 187-195 (sample of articles about Aven).

he is approached twice a year with proposals to write a book about his time in the Yeltsin

government.  Aven Dep. at 62:20-63:25.

Fridman and Aven are recognized as two of the most powerful Russian oligarchs.[14]  They

have maintained a close relationship to the highest reaches of the Russian government, and

forged a series of friendships and alliances with Russian luminaries and politicians.[15]  In

Fridman's words, they were "players in the oligarch games," amassing wealth and influence at an

---

[14]  See, e.g., Phillips Decl., Ex. 133 (May 30, 1998 Financial Post article) ("Amidst the
ruins of the former Soviet state, a vast portion of the country's wealth has quickly fallen into a
very few hands.  Identified as 'the seven boyars' or 'the Magnificent Seven,' a small group has
taken control of a major chunk of the Russian economy.  Though not necessarily linked with
organized crime, these large conglomerates have drawn the attention of law enforcement
agencies around the world.  The seven are: . . .  Mikhail Friedman of the Alfa Group (oil, tea,
sugar, cement) . . . ."); Ex. 397 (excerpts from book titled "The Sale of the Century: Russia's
Wild Ride From Communism to Capitalism" by Christia Freeland) ("Some savvy Russian
businessmen got in on the privatization, too, most notably Mikhail Friedman, an aggressive
hustler who would eventually become one of the oligarchs."); Ex. 204 (Nov. 7, 1998 Moscow
Times article) ("Aven, a former foreign trade minister in former acting Prime Minister Yegor
Gaider's 1992 government, has been named among Russia's 'oligarchs,' or powerful financiers
with political clout.").

[15]  See, e.g., Sullivan Decl., Ex 156 (May 20, 1999 Trud article) (noting Aven is one of
the Russian businesspeople "noted for their political influence"); Ex. 70 at 16072 (April 24, 2000
Kompanija article) ("If we believe some of these stories, Michail Fridman, who heads Alfa, has
become . . . one of the most powerful and efficient lobbyists in the Kremlin with its new
master"); Sullivan Decl., Ex. 88 (Nezavisimaya Gazeta interview) (Aven acknowledged that "I
am friendly with [oligarch Boris] Berezovsky"); Aven Dep. at 109:5-111:1 ("I know Mr. Putin
for many years because he worked for me when I was a minister."); Sullivan Decl., Ex. 142
(Euromoney article) (reporting that Fridman's allies include "flamboyant and influential Russian
banking and media tycoon Vladimir Gusinky . . . [and] Logovaz chief Boris Berezovsky.").
Plaintiffs also have achieved a level of prominence on the world stage.  Aven has spoken on the
subject of reform, corruption, and the Russian economy, to international audiences including the
IMF, the World Bank, and the Carnegie Endowment for International Peace.  In 2003, Fridman
was invited to attend a ceremony in Washington, D.C., to receive the Golden Plate Award of the
International Academy of Achievement alongside a U.S. Supreme Court Justice, two Senators,
and the presidents of Chile and Colombia.  Sullivan Decl., Ex. 420.

unprecedented rate.[16]  At critical points in Russia's history, they have stepped forward to direct the course of the nation's events.  When Yeltsin was confronted with a coup attempt in the fall of 1993, Fridman and the other oligarchs were called to the Kremlin.[17]  Several years later, with privatization deeply unpopular and Yeltsin in danger of losing his bid for re-election to a communist, Fridman, Aven and the remainder of the oligarchs banded together to save the Yeltsin re-election campaign, installing a new campaign manager and (it is alleged) backing the re-election bid with money and support in the media outlets owned by the oligarchs.[18]  Two years later, Yeltsin recruited the oligarchs to serve as a sort of  economic advisory counsel, and during a market crash several months later, the oligarchs backed the government and reassured a concerned public.[19]

In short, Aven and Fridman have assumed an unforeseen level of prominence and influence in the economic and political affairs of their nation.[20]  Russian newspapers coined a

---

[16]  Phillips Decl., Ex. 6, at 020634 (TBC TV Channel July 28, 2002 Transcript).

[17]  Phillips Decl., Ex. 76 at 20634 (interview with Fridman) ("If I am not mistaken, they asked us to get together first in 93, that was on the eve of the October coup.  The situation was very tense back then.  And they invited to the Kremlin the future players in the oligarch games.").

[18]  See, e.g., Phillips Decl., Ex. 397 (Chrystia Freeland, "The Sale of the Century: Russia's Wild Ride from Communism to Capitalism), at 201-212.

[19]  See, e.g., Phillips Decl., Ex. 150 ("The participants of the meetings in the Kremlin and in the White House do not hide the fact that they offered to perform the functions of a kind of expert council for Boris Yeltsin, which could functionally evaluate the most important economic decisions of the executive branch."); Ex. 36 (June 6, 1998 Nezavisimaya gazeta article titled "Business Elites Back Anticrisis Measures); Fridman Dep. at 290:6-291:10.  Aven describes participating in discussions at the Kremlin regarding who should serve in Yeltsin's new cabinet in the wake of the market crash.  Aven Dep. at 7:11-8:14.

[20]  As one of the plaintiffs' executives explained, "When a president is going to suffer some serious issues . . . he invites some of the most important and respectable persons in Russia

8

name for the leading oligarchs (Aven and Fridman among them) and the power they wielded:

"semibankirschina," or the "reign of the seven bankers."[21]  The Financial Times in 1996 named

Aven and Fridman as among the "group of seven businessmen and bankers that, according to one

of their number, is now running Russia."[22]  As the Moscow Times put it:  "When Soviet leaders

were in trouble, they turned to the Politburo for help. When President Boris Yeltsin is in dire

straits, he turns to his own, updated version of the Politburo -- the coterie of bankers and

businessmen who, by all accounts, run modern Russia."  Sullivan Decl., Ex. 135 (June 3, 1998

Moscow Times article).[23]

--------------------------------------------------

. . . . [H]e discusses with them issues of economic progress and production sector development, and it is always the case that a representative of the . . . Alfa consortium is there . . . .  Mostly it is Mr. Fridman who attends [the meetings].  I believe Mr. Fridman is one of the biggest . . . business authorities in Russia."  Phillips Decl., Ex. 13 at 300:100-302:18 (Fain Dep.).    Of course, Aven himself played a prominent role in world events while serving in the Yeltsin government.  On one occasion, as conditions worsened in the Russian economy, Aven accompanied the acting Prime Minister of Russia on a trip to the United States, where they attended key meetings with top United States officials including Secretary of State Madelaine Albright and Treasury Secretary Larry Summers.  Phillips Decl., Ex. 12, at 170:10-172:3 (Aven Dep.).

   [21]  Phillips Decl., Ex. 397 at 199-201 (excerpt from book titled "The Sale of the Century: Russia's Wild Ride From Communism to Capitalism").

   [22]  Phillips Decl., Ex. 153 (Nov. 5, 1996 Moscow Times article) ("A leading British newspaper has named the group of seven businessmen and bankers that, according to one of their number, is now running Russia. . . .  The group includes . . . Pyotr Aven and Mikhail Fridman, of Alfa Bank . . . .").

   [23]  The situation did not change when Vladimir Putin took power.  "Putin, said one analyst close to the Kremlin, has had dealings with several 'oligarch' groups.  The closest, at the moment, is Alfa Group, led by Pyotr Aven, who as Russia's foreign trade minister in 1992 approved Putin's export contracts in St. Petersburg."  Phillips Decl., Ex. 176 (Mar. 24, 2000 Boston Globe article).  Aven estimates that he spoke to Putin over 10 times in the course of two-and-a-half years, and they were one of a handful of private financial companies with a special, direct line to the Kremlin.  Phillips Decl., Ex. 12 Vol. I at 80:7-81:18, 153:4-155:4 (Aven Dep.).

Aven and Fridman have widespread access to the media and other channels of communications.  They have given numerous interviews to Russian and international press, have published articles in Russia's leading newspapers, and have spoken to international audiences on the subjects of reform, corruption, and the Russian economy.  Their media presence extends to the United States.  Aven and Fridman have spoken to numerous influential organizations in the United States (such as the Keenan Institute and the Carnegie Endowment for International Peace), and Aven has been interviewed by American television news outlets, including ABC's Nightlight and CNN.  Phillips Decl., Ex. 226, 227.  The Alfa Group has also devoted millions to developing a public relations strategy that includes in-house press departments, an external public relations agency, a litany of press releases, and an English-language web site on which plaintiffs post their own articles as well as favorable press coverage.[24]

As a result of their positions of prominence and their media strategy, plaintiffs are the subject of extensive media coverage.  An October 2003 search of an online news database for English language articles revealed more than 1,100 English language articles since 1990 that mention the name Mikhail Fridman, and more than 1,400 articles that include the name Petr Aven.  Likewise, Alfa Bank has been the subject of 7,900 English language articles available on-line during this period, and Alfa Eco is named in more than 1,200 such articles.  Affidavit of Sandra E.K. Burch, May 2, 2004, ¶ 4.  An April 2001 search that confined the scope only to certain United States news publications (including the Washington Post, the Los Angeles Times, the New York Times, the Chicago Tribune, TIME, Newsweek, and Business Week) revealed

---

[24]  Alfa Group's promotional materials, among other things, describe Aven as an "internationally recognized economist and author of many articles" and designates Aven to speak to the Western media on "various international issues and areas."

more than 8,500 pages of articles that contain the terms Aven, Fridman, Alfa Bank, Alfa Eco, Alfa Group, or TNK.  Id. ¶ 2.

Although Alfa Bank has developed a reputation in the international community as one of the most respected Russian financial institutions,[25] Aven and Fridman have been dogged by allegations of corruption and illegal conduct.  Russian newspapers have published repeated claims that Aven and Fridman have rigged the auction of state assets through government connections, threatened the lives of government officials, ordered the assassination of a mobster, and engaged in narcotics trafficking and money laundering.[26]  As one Alfa executive testified, "we all know the details because they have been printed over and over again, it's the same meetings with the same cartel representatives . . . crime, drugs, money laundering, all that stuff." Tolchinsky Dep. at 44:8-45:22.  Plaintiffs deny the allegations, and none of the allegations has been prosecuted, let alone proven true.  Even Fridman has acknowledged, however, that the "rules of business" in Russia "are quite different to western standards. . . .  To say one can be completely clean and transparent is not realistic."[27]

## II.    The Center for Public Integrity Article

Defendant Center for Public Integrity ("CPI") is a nonpartisan and nonprofit watchdog group founded by former "60 Minutes" producer Charles Lewis.  Lewis created CPI to serve as a

---

[25]  Fridman Dep. at 74:3-75:5; Topper Dep. at 74:12-75:10.

[26]  As early as during Aven's tenure in the Yeltsin government, a corruption task force informed Yeltsin that Aven was engaged in various misdeeds, including drug trafficking.  Aven Dep. at 126:3-130:1; see Phillips Decl., Ex. 173 (Aug. 23, 1993 Times article) (noting that Aven left office under a cloud of allegations of corruption).

[27]  Dep. Ex. 323 (August. 29, 2003 Financial Times article).

source for investigative and analytical reports on topics relating to government ethics and the accountability of public officials.  One of the several publications that CPI operates is "The Public I," an internet report that the organization inaugurated in 1999.  Publishing on the internet enabled CPI to increase its coverage of "spot news" reports, or breaking news that needs to be reported in a quick and compressed fashion.  Lewis Dep. at 18:15-21:15, 340:1-10.

A.      The Origins of the Article

Several days before the 2000 Republican National Convention in July of 2000, George W. Bush  announced that he would select Richard B. Cheney as his vice-presidential running mate.  When the news broke, Lewis assigned two reporters and two researchers to cover the announcement as a spot news report on The Public I.  CPI had considerable experience in tracking the role of money and influence in politics, and so Lewis suggested that the piece focus on the ways in which Cheney's tenure as CEO of the Halliburton Company affected the relationship between the company and the federal government.  Lewis Dep. at 8:18-18:14.  Lewis explained that they needed to "jump on" the piece, and that time was "of the essence" because the Republican convention was a few days away.  Lewis Dep. at 12:2-12:14.  The two reporters assigned to cover the story were defendants Knut Royce and Nathaniel Heller.

Royce was an award-winning reporter with more than thirty years of experience who had contributed to three Pulitzer-prize winning stories.  He had written extensively on international corruption issues, and possessed a number of contacts in the national security and intelligence community.  Royce Dep. at 298:19-301:11; Sullivan Decl., Appendix ¶¶ 31, 33, 34.  Royce recalled reading that Halliburton had connections to a Russian oil company that had obtained a high-profile loan guarantee from the United States Export-Import Bank ("Ex-Im bank").  While Heller searched public records for information on Halliburton's campaign contributions and

federal contracts,[28] Royce conducted an internet search for articles regarding the Russian oil company and the Ex-Im bank loan. Sullivan Decl., Ex. 11 at 63:15-64:15, 78:2-79:13; id., Ex. 12 at 70:4-71:6 (Lewis Dep.).

One of the articles Royce found was a January 2000 Washington Post report by David Ignatius entitled "The Strange Case of Russia, Big Oil and the CIA." Sullivan Decl., Ex. 69. The report described how the Ex-Im bank had been nearing decision for some time on a $500 million loan guarantee to the Tyumen Oil Company. Although it was prepared to conclude that the loan met the bank's test of creditworthiness, the bank was facing an unusual campaign to reject the loan, led by BP Amoco, which was battling Tyumen for control of the assets of the debt-ridden Sidanco oil company in Russia. The article described how BP Amoco believed that Tyumen was using "improper tactics" to acquire one of Sidanco's lucrative oil fields in a closed door bankruptcy auction, with no public bidding and at a heavily discounted price. BP Amoco hoped that it could use a delay in the Export-Import loan application as leverage in its battle with Tyumen.

According to the article, what made the lobbying campaign "unusual" was that it was "accompanied by heavy pressure" from the Clinton administration -- stung "by criticism that it hadn't done enough to fight Russian corruption" -- to "reject or delay the loan." Sullivan Decl., Ex. 69. As the bank neared a decision on the loan, the article said that the National Security Council asked the Central Intelligence Agency to examine Tyumen and make information on the company available to the Ex-Im bank's directors. The CIA provided "several analytical reports and some raw intelligence," including a 29-page investigative report on Tyumen labeled "Secret."

---

[28] Heller was a recent collegiate graduate who had begun working at CPI in July 1999. Sullivan Decl., Ex. 12 at 10:11-10:15.

Id. at 2.  The article quoted a CIA spokesman as stating that a CIA cover letter accompanying the report explained that it had been "commissioned by an international oil company, and produced by a Russian security firm that employs former members of the Russian security service."  Id. The CIA would not identify who commissioned the report, but the article reported that an "informed source outside the U.S. government" said that it was BP Amoco.  Id.

The Washington Post article advised that two and a half pages of the CIA report were labeled "criminal situation," and included "some detailed allegations about Tyumen management."  Id.  The article did not describe the contents of this section of the document, but it quoted another anonymous senior intelligence official as stating that CIA analysts later gave Export-Import officials a briefing, at which "we gave them our take on the Tyumen report," namely that "it tracked other information the agency had gathered."  Id.  The article concluded with a discussion of the result of BP Amoco's lobbying campaign against Tyumen, pointing out that although the bank held its ground, the State Department ordered that the loan be halted on national interest grounds, and the next day Tyumen negotiated a settlement with BP Amoco.  Id. at 2-3.

Royce reviewed other articles as well.  One of these was a summary in "Banking and Exchanges Weekly" of a July 1999 article in the Russian newspaper "Versiya," that included a description of several criminal allegations against Alfa Group/Tyumen officers.  The summary mentioned that Aven had met a Colombian drug cartel representative in Vienna in 1993, at which time they discussed an agreement to divert capital from offshore areas into Alfa Bank, that Fridman had a hand in organizing "drug trafficking from South East Asia to Europe via Russia," and that Fridman maintained "numerous contracts" with the "most aggressive" criminal syndicate in Moscow.  Royce Dep. at 91:4-91:12, Ex. 46 (abridged Versiya article).

14

Another Russian newspaper article that Royce found reported that Victor Ilyukhin, Chairman of the Security Committee of the Russian Duma, had in 1997 asked the Ministry of the Interior to verify allegations that Alfa Group officials had "used criminal groups for eliminating rivals" and had been involved in "bribe taking" and "embezzlement."  Sullivan Decl., Ex. 30. A second article in "Versiya" profiled ties between the Alfa Group and "the most influential organized crime group in Moscow's criminal world," and said that the latter had "influence" over Alfa Bank, guarantees the protection of Fridman and Aven, and supports certain Alfa "operations."  Sullivan Decl., Ex. 51 (email to Royce containing translation of Versiya article).

### B.       Royce's Intelligence Sources

With these articles in hand, Royce contacted one of his anonymous sources at the CIA. Royce asked the official about the report identified in the Washington Post article, and any information he possessed about Alfa Group or Tyumen independent of that report.  Royce Dep. at  231:9-232:3.  The source declined to give Royce a copy or summarize the contents of the report, and refused to tell Royce who had authored the report.  However, the source acknowledged that the report existed and that the source had read the report, and confirmed that the criminal information described in the report "tracked what the agency had."  Royce Dep. at 233:11-236:14.  As Royce described it, the source "effectively confirm[ed]" what had been described in the Washington Post article.  Royce Dep. at 237:16-237:20.

Royce then turned to a second source from the intelligence community, former CIA official Richard Palmer, who had been the Chief of Station in Russia in the early 1990s before working in the private sector in the Russian banking industry.  Palmer Dep. at 115:8-115:22; Sullivan Decl., Ex. 47 (redacted Palmer testimony before Congress).  Palmer provided Royce with a full copy of the Versiya article that Palmer had earlier read only in abridged form in

Banking and Exchanges Weekly.  Royce Dep. at 102:13-105:13.  The article stated that the

newspaper had obtained the report containing criminal allegations against Alfa Group officials

that Ilyukhin had passed on to the Ministry of the Interior for investigation.  The article reported

in detail the allegations in the report, which included claims that Aven and Fridman had engaged

in the drug trade and had ties to Russian organized crime.  Sullivan Decl., Ex. 49.[29]

Royce obtained other articles at this time that contained similar charges against Aven and

Fridman.  Royce reviewed a December 4, 1999 article in "The Economist" that repeated claims

that Tyumen officials had "intimidated judges and journalists," that "its sources of funds are

unclear," and that "behind the scenes it is run by bandits."  Sullivan Decl., Ex. 33 at 1 (email to

Royce containing Economist article).  A former high-ranking State Department official also

provided Royce with several Russian news articles about the Alfa Group that contained

allegations that "Fridman was friends with many leading crime bosses."  Sullivan Decl., Ex. 51 at

17-18.

### C.    The Russian-American Specialist and the FSB Report

Royce then contacted another anonymous source, this one a Russian-American specialist

on business practices in the Soviet Union who had several contacts in the Russian law

enforcement community.  Royce Dep. at 139:17-140:6, 433:10-434:19.  Royce describes the

individual as "extremely knowledgeable about criminal activity" in the Russian business world.

---

[29]   The article acknowledged that the Ilyukhin affair could be a "communist provocation aimed at three honest businessmen."  Id.  The abridged version of the article explains that it was written by Oleg Lurye.  Royce would later ask one of his other sources about Lurye; the source would tell Royce that he had a "reputation of being a real digger who comes up with stories that others don't come up with, who did have an occasional fault, and that is sometimes he was prone to exaggerate somewhat" and there would "[s]ometimes be something of a stretch in describing material."  Royce Dep. at 92:20-93:22, 95:16-95:18.

Sullivan Decl., Ex. 11 at 160:1-160:10 (Royce Dep.).  Royce met with the specialist for more

than an hour, during which time the specialist described the ownership and management of Alfa

Group and Tyumen and the controversy regarding its privatization.  The specialist explained to

Royce that "no major oil company is free of criminal activity," that all of this occurred at Alfa

Group and Tyumen too, including "bribery, tax evasion, [and] corruption," that he had "little

doubt that [Alfa Group and Tyumen] committed crimes in numerous occasions," and that

Russian organized crime money "has gone through Alfa Bank."  Royce Dep. at 151:7-154:22;

Ex. 52 (handwritten notes).

Royce asked the Russian-American specialist about the report that Ilyukhin had

forwarded to Russian law enforcement agencies.  The specialist told Royce that he had contacted

a source of his at the Russia Federal Security Bureau ("FSB," the successor agency to the KGB)

to ask about the report, and the source informed him that the FSB would be investigating the

allegations.  When the specialist asked again a couple months later, the source had told him that

the inquiry had been "put away for a better day" due to political considerations.  Royce Dep. at

163:8-164:22.

Some time after their meeting, the specialist faxed Royce an abridged copy of the report

(the "FSB report").  Royce Dep. at 162:1-163:8.  The specialist wrote a note on the fax cover

sheet:

> Find enclosed the open letter to Ilyukhin as discussed.  It is abridged and
> translated.  The other document that I discovered was the unabridged version in
> the original Russian.  I would still recommend looking into the Duma Archives
> for further actions on Ilyukhin's part.
>
> P.S.  Please don't take this article as the gospel.

17

Pl. Ex. 8.  Royce explains that he understood the postscript to mean that he should not "assume

that every bit of information is accurate," and that "[a]s in anything that comes out of Russia, be a

little careful."  Royce Dep. at 192:4-192:9.  Royce did not show the cover sheet to, or discuss its

contents with, Lewis, Heller, the fact-checker of the piece (Peter Smith), or the copy editor

(Richard Prince).[30]

> The FSB report is eight pages long.  The first page contains a header stating:
>
> This memo contains excerpts from a letter, sent from an anonymous group of
> Federal Security Bureau agents to the head of the national security commission,
> Victor Ivanovich Ilyukin.  Although we have been unable to determine the
> veracity of the allegations made in the letter, our sources confirm that they may be
> the basis for an ongoing investigation by the federal authorities in Moscow.

Sullivan Decl., Ex. 29 at 1.  The remainder of the document goes on to describe a number of

criminal allegations involving the Alfa Group, including that:

- Alfa Group "cooperat[ed]" with various Russian crime groups (including the Solntsevo mob).  Id. at 3.

- Fridman and Aven "allegedly participated in the transit of drugs from Southeast Asia through Russia and into Europe."  Id. at 3.

- Fridman had "secretly cooperated with operatives of the KGB" in the 1980s.  Id. at 4.

- The Ministry of Internal Affairs searched Alfa Eco buildings in April 1995 and found drugs and other compromising documentation in an Alfa Eco building.  The search was conducted due to the fact that, at the end of March residents in the city of Khabarovsk were "poisoned, apparently with sugar"; in "the course of the investigation, it was learned that the poisoning resulted from the fact that a large dose of some narcotic substance had contaminated the sugar," and it was later established that the containers in which the sugar was transported had been leased by an Alfa Group executive.  Id. at 4.

_____

[30]  See Lewis Dep. at 110:5-110:9; Smith Dep. at 106:10-106:15; Heller Dep. at 172:16-173:7; Prince Dep. at 89:11-89:18.

- Aven "met with a representative of the Colombian drug trade, Gilberto Rorigesom Orexuel, known by the nickname the 'Chessman.'  The meeting was held in part to conclude an agreement about the transfer of money into Alfa Bank from off-shore zones such as the Bahamas, Gibraltar, and others."  Id. at 8.

- Alfa Group relied on Aven's contacts to "transport drugs on a grand scale."  Id. at 8.

Sullivan Decl., Ex. 29.

The Russian-American specialist told Royce that "there was not much question in his mind that the material came from the FSB."  Royce Dep. at 198:11-199:1.  The specialist told Royce "that there were allegations in there that he couldn't personally substantiate and others that generally he could, given what he knew, what he himself knew."  Royce Dep. at 199:2-200:2. The specialist explained that he did not have personal knowledge of Fridman and Aven "being involved in drugs," but that he did have knowledge of their "involvement" with the Solntsevo mob, and that he could attest to Alfa Group having a "business relationship" and "a close relationship" with organized crime.  Royce Dep. at 155:1-157:8.

Royce left the conversation with the Russian-American specialist convinced that the FSB report was not a "phony document."  Royce Dep. at 185:10-187:1.  He believed there was "a high likelihood it was indeed from the Federal Security Bureau, that some agents, one or more agents, had put together the material but that they wanted to not be identified and submitted it anonymously."  Royce Decl. at 198:3-199:1.  Royce never identified or spoke with the anonymous officials who provided the FSB report to Ilyukhin.  Pls.' Mem. Ex. 7 at ¶¶ 31, 33-36 (interrogatory responses); Royce Dep. at 201:13-18, 209:1-210:5.  Royce also did not find out

whether any of the officials had personal knowledge of the allegations set out therein.  Pls.' Mem.

Ex. 7 at ¶¶ 37-44.[31]

### D.    Palmer and the KGB Report

Royce then arranged to meet with Palmer and John Forbes, a United States Customs

officer.  Royce Dep. at 244:6-249:20.  Royce asked both men to search for additional information

they might have about the Alfa Group.  Royce Dep. at 248:12-251:9.  According to Royce,

Forbes told him that he knew nothing about plaintiffs outside of "what he ha[d] read in the

newspapers."  Royce Dep. at 251:10-252:4.  Palmer, on the other hand, located in his files after

the meeting a memorandum detailing information that had been given to him in the summer of

1995 by a former KGB major (the "KGB major report").  Royce Dep. at 258:10-258:20.

Palmer gave Royce a copy of the KGB major report.  The report explains that it contains

notes from a September 1995 meeting with a former KGB major who was close to the

management of two Russian banks.  The report detailed the following allegations:

> •    "As to Alfa-Bank, there is evidence regarding its involvement with money
>       laundering of Russian and Latin American drug cartels.  Alfa was [a] KGB
>       creation in 1987 . . . eventually made into a bank to help move money."
>       Id. at 1.

---

[31]  Letters from Ilyukhin that came to light in the course of this litigation confirm that
Ilyukhin in fact received the FSB report from FSB officials who were "afraid for their
professional career" and therefore wanted to remain anonymous, and that Ilyukhin then referred
the report to the Director of the FSB and the Deputy Chairman of the Ministry of the Interior
("MVD") with the instruction that those agencies investigate the allegations.  See Sullivan Decl.,
Ex. 21, 22 (Nov. 26, 1997 letters from Ilyukhin); Bowman Decl., Ex. 30 (May 22, 2003 letter
from Ilyukhin).  The MVD reported back to Ilyukhin a month later that it has been established
that Alfa Group was "being investigated in connection with a number of criminal cases,"
including a case in which Moscow customs officials found arms and ammunitions in a shipment
addressed to Alfa Eco.  Sullivan Decl., Ex. 23 (Dec. 24, 1997 letter from V. Vasiliev to
Ilyukhin).

- "Alfa Bank was founded with both KGB and Communist Party funds.  By then, several 'rogue' former members of the KGB had come into this bank – often bringing their criminal world contacts with them. . . .  They quickly determined that dealing in drugs would bring the highest profits with literally no risk in Russia."  Id.

- "Alfa Bank's connections with drug dealers were revealed since autumn 1991– since the moment of the appointment of Pyotr Aven as minister of foreign trade.  At that time, a large channel of heroin transit was established."  Id.

- "Once a funny incident took place in a Siberian region.  There were some cases of strange intoxication registered in local people - this intoxication was caused by certain drugs.  It was learned that the drugs were contained in the sugar bought by these people from a certain railway worker.  The person confessed that he stole the sack of sugar from the train car.  Later, it was ascertained that the 'sugar' cargo belonged to the firm ALFA-ECO  . . . a branch of ALFA-bank.  The criminal investigations were instituted -- but were quickly stopped."  Id. at 2.

Royce asked Palmer for the identity of the KGB agent, and if Royce could talk to him, or if Palmer could get in touch with him and ask him more questions.  Palmer refused to disclose the major's identity, and said that Palmer would not even know how to track him down now.  Palmer Dep. at 30:11-31:14.  Palmer did tell Royce that the former KGB officer had been working with two banks that were founded by the KGB when Palmer talked with him.  Royce Dep. at 327:8-327:19.  Royce asked Palmer if he had ever given the document to anyone else, and Palmer said that he had not.  Palmer Dep. at 229:21-230:7.[32]

---

[32]  Palmer explained in his deposition that when he had met with the KGB major, the major gave him a handwritten memorandum.  The major told Palmer that these were his notes, and that he had received the information from some of his colleagues in Russia, which Palmer took to mean other members of the KGB.  Palmer Dep. at 57:14-58:3, 105:18-107:9, 122:20-123:2.  As they discussed the memorandum, Palmer asked the KGB major questions, and took notes of additional information that the KGB major had provided.  Palmer then typed up the handwritten memorandum, including the notes.  That document is the KGB major report.  Palmer Dep. at 54:20-55:9, 63:11-63:21, 149:15-22.

21

Royce asked Palmer if Palmer believed the KGB agent was credible.  Palmer explained that "based on the fact that he had given me other information, which I found to be very consistent and very accurate," that "he knew what he was talking about."  Palmer added that "in all my dealings with him, I found him to be credible," and that "I had seen nothing in the information to indicate that he was anything other than who he said he was and his information was accurate."  Palmer Dep. at 30:11-31:14, 114:13-114:19, 147:13-148:2; Royce Dep. at  290:1-290:15.[33]

Royce concluded that many of the allegations in the 1997 FSB report had been corroborated by the KGB major report written two years earlier.  Royce Dep. at 278:10-278:15, 407:10-408:8.  He explained in his deposition in this case that the "KGB and the FSB that succeeded it I believe employ hundreds of thousands of officers and agents," and the odds "were astronomic that the KGB officers would perhaps have been one of the FSB officers who had provided the report in '97."  Royce Dep. at 407:12-407:17.  Royce also testified that he found the information credible because it had been given to someone who "the former U.S. intelligence official deemed to be credible" and "who was not a journalist," reducing the likelihood that it was "compromat," the Russian term for the practice, common during this period, of arranging for the

---

[33]  Palmer elaborated in his deposition that the KGB agent had provided a description of his background that "seemed to me to be very credible"; the agent "gave me information on the threats to my wife and I, which was nonpublic, which was exceedingly accurate," indicating "that he certainly had exceptional access"; the KGB agent provided "identification" and other materials that were "exceptionally accurate," and provided other intelligence information that had "at that time, never been published" and was "definitely nonpublic information."  Finally, Palmer referenced the document itself, to which the KGB agent was "willing to immediately add notes" and "information on it.  All these are signs to me that this person is entirely credible."  Sullivan Decl., Ex. 16 at 114:9-117:21.

publication of compromising (and often false) material about one's competitors or rivals.  Royce

Dep. at 407:17-407:22; Tolchinsky Dep. at 45:16-45:22; Winer Dep. at 130:16-131:18.[34]

### E.   Preparing the Article for Press

Royce testified that, at this point, he believed the allegations of criminal conduct were

credible based on the "total body of evidence" that was available at that time, which included the

FSB report, the KGB major report, the multiple intelligence sources (the CIA source, the

Russian-American specialist, and Palmer),[35] the Versiya and other articles, the published

Washington Post and Economist articles, and the fact that the CIA and BP Amoco possessed

information suggesting criminality on the part of Tyumen officials.  Royce Dep. at 278:12 to

279:2.  Royce and Heller sought responses from the plaintiffs regarding the allegations.  Heller

called Tyumen's counsel at Akin Gump Strauss Hauer & Feld.  One of the attorneys told Heller

that CPI was "totally off the mark."  When Heller mentioned that they had corroborating

evidence from intelligence sources, the attorney directed Heller to Tyumen's public relations

---

[34]   Palmer explained that when he started talking to Royce, he set out ground rules:  "I never wanted to be quoted, I never wanted to be referred to[,] [and] I didn't want any of my information referred to."  Palmer Dep. at 32:16-33:3.  Palmer provided the information as "background material" that "would perhaps provide him a lead to other things to look for on the area."  Palmer Dep. at 80:19-80:22.  Palmer claims that when the article was published he called Royce to tell him that he was "surprised" to see even an oblique reference to him in the article and that he "thought we had an agreement that that was not to happen."  Palmer says that Royce was apologetic and said that he believed the ground rules had changed, and that Palmer expressed anger that Royce had violated their agreement.  Palmer Dep. at 80:22-81:15, 162:19-167:10.  Royce disputes that this conversation occurred.  Royce Dep. at 451:10-451:13, 465:2-470:14.

[35]   These were not the only sources Royce contacted.  At one point prior to publishing the article, Royce contacted Jeffrey Robinson, an author of a book on international organized crime.  Royce asked Robinson whether he had any information tying the plaintiffs with narcotics activity or organized crime figures.  Robinson told him that he did not have any material that bore on those allegations.  Royce Dep. at 274:13-22, 276:3-9.

people at Fleishman-Hilliard.  Heller Dep. at 241:8-12.  Heller contacted the account executive,

who also provided a denial, and referred Heller to Alexander Tolchinsky, a member of the Board

of Directors of Alfa Bank.  Heller Dep. at 203:21-204:9.

     Tolchinsky dismissed the allegations as "nonsense."  Tolchinsky Dep. at 64:17-65:1.

Tolchinsky explained that the allegations were "not new," and that they amounted to the same

"old story that had been reprinted by various obscure Russian publications from mid '90s."

Royce Dep. at 42:8-43:2.  He expressed the view that the entire "bag of dirt" about Alfa was

"compromat," which is the term for the Russian practice of arranging for the publication

(sometimes through payments) of compromising material about ones competitors or rivals.

Tolchinsky Dep. at 45:16-22; Royce Dep. at 383:14-385:1; Winer Dep. at 130:16-131:18.

Tolchinsky told Royce that the stories were planted by an Alfa Group competitor who he

declined to identify.  Tolchinsky advised Royce to ask around to learn more about the nature of

compromat and the Russian "yellow press."  Tolchinsky Dep. at 42:8-44:7.  Royce did not

contact Fridman or Aven to ask them to comment about the piece; he explained in his deposition

that he did not believe that they spoke English, and that he did not hire an interpreter because

they were "pressed for time at that point" to publish the piece.  Royce Dep. at 388:18-390:5

     The article proceeded through CPI's normal fact-checking and editing process.  The

article was fact-checked by a researcher named Peter Smith.  Smith Dep. at 54:11-54:16.  Smith

read the FSB and KGB major reports, and raised with Royce and Heller an anti-Semitic tone he

detected in the documents.[36]  Smith Dep. at 101:7-101:18, 106:16-107:6.  Royce responded that

---

[36]  The FSB report notes that Fridman and Aven were "born . . . Jewish," falsely asserts
that Aven's older brother is a successful Israeli businessman who works with the Mossad (Aven
has no siblings), and states that while living in Vienna in the late 1980s or early 1990s, Aven met
with "a certain Aizenberg" who was a representative of Israeli intelligence (Aven says that no

anti-Semitism was common in Russia during the period and therefore, if anything, that tone was "an indication of authenticity."  Smith Dep. at 101:7-18; 106:16-107:6.  Smith relates that Royce and Heller "indicated that they were persuaded that the documents were reliable, that the allegations in them were corroborated by one another and gave a solid basis for the story."  Smith Dep. at 101:13-101:18.  Royce pointed out to Smith "that these were two separate sources, separated in time from each other; one from the former KGB agent, one from the FSB."  He explained that the "separation . . . made it unlikely that it was one bad source that was feeding both of them."  Smith Dep. at 101:19-102:12.  Smith said that Royce was "emphatic" that the allegations were true.  Smith Dep. at 102:11-102:12.  Smith was left with the impression that "all the questions and issues I had raised had been resolved."  Smith Dep. at 109:21-110:4.

Lewis gave the final approval for the article to be published.  Lewis Dep. at 59:17-60:4. Lewis remembers that Royce "felt secure" about the basis for the article.  Lewis Dep. at 236:13-237:19.[37]  Royce and Heller both testified that they were confident that the allegations were credible at the time the article was published.  Royce Dep. at 278:7-279:11; Heller Dep. at 427:20-438:10.  The period of time from the assignment to the publication of the piece was approximately a week.  Lewis Dep. at 32:1-32:13.  On August 2, 2000, CPI published the article online on The Public I.  The article remains on the CPI web site to this day.

---

such meeting occurred).  Sullivan Decl., Ex. 29 at 424-26; Aven Decl. ¶ 18.

[37]  Lewis testified that he had a conversation at one point with Royce in which Royce indicated that Soros might have had a copy of the BP Amoco report, but expressed concern that Soros was a funder of CPI.  Royce Dep. at 237:2-238:16; Lewis Dep. at 150:11-21.  Lewis testified that he told Royce that he should do what he needed to do to get information on the article, and that the fact that Soros funded CPI should be deemed irrelevant.  Lewis Dep. at 150:11-21.  Royce testified that he did not have a conversation with Lewis before deciding not to call Soros.  Royce Dep. at 241:13-241:16.

## F.      The Article

The article was titled "Cheney Led Halliburton to Feast at Federal Trough."  Sullivan

Decl., Ex. 1.  The article reports that Halliburton has benefitted from billions of dollars in federal

contracts and loans under the stewardship of Cheney, and notes as one example the loan to

Tyumen guaranteed by the Export-Import bank.  The article advises that Halliburton lobbied for

the loan, and that it would receive $292 million of the loan to refurbish oil fields in Siberia for

Tyumen.  The article then notes that BP Amoco commissioned a report on Tyumen, which was

provided to the CIA.  The article notes that the BP Amoco report contains two and a half pages

labeled "criminal situation," that the CIA passed the report on to the Ex-Im bank, and that the

CIA told the bank that the report "tracked" its own information.  Article at 3.

The article notes that allegations of organized crime and drug activities "involving

Tyumen's parent company, the Alfa Group, had been made public in Russia last year," and that

the allegations are "contained in a report delivered in 1997 by anonymous officials from the FSB

(the Russian equivalent of the FBI) to the national security committee of the Duma, or lower

house of parliament)."  Article at 3.  According to the article, the Russian-American specialist

explained that the allegations had been the subject of an FSB investigation that had been "put

away for a better day," and that key elements of the FSB report were "virtually identical" to those

provided to an American intelligence officer two years earlier by a former KGB major.

The article then describes the allegations in the FSB and KGB major reports, including

that:

- The KGB major report "and the FSB report claim that Alfa Bank, one of Russia's largest and most profitable, as well as Alfa Eko, a trading company, had been deeply involved in the early 1990s in laundering of Russian and Colombian drug money and in trafficking drugs from the Far East to Europe."  Id. at 3.

- "The former KGB major . . . said that Alfa Bank was founded with party and KGB funds, and quickly attracted rogue agents who . . . 'quickly determined that dealing in drugs would bring the highest profits with literally no risk in Russia.'" Id. at 4.

- "The FSB report . . . claimed that Alfa Group's top executives, oligarchs Mikhail Fridman and Pyotr Aven, 'allegedly participated in the transit of drugs from Southeast Asia through Russia and into Europe.'" Id. at 4.

- "Both the FSB and KGB major reports cite an event in 1995 in which residents of a Siberian town became 'intoxicated,' according to the American's report, and 'poisoned,' according to the FSB report, after they had eaten heroin-laced sugar that had been shipped in a rail car container leased to Alfa Eko, which specializes in the shipment of foodstuffs." Id. at 4.

- "Both reports claim that Alfa bank has laundered drug funds from Russian and Colombian drug cartels.  The FSB document claims that at the end of 1993, a top Alfa official met with Gilberto Rodriguez Orejuela, the now-imprisoned financial mastermind of Colombia's notorious Cali cartel, "to conclude an agreement about the transfer of money into Alfa Bank from offshore zones such as the Bahamas, Gibraltar and others."  The article notes that the KGB major report "is unclear about Alfa's alleged role with Rodriguez," but reports that there was evidence "regarding [Alfa Bank's] involvement with the money laundering of . . . Latin American drug cartels." Id. at 5.

- "The former KGB officer claimed that the Alfa empire had its roots in a cooperative formed by KGB officers in 1987. . . ."  The FSB report claims that top officials of the Alfa Group 'cooperated' with a number of Russian crime organizations," and that the Russian-American specialist, "who has a wide array of contacts inside Russia's law enforcement and intelligence communities, agreed that Alfa Bank, as well as others, are used by the Solntsevo crime family." Id. at 5.

The article notes that the KGB officer was "at the time working for two banks formed by the KGB," and that he had been a part of the Soviet spy agency's "ideological counterintelligence branch," id. at 3, but does not mention the anti-Semitic tone of the article or discuss the phenomenon of compromat.  The introduction of the article emphasizes that the claims of drug trafficking and organized crime funds "are hotly disputed by the Russian oil firm's holding company." Id. at 1.  The article quotes Tolchinsky as stating that the allegations are "nonsense,"

and "[a]nother Alfa official" that "the reports were planted by representatives of a competing company, whom he would not identify." Id. at 4.  The article also quotes an unidentified Akin Gump lawyer as describing the claims as "way off the mark," and an individual from Tyumen's public relations firm as stating that the firm had performed a background check on Tyumen and that "there was no concern" about the alleged mob ties.  Id.

The article closes by noting that "Tyumen could have significant access to the White House should the Bush-Cheney ticket win in the November presidential elections," noting ties between Tyumen's legal counsel and the Bush campaign, and returning to a discussion of Halliburton's campaign expenditures and lobbying endeavors.  Id. at 6.  The article mentions that it talked to Halliburton and the Ex-Im bank about criminal allegations tying Tyumen and its officers to Russian organized crime, and states that an Ex-Im attorney said that the bank concluded that there was "no evidence to support the allegations" in the BP-Amoco report.  Id. at 6.

III.    **Procedural History**

Fridman, Aven, OAO Alfa Bank and ZAO Alfa Eco commenced this action against CPI, Royce, and Heller on September 14, 2000.  The complaint seeks compensatory and punitive damages and a permanent injunction preventing defendants from continuing to publish the article.  On May 3, 2004, following a lengthy period of discovery, defendants filed a motion for summary judgment (along with two accompanying motions going to the merits of plaintiffs' claims).  On June 1, 2004, the Court granted plaintiffs' motion to strike defendants' motion for summary judgment for exceeding the Court's page limits, and required defendants to file a renewed motion.  On June 18, 2004, defendants filed a renewed motion for summary judgment. The motion is now fully briefed, and the Court held a hearing on the motion on February 3, 2005.

28

## STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c)).  The party seeking summary judgment bears the initial responsibility of demonstrating the absence of a genuine dispute of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The moving party may successfully support its motion by "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Id. (quoting Fed.R.Civ.P. 56(c)).

In determining whether there exists a genuine issue of material fact sufficient to preclude summary judgment, the court must regard the non-movant's statements as true and accept all evidence and make all reasonable inferences in the non-movant's favor.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Lohrenz v. Donnelly, 350 F.3d 1272, 1274-75 (D.C. Cir. 2003).  A non-moving party, however, must establish more than the "mere existence of a scintilla of evidence" in support of its position.  Anderson, 477 U.S. at 252.  By pointing to the absence of evidence proffered by the non-moving party, a moving party may succeed on summary judgment. Celotex, 477 U.S. at 322.  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  Anderson, 477 U.S. at 249-50 (internal citations omitted).

Where, as here, the Court will be the trier of fact on an issue if the case were to proceed to trial, the rules of summary judgment are altered.  In such a case, the "Court is not confined to deciding questions of law, but also may . . . draw a derivative inference from undisputed subsidiary facts, even if those facts could support an inference to the contrary, so long as the

inference does not depend upon an evaluation of witness credibility." <u>Cook v. Babbitt</u>, 819 F.

Supp. 1, 11 & n.11 (D.D.C. 1993); <u>see</u> <u>Ramallo v. Reno</u>, 931 F. Supp. 884, 888 (D.D.C. 1996)

("Because the Court would be the ultimate trier of fact in this case if it went to trial, '[c]onflict

concerning the ultimate and decisive conclusion to be drawn from undisputed facts does not

prevent rendition of a summary judgment.'") (quoting <u>Fox v. Johnson & Winsatt, Inc.</u>, 127 F.2d

729, 737 (D.C. Cir. 1942)).

## ANALYSIS

To preserve the "national commitment to the principle that debate on public issues should

be uninhibited, robust, and wide-open," the Constitution sets a demanding bar for "public

figures" to recover for acts of defamation.  <u>New York Times v. Sullivan</u>, 376 U.S. 254, 270

(1964).  A public figure may prevail in a defamation suit only if he or she can produce "clear and

convincing proof" that the challenged publication was made with "actual malice" -- i.e., with

"knowledge that it was false or with reckless disregard of whether it was false or not." <u>Masson v.

New York</u>, 501 U.S. 496, 509 (1991); <u>Gertz v. Robert Welch, Inc.</u>, 418 U.S. 323, 342 (1974);

<u>Tavoularas v. Piro</u>, 817 F.2d 762, 775 (D.C. Cir. 1987) (en banc) (quotation omitted).

Defendants move for summary judgment on two independent grounds.  First, they

maintain that the publication of the CPI article is governed by a "fair reporting privilege" that

provides an absolute immunity from suit and therefore removes any need to consider the public

figure and actual malice questions.  Second, they contend in the alternative that plaintiffs are

limited public figures concerning the issue of Russian corruption and the future of Western aid

and investment, and that plaintiffs have not come forward with clear and convincing evidence

that defendants published the statements in the CPI article with actual malice.  The Court

addresses each of these contentions in turn.

## I.       The Fair Reporting Privilege

Defendants contend that this case can be resolved through the application of the fair

reporting privilege.  This privilege "is a recognized exception to the common law rule that the

republisher of a defamation is deemed to have adopted the underlying defamatory statements as

its own."  White v. Fraternal Order of Police, 909 F.2d 512, 527 (D.C. Cir. 1990).  The privilege

extends to "the report of any official proceeding, or any action taken by any officers or agency of

the government of the United States, or of any State or of any of its subdivisions,"  Restatement

(Second) of Torts § 611 cmt. d (1977), and will protect an article when it is "apparent either from

specific attribution or from the overall context that the article is quoting, paraphrasing, or

otherwise drawing upon official documents or proceedings," and the article is a "fair and

accurate" account of the document or proceeding," Dameron v. Washington Magazine, Inc., 779

F.2d 736, 739 (D.C. Cir. 1985).

Defendants maintain that the fair reporting privilege protects the CPI article because

practically all of the challenged statements in the piece are attributed to the "FSB report," a

memorandum delivered by anonymous Federal Security Bureau agents to Victor Ilyukhin,

Chairman of the Security Committee of the Russian Duma, containing various allegations of

misconduct concerning the leadership of the Alfa Group.  The evidence in the record shows that

Ilyukhin took action on the FSB report, passing it on to the Director of the FSB and the Deputy

Chairman of the Ministry of the Interior ("MVD") with the instruction that those agencies

investigate the allegations.[38]  See Sullivan Decl., Ex. 21, 22 (letters from Ilyukhin).  The MVD

reported back to Ilyukhin a month later that it had been established that Alfa Group was "being

---

[38]  The FSB and the Ministry of the Interior are both Russian law enforcement agencies.

investigated in connection with a number of criminal cases," including a case in which Moscow

customs officials found arms and ammunitions in a shipment addressed to Alfa Eco.  Sullivan

Decl., Ex. 23 (letter from Vasiliev to Ilyukhin).

The Court agrees with defendants that each of the ordinary prerequisites to application of

the fair reporting privilege is met in this case:  the FSB report is an "official document" for

purposes of the privilege,[39] the CPI article paraphrases or draws upon the FSB report,[40] and the

CPI article is a substantially accurate account of the report.[41]  Nevertheless, the privilege is

---

[39]  See White, 909 F.2d at 512 (holding that fair and accurate reporting privilege extended to articles reporting on a series of letters a police union wrote to a mayor alleging that irregular procedures were used in the drug test of a police captain, which the mayor then passed on to the police chief, who created an investigatory commission on the issue; "it would be untenable to make a distinction between a report about an official proceeding and that which, for all purposes, is the subject matter of the proceeding") (quotation omitted)); see also Reeves v. American Broadcasting Co., 719 F.2d 602, 603-04 (2d Cir. 1983) (fair reporting privilege applies to "reports of charges made to a grand jury," even though "[n]o formal charges were ever filed against any individual or corporate entity"); Medico v. Time, Inc., 643 F.2d 134, 139-40 (3d Cir. 1981) (applying fair reporting privilege to magazine's report of FBI documents that "express only tentative and preliminary conclusions that the FBI never adopted as accurate").

[40]  The article explains that the FSB report was "delivered in 1997 by anonymous officials from the FSB (the Russian equivalent of the FBI) to the national security committee of the Duma, or lower house of parliament," and that according to a source, the "allegations contained in the 1997 report have been the subject of an investigation by the FSB but that the probe, for unexplained reasons, had been put away for a better day."  Article at 3.  The article then goes on to attribute explicitly to the FSB report each of the allegations discussed in the article that are contained in the FSB report (using language such as the "FSB report . . . claimed" and the "FSB report said").  This more than satisfies the attribution requirement for the privilege.  See White, 909 F.2d at 528 (attribution requirement met where report describes the relevant documents and then "consistently attributed the reported facts to those documents"); Dameron, 779 F.2d at 739 (report need only be "written in such a manner that the average reader would be unlikely to understand the article (or the pertinent section thereof) to be a report on or summary of an official document or proceeding").

[41]  Plaintiffs point to minor inaccuracies in the article's description of the FSB report (for instance, the article states that bags of sugar in an Alfa Eco railcar were laced with heroin, while the FSB report does not specify the nature of the drugs in the bags).  However, the law requires only that the article provide a "substantially" accurate portrait of the document, and the CPI article plainly meets this standard.  White, 909 F.2d at 527-28; compare Dameron, 779 F.2d at

unavailable to defendants in this case, because it does not extend to the official reports of the actions of a foreign government.

The Fourth Circuit so held in Lee v. Dong-A Ilbo, 849 F.2d 876 (4th Cir. 1988), in which the court refused to extend the privilege to a United States news agency report of a South Korean government press release.  Reasoning that "[w]e are familiar with the workings of our government and consider it to be open and reliable," while "[f]oreign governments, like nongovernmental sources of information, are not necessarily familiar, open, reliable, or accountable," the Fourth Circuit declined to "provide a blanket privilege to those who report the activities of foreign governments."  Id. at 879-80.  The court then held that applying "the privilege in a piecemeal fashion would be extremely difficult," placing the court in the untenable position of attempting to determine whether a foreign state exhibits the "openness and reliability that warrant an extension of the privilege."  Id.  The court therefore concluded that the privilege should not apply to reports on the acts of foreign governments.

This Court agrees with and follows the reasoning of the Fourth Circuit.  Indeed, the Restatement adopts the same approach, explicitly limiting the compass of the privilege to reports of the proceedings or actions of "the government of the United States, or of any State or of any of its subdivisions," Restatement (Second) of Torts § 611 cmt. d (1977), and the D.C. Court of Appeals and the D.C. Circuit have both looked to the Restatement in the past in assessing the fair reporting privilege.  See White, 909 F.2d at 527; Phillips v. Evening Star Newspaper Co., 424 A.2d 78, 88 (D.C. 1980).  Finally, even if the better course would be to assess the application of

---

739 (reports fall outside privilege where they were "garbled or fragmentary to the point where a false imputation is made about the plaintiff which would not be present had a full and accurate report been made").

the privilege to a foreign state on a case-by-case basis,[42] the defendants in this case allege that

Russia during this period was a "corrupt system run by crony capitalists," Def. Mem. at 12-13,

hardly the showing of "openness and reliability" one would presumably look for in extending the

privilege.  Accordingly, the Court concludes that the fair reporting privilege does not protect the

CPI article.[43]

## II.    Public Figures and Actual Malice

Defendants argue in the alternative that plaintiffs are public figures, and that plaintiffs

cannot prove actual malice as a matter of law.  These issues will be assessed separately.

### A.    Public Figures

The Supreme Court has identified two categories of public figures.  A general public

figure is an individual of "general fame or notoriety in the community" who has assumed a

"pervasive involvement in the affairs of society."  Gertz, 418 U.S. at 352.  General public figures

are limited for the most part to those well-known "celebrities" whose names have become a

"household word," and who therefore can be regarded as having "knowingly relinquished [their]

anonymity in return for fame, fortune, or influence."  Tavoulareas, 817 F.2d at 771.  Such a

person has entered public life "for all purposes and in all contexts," and therefore must prove

---

[42]  This is the approach advocated by the dissenting opinion in Lee, 849 F.2d at 881, and apparently adopted by the district court in Friedman v. Israel Labour Party, 957 F. Supp. 701, 714 (E.D. Pa. 1997), which held that "[b]y everyone's standards, Israel is an open and reliable democracy," and therefore the fair reporting privilege could extend to reports on its official acts.

[43]  The Court notes that the D.C. Circuit indicated in White that it is inclined to conclude that the fair reporting privilege is qualified rather than absolute, meaning that it could be overcome by a showing of actual malice.  See White, 909 F.2d at 527.  Therefore, even if the Court were to extend the privilege to the CPI article, the Court would nonetheless need to proceed to the actual malice inquiry.

actual malice in all defamation cases. Id. at 771. Defendants do not contend that plaintiffs rise to the level of general public figures.

Far more common than the general public figure is the "limited public figure," an individual who "voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues." Gertz, 418 U.S. at 352; Tavoulareas, 817 F.2d at 772. The D.C. Circuit has set out a three-part inquiry to determine whether a plaintiff is a limited public figure. Waldbaum, 627 F.2d at 1297-98. First, the court must isolate an existing "public controversy" at issue, because the scope of the controversy in which the plaintiff involves himself defines the bounds of the public presence. Id. at 1297; see Tavoulareas, 817 F.2d at 772. Second, the court should assess whether the plaintiffs have achieved more than a trivial or tangential prominence in the debate. Waldbaum, 627 F.2d at 1297. Finally, the "alleged defamation must have been germane to the plaintiff's participation in the controversy." Id. at 1298.

Defendants contend that plaintiffs are limited public figures for purposes of the public controversy involving corruption in post-Soviet Russia and the future of Western aid and investment in the country. Def. Mem. at 9. The public figure question is one of law that the Court must resolve itself, looking at the facts "taken as a whole, through the eyes of a reasonable person." See Rosenblatt v. Baer, 383 U.S. 75, 88 (1966); Waldbaum, 627 F.2d at 1293. Following a careful review of the parties' arguments and the entire record in this case, the Court has concluded that plaintiffs are public figures for purposes of the limited controversy identified by defendants.

First, defendants have isolated a "public controversy" within the meaning of Waldbaum. The rise of the oligarchs and the decline of the Russian economy into what one observer

35

described as a "criminal-syndicalist state" was one of the defining foreign policy controversies of the 1990s, and the topic of intense discussion in the media, classrooms, think tanks, and the government of the United States, as well as through the rest of the world.  See supra at 2-4.  As the events of this period unfolded, untold millions of Russians lost their savings, millions more in the West lost their investments, and the world economy was shaken to its core.  The choices made in the period, on the part of Russia and the United States, are still being debated to this day.[44]  A public controversy is a "real dispute, the outcome of which affects the general public or some segment of it in an appreciable way."  Waldbaum, 627 F.2d at 1296.  The controversy in this case certainly qualifies, and does not differ meaningfully from the controversies found adequate in other cases.   See Tavoulareas, 817 F.2d at 772 ("public controversy" exists concerning the "manner in which the United States should respond to the rise of OPEC and the ensuing energy crisis" and "whether the management and structure of the United States' private oil industry was in need of alteration or reform"); Foretich v. Advance Magazine Publishers, Inc., 765 F. Supp. 1099, 1102 (D.D.C. 1991) ("public controversy" exists over "child abuse, women's rights, the intrusion of the state into private affairs, and the limits of punishment for contempt of court").

_____

[44]  For just a few of the numerous books that have been written about the transformation of the Russian economy and the response of the Western world in this period, see Marshall I. Goldman, "The Piratization of Russia: Russian Reform Goes Awry" (2003) (excerpted in Sullivan Decl., Ex. 398); David E. Hoffman, "The Oligarchs: Wealth and Power in the New Russia" (2002) (excerpted in Sullivan Decl., Ex. 399); Stephen F. Cohen, "Failed Crusade: America and the Tragedy of Post-Communist Russia" (2001) (excerpted in Sullivan Decl., Ex. 401); Rose Brady, "Kapitalizm: Russia's Struggle to Free Its Economy" (1999) (excerpted in Sullivan Decl., Ex. 396); Chrystia Freeland, "The Sale of the Century: Russia's Wild Ride From Communism to Capitalism" (2000) (excerpted in Sullivan Decl., Ex. 397).

Second, plaintiffs have assumed a "special prominence" in the controversy.  Waldbaum,
627 F.2d at 1297.  They were two of the leading participants in the transformation of the Russian
economy.  The economic changes attending the fall of the Soviet Union catapulted the plaintiffs
into an elite class of Russian businesspeople, converting them almost overnight into two of the
richest and most powerful individuals in the country.  Plaintiffs not only benefitted from the
economic reforms in the period, but they have influenced the course of those reforms.  From the
outset of the campaign of privatization (when Aven was a cabinet minister in the first Yeltsin
administration) to the 1993 coup attempt, to the 1995 near-election defeat of Yeltsin, to the 1998
market crash, the plaintiffs have stepped forward to guide the political and economic direction of
Russia at every turn.  Further, plaintiffs have fully engaged in the worldwide debate regarding the
causes and the cure for the corruption that has overcome the Russian economy, and have
themselves been the repeated target of allegations of collusion and illegality.  Plaintiffs have
risen to positions of unprecedented influence in the political and economic affairs of their nation
-- far from being "trivial" or "tangential" to the upheaval of the Russian economy, they are the
very centerpiece of the public controversy in this case.  Id. at 1297.

Finally, the challenged statements in the CPI article were "germane" to the public
controversy.  Id. at 1298.  The statements set out detailed allegations of corruption and illegal
conduct on the part of two of the Russian oligarchs.  This account of plaintiff's exploits -- true or
not -- is a component of the debate over the consequences of Russia's economic reforms and the
corruption that most agree has gripped the post-Soviet economy.  At the very least, it can safely
be said that these statements are not "wholly unrelated" to this broader debate.  Id.  This becomes
even more evident when one steps back and views the comments in relation to the rest of the
article.  The allegations of criminal conduct appear amid a report of a discussion of the heated

37

debate regarding a particular form of planned United States aid to the plaintiffs' oil company, and

the various factors that came to bear on that process, including allegations of corruption and the

intense lobbying (according to the article) of Halliburton and BP Amoco.  The entire article

therefore purports to present an example of -- and serves to shed light on -- the emergence of

corruption in the post-Soviet Russian economy and the ongoing debate in the West about how to

confront it.  This relationship more than suffices to satisfy the "germaneness" prong of the

Waldbaum test.  See, e.g., Tavoulareas, 817 F.2d at 773-74 (article discussing alleged nepotism

at an oil company was germane to public controversy on the direction of national energy policy;

"[t]he alleged nepotism by Tavoulareas was not 'wholly unrelated' to a public controversy where

the credibility and integrity of representatives of the oil industry had become an issue").

Several other guideposts bear on the public figure inquiry, and each of them is present in

this case.  First, plaintiffs have chosen paths of endeavor that "invite attention and comment."

Tavoulareas, 817 F.2d at 773.  They are among the richest and most influential businesspeople in

Russia, if not the world.  They have taken an active role in the political direction of their country,

and have spoken vocally on the world stage.  These choices have placed plaintiffs squarely in the

public light.  See, e.g., id. (fact that plaintiff is "president and chief operating officer of one of the

world's largest multinational corporations" is relevant to "whether that person has 'invite[d]

attention and comment' with respect to public issues affecting his business dealings"); Novecon,

977 F. Supp. at 49 (plaintiff's "impressive resume is a factor in his public figure status").

Second, Aven and Fridman and their companies have been the subject of widespread

news coverage.  See Waldbaum, 627 F.2d at 1297 (advising that courts should "look to . . . the

extent of press coverage" of the plaintiffs in undertaking the limited public figure analysis);

Schiavone Construction Co. v. Time, Inc., 847 F.2d 1069, 1078 (3d Cir. 1988) ("plaintiffs who

had appeared frequently in the news could not escape limited public figure status").  An October

2003 internet search of a news database yielded more than 1,100 English language articles since

1990 that mention the name Mikhail Fridman, and more than 1,400 articles that include the name

Pyotr Aven (or variations thereof).[45]  See supra at 10.  These articles appear in publications

ranging from the New York Times to the Russian newspaper Versiya.  This media footprint is far

greater than those found sufficient to support public figure status in other cases.  See Ellis v.

Time, 1997 WL 863267, at *6 (D.D.C. 1997) (plaintiff is limited public figure where he was the

subject of five articles in newspapers ranging from the Washington Post to the Russian

newspaper Izvestia); Bell, 584 F. Supp. at 131 (plaintiff is limited public figure where "over one

hundred newspaper articles have appeared concerning his various activities during the course of

plaintiff's career").

Third, Aven and Fridman enjoy "access to the channels of effective communication" that

enable them to respond to any defamatory statements and influence the course of public debate.

Gertz, 418 U.S. at 344; Tavoulareas, 817 F.2d at 772-73.  They have written articles in Russian

newspapers, given interviews to newspapers and other media outlets throughout the world

---

[45]  Plaintiffs note that some of these articles are duplicates, and others concern individuals bearing those names but who are not the plaintiffs in this case.  Pl. Mem. at 47-48.  These  are fair criticisms, but plaintiffs do not claim that this reflects more than a handful of articles. Plaintiffs also contend that a "significant" number of the articles date from after the publication of the article at issue here in August 2000, making them irrelevant.  The Court doubts that one can ignore articles published so soon after the date of publication of the article at issue, unless there is some identifiable reason why those articles do not provide an accurate reflection of the extent of the media coverage of the plaintiff at the time of publication of the article.  The Court cannot find such a reason in this case (plaintiffs do not claim that there was a spike in publicity as a result of the CPI article, for example).  At any rate, even an April 2001 search of United States news publications revealed 8,609 pages of English language news articles stretching back to 1990 about plaintiffs and their companies, supra at 10, a showing of media coverage that lends ample support to the conclusion that plaintiffs are public figures.

(including ABC's Nightline and CNN), spoken on economic reform issues to international audiences, and developed a well-coordinated and sophisticated public relations strategy through in-house press departments, external public relations firms, and corporate websites.  Plaintiffs have even given interviews in which they responded to the very allegations made in the CPI article.[46]  These facts also lend strong support to the conclusion that plaintiffs are limited public figures.  See Secord v. Cockburn, 747 F. Supp. 779, 784 (D.D.C. 1990) ("[P]laintiff has appeared as a speaker at many political gatherings and has been interviewed on network television programs . . .  including Nightline, Good Morning America and Cross-Fire (the latter to discuss [the allegedly defamatory publication]) and in publications . . .  demonstrating 'access to the channels of effective communication' that the Supreme Court felt characterized a public figure."); Foretich, 765 F. Supp. at 1108 (plaintiff gave statements to press and sat for an interview with a television crew, "a course of conduct that was likely to attract substantial attention").

Finally, Aven and Fridman have used their positions to influence the events of their country and the world, and have assumed a prominent role in the civic life of Russia, associating closely and openly with the Russian business elite and politicians at the highest positions of government.  Such facts have been held to signify that plaintiffs are public figures who have voluntarily exposed themselves to public scrutiny and are therefore less deserving of protection than private persons.  See Clyburn, 903 F.2d at 33 (one who "hobnob[s] with high officials . . . runs the risk that personal tragedies that for less well-connected people would pass unnoticed

---

[46]  For example, shortly after the CPI piece was published, the New York Times conducted an interview with Fridman in which a reporter discussed the allegations of drug running and criminal ties.  The reporter explains that when he "asked Fridman about it, he shrugged and said, 'That stuff's always around.'"  John Lloyd, "The Autumn of the Oligarchs," The New York Times, Oct. 8, 2000.

may place him at the heart of a public controversy"); Tavoulareas, 817 F.2d at 773 (plaintiff

corporate president "thrust himself to the forefront of the national controversy over the state of

the oil industry" and "became an activist" on these issues); Matusevitch v. Telnikoff, 877

F. Supp. 1, 5 n.3 (D.D.C. 1995) (plaintiff who was a "confident to several Soviet activists such as

Alexander Solzhenitsyn, Andrei Sakharov, Yelena Bonner, and Vladimir Bukovsky" was a

limited public figure).

   Plaintiffs raise two principal objections to the conclusion that Aven and Fridman are

limited public figures.  First, they contend that the issue of Russian corruption and the future of

Western aid and investment is too generalized to qualify as a public controversy.  Pl. Mem. at 49.

However, the public controversy in this case is no more general than controversies that have been

found sufficient in a host of other cases, which include "the methods and influence of lobbyists in

Washington," Gray v. St. Martin's Press, Inc., 221 F.3d 243, 251 (1st Cir. 2000); "drug

trafficking," Marcone v. Penthouse Int'l Magazine for Men, 754 F.2d 1072, 1083 (3d Cir. 1985);

the "relations between the sexes" and "contemporary standards regarding nudity," Lerman v.

Flynt Distrib. Co., 745 F.2d 123, 137 (2d Cir. 1984); and the problem of "child abuse,"

Underwager v. Salter, 22 F.3d 730, 734 (7th Cir. 1994).

   This is not a case where the proposed controversy is so generalized that it would be

"shared by most" -- for example, the proposed controversy of "concern about general public

expenditures," which "relates to most public expenditures" and would transform into a public

figure anyone receiving a public grant.  See Hutchinson v. Proxmire, 443 U.S. 111, 135 (1979).[47]

Plaintiffs' suggestion that treating them as public figures would convert any participant in the

---

   [47] This is also not a case where the issue is of private rather than public concern, such as
a famous couple's marital difficulties.  See Time, Inc. v. Firestone, 424 U.S. 448, 458 (1976).

Russian economy into a public figure is practically a non-sequitur.  Def. Mem. at 50.  As already discussed at length, plaintiffs were not just any "participant" in the Russian economy, but assumed positions of unique wealth, influence and renown.  See, e.g., McDowell v. Paiewonsky, 769 F.2d 942, 948 (3d Cir. 1985) (concern in Hutchinson not present where the particular government grants or projects at issue have "been the subject of considerable media attention").  To qualify as a public controversy, the law requires only that the issue be discussed publicly, and that the resolution of the issue affect others besides the immediate participants in the debate.  Waldbaum, 627 F.2d at 1297.  Those requirements are manifestly satisfied here.

Second, Aven and Fridman argue that although they may have risen to a certain level of prominence, their fame is confined to Russia -- hence, they have not achieved "general fame or notoriety in the community" of the United States.  Gertz, 418 U.S. at 352.  At the outset, the "general fame or notoriety" formulation is the standard for a general public figure; a plaintiff need not attain that level of notoriety to be a limited public figure.  Id. at 351-52; Waldbaum, 627 F.2d at 1298 n.32.  Moreover, while it is true that the case law requires that even a limited public figure have achieved the "necessary degree of notoriety . . . *where the defamation was published*," the defamation in this case was published on the Internet.  Waldbaum, 627 F.2d at 1295 n.22 (emphasis added).  The audience for the CPI article is not confined to the United States merely because that is where the authors of the piece choose to work, and it is not immediately apparent why the limited public figure inquiry should be so confined.

Even if the Court were to limit its review of the defendants' prominence to the United States, the evidence in the form of Alfa Group's promotional materials describe Aven as "an

internationally recognized economist and author."  Phillips Decl., Ex. 101.[48]  Aven and Fridman

speak to influential organizations and appear on television in the United States.  Aven

accompanied the acting prime minister on a diplomatic mission to the United States, where he

attended meetings with senior Clinton administration officials and cabinet members.  See supra

at 8 n.20.  Fridman was invited to Washington D.C. to receive a prominent award alongside

luminaries such as a Supreme Court Justice and United States Senators.  See supra at 7 n.15.  An

April 2001 search confined only to certain United States news publications (including the

Washington Post, the Los Angeles Times, the New York Times, the Chicago Tribune, TIME,

Newsweek, and Business Week) yielded more than 8,500 pages of newspaper articles that

contain the words Aven, Fridman, Alfa Bank, Alfa Eco, Alfa Group, or TNK.  Id. ¶ 2.  Simply

put, Aven and Fridman are players on the world stage; hence, they are limited public figures not

only in Russia, but in the United States as well.[49]

**B.      OAO Alfa Bank and ZAO Alfa Eco**

The corporate plaintiffs OAO Alfa Bank and ZAO Alfa Eco are also public figures for

purposes of the defamation analysis in this case.  Corporate plaintiffs are treated as public figures

as a matter of law in defamation actions brought against mass media defendants involving

matters of legitimate public interest.  See Metastorm, Inc. v. Gartner Group, Inc., 28 F. Supp. 2d

---

[48]  Aven and Fridman recently acknowledged in another defamation suit that they "are
well known both in Russia and abroad."  Bowman Decl., Ex. 15 at 9242 (decision of arbitration
court of the City of Moscow).

[49]  Defendants also suggest that plaintiffs are limited public figures for purposes of a
narrower public controversy involving the battle between BP Amoco and Tyumen for the assets
of the bankrupt Sidanco oil company.  Because the Court concludes that the involvement of the
plaintiffs in the broader public controversy of corruption in the post-Soviet Russian economy
meets the requirements of the limited public figure analysis, the Court need not consider the
proposed narrower controversy.

665, 669 (D.D.C. 1998); Martin Marietta Corp. v. Evening Star Newspaper Co., 417 F. Supp.

947, 955 (D.D.C. 1976).  As a judge of this court once explained:

> It is quite clear from the Court's opinion [in Gertz], however, that the values
> considered important enough to merit accommodation with interests protected by
> the first amendment are associated solely with natural persons, and that
> corporations, while legal persons for some purposes, possess none of the attributes
> the Court sought to protect. . . .   [A] libel action brought on behalf of a
> corporation does not involve 'the essential dignity and worth of every human
> being' and, thus, is not 'at the root of any decent system of ordered liberty.'

Martin Marietta, 417 F. Supp. at 955 (quoting Gertz, 418 U.S. at 341); see also Brown &

Williamson Tobacco Corp. v. Jacobson, 713 F.2d 262, 273 (7th Cir. 1983) ("[I]f the purpose of

the public figure-private person dichotomy is to protect the privacy of individuals who do not

seek publicity or engage in activities that place them in the public eye, there seems no reason to

classify a large corporation as a private person.").[50]  CPI is a member of the mass media, and the

topics discussed in the CPI article (which include the relationship between United States

politicians and Russian banks accused of engaging in corrupt activities) are a matter of legitimate

public interest.  Therefore, the corporate plaintiffs in this case are public figures as well.[51]

---

[50]  Plaintiff maintains that the Martin Marietta ruling is in error because it "was based
upon the discredited rationale for the plurality opinion in Rosenbloom, 403 U.S. 29," which the
Supreme Court later rejected in Gertz, 418 U.S. at 346.  Pl. Mem. at 55.  This argument
mischaracterizes the reasoning in Martin Marietta, which discuss both Rosenbloom and Gertz,
notes that Gertz rejected the plurality opinion in Rosenbloom, and then bases the corporate
public figure doctrine expressly on the analysis in Gertz.  See Martin Marietta, 417 F. Supp. at
954.

[51]  Even if the rule discussed in the text were unsound, the corporate plaintiffs would
nonetheless be public figures for the same reason as Aven and Fridman.  Alfa Bank is the largest
bank in Russia, and both corporate plaintiffs are components of one of the most lucrative
business conglomerates in the country.  The corporate plaintiffs are the subject of frequent media
coverage, and the relevant documents in this case reference the corporate plaintiffs
interchangeably with their officers (including Aven and Fridman).  There is no reason to treat the
corporate plaintiffs any differently than Aven and Fridman themselves.

44

III.    **Actual Malice**

Because plaintiffs are public figures, they may prevail on their defamation claims only if they can prove by clear and convincing evidence that defendants published the challenged statements with actual malice.  Masson, 501 U.S. at 510; New York Times, 376 U.S. at 279-80.  The "standard of actual malice is a daunting one."  McFarlane v. Sheridan Square Press, 91 F.3d 1501, 1515 (D.C. Cir. 1996) (quotation and citation omitted).  A publisher acts with "actual malice" if it "either knows that what it is about to publish is false or it publishes the information with 'reckless disregard' for its truth or falsity."  Id. at 1508.  The test is subjective:  the plaintiff must come forward with sufficient evidence to prove "that the defendant in fact entertained serious doubts" as to the truth of the publication or acted "with a high degree of awareness of . . . its probable falsity."  St. Amant v. Thompson, 390 U.S. 727, 731 (1968); McFarlane, 91 F.3d at 1508.  To have acted with actual malice, the publisher must have "come close to wilfully blinding itself to the falsity of its utterance."  McFarlane, 91 F.3d at 1508 (quoting Tavoulareas, 817 F.2d at 775).

The burden of proof "imposed on public figures is significantly more onerous than the usual preponderance of the evidence standard."  Tavoulareas, 817 F.2d at 776.  A public figure may recover "only on clear and convincing proof" that the defamatory falsehood was made with actual malice.  Gertz, 418 U.S. at 342; McFarlane, 91 F.3d at 1508.  The requirement of clear and convincing evidence "administers an extremely powerful antidote to the inducement to media self-censorship of the common-law rule of strict liability" for defamation claims.  Gertz, 418 U.S. at 342.  "Few public figures have been able clearly and convincingly to prove that the scurrilous things said about them were published by someone with 'serious doubts as to the truth of [the] publication.'"  McFarlane, 91 F.3d at 1515 (quoting St. Amant, 390 U.S. at 731).

45

Unlike the public figure inquiry, the question of actual malice is ordinarily one for the jury to decide.  See Liberty Lobby v. Rees, 852 F.2d 595, 598 (D.C. Cir. 1988).  However, plaintiffs in this case do not request a jury trial.  The Court, then, would be the ultimate fact-finder were this case to go to trial, and hence the normal summary judgment approach is altered: the Court is not limited to deciding questions of law on the basis of undisputed facts, but also may "draw a derivative inference from undisputed subsidiary facts, even if those facts could support an inference to the contrary, so long as the inference does not depend upon an evaluation of witness credibility."  Cook v. Babbitt, 819 F. Supp. 1, 11 & n.11 (D.D.C. 1993).  As in any defamation case involving a public figure, the question for the court at the summary judgment stage is whether plaintiffs have identified evidence that "could support a . . . finding, by clear and convincing evidence, that the defendants acted with actual malice in publishing" the CPI article. Liberty Lobby, 852 F.2d at 598.

The Court notes at the outset that plaintiffs have not come forward with any direct evidence of actual malice.  Each of the witnesses who was part of the decision-making process has testified that defendants believed the allegations of criminal conduct to be credible.  See Royce Dep. at 279:5-279:11 (explaining that the "total body of information" available at the time led him to "believ[e] that the specific allegations indeed were credible"); Heller Dep. at 428:4-428:11 ("From the moment the article was reported, written and published, I've always been confident, entirely confident in the sources, that they were corroborated and independent, and in the truth of the reporting.  That's never been of question to me, either then or now."); Lewis Dep. at 237:9-237:10 (explaining that in discussions with Royce "I do remember that he felt secure" about the piece); Smith Dep. at 101:7-101:18 (explaining that Royce and Heller said that they "were persuaded that the documents were reliable, that the allegations in them were corroborated

46

by one another and gave a solid basis for the story" and that "all the questions and issues I had

raised had been resolved").  Indeed, one of the CPI employees testified that Royce was

"emphatic" that the allegations in the KGB and FSB reports were credible.  See Smith Dep. at

101:19-102:1-12.  Thus, plaintiffs are unable to point to any direct evidence that defendants in

fact "entertained serious doubts" as to the truth of the publication or acted "with a high degree of

awareness of . . . its probable falsity."  St. Amant, 390 U.S. at 731; McFarlane, 91 F.3d at 1508;

see Herbert v. Lando, 441 U.S. 153, 169 (1979) (holding that "the relevance of answers" from the

"mouth of the defendant himself" to questions regarding his awareness of falsehood "can hardly

be doubted"); Foretich v. American Broad. Co., 1997 WL 669644, at *6 (D.D.C. Oct. 17, 1997)

("Plaintiffs offer no direct evidence of actual malice.").

Proof of actual malice may take the form of circumstantial evidence.  See Clyburn, 903

F.2d at 33.  However, the "standard for actual malice is not what a reasonable person or a prudent

publisher would do."  Lohrenz v. Donnelly, 223 F. Supp. 2d 25, 45 (D.D.C. 2002), aff'd, 350

F.3d 1272 (D.C. Cir. 2002).  To prevent the inquiry into the defendant's subjective state of mind

from slipping into an open-ended review of the reasonableness of the defendant's investigation

or his compliance with professional standards, the courts have identified only three scenarios in

which the circumstantial evidence of subjective intent could be so powerful that it could provide

clear and convincing proof of actual malice.  These scenarios are where there is evidence that the

story:  (i) was "fabricated" or the product of defendants' imagination; (ii) is "so inherently

improbable that only a reckless man would have put [it] in circulation"; or (iii) is "based wholly

on a source that the defendant had obvious reasons to doubt, such as an unverified anonymous

telephone call."  McFarlane, 91 F.3d at 1512-13 (quotation omitted); see St. Amant, 390 U.S. at

732.

47

No claim is made that defendants fabricated the assertions in the CPI article.  Nor are the allegations of organized mob ties and drug trafficking so inherently improbable that actual malice can be presumed.  It was widely reported during the period that organized crime had infiltrated the Russian marketplace; indeed, the Director of the FBI estimated in testimony before Congress that the Russian mafia had taken control of more than 70% of all Russian commercial enterprises and that most of the 2,000 banks in Russia were "controlled by organized crime."  It was thus not inherently improbable that Alfa Bank -- the largest privately owned bank in Russia -- had also developed a relationship with organized crime and participated in other criminal activity during this period.

Russian officials have investigated similar criminal allegations on several occasions.  The allegations of organized criminal ties and drug trafficking in the FSB report were passed on by Ilyukhin to law enforcement officials, who wrote back a month later that Alfa Group was "being investigated in connection with a number of criminal cases," including a case in which Moscow customs officials found arms and ammunitions in a shipment addressed to Alfa Eco.  Sullivan Decl., Ex. 23 (letter from Vasiliev to Ilyukhin).  A corruption task force once told Yeltsin that Aven was abusing his government position, and Alfa has acknowledged that Russian law enforcement officials searched the Alfa Eco offices in 1995.  See Aven Dep. Vol. IIA at 126:3-130:1; Phillips Decl., Ex. 173; Sullivan Decl., App. 61.

Even as to the most fantastic of the allegations -- that involving heroin transported in sugar bags that led to the poisoning of a Siberian town -- plaintiffs' own expert explains that he read a Russian wire story report of the sugar poisoning incident while with CBS in Moscow; he found the story "intriguing" and wanted to run it down, but never got around to doing so.  Sanders Dep. at 145:3-146:14.  Alfa Eco is one of Russia's largest sugar dealers, and transports

sugar by rail across Russia.  Fain Dep. at 128:12-132:13, 140:22-143:6, 357:20-358:6, 389:12-392:4.  The BP Amoco report, which surfaced in the course of discovery, contains a description of the "sugar poisoning" incident; the CIA passed the information in the BP Amoco report on to the Export-Import bank, and sources have stated that the allegations in the BP Amoco report tracked other information in the possession of the CIA.  This is not to say that the assertions in the CPI article are true.  Indeed, there is reason to believe that at least some of them are not:  for example, no credible reports have come to light indicating that an unusual number of citizens of a Siberian town ever fell ill.   However, it cannot be said that the allegations were so inherently improbable that defendants' decision to publish the allegations amounted to actual malice.

Lastly, this was not a case where the defendants based their article "wholly on a source that the defendant had obvious reasons to doubt, such as an unverified anonymous telephone call."  McFarlane, 91 F.3d at 1512.  Defendants grounded their article on several intelligence sources, corroborating documents, and a wealth of reports in the United States and Russian media.  The investigation began with a review of a Washington Post article that described the BP Amoco report and noted that it contained two and a half pages describing criminal allegations against the officers of the Tyumen oil company.  The CIA believed the report serious enough to pass it on to the Export-Import bank and give the bank a briefing on the report, and the National Security Council believed the report serious enough to recommend to the State Department that it block the loan (which the State Department did).  The Washington Post article quoted an unnamed CIA source as stating that the report "tracked other information the agency had gathered."

Royce also reviewed a series of Russian newspaper articles describing reports that Fridman and Aven had organized crime and drug trafficking ties.  Royce then contacted a CIA

source who refused to provide the BP Amoco report but confirmed that the information in the BP Amoco report in fact did track the CIA's own intelligence.  Royce talked to Richard Palmer, a second source in the intelligence community who had extensive experience in the Russian business world.[52]  Palmer provided Royce with an unabridged version of one of the Russian newspaper articles, which reported that Victor Ilyukhin, Chairman of the Security Committee of the Russian Duma, had passed on to Russian law enforcement agencies a dossier containing allegations of criminal activity by Fridman and Aven in 1997.  The article provided a detailed discussion of the allegations in the dossier, including a description of alleged organized crime ties and drug trafficking.

Royce then turned to a third source, a Russian-American specialist on business practices in the former-Soviet Union with several contacts inside Russia's law enforcement and intelligence communities.  The specialist told Royce that "no major oil company [in Russia] is free of criminal activity" and that he had "little doubt that [Tyumen] committed crimes in numerous occasions."  The specialist also told Royce that the specialist "himself knew" that plaintiffs had a "close relationship" with one of the leading organized crime groups in Russia.  The specialist gave Royce an abridged copy of the FSB report that Ilyukhin passed on to Russian law enforcement agencies, which matched the allegations discussed in the Russian newspaper article.  The specialist explained that he had contacted a source in the FSB, and that the source had said that the law enforcement agency would be investigating the allegations, but that the inquiry had been "put away for a better day."[53]  The specialist included a fax cover sheet on the

---

[52]  Plaintiffs' expert describes Palmer as an "extremely good source."  Kaplan Rep. at 83.

[53]  Plaintiffs contend that defendants cannot rely on Royce's description of what the Russian-American specialist told him, because defendants refused to provide his identity.  Pl.

report with a comment as a postscript stating "Please don't take this article as the gospel," a statement Royce testified he took to mean that he should not "assume that every bit of information is accurate," and that "[a]s in anything that comes out of Russia, be a little careful." Royce Dep. at 192:4-192:9

Royce returned to Richard Palmer, looking for information that would corroborate the FSB report. Palmer searched in his files and found the KGB major report, which contained information that a former KGB major had conveyed to Palmer in 1995. The information included detailed allegations of criminal activities by Fridman and Aven that paralleled the allegations in the FSB report. Palmer vouched for the credibility of the KGB major, and noted that while Palmer himself could not confirm the allegations of drug trafficking, other information that the KGB major had provided was correct, including a great deal of information that was not public knowledge at the time. Royce pressed for more information about the KGB major, but Palmer refused to provide any more information or to allow Royce to talk with him.

---

Mem. at 8 n.10. The Court has some doubt as to plaintiffs' position. The proper course for the plaintiffs if they wanted the identity of defendants' confidential source would have been to file a motion to compel his identity. See Price v. Time, Inc., 416 F.3d 1327, 1345-46 (11th Cir. 2005) (considering motion to compel the identity of a confidential source in a defamation case). Were the Court to grant the motion, both parties would then have been able to use the Russian-American specialist's knowledge to their respective advantage. The Court does not see the wisdom in allowing plaintiffs to lie in the weeds until a motion for summary judgment is filed, and then spring the issue at summary judgment, denying defendants any right to use the evidence at all. See, e.g., Clyburn, 903 F.2d at 34 (noting in defamation case that "[w]e recognize that where the primary source of evidence is the reporter's own (naturally self-interested) testimony of what a confidential source told him, the combination of the burden of proof and the reporter's privilege to withhold the source's identity confront a defamation plaintiff with unusual difficulties," but allowing defendant to rely on source where plaintiff did not appeal district court's denial of motion to compel the source's identity). The Court notes that no hearsay issues are raised in this case by reliance on the confidential source's information, because the Russian-American specialist's statements are being offered not for the truth of the matter asserted, but to demonstrate defendants' state of mind and knowledge (i.e., actual malice) when they published the CPI articles.

At that point, Royce possessed two reports corroborating criminal wrongdoing written two years apart and attributed apparently to different individuals.  Royce knew that one of his intelligence sources vouched for the credibility of the individual who gave him the information, and that one of his other sources had confirmed personal knowledge of plaintiffs' close ties to organized crime.  Royce knew that more than one CIA source, including one of his own, had confirmed that the CIA possessed intelligence that tracked the still-unseen allegations in the BP Amoco report, and that other United States officials found the allegations serious enough to block the Export-Import loan to Tyumen.  He knew that several Russian newspaper articles had also reported on allegations of defendants' criminal world contacts and drug trafficking.  Finally, the allegations were consistent with the widespread understanding, confirmed by one of his sources, that the Russian economy and the business dealings of the oligarchs were overrun with corruption and ties to organized crime.

Royce contacted several different Tyumen executives and representatives for comment, and the piece was fact-checked and edited consistent with the normal CPI procedures.  As published, the article included firm denials of the allegations of criminal wrongdoing from Tyumen executives and representatives, and a reference to the denials at the very outset of the piece.  The article contained an objective description of the sources and background of the reports.  Finally, the piece attributed the allegations of criminal conduct to the FSB and KGB major reports, and referred to the allegations as just that -- allegations rather than fact.[54]  The

_____

[54]  See Harte-Hanks Commc'n, Inc. v. Connaughton, 491 U.S. 657, 695 (1989) ("Under our precedents, I find significant the fact that the article in this case accurately portrayed Thompson's allegations *as* allegations, and also printed Connaughton's partial denial of their truth . . . .  These differences in presentation are relevant to the question whether the publisher acted in reckless disregard of the truth:  presenting the content of Thompson's allegations as though they were established fact would have shown markedly less regard of their possible falsity.")

investigation of the piece was not perfect, and as indicated, several of the allegations in the final product may very well be inaccurate.  But the Court cannot conclude on this record that the defendants published the article with actual malice or a reckless disregard towards its accuracy.

Plaintiffs complain that defendants failed to track down certain leads -- for instance, failing to pursue the line of inquiry the Russian-American recommended in the fax cover sheet of determining the status of Ilyukhin's request that Russian law enforcement authorities investigate the allegations of the FSB report, or failing to contact George Soros to attempt to obtain a copy of the BP Amoco report that Soros might have possessed.  This line of argument focuses improperly on what more a reasonable reporter might have done in the circumstances, not on the defendants' state of mind.  The "cases are clear that reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication."  St. Amant, 390 U.S. at 731; see also Herbert v. Lando, 781 F. 2d 298,  308 (2d Cir. 1986) ("We reiterate, however, that a finding of actual malice cannot be predicated merely on a charge that a reasonable publisher would have further investigated before publishing.").  A plaintiff will always be able to point to ways in which the defendant could have pursued another lead, or sought another piece of corroborating evidence.

---

(Blackmun, J., concurring); Church of Scientology, Int'l v. Behar, 238 F.3d 168, 175 (2d Cir. 2001) ("In view of the extensive research Behar conducted, and the fact that the death threat was accurately reported as an allegation, we agree with the district court that no reasonable jury could find that Behar had published the statements about the stock scam or the murder-suicide allegation with purposeful avoidance of the truth.").

Here, the failure to pursue this additional information does not evince a willful blindness to competing evidence, but only a desire to put a close to the investigation of a story.[55]

Plaintiffs argue that defendants could have attempted to track down the origins of the information that the FSB officers provided in the FSB report or the KGB major provided to Palmer.  Pl. Mem. at 27-32, 35-38.  But there is "no authority for the proposition that anything short of interviewing those with first-hand knowledge amounts to 'willful blindness.'" McFarlane, 91 F.2d at 1510; see also Clyburn v. News World Commc'n, Inc., 705 F. Supp. 635, 641-42 (D.D.C. 1989) ("[D]efendants' reliance on the confidential sources, who, in turn, relied on informants, does not indicate actual malice."), aff'd, 903 F.2d 29 (D.C. Cir. 1990).  Defendants in this case obtained corroboration for the FSB report in the form of the KGB major report, and Palmer vouched for the credibility of the KGB major.  The failure to investigate exactly who provided the information to the FSB officials or the KGB major is not evidence of actual malice. See Clyburn, 705 F. Supp. at 641-42 ("Even if the sources did not know the identities of the informants in the witness summaries, and the reporters were aware of that fact, the credibility of the information provided in the summaries would be bolstered by the sources' inherent reliability and experience as law enforcement officials.").

In fact, the D.C. Circuit has rejected the proposition that a publisher has a duty to corroborate even when a single source "of potentially libelous material is a person of questionable credibility."  McFarlane, 91 F.3d at 1508.  The court explained that to "hold that a publisher who relies upon a questionable source must  . . . establish through an independent

---

[55]  Had the defendants obtained the BP Amoco story, they would have found that it contained allegations consistent with those in the FSB Report and the KGB major report. Sullivan Decl., Ex. 68.

source that the allegations are true" would "turn the inquiry away from the publisher's state of

mind and to inquire instead whether the publisher satisfied an objective standard of care." Id. at

1509. Here, as indicated, the defendants relied on a host of corroborating evidence in publishing

the piece. The fact that they could have researched even further does not itself supply evidence

of actual malice.

Next, plaintiffs maintain that defendants should have known from the anti-Semitic and

anti-free market language in the FSB report that the document was designed to appeal to the

prejudices of Ilyukhin, a "communist and virulent anti-semite," and therefore was not credible.

Pl. Mem. at 39. But there is no evidence that defendants knew Ilyukhin to be a reputed anti-

semite. Royce Dep. at 309:12-311:9. Royce did know that he had communist leanings, Royce

Dep. at 306:7-307:8, but the presence of communist rhetoric in the FSB report does not mean

that the allegations in the FSB piece are not credible. Defendants would have done well to

present these facts to the reader to allow them to reach their own judgment. However, it is far-

fetched to infer from plaintiffs' failure to do so an effort to shade the truth, particularly since

defendants included other caveats in the piece, such as that the KGB major was working for

banks (which would presumably be defendants' rivals) and was from the "ideological

counterintelligence branch."

Plaintiffs take issue with defendants' failure to contact Aven and Fridman prior to

publication of the piece, noting that defendants might have discovered information from them

that would have cast doubt on the reliability of the FSB and KGB major reports. Pl. Mem. at 23-

28. Plaintiffs maintain that it is a clear ethical violation to fail to call the subject of a piece (at

least when the piece advances charges as serious as narcotics trafficking). Kaplan Report at 23;

Heller Dep. at 221:8-221:15. Royce explains that he failed to contact Aven and Fridman because

he thought that he might need a translator, and that time was running short to publish the article. Royce Dep. at 238:17-238:22, 241:5-241:16.  This explanation is less than compelling, and might not excuse defendants' failure to contact Aven and Fridman as a matter of ethics.  But it does not amount to actual malice.  See McFarlane, 91 F.3d at 1509 ("Schaap's failure to contact McFarlane himself about the allegations provides even less support for a finding of actual malice."); Secord, 747 F. Supp at 789 ("plaintiff cannot rely on the defendant's failure to consult with him prior to the publication . . . as evidence of actual malice").  An inference of actual malice would be particularly inappropriate in this case given that defendants contacted several of the plaintiffs' executives and representatives, and included each of their comments in the article.[56]

Finally, plaintiffs charge defendants with several other alleged ethical and professional lapses involved in the research and publication of the piece.  For instance, they complain that the article falsely suggests that two representatives of plaintiffs were contacted before the article was published when in fact only a single representative was contacted; that Royce violated an alleged pledge to Palmer not to use his information in the piece; that the article attributes a comment to the FSB report that is not in the report; and that Royce failed to take adequate notes of his discussions.  The Court does not condone any ethical or professional breaches that might have

---

[56] Shortly after the CPI article was published, the New York Times conducted an interview with Fridman in which a reporter discussed the allegations of drug running and criminal ties.  The reporter explains that when he "asked Fridman about it, he shrugged and said, 'That stuff's always around.'"  John Lloyd, "The Autumn of the Oligarchs," The New York Times, Oct. 8, 2000.  Likewise, when the Moscow Times sought Aven's reaction to the CPI article, he issued only blanket denials.  Sullivan Decl., Ex. 100 (August 3, 2000 Moscow Times article).  There is little reason to believe that defendants would have elicited any more specific response than what Aven and Fridman provided in these other settings.  See McFarlane, 91 F.3d at 1509 ("Nor is it clear . . . that the individuals whom the defendant failed to contact would have provided any credible information. . . .  Schaap could reasonably expect McFarlane to deny any involvement regardless of the facts.").

occurred.  However, none of them can fairly be said to bear on the defendants' subjective

knowledge of the falsity of the criminal allegations in the article.  That test examines the

publisher's subjective state of mind, and does not turn on what more, or different, a good

publisher could have done.  Hence, the standard of actual malice "is not satisfied even by proof

of 'highly unreasonable conduct constituting an extreme departure from the standards of

investigation and reporting ordinarily adhered to by responsible publishers.'"  Clyburn, 903 F.2d

at 33 (quoting Harte-Hanks, 491 U.S. at 666).[57]

It follows, then, that plaintiffs cannot survive summary judgment on the shoulders of their

journalism expert's opinion that defendants "violated journalism ethics" and the article does not

"hold[] up to normal standards of investigative reporting."  Kaplan Rep. at 7, 14.  Courts and

commentators generally have not permitted plaintiffs to prove actual malice through expert

testimony.  See Lohrenz, 223 F. Supp. 2d at 36 ("courts have generally disfavored expert

testimony in determining actual malice, which is essentially a determination of defendants'

subjective state of mind"); Harris v. Quadracci, 856 F. Supp. 513, 518-19 (E.D. Wis. 1994)

("expert opinion testimony generally is not helpful when determining actual malice against a

subjective standard"); Sack on Defamation § 5.5.2.4 (3d ed. 2004) ("Inasmuch as the 'actual

---

[57]  Plaintiffs argue that an adverse inference should be drawn from defendants' failure to produce a draft of the article that Peter Smith marked up in fact-checking the piece.  Pl. Mem. at 44-45.  Plaintiffs do not explain precisely the issue on which they want an adverse inference, or the information they hoped would be revealed through production of Smith's mark-ups.  The "party seeking an adverse inference must adduce sufficient evidence from which a reasonable trier of fact could infer that "the destroyed [or unavailable] evidence would have been of the nature alleged by the party affected by its destruction."  Residential Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d 99, 108-09 (2d Cir. 2002).  Plaintiffs have not done so here.  A party cannot survive summary judgment simply on the basis that the opposing party has not retained every piece of evidence of even passing relevance to the case.

malice' test is entirely subjective, the use of journalism experts in 'actual malice' cases is often puzzling . . . [and] [f]or a variety of good reasons, the courts have been reluctant to allow it.").

The Court cannot say that the views of an expert in the field could never be helpful in illuminating the options available to a publisher in investigating a piece -- an essential element of an inquiry into whether a defendant was wilfully blind is some understanding as to what he should be looking for.  See Harte-Hanks, 491 U.S. at 667 ("[A] plaintiff is entitled to prove the defendant's state of mind through circumstantial evidence . . . and it cannot be said that evidence concerning motive or care never bears any relation to the actual malice inquiry.").  But reliance on expert opinion as to the defendant's departure from journalistic ethics and the "standards of investigation" is unhelpful here in light of the settled law closing the door on such evidence for the actual malice inquiry.  Clyburn, 903 F.2d at 33 (quoting Harte-Hanks, 491 U.S. at 666).

For all of these reasons, the Court concludes as a matter of law that defendants did not publish the CPI article with actual malice.  This is not to say that defendants or the article are without fault.  Defendants likely should have researched certain points more carefully before leveling allegations as serious as drug trafficking and organized crime connections against plaintiffs.  The fact that certain of defendants' sources had no information to provide should have given defendants pause.  They might have painted a fuller portrait of the backdrop to the allegations for the reader (on issues such as compromat and Ilyukhin's tendencies).  As for the defendants' suggestion, which surfaces in several of the depositions in this case, that further research was not pursued because of time pressures and a desire to beat their competitors to a breaking story, that is no excuse for less than thorough reporting.  Nonetheless, these lapses in ethics and judgment amount at most to negligence or bad journalism, not actual malice.

The entire truth regarding the allegations of criminal conduct in the FSB and KGB major reports might never be known, but there is cause to believe that at least some of the allegations in the reports are exaggerated or inaccurate.  However, serving as the target of criticism -- sometimes false -- is the burden that our system of laws quite consciously places on the shoulders of public figures.  As the Supreme Court explained in a case decided not long after it crafted the actual malice standard in New York Times v. Sullivan:

> It may be said that [the actual malice] test puts a premium on ignorance, encourages the irresponsible publisher not to inquire, and permits the issue to be determined by the defendant's testimony that he published the statement in good faith and unaware of its probable falsity. . . .  New York Times and succeeding cases have emphasized that the stake of the people in public business and the conduct of public officials is so great that neither the defense of truth nor the standard of ordinary care would protect against selfcensorship and thus adequately implement First Amendment policies. . . . [T]o insure the ascertainment and publication of the truth about public affairs, it is essential that the First Amendment protect some erroneous publications as well as true ones.

St. Amant, 390 U.S. at 371.  Plaintiffs no doubt have the wherewithal to respond to erroneous publications through persuasion rather than litigation.  The First Amendment demands that they pursue that path.

## CONCLUSION

For these reasons, defendants' motion for summary judgment is GRANTED, and judgment will be entered in favor of the defendants.[58]  A separate order will be issued.

_____/s/ John D. Bates_____
JOHN D. BATES
United States District Judge

Date:   September 27, 2005

---

[58]  Because the Court concludes that summary judgment should be granted against the plaintiffs as a matter of law, the Court need not reach defendants' contention that the complaint should be dismissed as to Alfa Eco because it is not the real party in interest in the action.  See Def. Mem. at 54-58.

Copies to:

Daniel Joseph
Jonathan S. Spaeth
Tobias Eli Zimmerman
AKIN, GUMP, STRAUSS, HAUER & FELD, L.L.P.
1333 New Hampshire Avenue, NW, Suite 400
Washington, DC 20036-1511
Email: jspaeth@akingump.com

Peter John Loughlin
HUNTON & WILLIAMS
1900 K Street, NW
Washington, DC 20006
Email: ploughlin@hunton.com

Elizabeth C. Koch
Michael Dennis Sullivan
Chad R. Bowman
LEVINE SULLIVAN KOCH & SCHULZ, LLP
1050 17th Street, NW, Suite 800
Washington, DC 20036
Email: msullivan@lsklaw.com